```
                                                                1

 1    UNITED STATES DISTRICT COURT

 2    EASTERN DISTRICT OF NEW YORK

 3   - - - - - - - - - - - - - - - X

 4  UNITED STATES OF AMERICA,   :
                                            08-CR-00640
 5
            -against-              United States Courthouse
 6
                              :    Brooklyn, New York
 7
    ROBERT SIMELS
 8  ARIENNE IRVING,

 9           Defendants.
                              :    June 29, 2009
10                                 Four o'clock p.m.
   - - - - - - - - - - - - - - - X
11
      TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
12    BEFORE THE HONORABLE JOHN GLEESON
      UNITED STATES DISTRICT JUDGE
13
      ATTORNEYS FOR GOVERNMENT:
14    BENTON CAMPBELL
      United States Attorney
15    BY:  MORRIS FODEMAN
           DANIEL BROWNELL
16     Assistant United States Attorneys
       271 Cadman Plaza East
17     Brooklyn, New York 11201

18    STEVEN D'Allesandro
      ASSISTANT U.S. ATTORNEY
19    (Via telephone)

20
      ATTORNEY FOR DEFENDANT:
21     GERALD SHARGEL, ESQ.
       EVAN LIPTON, ESQ.
22     For:  ROBERT SIMELS

23     JAVIER SOLANO, ESQ.
       (Via telephone)
24     For:  Arienne Irving

25    Court Reporter:
      Marsha Diamond
```

*MARSHA DIAMOND, CSR*
*OFFICIAL COURT REPORTER*

2

```
1    225 Cadman Plaza East
     Brooklyn, New York
2    TEL: (718) 613-2489
     FAX: (718) 613-2369
3
         Proceedings recorded by mechanical stenography,
4    transcript produced by CAT.
5            THE CLERK: Criminal cause for Status Conference:
6    United States versus Robert Simels and Arienne Irving.
7            Docket No.  08-CR-00640.
8            MR. FODEMAN: Moe Fodeman for the government.
9            Mr. BROWNELL: Dan Brownell, for the government.
10           MR. SHARGEL: Jerry Shargel and Evan Lipton, for
11   Mr. Simels.
12           THE COURT:  Good afternoon.  Mr. Simels is here.
13           Mr. Solano is on the phone?
14           MR. SOLANO: Yes, Your Honor.
15           THE COURT:  Good afternoon.
16           MR. SOLANO:  Good afternoon. I had spoken to
17   Ms. Irving and I will waive her appearance.
18           THE COURT:  I believe that is appropriate, given the
19   subject matter.  Sorry you were running around on Thursday
20   trying to get everyone together.  I thought it was an easier
21   mission than it turned out to be to get you on board, to pose
22   some questions.  I didn't realize that Mr. D'Allesandro was
23   away and there's no one else who could answer them. In any
24   event, I appreciate everybody's efforts to be available
25   Thursday.  Sorry it didn't work out.
```

*MARSHA DIAMOND, CSR, RPR*
*OFFICIAL COURT REPORTER*

1            I had some questions about the minimization
2   provisions in the order, as your remember, I kept undecided. I
3   kept on submission that aspect of the defendant's motions, and
4   for reasons that should be become clear, I am just a little
5   confused about how the minimization was ^ effected and how
6   these two minimizations provisions in the order worked. I
7   think I have it down, actually, and I think the confusion
8   arises from this memo to the monitoring agents and the wall
9   agents that's included -- that was included in the
10  government's memo in opposition to the defendant's motions,
11  but to get to my point -- to my questions, there were, as this
12  memo reflects, monitoring agents and wall agents, and If I got
13  it down right, monitoring agents were doing the live -- they
14  were in the plant deciding whether to record or not to record.
15  All agents got after the fact recordings to review, correct?
16            MR. FODEMAN:  That's right, Judge.
17            THE COURT:  And the tailored minimization provision
18  -- the one -- there's one that's kind of off the rack.
19  There's on page five of the order, there's a minimization
20  provision you can read in every T-3 order that said:
21            All monitoring and oral communications shall be
22  conducted in such a way as to minimize the interception of
23  communications not otherwise subject to interception,
24  including, but not limited to, privileged communications.
25            That's pretty standard.  You see that in most T3s

4

1  and then on pages five to seven there's what is -- I mean
2  obvious to all of us -- the kind of tailored minimization
3  provision that is expressly designed to avoid the interception
4  of any privileged communications and it has two provisions.
5           First, there's an initial limitation.  I'll read it
6  into the record.  First,  this is subsection A of that second
7  minimization provision:  "First interception of oral
8  communications at the subject location is initially limited to
9  those instances in which the agents and officers conducting
10 the interception have reason to believe through physical
11 surveillance, source information, prior conduct, or other
12 facts revealed during the course of the investigation, that
13 the subjects are meeting at the MCC to engage in conversations
14 regarding the criminal activities described above, and then it
15 says:  Second -- this is the second piece of the second
16 minimization provision:
17          "When the agents have reason to believe that the
18 oral communications of the subjects intercepted at the subject
19 location satisfy the threshold requirements described in
20 subsection A, the agents intercepting the meeting will record
21 but not listen to the communications occurring at the meeting
22 (i.e. the monitoring agents will set down their headphones,
23 but continue to record the conversation)."
24          It goes on to then to say:
25          The recordings that are made in that fashion are

1  handed over to the wall agents.
2           Now, if I have this right, the way this was
3  implemented -- the way these provisions were implemented was
4  once either Simels or Irving, or both of them, were in the
5  room in the MCC with Khan.  Then everything was recorded
6  subject to these post interception minimization efforts by the
7  wall agents; is that right?
8           MR. FODEMAN:  That's right. Mr. D'Allesandro,
9  correct me if I'm wrong, but that is my understanding.
10          MR. D'ALLESANDRO: That's right.
11          THE COURT:  So, and more specifically -- I think
12  you've answered the question, but in that subsection A of this
13  second minimization provision, the last clause of it is that
14  the subjects are meeting in the MCC to engage in conversations
15  regarding the criminal activities described above.
16          As I understand it, the monitoring agents once
17  either Khan -- once either Simels or Irving or both of them
18  are in the room with Khan, they weren't doing any minimizing
19  pursuant to that clause.  Like, to see if they were engaging
20  in particular conversations.  They were recording everything;
21  is that right?
22          MR. FODEMAN:  That's right.
23          THE COURT:  And the post minimization -- sorry, the
24  post interception minimization --- just so we're all clear --
25  was not a minimization on interception, it was a minimization

1  on dissemination.
2          MR. FODEMAN:  Exactly.
3          THE COURT:  Of what had been intercepted?
4          MR. FODEMAN:  Exactly.
5          Everything was recorded.  Then, after the fact,
6  certain portions were -- there was an attempt or an effort to
7  minimize after the fact.
8          THE COURT:  Okay. You'll see why I summoned you here
9  to answer these questions.  It might seem self evident to you,
10 but going through these papers, if you look at the -- I want
11 to sharpen my understanding of what happened by reference to
12 parts of this memorandum.
13         On page four of this memorandum from AUSA Dugger to
14 the monitoring agents and the wall agent, it says here at the
15 bottom of page four paragraph six:  Minimization.
16         And it says:  When wall agents are monitoring the
17 intercepted oral communications of the subjects they should
18 utilize the CCTV and spot the monitor.
19         Now, first, they are not monitoring in any sense,
20 correct?
21         MR. FODEMAN:  Actually hearing the conversation,
22 right.
23         THE COURT:  Right.  Am I right that the CCTV was
24 used not by wall agents but by monitoring agents to make sure
25 -- as part of the way of making sure that one of the two

7

1  lawyers was in the room with Khan?
2           MR. FODEMAN:  That's right.
3           THE COURT:  And the wall agents, they are not using
4  CCTV at all, correct?
5           MR. FODEMAN:  Right.
6           THE COURT:  The next paragraph says:
7           If subjects are engaged in conversation interception
8  can continue for a reasonable time.  This is paragraph seven.
9  And then sub A and sub B under paragraph seven talks about
10 interception can continue, that is sub A, interception should
11 cease, that's sub B.  I take it at this point interception is
12 complete because those monitoring agents put down their
13 headphones and this is really not about interception but about
14 listening; is that right?
15          MR. FODEMAN:  That's right. I mean, obviously, the
16 people who are there when it's happening aren't hearing what's
17 going on.  They have their headphones down.
18          THE COURT:  Right.  So this -- when it says here
19 these provisions, if the word listening were substituted in
20 paragraph seven for interception, I take it that would
21 describe what the wall agents are doing after the fact.
22          MR. FODEMAN:  Right.
23          THE COURT: So as they are listening and subjects are
24 engaged in conversation, listening can continue, right?
25          MR. FODEMAN:  Right.

1  THE COURT: Because the interception is already done?
2  MR. FODEMAN:  Right.
3  THE COURT:  In paragraph nine it says:
4  Any time a communication or any part thereof is
5  intercepted, it must be recorded. However, if a machine
6  malfunctions or a tape has just run out, monitoring by a wall
7  agent is permissible.
8  Now, in this interception, as I understand it, it's
9  only recorded, it's not even listened to; right?
10  MR. FODEMAN:  Correct.
11  THE COURT:  And just so I'm clear, was there any --
12  apart from the conversation -- was there any minimization that
13  the monitoring agents did?  I mean are there interceptions
14  where neither of the two lawyers was in the room with Khan?
15  MR. FODEMAN:  There's no minimization -- you can
16  correct me if I'm wrong, again, Mr. D'Allesandro, by any of
17  the monitoring agents.
18  MR. D'ALLESANDRO: Correct.
19  MR. FODEMAN:  They turn the switch on, it's going,
20  it's recording, they are not listening.  Ultimately the
21  targets leave or the target leaves, the switch is turned off,
22  it is handed to the wall agent for minimization.
23  THE COURT:  Got it.
24  And I'm right, then, that there's no way a wall
25  agent could listen to an unrecorded conversation because the

1  wall agents are only listening to recorded conversations after
2  the fact?
3           MR. FODEMAN:  Exactly. That's right.
4           THE COURT:  All right. I won't go through the rest
5  of these. I think the problems I see in this memorandum are
6  adopting the typical minimization -- written minimization
7  lecture to your customized procedure.
8           MR. FODEMAN:  It seems that way, right.
9           THE COURT:  My last question is these two provisions
10 -- the first one that's kind of the off the rack minimization
11 provision that you read in all the T-3 orders as compared to
12 the customized one, whether they are inconsistent and by that
13 I mean if you assume there's a conversation involving Khan and
14 Simels and Irving that's non-pertinent, there's nothing to do
15 with any of the -- nothing of any crime, let alone the ones
16 enumerated in the order. The way I read the first
17 minimization provision, it says here:
18           All monitoring of oral communication shall be
19 conducted in such a way as to minimize the interception of
20 communications not otherwise subject to interception.
21           That provision, as long as it's a long enough
22 non-pertinent conversation so that it's apparently to someone
23 that is not pertinent, that provision requires minimization,
24 right?
25           MR. FODEMAN:  Right.

10

1       THE COURT:  Whereas, the customized provision, the
2  way it's written and implemented, requires the interception,
3  at least, and deals only with the dissemination of the
4  intercepted recording of a non-pertinent conversation, right?
5       MR. FODEMAN:  I'm sorry, Judge. Could you repeat
6  that again.
7       THE COURT:  If you assume it's non-pertinent and it
8  looks to me like this -- and I have to emphasize I don't
9  question the government's good faith here.  I'm seriously
10 concerned about the authorization under the statute for what
11 procedure was implemented here, but under this customized
12 minimization provision, if you assume a long non-pertinent
13 conversation because the agents, once the targets were in the
14 room, put their headphones down and were required to put their
15 headphones done, they were required to record, to intercept?
16      MR. FODEMAN:  Right.
17      THE COURT:  That non-pertinent conversation, right?
18      MR. FODEMAN:  Right.  Exactly.
19      THE COURT:  And the protections afforded the
20 subjects of the T-3 all attended the dissemination of the
21 recorded conversation.
22      MR. FODEMAN:  That's right.
23      THE COURT:  All right.  Do you want to be heard?
24      MR. SHARGEL:  Just one thing.
25      It is not clear on this record, and I think unless I

misunderstood or misapprehended your question, it is not clear on this record that wall agents after they received the recordings minimized in any traditional sense -- in other words, they weren't following these instructions, it would seem to me; they were just listening to the conversation and were trying to determine for dissemination purposes what was relevant as opposed to what was not relevant.

So even if at that level -- again, on this record we have nothing to support the proposition that they didn't listen to non-pertinent conversation after they had been wholesale -- or seized on a wholesale manner, and I don't need to repeat the statutory argument because Your Honor has that.

MR. D'ALLESANDRO: I can respond to that?

THE COURT: Sure. Go ahead.

I have to tell you I don't really have the problem with the execution of this minimization provision. I am not focusing on that problem as much as I am whether the minimization provision you got is permitted by the statute, but you can -- I am not going to require you to leave -- I understood what Mr. Shargel said.

MR. D'ALLESANDRO: For the record, we did. We followed the instructions.

THE COURT: All right. I will issue a decision soon on this.

There's one other matter that is completely

12

1  unrelated that relates to you, Mr. Solano.  I have thought
2  about this and I've thought it's a delicate issue.  It is hard
3  to raise it without running the risk of offending you but I'm
4  raising it anyway.  If -- and we'll address it on another
5  occasion when your client is present, and it's the spectre
6  would arise should there be any contribution to the funding of
7  your client's defense by Mr. Simels.  You know, if this case
8  proceeds to trial and Ms. Irving is convicted and then two or
9  three years down the road I get a 2255 that says Mr. Salano's
10 fee was paid in whole or in part by Mr. Simels, I don't really
11 need to go into detail about the case law that would support
12 an application for relief based on the potential for -- not
13 the potential but the actual divided loyalty.
14         No one's raised this. As I say, I thought long and
15 hard about it.  I don't mean to offend you by it, but at the
16 appropriate time when your client is present I want to address
17 whether or not the circumstances of your retention and the
18 payment of your fee creates a benefactor payment situation,
19 and if it does, I want to address it sooner, rather than
20 later.
21         MR. SOLANO: Understood, Your Honor.
22         THE COURT: Thank you.
23         MR. SHARGEL:  Judge, while we are here may I raise
24 one other thing?
25         THE COURT:  Yes.

13

1        MR. SHARGEL: Your Honor will recall, these things
2   are all very recent events, that the government in responding
3   to your repeated request for all recordings made by
4   Selwin Vaughn, said that there were irrelevant conversations.
5   At one point the government put before you that there are
6   ongoing investigations, there was need to protect these
7   conversations, and they had nothing whatever to do with either
8   the substance of this case, the investigation of this case.
9   Finally, in a letter dated June 9th, 2009 the government
10  reiterated the fact that these were made -- these
11  conversations were made during the course of the alleged
12  conspiracy, they do not relate to this case, nor were they
13  made in furtherance of the conversation -- investigation, but
14  the government went on to say that if we agreed to a
15  protective order, which we did, and which Your Honor signed,
16  that the conversations would be turned over. We have not
17  listened to all the tapes because it's a Herculean task -- we
18  are involved in that now, but as soon as we started listening
19  there was a call -- and I hope I'm not violating the
20  protective order by telling you this, but there was a call,
21  and I'll say no more about the substance of it, where
22  Mr. Simels is being discussed.  Not only is he being
23  discussed, his name is spelled out lest there be any doubt
24  S-I-M-E-L-S and his telephone number in a call to Guyana, and
25  Judge, this seemed to me has something to do with the

14

1  investigation of this case.
2         My application at this point is to vacate the
3  protective order.  A lot of these conversations are in Patois
4  and it's necessary for us to have a Guyanese individual help
5  us translate -- if that is an appropriate word -- the
6  conversation.  It's necessary to discuss these conversations
7  with the clients, and I'm at a loss to understand how a
8  prosecutor can be stand before you and say I have reviewed
9  this and it has nothing whatever to do with Mr. Simels.  I
10 don't think there's another Mr. Simels with the same telephone
11 number.  So, again, I'm somewhat surprised.
12        THE COURT: All right. Do you want to respond,
13 Mr. Fodeman?
14        MR. FODEMAN:  I don't. You know, this is the first
15 I'm hearing about it.  I don't know which tape it is.  I don't
16 know if it's a tape that has been previously disclosed or not.
17 I take Mr. Shargel at his word.  This issue hasn't been raised
18 with us before.  I certainly don't have a problem with them,
19 without having spoken to my colleagues, having an interpreter
20 listen to these and being -- and having the protective order
21 amended so as to include the opportunity for a Patois
22 interpreter to listen to it.  I don't think that's the concern
23 here.  We are doing, obviously, everything we can to get the
24 information Mr. Shargel needs into his hands to represent his
25 client.  This is not a case about trying to hide the ball.  I

15

know he'll respond and say otherwise, but we're doing everything we can here, you know, in good faith.

I have here notes where I personally listened to all these calls. I am showing them to you, my green book here (indicating), talks about this, talks about -- so I mean it is not as if we are kidding here. As he said, this a Herculean effort and we undertook it. We didn't take agents at their word that this has nothing to do with Mr. Simels. We listened to it. I don't know. Maybe something slipped by. Maybe there's a misunderstanding here, but we will explore it.

THE COURT: Is this the first you are hearing it?

MR. FODEMAN: Yes.

THE COURT: Any particular reason not have to raised this with counsel?

MR. SHARGEL: Well, first of all, we just found out about this -- literally just found out about and the way we found out about it -- I'll tell you the call, N 10 recorded on 3/21 -- March 21st 07. It has some significance, and I'll show you why. Because Your Honor is well familiar with the fact that there was a recorded conversation in March of 2007, that the recording was lost, but during argument and motions we referred to the fact that a year before -- more than year before, that the conspiracy was alleged to begun, at least in the original indictment, that there was a telephone call. We learned that. We brought that Your Honor's attention. So

1  when we got the log of calls we were, obviously, most
2  interested in the calls that were made around the same time in
3  March '07.  So I don't know if Mr. Fodeman's notes include
4  this call, but it is the third.  I'll show it to you
5  Mr. Fodeman right now.
6              THE COURT:  Do this on your own time.
7              I don't begrudge you seeking relief, but this is
8  exactly what you could have done before you came in. Maybe
9  you're right.  Maybe you're the victim of an abusive tactic,
10 maybe there's some mistake, but you will make your motion.
11 You've made it.
12             MR. SHARGEL:  I made a motion to vacate the order.
13             THE COURT: I know you have.  I am going to give the
14 government a chance to respond in writing.  I think you serve
15 your clients, and the Court better if you do communicate with
16 them, and if there is a misunderstanding maybe we don't need
17 to have motion practice, but if there is I'll give the
18 government an opportunity to respond in writing.
19             How much time do you need?  Do you want to rest on
20 your oral application?
21             MR. SHARGEL:  Yes.
22             THE COURT:  How much time do you need to respond?
23             MR. FODEMAN:  When are we back here, Judge?
24             THE COURT:  I don't know.
25             MR. FODEMAN:  When are we back here, Judge? We have

1  some motions that are outstanding, I think. I know you want to
2  get this resolved.
3          MR. SHARGEL:  With all respect, this has to be
4  resolved.  I'm bringing it up at the earliest possible time.
5  This has to be resolved because it's necessary to vacate the
6  order for us to --
7          THE COURT:  Mr. Shargel, you raised this argument
8  for the first time two minutes ago.  You didn't put the
9  government on notice of it.  You say it has to get resolved.
10 I'm not resolving it now.  I am going to give them a chance to
11 digest your accusation and your response to it.
12         MR. SHARGEL: I am not asking for it to be resolved
13 now.  I am asking -- Judge, let me make this clear.  I'm just
14 saying to come back the next time we are in court, which I
15 think is several weeks from now wouldn't --
16         THE COURT:  I didn't know it was several weeks from
17 now.
18         MR. FODEMAN:  Neither did I.
19         THE COURT:  We will set a reasonable schedule.
20         MR. SHARGEL:  Fine.
21         THE COURT:  How much time do you need to respond in
22 writing?
23         MR. FODEMAN:  The beginning of next week will be
24 great, Judge.
25         THE COURT:  Today is Monday.

18

1          MR. SHARGEL:  29th.
2          THE COURT:  Monday the 29th.
3          MR. BROWNELL: The 6th is Monday.
4          THE COURT:  Why don't you get your -- Friday is the
5  holiday, filed by the 6th, response by the 7th.
6          MR. SHARGEL:  All right.
7          THE COURT:  If I need oral argument I will see you
8  on -- Ilene, do we have time? Let's  make it on the 10th,
9  since we are going to be on trial.  If you want to the 8th you
10 can have to the 8th to respond.  Mr. Shargel, we will see you
11 on the 10th.
12         THE CLERK:  Twelve noon.
13         MR. SHARGEL:  I have a hearing on the 10th.  It is
14 an all day hearing.
15         THE COURT: All right.
16         MR. SHARGEL:  Can we do it before trial starts, nine
17 o'clock?
18         THE COURT:  Let's do it on the 10th or 9th?
19         MR. SHARGEL:  10th.  The hearings starts on the 9th
20 and 10th, that is Thursday, and Friday.  That's my hearing.
21         THE COURT: Can you come in at nine o'clock on the
22 10th?
23         MR. SHARGEL:  Sure.
24         THE COURT:  We will do it then. Friday July 10th.
25         MR. FODEMAN:  Response is due?

*MARSHA DIAMOND, CSR, RPR*
*OFFICIAL COURT REPORTER*

1          THE COURT:  Your response is due the 6th.  Reply on
2   8th.
3          MR. SHARGEL:  May Mr. Simels be excused?  He has on
4   that day -- he has a court appearance and that is simply a
5   question of law.
6          THE COURT:  Yes.
7          MR. SHARGEL:  Is this definite or if Your Honor
8   wants oral argument?
9          THE COURT:  Plan on it unless I call you up.  When I
10  see your reply I'll make a determination.
11         Mr. Solano, we'll address that issue when Ms. Irving
12  is next before the Court.  I am likely to require an affidavit
13  from her, just so you know, about the fee arrangement.
14         MR. SOLANO: Understood, Your Honor.
15         THE COURT:  Okay?
16         MR. SOLANO: Yes.
17         THE COURT:  Thank you.  Have a good day.
18         (Proceedings adjourned as above set forth)
19              *  *  *  *  *  *  *  *