1594

1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - X

     UNITED STATES OF AMERICA,          :     08-CR-640
4
                   v.                   :     U.S. Courthouse
5                                             Brooklyn, New York
     ROBERT SIMELS,                     :
6    ARIENNE IRVING,                          August 6, 2009
                       Defendants.      :     2:00 o'clock p.m.
7
8    - - - - - - - - - - - - - - - - - - - X

9                   TRANSCRIPT OF TRIAL
              BEFORE THE HONORABLE JOHN GLEESON
10       UNITED STATES DISTRICT JUDGE, and a jury.

11
     APPEARANCES:
12
     For the Government:              BENTON J. CAMPBELL
13                                    United States Attorney
                                      By:   STEVEN L. D'ALESSANDRO
14                                          MORRIS FODEMAN
                                            DANIEL BROWNELL
15                                    Assistant U.S. Attorneys

16   For the Defendants:             GERALD SHARGEL, ESQ.
                                     EVAN L. LIPTON, ESQ.
17                                   For Robert Simels

18                                   JAVIER A. SOLANO, ESQ.
                                     LAWRENCE BERG, ESQ.
19                                   For Arienne Irving

20
     Court Reporter:                 Anthony M. Mancuso
21                                   225 Cadman Plaza East
                                     Brooklyn, New York 11201
22                                   (718) 613-2419

23   Proceedings recorded by mechanical stenography, transcript
     produced by CAT.
24
25

1595

1     (Trial resumed.)

2     (In open court; jury not present.)

3     THE COURT:  Good afternoon.

4     MR. D'ALESSANDRO:  Good afternoon, your Honor.

5     MR. SHARGEL:  Good afternoon, your Honor.

6     THE COURT:  Okay.

7     MR. SHARGEL:  Your Honor, I don't know if he's

8  appeared before.  This is Ross Kramer, who is another

9  associate from my office.

10     THE COURT:  Hi.

11     MR. KRAMER:  Hi, Judge.

12     THE COURT:  Nice to meet you.

13     Okay.  I circulated a draft.  There's already a

14  couple of things that I'm inclined to think -- a couple of

15  ways I'm inclined to tinker with it, I'll just tell you up

16  front, and everything I say is subject to whatever comments or

17  objections you might have.

18     But I've included the -- kind of short form of the

19  government's theory of each of these counts and the defense

20  theory.  I think I left out the defense theory on the

21  nontampering counts, but I'll add it in, if you want it.

22     The thing I want to add is, I think it's important

23  up front to tell the jury.  I don't want the jury to start to

24  think that the question is, which side has the better case.

25  I'll emphasize up front that although the defense theory is

1596

1   set forth, it's at all times the government's burden to prove

2   guilt beyond a reasonable doubt.  I think that probably bears

3   a little emphasis.

4          And I want to talk to you -- let's not adjourn until

5   we talk about -- you see, I have not included anything in the

6   proposed charge about the suppression of the Title III.  I

7   don't think I should.  But I'm curious as to how you're going

8   to argue it, Mr. Shargel.

9          I think two things ought to happen.  One is, the

10  jury shouldn't know or be told, even in an indirect way, there

11  was a motion to suppress that was granted.

12         Second, I don't think the defendant ought to be

13  allowed to make unfair advantage of that fact in your

14  argument.  So, I'm going to talk to you about how you intend

15  to argue that.

16             MR. SHARGEL:  I can tell you in one sentence.

17             THE COURT:  Go ahead.

18             MR. SHARGEL:  I'm going to simply argue it's

19  inaudible and it has no evidentiary weight.  I'm not talking

20  about the timing of it.  I'm not talking about anything about

21  it other than it's inaudible.

22             THE COURT:  All right.  There are other arguments I

23  could imagine that might cause the government to bristle a

24  little bit, because the tapes are unavailable through a

25  defendant's motion.  That doesn't strike me as one.  You

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1597

1    agree?

2              MR. D'ALESSANDRO:   Yes, your Honor.

3              THE COURT:   Comments, objections, to the proposed

4    draft?

5              MR. SHARGEL:   Who should go first?

6              THE COURT:   Who wants to go first?

7              MR. D'ALESSANDRO:   I can make some -- share some of

8    my thoughts.   One was, as a testament to my continued struggle

9    to capture the English language, I mistakenly used i.e. where

10   we should have used e.g., for example.   I didn't want there to

11   be constriction.   This is the essence of what the government's

12   theory is, where we gave examples of the conformity.

13             For example, on page 15, the parenthetical which

14   talks about the theory of the case, i.e., we intended to

15   use e.g.  it's not exhaustive.   It's not an exhaustive list.

16   So, my point is, where the government had these parentheticals

17   identifying the defense's theory of the case.

18             THE COURT:   If that said e.g., how long would the

19   list be?

20             MR. D'ALESSANDRO:   I don't know it would be that

21   much longer, and I don't think there's going to be anything

22   out of left field that the defense is going to get on

23   surprise.

24             MR. SHARGEL:   I'm not sure -- you're thinking that

25   this may be limiting your argument?

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1598

1       MR. D'ALESSANDRO:   Yes.

2       MR. SHARGEL:   I don't get that from whether it's

3   e.g. or i.e.

4       THE COURT:   I'll just say "for example."   I wouldn't

5   say "i.e.," anyway.

6       MR. D'ALESSANDRO:   That was my point.

7       MR. SOLANO:   On that point, I'm afraid that the jury

8   might speculate that there might be something else out there

9   that's not in the record.   If the list is not that much

10  longer, maybe the best thing to do is to have them --

11      THE COURT:   You want to catalogue the entire list of

12  ways, have a laundry list of things from which the jury might

13  select, as though it were a Chinese menu?

14      MR. SOLANO:   One second, your Honor.

15      (Pause.)

16      MR. SOLANO:   I'll withdraw that, your Honor.

17      THE COURT:   All right.

18      What else?

19      MR. D'ALESSANDRO:   I apologize.   I'm trying to go

20  through this in order.

21      On page fourteen, where you are instructing the jury

22  about what's permissible for an attorney to do, this obviously

23  explains what attorneys are permissible to do.   I think it

24  bears some discussion.   From the government's view, there

25  should be some things that are in there on what are

1599

1    impermissible, which were discussed.  The last sentence, for

2    example, it says:  "It is also permissible for an attorney to

3    retain an investigator to locate potential witnesses and to

4    make payments to obtain information, as long as such payments

5    are not made to influence a witness's testimony in court."

6              That's correct.

7              But, if we look at the 201 charge, there doesn't

8    have to be any intent to influence witnesses.  The federal law

9    is very clear that you can't pay a witness beyond reasonable

10   fees.  I'm not trying to get a more convoluted charge here.

11   That's an example of where I don't think it's as inclusive as

12   to what is permissible and impermissible.

13             There's also a question of whether your Honor would

14   permit instructions about it would be impermissible to contact

15   a witness once they have expressed, either directly or through

16   their attorney, they don't want to have contact with you

17   anymore.

18             THE COURT:  Did that happen here?

19             MR. D'ALESSANDRO:  It's an argument in play with

20   Vijai Jagnarain, also known as "Son."

21             THE COURT:  So, what do you want me to add?

22             MR. D'ALESSANDRO:  Well, I would request that there

23   be a charge with regards to the contact, that it would be

24   impermissible for an attorney to seek to contact a potential

25   witness where they had been instructed that they do not want

1  to be contacted, either directly or through their attorney,

2  words and substance.

3          THE COURT:  I don't think it's necessary.

4          What else?

5          MR. D'ALESSANDRO:  Well, again, in regards to the

6  language of payments to influence a witness's testimony as

7  opposed to --

8          THE COURT:  This charge really only pertains to One

9  through Nine.  It doesn't pertain to the bribery charge, in

10  any event; right?

11          MR. D'ALESSANDRO:  To the extent, your Honor, what

12  we're addressing is, what's lawful conduct.  It would not be

13  lawful conduct to pay a witness beyond reasonable expenses.

14  Clearly, it would be, in the truest sense, bribery if you did

15  it with the intent to influence their testimony.

16          But also, it would still be illegal if you didn't

17  intend to influence their testimony but you paid them $10,000

18  when there's no justifiable reason to pay them, even if you

19  paid for truthful testimony that cost $10,000.

20          THE COURT:  Wouldn't the jury infer that would be to

21  influence testimony, in any event?

22          MR. D'ALESSANDRO:  I think that's a fair argument,

23  your Honor.

24          THE COURT:  Denied.

25          MR. D'ALESSANDRO:  With regards to -- there's some

1601

1  typographical errors.

2          THE COURT:  Good for catching them.

3          MR. D'ALESSANDRO:  Would you like me to e-mail

4  those?

5          THE COURT:  You can tell me now.

6          MR. D'ALESSANDRO:  On page 16, the second line of

7  Count Five, "Vijay" is with an I.  It's there with a Y.  It

8  should be with an I.

9          MR. SHARGEL:  Do you send the written charge to the

10  jury?

11          THE COURT:  No.

12          I don't mean to digress.  I may as well tell you

13  what I normally do.  I don't like them to get the charge.  If

14  they ask for it, then I usually send it in, but I think it

15  turns them into mini lawyers.  I think that instruction about

16  taking the charge as a whole and not any one instruction

17  individually, you run the risk that they avoid that, that they

18  don't follow that once you send it in.  Once, I had a jury,

19  one of them turned into like a little lawyer.  I prefer them

20  not to have it, although if they ask for it, I'll send it in.

21          MR. D'ALESSANDRO:  Going earlier, your Honor, on

22  page nine, the last line, David Clark.  "David" is there with

23  an E.

24          THE COURT:  Okay.

25          MR. D'ALESSANDRO:  On page 17, your Honor, Count

1602

1    Six, the first line doesn't have the defendant.  It just

2    says "Robert Simels."  Count Six.

3              THE COURT:  Yes.

4              MR. D'ALESSANDRO:  Again, if this is not going back

5    to the jury, I apologize for spotting these with no meaning.

6    Page 20, the first line for Count Eleven, the word "on" is

7    capitalized.

8              THE COURT:  Okay.

9              MR. D'ALESSANDRO:  On page 21, the line right before

10   Count Twelve, I believe the last word should be "department."

11   It just says "The statement must concern an authorized

12   function of that."

13             THE COURT:  You want that to be a complete word?

14             MR. D'ALESSANDRO:  Yes, your Honor.  That's the

15   government's application.

16             I raised this issue with Mr. Shargel about the

17   wiretapping equipment.  There's no definition of wire

18   communication.  I don't know if it is, at the end of the day,

19   necessary to in explain it to them, or if we can just agree

20   that you can instruct the jury that wire communications

21   includes cellular telephone calls.

22             THE COURT:  Any objection?

23             MR. SHARGEL:  No objection.

24             THE COURT:  Where would that go?

25             MR. D'ALESSANDRO:  I believe it would fit on

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1603

1    page 22.   You can just insert it right before where Count

2    Thirteen begins.

3            THE COURT:   "Wire communications includes cellular

4    telephone calls"?

5            MR. D'ALESSANDRO:   Yes.

6            THE COURT:   Okay.

7            Was that correspondence from Ms. Peterson, directing

8    the defendant to provide this equipment, on which these

9    recordings were made?

10           MR. D'ALESSANDRO:   I think at the beginning of the

11   second day of Mr. Simels's testimony, there was -- as I

12   understood the testimony -- the tapes related to the Felix

13   calls, and the defendant testified that that was hardwired

14   equipment.   Those are different than some other conversations.

15   So, there was, as I understood the testimony -- perhaps Mr.

16   Shargel, since he has access to his client, could articulate

17   this.   There was Felix calls and David Clark calls.   David

18   Clark calls are on the equipment we have.   Felix calls were

19   hardwired, like a splice into the telephone lines.

20           What was disclosed were the Felix calls, not the

21   David Clark calls, so that when there was a demand by the

22   government for the equipment, he didn't have the equipment

23   that was in Guyana from the Felix calls.   He had equipment for

24   the David Clark calls.

25           MR. SHARGEL:   I don't know that that's a question

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1604

1    that your Honor had.  I think the question is, if I have this

2    right, whether the government was asking to have access to the

3    equipment and what the letters show, and the best thing would

4    be to show you the letters.  We can get them over to you this

5    afternoon.

6             But what the letters show is that the prosecutors in

7    the Khan case were asking for the originals, the opportunity

8    to inspect -- I don't think they said in haec verba, "Give us

9    the equipment."  They said, What kind of equipment was this

10   on?  And our position is that this was brought to the United

11   States for no reason other than it may be necessary to get

12   this in evidence.  It's not an authorization defense,

13   because --

14             THE COURT:  I understand, I think.

15             Were those requests related to the Clark calls, not

16   just the Felix calls?

17             MR. SHARGEL:  Yes, the Clark calls.  Remember, there

18   was a transmittal letter that said, I'm including four CD's.

19   That included both the Clark calls and the Felix calls.  And

20   the equipment, if I remember, the equipment that obtained the

21   Clark calls was the equipment that's in issue here.

22             THE COURT:  Anything else on the charge?

23             MR. D'ALESSANDRO:  Page 24, your Honor, there's a

24   parenthetical at the end of the second full paragraph.  You

25   refer to drugs and the weapons and ammunition going back to

1    the jury.  Don't make promises you can't keep.

2         THE COURT:  The miracle of word processing.  So,

3    there's no drugs.  I suppressed the weapons, and there's no

4    ammunition; right?

5         We'll take that out.  And herein lies another reason

6    not to give the jury a copy of the charge.

7         MR. SHARGEL:  Both sides caught that.  We were not

8    letting that happen.

9         THE COURT:  All right.

10        Mr. Shargel, Mr. Solano.

11        MR. SHARGEL:  Yes.

12        Page seven.

13        THE COURT:  Yes.

14        MR. SHARGEL:  I believe that with regard to a paid

15   informant, the charge should be the same as with an accomplice

16   witness, that the testimony of such a witness should be

17   scrutinized more carefully, that the caution-and-care language

18   that would accompany an accomplice witness.

19        THE COURT:  The same principles apply.

20        I'll hear you, Mr. D'Alessandro, if you want to be

21   heard.  I'll add something to this about the need to

22   scrutinize the testimony more carefully because of the

23   relationship with the government.  Any objection?

24        MR. D'ALESSANDRO:  No, your Honor.

25        MR. SHARGEL:  I also object, in that same section, I

1   object to the language "Indeed, certain types of evidence

2   would be extremely difficult to detect without the use of such

3   informants."

4           I am seeing this for the first time now.  I'm

5   thinking back to the reasonable doubt charges that were

6   condemned by the Second Circuit.  I'm giving it to you

7   paraphrased:  There would be few convictions if the standard

8   of proof was proof beyond all doubt.  I don't think this

9   really adds anything, and this kind of gives your imprimatur

10  to the use -- I'm not going to argue that the proposition is

11  not lawful.  To have to tell the jury that this is important,

12  to pay people like this, I think is wrong.

13          THE COURT:  Any objection?

14          MR. D'ALESSANDRO:  May we confer one moment?

15          (Pause.)

16          MR. D'ALESSANDRO:  Obviously, from the government's

17  position, we think it's fair for the jury to have this.  I

18  think it reinforces what we've all strived for during this

19  trial about the assymetry -- it's the assymetry that was

20  present and the similarities between what's a proper defense

21  of the sting, and how it mirrors some of the types of

22  investigations that were used by the government here.  I don't

23  think it would give the inference to the jury anything other

24  than what it's intended to do, just to explain to them in very

25  clear terms that it's permitted and the reason why we use it.

1607

1          THE COURT:  I'm going to take it out.  You can argue

2     that.  The previous sentence gets you what you need.

3          MR. SHARGEL:  In connection with the conspiracy, I

4     would ask that somewhere, the jury be told that Selwyn Vaughn

5     is an ineligible conspirator, that you can't conspire -- the

6     agreement could not be with Selwyn Vaughn.

7          THE COURT:  All right.  I'll add that.

8          Hang on one second.

9          (Pause.)

10          THE COURT:  After the second sentence, under -- on

11    page ten -- under "Existence of the agreement," after the

12    word "alone," which concludes the second sentence, I'll

13    add, "Nor, I should add, can someone conspire with an

14    undercover agent or informant such as Selwyn Vaughn.  Rather,

15    the proof must convince you that at least two persons, not

16    including Vaughn, joined together"; right?

17          MR. SHARGEL:  Yes.

18          THE COURT:  Go ahead.

19          MR. SHARGEL:  On page 13 -- this may just be a

20    matter of linguistics, but I'm struggling with this a little

21    bit -- the part where you say --

22          THE COURT:  Where are you?

23          MR. SHARGEL:  Six lines from the bottom.

24          -- "You heard from Anthony Ricco on the subject of

25    representing defendants in criminal cases.  In considering

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1608

1  this conspiracy charge in Count One, and in considering all of

2  the attempted witness-tampering charges" -- I don't have to

3  read the whole thing.  It should read: "You heard, actually,

4  from all testimony in the case, from all the evidence in the

5  case" --"and all the evidence in the case should be considered

6  on the question of whether the government proved beyond a

7  reasonable doubt that this did not constitute lawful, bona

8  fide legal representation."

9        THE COURT:  So four lines up from the bottom, why

10  don't I say: "You may consider that testimony along with all

11  the other evidence in the case"?

12        MR. SHARGEL:  Fine.

13        One more thing, if I may?

14        THE COURT:  Any objection, Mr. D'Alessandro?

15        MR. D'ALESSANDRO:  No, your Honor.

16        MR. SHARGEL:  I would ask that it continue: "In

17  considering this conspiracy charged in Count One, and in

18  considering all of the attempted witness-tampering charges

19  I'll be discussing in a few moments, you may consider that and

20  all the other evidence in the case."

21        Going into the next sentence: "In determining

22  whether the government has proven beyond a reasonable doubt

23  the elements of the particular charge and beyond a reasonable

24  doubt the conduct of the defendant you are considering did not

25  constitute lawful bona fide legal representation."

1609

1      My point is, that it's not one thing.  We should

2  break this down.  Even if they were to prove -- and I think

3  you say this later -- even if they were to prove the elements

4  of the offense beyond a reasonable doubt, they still have a

5  separate task, because of the statutory defense, there's a

6  separate task of proving beyond a reasonable doubt the rest of

7  it.

8           THE COURT:  I understand.

9      I think that "beyond a reasonable doubt" that's

10  there travels far enough along the sentence that makes it

11  sufficiently clear.

12           MR. SHARGEL:  Very well.

13           THE COURT:  What else?

14           MR. SHARGEL:  Judge, as you know, there were

15  simultaneous submissions this morning at 10:00 o'clock as to

16  our versions of the offense.  We didn't have the chance to see

17  each other.  I would like to tinker with our version of the

18  offense by changing essentially one word.

19      In each of the -- in each presentation of the theory

20  of the defense, we say "intend to have Selwyn Vaughn," and

21  then it continues.

22           THE COURT:  Right.

23           MR. SHARGEL:  We would like to say --

24           THE COURT:  "Intend to cause."

25           MR. SHARGEL:  "Did not attempt to have Selwyn

1610

1    Vaughn.  In other words, the mirror image of the government's

2    attempt language.

3         THE COURT: "Did not attempt to cause Vaughn to

4    threaten?"

5         MR. SHARGEL:  Yes.

6         THE COURT:  All right.  We changed all

7    those "intends" to "attempts."  And you'll see this again

8    before I deliver it.

9         So, for example, let's just get one context down.

10        On page fifteen, in Count Two, the third lineup,

11   before we get to Count Three, "He further contends that he did

12   not attempt to cause Vaughn."

13        MR. SHARGEL:  Yes.

14        THE COURT:  Okay.

15        MR. SHARGEL:  Page 19 -- I don't have a whole lot

16   more.  Page 19.

17        THE COURT:  Yes.

18        MR. SHARGEL:  I would ask that before you get to

19   affirmative defense --

20        THE COURT:  I changed your mind on this overnight, I

21   noticed.

22        MR. SHARGEL:  Yes.

23        The trial of a criminal case is a fluid proposition.

24        THE COURT:  It is.

25        MR. SHARGEL:  On page 19, Simels argues, the next

1611

1  sentence, "He argues that Singh was not a potential witness at

2  Khan's trial."  In light of what I received from the

3  government, I would like to put a period there.

4          THE COURT:  Slow down.  Where do you want to put a

5  period?

6          MR. SHARGEL:  "He argues that Singh was not a

7  potential witness at Khan's trial."

8          THE COURT:  Were you within the "Truth-seeking

9  lawful conduct"?

10          MR. SHARGEL:  No.  Right above that subheading.

11          THE COURT:  Go ahead.

12          MR. SHARGEL:  I would like to put a period

13  after "trial."

14          THE COURT:  All right.

15          MR. SHARGEL:  I want it to stop there.

16          THE COURT:  Now, I understand.

17          Any objection?

18          MR. D'ALESSANDRO:  No.

19          MR. SHARGEL:  I found a typo.  The fourth line down

20  in the affirmative defense.

21          THE COURT:  Yes.

22          MR. SHARGEL:  The defense is referred to

23  as"truth-seeking defense" as opposed to "the."

24          Judge, on the bottom of one on to twenty, when you

25  define preponderance of the evidence, never having tried a

1612

1    civil case, I don't know how you instruct the jury, but it

2    would seem to me that -- it would seem to me that the

3    definition that really tells the jury what this is about is

4    that it's fifty-one percent.  In other words, if it's tipped

5    at all in favor of the defendant, he prevails, and fifty-one

6    percent, as far as I know, essentially defines what the

7    preponderance of the evidence standard is.

8              Here, you say "If it's an imbalance, then you

9    resolve it against Mr. Simels."  So, just a tiny bit off,

10   over.

11             THE COURT:  I'll consider adding a little bit more

12   language in there.  I'm not going anywhere near percentages.

13   Then the next question for the jury, What's the percentage for

14   beyond a reasonable doubt?  We're not going there.

15             MR. SHARGEL:  It's a metaphysical discussion.

16             THE COURT:  Right.

17             MR. SHARGEL:  Here is a big-ticket item.  I

18   understand that in the bribery charge, there is no need to

19   prove a corrupt intent or influencing the witness's testimony.

20   I understand all that.  But my position is that there has to

21   be an actual intent to make an offer, as opposed to a ruse or

22   trick.

23             THE COURT:  Understood.

24             MR. SHARGEL:  And I think that that has to be made

25   clear.

1613

1       As your Honor stated at the beginning of this

2  conference, you did not include our defense theory here, and I

3  would ask that the defense theory be added.

4       THE COURT:  I intend to add them all.

5       MR. SHARGEL:  Very well.

6       THE COURT:  Is that what's in there?

7       MR. SHARGEL:  Yes.  I say: "As to Count Ten, Robert

8  Simels argues that he did not intend to pay a bribe to Leslyn

9  Camacho, and that the words spoken to Vaughn were a ruse to

10 induce Camacho to come to his office."

11      THE COURT:  In fairness to the government, since I

12 left out -- I was focusing on Counts One through Nine.  I left

13 out the defense-theory proposals with regard to Counts Ten

14 through Thirteen, and they are right here.

15      Do you have any objection to these?

16      MR. D'ALESSANDRO:  We didn't --

17      THE COURT:  I'm going to include them.  I really

18 don't want you to save your arguments and your big-ticket

19 items, as you put it, until Monday.  This is not your last

20 crack at seeing this.  If you have some problem with this and

21 want to bring it to my attention before the end of the day

22 tomorrow, and, really, any other changes, like switch back on

23 the affirmative defense again, let me know tomorrow.  I'll

24 include these.

25      But, Mr. Shargel, I take it your proposal is not

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1614

1  just to include your defense theory, but to tinker with the

2  language that's already in the Count Ten instructions; right?

3         MR. SHARGEL:  Because I would ask for --

4         THE COURT:  Where was it in here?

5         MR. SHARGEL:  Page 20.  It's before "False statement

6  to the United States."  It's the sentence that says "The

7  bribery statute makes no distinction between offering,

8  promising or giving a bribe.  The mere offer or promise of a

9  bribe."

10        That's true as far as it goes.  My position is

11  merely uttering the words is not enough.  That's our defense.

12        THE COURT:  I understand.  I'll hear from the

13  government, if you have a different view.  Maybe what I ought

14  to do is, add your theory and just finish that by saying "The

15  government must prove beyond a reasonable doubt that Simels

16  intended to make an offer of a bribe to Camacho through

17  Vaughn."  That's what you want?

18        MR. SHARGEL:  Correct.

19        THE COURT:  I think that's right.

20        MR. D'ALESSANDRO:  Absolutely.

21        THE COURT:  That's what we'll do, then.

22        (Continued on next page.)

23

24

25

1    THE COURT:  What else?  You call that a big ticket

2  item?  It goes to show you how good my law clerk is.

3    What else?

4    MR. SHARGEL:  I may be done.  Give me one more

5  moment.

6    A little typo on 22.  The middle of the page, under

7  possession of eavesdropping equipment.  The end of the

8  third -- purposes, for this purpose.  You put plural.

9    THE COURT:  Thank you.

10    MR. SHARGEL:  I think that's all I have.

11    THE COURT:  Let's talk about timing a little bit.

12    MR. FODEMAN:  A few small issues.  I spoke to

13  Mr. Shargel about this before, the investigative techniques

14  charge.  I don't think Mr. Shargel --

15    MR. SHARGEL:  I don't object to it.  I expect it.

16  That's fine.

17    THE COURT:  Mr. Solano, I meant to ask you -- do you

18  have another one.

19    MR. FODEMAN:  There's another sort of bigger ticket

20  item that maybe we can talk about in a second. .

21    THE COURT:  Mr. Solano.

22    MR. SOLANO:  Yes, your Honor.

23    Beginning first on page 9, the paragraph that

24  begins -- I think it's the second full paragraph, let me turn

25  to the specific count.  The second line, you must consider the

1   evidence separately with respect to this --

2               THE COURT:  Slow down.

3               MR. SOLANO:  You must consider the evidence

4   separately with respect to defendant --

5               THE COURT:  Each defendant.

6               MR. SOLANO:  Each defendant.  I know that your Honor

7   in his opening instructions to the jury went into a little

8   more detail in terms of two separate trials, and I'd ask your

9   Honor to consider putting in some language a little bit more

10  than just that one line.

11              THE COURT:  I will.  I will put something together

12  that conveys that separate trial, the two-trials-in-one

13  principle.

14              MR. SOLANO:  On line 10. .

15              THE COURT:  Line 10?

16              MR. SOLANO:  Page 10, which has to do with count

17  one.  The words Ryan Pemberton.  I understand that Miss Irving

18  could be charged with a conspiracy count, but they are not

19  charged with an individual crime as to Ryan Pemberton.

20              My concern that is the jury my get confused as to

21  why she's not specifically charged as Mr. Simels is separately

22  but she's included in the conspiracy count, particularly in

23  light of the fact that the government moved to dismiss it and

24  I don't know how that's going to get all lumped together.

25              I don't know if there is something -- that is in the

1 "thinking out loud" category.

2 THE COURT: I wouldn't worry about it.

3 MR. SOLANO: Similarly, your Honor, on page 10, the

4 first paragraph in the existence of an agreement where it

5 says, one person cannot commit the crime of conspiracy alone;

6 rather the proof must convince you that at least two

7 persons -- I understand that that's the law, I don't have a

8 problem with that, Judge, but my concern is that you can --

9 the jury can find themselves in a position where they find

10 there's enough evidence to convict as to Mr. Simels and feels

11 that the two persons element must include Miss Irving.

12 So what I would propose is something that reads,

13 after that sentence, a coconspirator -- coconspirator does not

14 necessarily have to be a defendant in this case. .

15 THE COURT: I think the concern you have is properly

16 addressed by the membership in the conspiracy charge. A

17 minute later I'm going to tell the jury the government has to

18 prove beyond a reasonable doubt that a -- I will change that

19 to the defendant you are considering became a member of the

20 charged conspiracy. I think that will do the trick.

21 MR. SOLANO: If you take a look, your Honor, at page

22 15, the first full paragraph that begins the government's

23 allegations that Robert Simels and Arienee Irving attempted to

24 have Selwyn Vaughn testify in the case. You will see first

25 that Selwyn Vaughn is incorrectly spelled, unless it's been

1618

1   fixed.

2          THE COURT:   Where are you?

3          MR.  SOLANO:   The second line of the first full

4   paragraph.

5          THE COURT:   Got it.

6          MR.  SOLANO:   The point I really want to address is

7   the issue of Robert Simels and Arienee Irving, and I would

8   suggest -- I would offer to the court the suggestion of maybe

9   putting Robert Simels and/or Arienee Irving.

10          Again, my concern is that they're going to see this

11   charge lumped together and they are going to think that in

12   order to find either Arienee Irving guilty of something they

13   have to find Robert Simels guilty similarly, and I want to

14   draw the distinction that they could come to separate verdicts

15   as to each specific count.

16          THE COURT:   So you want me to say and/or Arienee

17   Irving?

18          MR.  SOLANO:   Correct.

19          THE COURT:   Any objection?

20          MR.  FODEMAN:   No, Judge.

21          MR.  D'ALESSANDRO:   No.

22          THE COURT:   All right.

23          MR.  SOLANO:   On that same page, 15, the second

24   paragraph from the bottom, second line, which begins Vaughn --

25   Vaughn to have David Clarke either refuse to testify or

1619

1   testify in conformity with the defense theory.  I would

2   suggest that it would say testify falsely in conformity with

3   the defense theory.

4            THE COURT:  Any objection?

5            Why don't I say refuse to testify or to give false

6   testimony in conformity with the defense theory of the case?

7   That a theory, right.

8            MR. D'ALESSANDRO:  It doesn't have -- no, because

9   even if -- if you have a witness that is about to commit

10  perjury, you can't go up to them, kidnap their kid and say, if

11  you don't get on the stand --

12           THE COURT:  I'm talking about what your case is.  I

13  thought your case was, the theory of your case was Vaughn was

14  supposed to go out there and get these people, not just to

15  testify in conformity with the defense theory but to give

16  false testimony for the defense theory.

17           We're down to brass tacks.  The evidence is in.  I

18  thought that's what your case was.  Are there instances here

19  in which Vaughn is being used to pressure people to give

20  truthful testimony in support of -- I can't think of one.

21           I understand what theoretically might be available

22  to you, but you already got a record.

23           MR. D'ALESSANDRO:  The truth seeking defense is that

24  you have to solely do lawful conduct to get someone to say

25  something truthful.

1620

1          At the end of the day, whether or not what the

2    testimony was going to be on the stand was truthful or not, if

3    it was acquired by threats or intimidation, you don't get the

4    affirmative defense; it's still a form of corruptly persuade.

5          MR. SOLANO:   Judge, that is the point.   I haven't

6    requested the truth seeking portion.

7          THE COURT:   Are there any facts in the record from

8    which the jury could infer that as to a particular witness

9    someone was threatened or intimidated to give truthful

10   testimony?

11         MR. D'ALESSANDRO:   My point --

12         THE COURT:   Or that there was an attempt to have

13   Vaughn go out to do that?

14         MR. D'ALESSANDRO:   If you credit Simels' testimony

15   that what these people were going to say was truthful, he

16   still doesn't get the affirmative defense.   It's still a crime

17   if the jury finds that Selwyn Vaughn was out there to threaten

18   their family or themselves to testify in that way.

19         THE COURT:   What's your answer to that, Mr. Solano?

20         MR. SOLANO:   Judge, it's Mr. Simels' testimony, it's

21   not Miss Irving's testimony.   It's not Miss Irving's position.

22         THE COURT:   Let's look at what the statute

23   prohibits.   It says knowingly use intimidation, threatens or

24   corruptly persuades another person with the intent to

25   influence or prevent the testimony, or cause a person to

1    withhold testimony.  So as written, the statute doesn't

2    require the government to prove that the influence would be to

3    provide false testimony, right?

4              MR. SHARGEL:  May I say this?

5              THE COURT:  Yes.

6              MR. SHARGEL:  I didn't know this issue was going to

7    come up, but I think there are some cases that I read in

8    preparation for this trial that said that the word corruptly

9    and corruptly persuades involves the notion that it would be

10   false testimony.

11             I'm not saying that that's the theory of my defense,

12   it's not.  But if you squarely raise that question, I believe

13   that there are cases -- and I'm not saying it's the weight of

14   authority, I'm not saying that the Circuit has addressed it --

15   but I remember I read cases that said exactly that, that

16   corruptly persuade involves payment for -- does not involve

17   payment for truthful testimony.

18             THE COURT:  That only pertains to one means of

19   violating the law, because the corruptly doesn't modify

20   intimidate or threaten.

21             I don't think we want to go there, the "there" being

22   parsing out the different ways the statute can be violated and

23   deciding which one requires intent to basically create false

24   testimony as opposed to intimidate away from providing true

25   testimony.

1622

1      I don't think you want to go there either, but if
2  you do, you have to explain to me why here, in this sentence,
3  I should add false testimony when the statute itself, even
4  accepting Mr. Shargel's assertion that there's a judicial
5  gloss when it comes to corruptly persuade, there are other
6  ways to violate the statute that don't require false
7  testimony.
8      You want to break this out and talk about, on the
9  one hand, intimidation and threatening and on the other
10  corruptly persuading?
11      MR. SOLANO:  I certainly don't want to break it
12  down.
13      THE COURT:  Let's just not add this give false
14  testimony, part.  Agreed?
15      MR. SOLANO:  Yes.
16      MR. D'ALESSANDRO:  Yes.
17      MR. SOLANO:  On page 17, count six, second
18  paragraph.  The government alleges that Simels and Irving,
19  Miss Irving is not included in count six, that's been
20  dismissed.
21      THE COURT:  Thank you.  She's off the verdict sheet
22  right, on that?
23      MR. D'ALESSANDRO:  She's not on the verdict sheet
24  for count six, your Honor.
25      THE COURT:  All right.

1623

1          MR. SOLANO:  On page 20 there's another typo,

2    forgive me if I missed someone pointing it out, but on count

3    ten, the bribery of Leslyn Camacho, it says before you may

4    find either defendant guilty of this crime the government must

5    prove beyond -- two things beyond, the beyond, first beyond

6    should be taken out.

7          THE COURT:  Yes.

8          MR. SOLANO:  Finally, as to the count of bribery of

9    Leslyn Camacho.  I know that I have already spoken about the

10   and/or issue on the previous count.  I'd ask that it be

11   included in this as well and specifically this count doesn't

12   separate the defendants by name, just says the defendants.

13         I'd ask that it be separated by name as in the

14   previous counts and included with the and/or.  If I'm making

15   myself clear?

16         THE COURT:  I never liked that and/or thing.  Now

17   would be a good time, now meaning when I give the charge, and

18   I'm at count ten, to remind them -- I will do another reminder

19   there, I'll he remind you that you are deciding the case

20   separately as against each defendant.

21         All right?

22         MR. SOLANO:  Fine, your Honor.

23         MR. SHARGEL:  I have one more thing, Judge.

24         THE COURT:  Are you done, Mr. Solano?

25         MR. SOLANO:  One second.

1624

1    THE COURT:  I do think from your perspective less

2    might be more.  I was cognizant of the fact that when I'm

3    adding in the theories of the defense it appears that I'm not

4    adding one in for Miss Irving but I can imagine for tactical

5    reasons you would prefer that.

6    MR. SOLANO:  I have nothing further.

7    MR. SHARGEL:  I will confess this is inspired by

8    your Honor.  I'm going to ask a charge in connection with

9    counts 12 and 13, that if the sole purpose of either bringing

10   into the United States or possessing the wiretapping equipment

11   was to ensure that the conversations were admitted into

12   evidence, he would be not guilty of that crime.

13   MR. FODEMAN:  I don't think that is the law.  That

14   is exactly the problem.

15   THE COURT:  What if the sole purpose were to comply

16   with the prosecutor's request?

17   MR. FODEMAN:  Illegal request.

18   THE COURT:  What, the prosecution's illegal request?

19   Some of them may be prosecutorial discretion.

20   The reason I asked the question, to the extent there

21   is a specter that -- and I hadn't appreciated the nuances in

22   the negative, but -- and with that disability, I detected a

23   specter of the situation which the prosecutor said, Hey, you

24   got to get this stuff here so we can determine the integrity

25   of your evidence only to play gotcha once it's here.

1625

1    Now, it may well be that the law permits you to do

2    that, but it doesn't mean I wouldn't consider telling the jury

3    that if the defendants brought the stuff here because the

4    prosecutor asked them to, the sole purpose of bringing it here

5    was to comply with the prosecutor's request, you shouldn't

6    find them guilty.

7        What would be wrong with that?  I mean, if that's

8    the case --

9        MR. FODEMAN:  I could see that.

10       THE COURT:  You get the point?

11       MR. FODEMAN:  I do.

12       First, it's hard to fathom -- I guess they're going

13   to argue that, but I don't think that necessarily adds up with

14   the evidence that was nuanced and presented to the jury.

15       THE COURT:  Is it a permissible inference?

16       MR. FODEMAN:  It's certainly what Mr. Simels was

17   suggesting in his testimony, that he was doing this to comply

18   with -- I don't think that's what is reflected in the

19   documents necessarily, the timing of it.

20       THE COURT:  I heard his testimony.  I saw Paige

21   Peterson's letters and that was really the origin, genesis of

22   my question to you.

23       I got the feeling that it looked like the government

24   was insisting that this equipment be produced or at least

25   requesting that it be produced, or they would argue that the

1   tapes made from them couldn't be introduced at the Khan trial.

2          MR. FODEMAN:  I will review those.  I think you're

3   right its nuance, but I thought the tenor of that was, hey,

4   where did you come up with wiretap calls?  Not we need you to

5   bring us these items tomorrow so we can look at them.  But

6   again, I think it may be nuance and we'll look at that.

7          MR. D'ALESSANDRO:  Here's the problem.  At the

8   conclusion of Mr. Simels' testimony during the first day, it

9   seemed as though, although it wasn't clear and it was

10  obviously something I needed to flesh out on

11  cross-examination, whether or not the Felix tapes or the David

12  Clarke conversations and overnight the government was in

13  possession of an August 15 proceeding before Judge Irizzary in

14  which Mr. Simels represented that on August 15 he didn't have

15  the equipment, he didn't know where it was, it was in Guyana.

16         THE COURT:  This is Felix.

17         MR. SHARGEL:  Felix equipment.

18         MR. D'ALESSANDRO:  Then what as brought out was that

19  on the first day -- the second day rather of direct

20  examination at the beginning, the testimony was that the disks

21  which were being discussed were the Felix tapes and the Felix

22  tapes were the hard-lined wired equipment in Guyana, making

23  Mr. Simels' representation on August 15 to Judge Irizzary a

24  truthful statement.

25         Now what we're hearing is that, Oh, no, the Felix

1627

1  tapes are the David Clarke tapes, which then makes Mr. Simels'

2  statement to Judge Irizzary a false statement and there's been

3  a material shift.

4          If the Felix tapes are not the David Clarke tapes,

5  and that equipment was in Guyana, and there can be no argument

6  that the government said we want that equipment because what

7  the government was asking for was equipment that Mr. Simels

8  was saying is still in Guyana, this hard-line spliced

9  equipment.

10         If what he's now saying that is the Felix tapes had

11  the David Clarke conversations on them, which were in the

12  equipment, and I apologize if I'm being confusing with this --

13         THE COURT:  I'm sure it's my fault.

14         MR. D'ALESSANDRO:  Then he did have that equipment

15  with him.  The equipment was in his office, both the

16  computers -- we're in October of '07 -- and the base was in

17  the office by June of '07.  It makes his statement a false

18  statement to Judge Irizzary.

19         So I think there's been a change from the conclusion

20  of his testimony to the charge conference.

21         MR. SHARGEL:  May I respond?

22         THE COURT:  Yes.  I will take it under advisement.

23         MR. SHARGEL:  The statement on August 15 was not

24  false.  Mr. Simels testified, and there is no evidence to the

25  contrary, that he never had the hard wire equipment that

1628

1   captured the Felix, the police chief's conversations.  When

2   the four CDs were turned over, they had Felix and they had the

3   Clarke conversations.

4        What the government seemed to be interested in, and

5   that's why they got the response they did, that schedule of

6   calls on one number, was not the Felix calls but the Clarke

7   calls.

8        The Clarke equipment -- I will call it the Clarke

9   equipment, the equipment used to capture the Clarke calls, the

10  equipment we heard about.  First the laptop come in October

11  and then the base comes in June, those are the facts.

12       But in the letters from Paige Peterson, she's asking

13  questions about the equipment that from the numbers she's

14  talking about, she's talking about Clarke calls, and she

15  asks -- I will concede that she doesn't say turn over the

16  equipment to me, she says, can our experts examine the

17  originals?  Number one.  Number two, what kind of equipment

18  was this recorded on?   So there was some question about

19  examining the equipment.

20       So there was certainly a factual basis on which a

21  jury could infer that this came over to the United States in

22  response to the government's inquiry and to ensure this would

23  be admitted into evidence, coupled with the proposition that I

24  think is beyond dispute, Mr. Simels had no other use or

25  potential use for equipment that, A, was not operable, B,

1    would not operate on our phone system; there was no reason to

2    have it, it didn't add anything.  It didn't give him greater

3    access to the conversations because they were already made

4    from radio waves, as we heard from Mr. Myers and was converted

5    into the laptop. .

6            THE COURT:  All right.  You're arguing facts, and

7    that's what you'll argue to the jury, but there is a larger

8    issue.  I think the initial reaction to my question was, so

9    what?

10           I take it your point, when you said that, was even

11   if there was an explicit demand to produce it, it might not be

12   such a wonderful exercise of prosecutorial discretion to bring

13   the charge but the charge sticks.  Kind of like a defense

14   lawyer ask asking for the evidence in a child pornography

15   case, you give it to him and then arrest him.  Right?  It's

16   kind of a crummy case to bring.

17           MR. FODEMAN:  Not a great case.

18           THE COURT:  It may come out in the wash in that the

19   jury, if they believe your version of the facts, Mr.

20   Shargel -- you know, they're not lawyers, they are just going

21   to find him not guilty anyway.  I will take under advisement

22   whether to include the charge that they inspired it.

23           MR. SOLANO:  What might be a little bit different

24   with the example that you provided, specifically in this case,

25   we have a simultaneous investigation going on by the same

1630

1  office into these two attorneys and on the other hand you have

2  prosecutors from the same office asking for this equipment to

3  come in.

4      So I think it goes a little step beyond just a

5  crummy prosecution, and I think it's just a little bit more

6  than that, because of these two different investigations going

7  on.

8      THE COURT:  You don't have any evidence to support

9  that suggestion.  What you're talking about there is -- that's

10  a far more venal act by a prosecutor's office than this crummy

11  exercise of discretion we're talking about.

12      I take it you're saying either side of the conflict

13  team, one side of the conflict team was working with the other

14  to manufacture a charge?

15      MR. SOLANO:  I'm not saying they were working to

16  manufacture.  I'm saying that to cover the specific facts in

17  this case, it could be that it was just negligence, it was

18  more reckless -- nothing intentional, your Honor, I'm not even

19  suggesting that, but I think all I was saying is that in this

20  case the facts in this case are just a little different than

21  the example that your Honor just put forward.

22      THE COURT:  You not only haven't established the

23  intentional creation of a count, you haven't established the

24  negligence creation.  That would have to go into the integrity

25  of this conflict team and I'm not satisfied that's a specter I

1    ought to consider.

2         MR. FODEMAN:  With respect to the equipment, just

3    two last points.

4         I know they have -- the defense has suggested that

5    there should be language in there about operability, had to

6    work, and we suggested the opposite that it doesn't have to

7    work.

8         I raise it now because it certainly been sort of a

9    flavor running through the defense that this stuff is

10   obsolete, doesn't work here, and that has some bearing on

11   something.

12        THE COURT:  Was the comment related to the proposed

13   charge?

14        MR. FODEMAN:  In a sense because we propose the jury

15   be instructed that it's of no moment, that the equipment is

16   nonfunctional because the focus should be on the design of it.

17        So my question is -- we're fine with the charge as

18   it is, but given the argument that I would expect, and given

19   the way the case has been tried, there is a very strong

20   likelihood that the jurors will come back and say does it

21   matter if it works or not?

22        And I'd like to know before I rebut and make

23   arguments to the jury, is the court going to say, in response

24   to that question, it does matter or it doesn't matter?

25        In our view it doesn't matter if it's broken or not

1  because the focus is on the design.  The defense says -- for a

2  long time, in their Rule 29 motion, has always maintained that

3  that's crucial.  They questioned all the witnesses related to

4  that.  Mr. Myers, is it obsolete?  Is it broken?  Is there an

5  antenna?  Is there not an antenna?

6          If I get up and argue what you just heard from Mr.

7  Shargel is irrelevant, and then your Honor goes and tells them

8  that it is relevant, it's a problem for us.  I just emphasize

9  that it's our view that the broken is of no relevance, and we

10  would ask that you include that in the charge.

11          MR. SHARGEL:  This is a big ticket item because I

12  take something different from the charge.  I agree with the

13  charge.

14          You say in the charge when the device was sent,

15  meaning when the actor committed the act -- page 21, its

16  design rendered it primarily useful for surreptitiously

17  intercepting wire, oral or electronic communications.  If I'm

18  taking it wrong I guess we should address this now, but my

19  understanding is that it has to be workable at the time that

20  it's sent.

21          MR. FODEMAN:  Then we lose.

22          THE COURT:  If and when we get a jury note -- look

23  at it from my perspective, I got a charge nobody disagrees

24  with.  If we get a jury note, I'm going to do what Rule 30

25  requires me to do every single time I get a jury note.  I give

1    it to you.  I'll hear argument and I'll respond to the note.

2           MR. SHARGEL:  The problem I think for both of us,

3    with all respect, I think the problem that exists for both of

4    us is that I would need to know as a defense lawyer -- Mr.

5    Solano would need to know, and I guess the government would

6    need to know -- if I plan on getting up, as I plan to right

7    now -- and I am emboldened by the charge -- to say that this

8    couldn't be used; at the time it was brought into the United

9    States it was already obsolete, as Mr. Myers, the government's

10   own witness testified, and it didn't work.

11          So if it didn't work, does the government suggest

12   that if this was going to be imported into the United States

13   so it could be put in a telecommunications museum that the

14   museum curator is violating the law with something that

15   doesn't work and is not capable of capturing the conversation?

16          THE COURT:  You want to know whether I'm going to

17   tell you to be quiet?

18          MR. SHARGEL:  I don't want to be charged out of

19   court.

20          THE COURT:  I'm going to give this charge.

21          MR. SHARGEL:  I can live with this charge, fine.

22          THE COURT:  If you want me to catalogue -- the way

23   you began this was this argument would be of no moment --

24   let's face it, if I were to catalogue in the charge all the

25   arguments on both sides that are of no moment, we'd be here

1634

1  for a couple of days.

2      MR. FODEMAN:  I understand.  I took this charge to

3  mean something completely different.  I think we highlighted

4  what I think is a big ticket item here.

5      THE COURT:  These are a barrel of laughs.

6      MR. FODEMAN:  If this is the law as Mr. Shargel

7  pointed out, we lose, there is no reason to send it into the

8  jury, it's Rule 29.

9      THE COURT:  What do you want me to add to the

10 charge?

11     MR. FODEMAN:  This is what we'd like.  We proposed

12 this, in order to convict the defendants on this count, you

13 need not find that the device was operable or, in other words,

14 capable of interception at the time the device was mailed;

15 rather, the focus of the inquiry is on whether the design, not

16 the condition of the device, rendered it primarily useful for

17 the surreptitious interception of communications, as I've

18 defined design, primarily useful, and surreptitious.

19     THE COURT:  How is that difference in substance from

20 what I'm charging, at the time of the possession the design

21 rendered it primarily useful for surreptitious interception.

22     MR. FODEMAN:  We're fine with that.  I don't think

23 that is Mr. Shargel's interpretation of what you're saying.

24     THE COURT:  We may have a dispute with a jury note.

25 You're both going to make your arguments.  You're both fine

1  with the charge.  It's like a Rorschach ink blot for you.

2  What do you want me to do about it?  I'm not going to add your

3  language.  It's consistent with what is in here.  You're happy

4  with the language.

5          MR. SHARGEL:  I'm happy with the language because I

6  interpret it to mean it had to be useful at the time they were

7  either importing it or --

8          THE COURT:  Maybe you will join issue in such a way

9  that produces a note and we'll get to revisit this all again,

10  but unless and until we get to that bridge, I refuse to burn

11  it.

12          MR. FODEMAN:  Just to make these two counts even

13  more annoying, I would propose a request that informs the jury

14  that ignorance of the law is not a defense -- especially if

15  they're going to argue essentially, how was I supposed to know

16  that this was a problem?

17          MR. SHARGEL:  It's not ignorance of the law.  The

18  testimony in the case was ignorance of the fact, not ignorance

19  of the law.

20          THE COURT:  Normally this is accomplished, when we

21  talk about knowingly and intentionally, the need for the

22  government to show that the person needed to intend to engage

23  in the conduct that the law forbids, didn't have to be aware

24  of the law itself.

25          Do I say that here?  Where is knowingly and

1636

1    intentionally?

2            MR. SHARGEL:   Page 8, at the bottom.

3            THE COURT:   Page 8 and the top of page 9.

4            I will craft some language after the intentionally,

5    the two sentences regarding intentionally, about the key being

6    the defendant need to have intended to engage in the conduct

7    the law forbids, need not be proved that he's aware of the

8    particular law.   I will do it generically outside that

9    specific count.   You can argue if you want.

10           Any objection?

11           MR. SHARGEL:   No.

12           MR. SOLANO:   No, your Honor.

13           THE COURT:   What else?

14           MR. SHARGEL:   I'm done.

15           MR. SOLANO:   That's it.

16           THE COURT:   Let's talk about timing.   Whose summing

17   up?

18           MR. D'ALESSANDRO:   Me.

19           THE COURT:   How long do you intend to be?

20           MR. D'ALESSANDRO:   I think at the outside two hours,

21   your Honor.

22           THE COURT:   All right.   Who's going to go first,

23   you?

24           MR. SHARGEL:   No.

25           THE COURT:   You're going to go first?

1637

1        MR. SOLANO:  Yes.

2        THE COURT:  How long do you intend to be?

3        MR. SOLANO:  An hour.

4        THE COURT:  How about you?

5        MR. SHARGEL:  I'm thinking between 90 minutes and

6   two hours.

7        THE COURT:  All right.  That's a total of only five

8   hours.

9        You're going to rebut?

10       MR. FODEMAN:  An hour on the outside, Judge.  Maybe

11   a little over, maybe a little under.  It depends what they

12   say.

13       THE COURT:  All right.  You don't have to take all

14   the time you discussed, but I'm going to reserve the right at

15   the two hour mark to tell to you collect your thoughts and

16   wrap it up, Mr. D'Alessandro.

17       I will do it to you at the one hour mark.  It's

18   always good to give time back.

19       MR. SOLANO:  How about if I say two hours then,

20   Judge?

21       THE COURT:  You didn't.  Same with you, two hours.

22   I won't be unreasonable, I'm not going to cut you off in the

23   middle of it, but roughly I'll ask you to abide by it.  The

24   same deal on the rebuttal.

25       MR. SHARGEL:  There's no way I'm going over two

1638

1  hours.

2        THE COURT:  I'd like to charge them and have them

3  come back and deliberate Tuesday.

4        MR. SHARGEL:  How long do you think it will take, 24

5  pages?

6        THE COURT:  It will take about 45 minutes.

7        MR. D'ALESSANDRO:  Can I ask for another hour just

8  to be safe?  I haven't crafted the summation.  My thoughts are

9  two hours, but I was always misestimating how long I thought

10 Selwyn Vaughn's direct was going to take.

11       THE COURT:  I'm not going to be wooden about it, but

12 if I see you're going far into the third hour and it seems

13 like a lot of repetition, I'm going to cut you down.

14       MR. D'ALESSANDRO:  I understand.

15       THE COURT:  I'll be as flexible with all of you, but

16 don't abuse it.  I don't want to have the rebuttal summation

17 on Tuesday morning.

18       One reason to have the summations in one day so you

19 won't be too lengthy to force that to happen, and I don't want

20 you to force it to happen.  I don't think you should take

21 three hours.  You tried the case in a week.  It's not a three

22 hour summation.

23       MR. D'ALESSANDRO:  All right, your Honor.

24       THE COURT:  All right.  Have a nice weekend.

25                 *********.

1639

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25