405

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,   :
4                                   :
                    Plaintiff,  :     08-CR-640
5                                   :
            -against-          :     United States Courthouse
6                                   :
                              :     Brooklyn, New York
7
ROBERT SIMELS,                :
8   ARIENNE IRVING,              :
                              :
9               Defendants. :     July 29, 2009
                              :     9:30 a.m.
10  - - - - - - - - - - - - - - X

11                       TRANSCRIPT OF TRIAL
                     BEFORE THE HONORABLE JOHN GLEESON
12               UNITED STATES DISTRICT JUDGE, and a jury

13  APPEARANCES:

14  For the Plaintiff:      BENTON J. CAMPBELL, ESQ.
                           United States Attorney
15                         BY:   STEVEN L. D'ALESSANDRO, ESQ.
                                 MORRIS FODEMAN, ESQ.
16                               DANIEL BROWNELL, ESQ.
                           Assistant United States Attorneys
17
For the Defendant:      GERALD SHARGEL, ESQ.
18                         EVAN L. LIPTON, ESQ.
                           For:  Robert Simels
19
                           JAVIER A. SOLANO, ESQ.
20                         LAWRENCE BERG, ESQ.
                           For:  Arienne Irving
21

22  Court Reporter:         FREDERICK R. GUERINO, C.S.R.
                           225 Cadman Plaza East
23                         Brooklyn, New York
                           718-330-7687
24
Proceedings recorded by mechanical stenography, transcript
25  produced by CAT.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

1            Case on trial:  United States of America v. Simels,

2    et al.

3            (Judge Gleeson enters the courtroom at 9:30 a.m.)

4            THE COURT:  We are all here and ready?.  Bring the

5    witness in.

6    S E L W Y N   V A U G H N,

7            called as a witness, having been previously sworn,

8            resumes the stand

9            (The jurors enter the courtroom at 9:32 a.m.)

10           THE COURT:  Good morning, everybody

11           THE JURY:  Good morning

12           THE COURT:  Nice to see you.  Have a seat, please.

13   We are ready to resume.

14           Mr. D'Alessandro.

15           MR. D'ALESSANDRO:  Thank you, your Honor.

16

17           Your Honor, may we approach for a brief moment?

18           THE COURT:  Yes

19           MR. D'ALESSANDRO:  Thank you.

20

21

22

23

24

25

```
 1                         SIDE BAR

 2              MR. D'ALESSANDRO:  I apologize for starting off this

 3    way.  I advised Mr. Shargel that I was going to begin by

 4    seeking to introduce a head shot of his client, and Mr.

 5    Shargel said he would object.  I just thought rather than go

 6    through the machinations, to deal with this at side bar.

 7              THE COURT:  A head shot, meaning a photograph.

 8              MR. D'ALESSANDRO:  Yes.

 9              MR. SHARGEL:  A mug shot and I strongly object.

10    This is not a Gambino case where Mr. Simels is head of a

11    gang.  He's here in the courtroom.  The purpose of this is to

12    recall the story and to show the people so that the jury has

13    an idea what is being discussed and is being testifying

14    about.

15              Putting Mr. Simels on the chart with everyone else,

16    there is no probative value, if it has any probative value

17    whatsoever.  It outweighs the prejudicial impact with the

18    jury for the rest of the trial staring at a chart appears

19    that Mr. Simels is the leader of the gang.

20              THE COURT:  What is your response?

21              MR. D'ALESSANDRO:  First, it is evidence, your

22    Honor, and the government wants to use it so that in

23    summation or rebuttal we can put charts up for the jury so

24    that they can see it in context.

25              If the problem becomes where we place it, we are
```

S. Vaughn - Direct/D'Alessandro

1    placing it next to the people who we are alleging are

2    coconspirators.  He should be next to coconspirators, that's

3    the charge.  We are not just giving them pictures of people.

4    If they draw the connection, just because they are connected

5    with each other.  I don't think the jury is going to do that.

6    That they will either connect it because of the evidence --

7              THE COURT:  It is overruled, the objection.  The

8    prejudice only enures to how strong the government's proof is

9    that he was a coconspirator.  I don't think the jury will

10   draw a conclusion that is not supported by the government's

11   proof.  If your concern is the chart on which the photograph

12   is being placed is in front of the jury for too long, you can

13   renew that objection.  I will overrule your objection to the

14   photograph.

15             (Side bar ends)

16

17

18

19

20

21

22

23

24

25

409

S. Vaughn - Direct/D'Alessandro

1   DIRECT EXAMINATION (Cont'd.)

2   BY MR. D'ALESSANDRO:

3   Q    Placing on the screen Government's Exhibit 1.

4        Do you recognize the person in Government Exhibit 1?

5   A    Yes, sir.

6   Q    Who do you recognize that person to be?

7   A    Robert Simels.

8        MR. D'ALESSANDRO:  Your Honor, the government offers

9   Government's Exhibit 1.

10            THE COURT:  Objection is overruled.  It is received.

11            (Whereupon, Government's Exhibit 1 was received and

12   marked into evidence, as of this date.)

13   BY MR. D'ALESSANDRO:

14   Q    On the screen, Government Exhibit 2.

15        Do you recognize the person in government Exhibit 2?

16   A    Yes, sir.

17   Q    Who do you recognize that person to be?

18   A    Arienne Irving.

19        MR. D'ALESSANDRO:  Your Honor, the government offers

20   Government's Exhibit 2 at this time.

21        THE COURT:  Same objection?

22            MR. SOLANO:  Yes, Your Honor.

23            THE COURT:  Overruled.  Received.

24            (Whereupon, Government's Exhibit 2 was received and

25   marked into evidence, as of this date.)

410

S. Vaughn - Direct/D'Alessandro

1  BY MR. D'ALESSANDRO:

2  Q    Before the end of the day yesterday, we were in the

3  middle of the reporting of your second meeting with Robert

4  Simels; is that correct?

5  A    Yes, sir.

6  Q    And during that conversation, you were discussing an

7  individual named David Clarke; is that right?

8  A    Yes, sir.

9  Q    And who did you understand David Clarke to be in

10 relation to the khan case?

11 A    He's supposed to be a witness.

12      MR. D'ALESSANDRO:  For the record, we left off yesterday

13 on page 17 of transcript T10, I believe it is at line 34,.

14          THE COURT:  Did you say T10?

15          MR. D'ALESSANDRO:  Yes, your Honor, 401 T10.

16          THE COURT:  What page?

17          MR. D'ALESSANDRO:  17, line 34.

18

19          (The audiotape is played.)

20          (The audiotape is shut off.)

21          MR. D'ALESSANDRO:  Stop the recording at that time.

22 Q    Mr. Vaughn, directing your attention to the prior page,

23 page 17, line 38.  There's a reference to:  "See what they

24 did to Fineman in Guyana?  His sister got knocked off

25 suddenly - on the next page - mash breaks started immediately

411

S. Vaughn - Direct/D'Alessandro

1    he, you know.  You and Mr. Simels are talking about this

2    person.

3         Who is the Fineman that is being discussed there?

4    A    Rondell Rawlins, the head of the Buxton gang in Guyana.

5    Q    What was going on at that time?

6    A    His sister was killed just a few days before.

7    Q    And when there's talk about they almost have him, who is

8    it that almost has him?

9    A    I guess the police.

10        MR. SHARGEL:  Objection to what he guesses.

11        THE COURT:  Sustained.

12        (The audiotape is played.)

13        (The audiotape is shut off.)

14   BY MR. D'ALESSANDRO:

15   Q    Mr. Vaughn, I want to direct your attention to what we

16   just heard.

17        On line 6 of page 21 of the transcript, Mr. Simels says:

18   You tell me what it is, um, I mean, I think that whatever

19   he's got to do financially he's gonna do to be able to

20   resolve these issues.  There is money that is available.  The

21   only issue that I have to know is just what, and, and, and

22   and that they can let us know.

23        Who is the "he" that you understood Mr. Simels to be

24   referring to?

25   A    Roger Khan.

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

S. Vaughn - Direct/D'Alessandro

1   Q    And what did you understand Mr. Simels to mean when he

2   said, I think that whatever he's got to do financially, he's

3   got to do to resolve these issues?

4   A    Means Roger Khan had to do whatever to have the witness

5   not testify or give testimony.

6   Q    On line 8, the only issue I have to know is just what,

7   and, and, and they can let us know.

8        Who are the "they" did you understand that to be?

9   A    That would be the witnesses.

10  Q    On line 11 you say, because Clarke would have relatives,

11  I mean, he would be allowed visits by his relatives on line

12  16, when they get to talk to him about it, wealth is it, he

13  can probably suddenly just get amnesia.

14       When you say they get to talk to him about it, well,

15  this is it, what were you explaining to Mr. Simels?

16  A    That I would discuss with relatives pretty much what I

17  wanted to tell Clarke, change his testimony or not testify,

18  and what we were prepared to offer him.  So I'm saying, you

19  know, wants to tell him that he can suddenly just get

20  amnesia.

21            MR. D'ALESSANDRO:  Continuing.

22            (The audiotape is played.)

23            (The audiotape is shut off.)

24  BY MR. D'ALESSANDRO:

25  Q    On line 9 of this transcript, on page 22, you say, in

413

S. Vaughn - Direct/D'Alessandro

1   response to Mr. Simels:  Cause you know, I mean, we can try

2   to, well, as he always put it, you know, you can choose, you

3   can either choose gold or lead.

4       Who is the "he" that you are referring to?

5   A   Roger Khan.

6   Q   Had you heard that expression before?

7   A   Yes, sir.

8   Q   From who?

9   A   Roger Khan.

10  Q   What did you understand the expression to mean?

11  A   You can either choose money or a bullet from a 347.

12       MR. SHARGEL:  I ask for a repeated instruction like

13  I did yesterday.

14       THE COURT:  It remains true - this is just with

15  regard to the statement of Vaughn, not the statement he

16  attributed to Roger Khan just now, but it remains true that

17  the statements made by Mr. Vaughn on the tapes can't be

18  considered for the truth.  The statements he attributes to

19  Roger Khan and to Mr. Simels can be, but the statements made

20  by Mr. Vaughn when he's acting for the government, recording

21  these conversations, can't be considered for the truth.  Go

22  ahead.

23       MR. D'ALESSANDRO:  Thank you.

24       Continuing.

25       (The audiotape is played.)

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

414

S. Vaughn - Direct/D'Alessandro

1          (The audiotape is shut off.)

2     BY MR. D'ALESSANDRO:

3     Q     Stopping the recording at that time.

4          In this portion of the conversation that we just heard,

5     there's a reference to a Ricardo, Clay and a Roger.

6          Who did you understand that was being discussed as Clay?

7     A     A friend of Roger Khan.

8     Q     What is his name?

9     A     Clayton Hudson.

10    Q     Who is Ricardo?

11    A     Ricardo Rodrigues.

12    Q     And Roger is?

13    A     Shaheed Khan.

14    Q     The conversation is about who is the number one man,

15    correct?

16    A     Yes, sir.

17    Q     Who did you understand was the number one, what are they

18    vying for, what are they jockeying for the position of?

19    A     The one in charge.

20    Q     In charge of what?

21    A     Of the Phantom Squad.

22          (The audiotape is played.)

23          (The audiotape is shut off.)

24    BY MR. D'ALESSANDRO:

25    Q     On line 19 of what we just heard, you say the problem is

FREDERICK P. GUERINO, C.S.R.     OFFICIAL COURT REPORTER

415

S. Vaughn - Direct/D'Alessandro

1   that, you know, they can't come here and some of them might

2   be afraid, well, you know, to come out in public, you know.

3       Who is the "they" that you are referring to?

4   A    The people who are associated with Roger Khan.

5   Q    Why is it that they can't come here, where is here?

6   A    The United states.

7   Q    And some of them might be afraid, you know, to come out

8   in public.

9       Why would they be afraid to come out in public?

10  A    Fear of being arrested.

11  Q    You then say:  I think the only option that he has here

12  now is, you know.

13      Who is the "he" you are referring to?

14  A    Roger.

15  Q    And Mr. Simels says, neutralize Clarke.

16      How are you going to neutralize Clarke?

17  A    Well, pay him so he can change his testimony or not

18  testify.

19      MR. D'ALESSANDRO:  Continuing.

20      (The audiotape is played.)

21      (The audiotape is shut off.)

22      MR. D'ALESSANDRO:  Your Honor, at this time we are

23  going to forward the recording to one minute eight seconds to

24  the corresponding -- I'm sorry, one hour, eight seconds to

25  the corresponding line on the transcript we believe is line

416

S. Vaughn - Direct/D'Alessandro

1   23 on page 27.

2              THE COURT:  Okay.

3              MR. D'ALESSANDRO:  Your Honor, for the witness.

4              THE COURT:  Yes.

5   Q    Mr. Vaughn, do you recall during this meeting whether

6   you received any documents?

7   A    Yes, sir.

8   Q    On screen is Government's Exhibit 301, four pages.

9        Would you look at that and tell me whether or not you

10  recognize this document?

11  A    Yes, sir.

12  Q    What do you recognize -- one moment, your Honor.

13       It is a 5-page document.

14       Do you recognize those five pages?

15  A    Yes, sir.

16  Q    What do you recognize those five pages to be?

17  A    Given to me by Mr. Simels.

18  Q    During this meeting?

19  A    Yes, sir.

20             MR. D'ALESSANDRO:  The government offers 301 into

21  evidence.

22             MR. SHARGEL:  Your Honor, may I have one moment?

23             THE COURT:  Yes.

24             (Pause)

25

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

417

S. Vaughn - Direct/D'Alessandro

1          MR. SHARGEL:  Your Honor, I believe that these are

2     two separate documents, that's the only question I have.

3          MR. D'ALESSANDRO:  That's right.  I'm offering them

4     collectively and marking them as 301-A and 301-B.

5          MR. SHARGEL:  No objection.

6          THE COURT:  All right. Received.

7

8          MR. D'ALESSANDRO:  For the record, your Honor, just

9     to address it, I will have the first four pages marked

10    collectively as Government's Exhibit 301-B, and the one page,

11    301-A.

12         THE COURT:  All right.  They are both received.

13         (Whereupon, Government's Exhibit 301-A and 301-B

14    were received and marked into evidence, as of this date.)

15         MR. D'ALESSANDRO:  On screen is Government's Exhibit

16    301-A.

17    BY MR. D'ALESSANDRO:

18    Q    You testified that this is one of the documents that you

19    received from Mr. Simels during this meeting; is that

20    correct?

21    A    Yes, sir.

22    Q    Can you read the line right here?

23    A    Family has recent history at 590 DeKalb Avenue, 7N, but

24    haven's picked him up in Brooklyn yet, all current markers

25    are in nc.

418

S. Vaughn - Direct/D'Alessandro

1   Q    What is the subject line, fourth e-mail?

2   A    George Allison.

3   Q    Who is George Allison?

4   A    Brother of Donald Allison.

5   Q    What nickname did he have?

6   A    Chinaman.

7        MR. D'ALESSANDRO:  Continue the recording, your Honor.

8        THE COURT:  All right.  Where are we again, page 28?

9            MR. D'ALESSANDRO:  Page 28, your Honor.

10           (The audiotape is played) .

11           (The audiotape is shut off.)

12           (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

419

1          MR. D'ALESSANDRO:  Stepping away from the

2   transcript. On the screen is the first page of Government

3   Exhibit 301 B.

4   BY MR. D'ALESSANDRO:

5   Q    You testified this is one of the documents that Mr.

6   Simels provided you during this meeting, is that correct?

7   A    Yes, sir.

8   Q    And is it fair to say there are black and white words

9   that appear on it and then there is also some handwritten

10  notes?

11  A    Yes, sir.

12  Q    Which are in a color, correct?

13  A    Yes, sir.

14  Q    Do you recognize that handwriting?

15  A    Yes, sir.

16  Q    Whose handwriting is that?

17  A    My handwriting.

18  Q    Could you describe for the jury what was going on while

19  you were writing those things down?

20  A    I was just writing for memory, he was telling me about

21  people who would be friends and I was writing for future

22  reference.

23  Q    Is that what we just heard?

24  A    Yes, sir.

25  Q    For example, on page 33, line four of the transcript:

420

1    All right, Alan Cutting is the boyfriend, right.

2         Where does Alan Cutting appear on this document?

3    A    Here.

4         MR. D'ALESSANDRO:  Indicating for the record right

5    underneath it second bullet point on the page.

6    Q    Next to it are some letters.  With what do those

7    signify?

8    A    BF signifies boyfriend.

9         MR. ALESSANDRO:  Thank you.

10        Continuing.

11        (Tape played.)

12        MR. D'ALESSANDRO:  At this time we will move the

13   recording to one hour twenty-nine minutes and ten seconds.

14   Continues online the 24.

15        (Tape played.)

16   Q    Mr. Vaughn, at the end of that conversation there was

17   some discussion about expenses, is that right?

18   A    Yes.

19   Q    What were you explaining why you needed expense money?

20   A    For unregistered cell phones.

21   Q    For whom?

22   A    For myself and guys I would have working for me.

23   Q    Why would you need unregistered phones?

24   A    Because we were going to get into things illegal, I

25   don't want anything to tie back to me or the guys.

HENRY SHAPIRO      OFFICIAL COURT REPORTER

421

1    Q    Now, did there come a time that you learned that there

2    was expense money available?

3    A    Yes, sir.

4         MR. D'ALESSANDRO:  Your Honor, this is Government

5    Exhibit 208.  This is e-mail.

6    Q    What account was it sent to?

7    A    Fineman.manone@hotmail.com.

8    Q    From whom was it sent?

9    A    Robert Simels.

10   Q    When was this?

11   A    June 13, 2008.

12   Q    Can you read is into the record, please?

13   A    Simply says, be careful in your effort regarding

14   information, not to do anything that can be misconstrued by

15   anyone. These are difficult times and people will draw most

16   unfavorable inferences.  So be cautious. Have authorization

17   for payment for gathering material.  Robert H. Simels.

18   Q    There is a reference to an individual I suppose, Simply,

19   simply says be careful in your effort to gather information

20   and not to do anything that can be misconstrued by anyone.

21        Who did you understand Simply was?

22   A    Roger Khan.

23        MR. D'ALESSANDRO:  In evidence Government Exhibit 209.

24   Q    From which account was this e-mail.

25   A    Fineman.manone@hotmail.com.

422

1    Q    And when was it sent?

2    A    June 17, 2008.

3    Q    What account was it sent to?

4    A    Robert Simels.

5    Q    Can you read that into the record?

6    A    I received your e-mail, please call on your return.

7    Q    This is the responsive e-mail to Government Exhibit 208?

8    A    Yes, sir.

9         MR. D'ALESSANDRO:  Your Honor, at this time we will play

10   Government exhibit R-11.

11        THE COURT:  Turn to T-11, please, ladies and

12   gentlemen. The next transcript.

13        (Tape played.)

14        MR. D'ALESSANDRO:  At the conclusion of that

15   telephone call Ms. Irving said they'll e-mail you sometime

16   today; is that right.

17   A    Yes, sir.

18   Q    That was a call on June 17, 2008?

19   A    Yes, sir.

20        MR. D'ALESSANDRO:  On the screen in evidence Government

21   Exhibit 210.

22   Q    From what account was what e-mail sent?

23   A    Robert Simels.

24   Q    And what date was it sent?

25   A    Judge 17, 2008.

1    Q     To what account was it sent?

2    A     Fineman.manone@hotmail.com.

3    Q     Could you read that into the record?

4    A     Paul says, hello, says he's happy you are healthy.

5    Robert Simels.

6    Q     During the conversation, 401 R-11, that we just played,

7    there was conversation about Mr. Simels not being here, may

8    be back Thursday or Friday.

9          At that time where did you understand Mr. Simels was?

10   A     In Guayana.

11   Q     And Government Exhibit T-10 there is reference to Paul,

12   Paul says, hello.  Who do you understand him to be referring?

13   A     Paul Rodrigues.

14   Q     Where it says, and says he's happy you are helping.

15   What did you understand happy your helping with?

16   A     Trying to get these witnesses up to either not testify

17   or change their testimony.

18         MR. D'ALESSANDRO:  At this time the government would

19   play R-12, corresponding transcript, T 12.

20         THE COURT:  All right.

21         (Tape played.)

22   Q     Mr. Vaughn, did you go and meet with Mr. Simels the next

23   day at 1:00 o'clock, approximately?

24   A     Yes, sir.

25   Q     And did you have a personal meeting with the defendant

424

1    Robert Simels?

2    A    Yes.

3    Q    And was Ms. Irving there during this meeting?

4    A    I don't remember.

5         MR. D'ALESSANDRO:  Your Honor --

6    Q    Was that meeting recorded?

7    A    Yes, sir, it was.

8         MR. D'ALESSANDRO: -- at this time we will play R-13

9    corresponding to transcript T 13.

10        THE COURT:  All right.

11        (Tape played.)

12        MR. D'ALESSANDRO:  Your Honor, we will move the

13   recording forward to four minute eighteen seconds

14   corresponding page one, line the 27 of the transcript.

15        THE COURT:  All right.

16        (Tape played.)

17        MR. D'ALESSANDRO:  Just stop the recording at that

18   time and go back to page four.

19        Mr. Simels' says on line eighteen, because everyone

20   that I spoke to tells me that the wife moved out of the

21   house, she told everybody that he's talking to the DEA on the

22   phone trying to get them to cut a deal with him and move him

23   out of Guayana, hiding high in father's house on the second

24   floor, you know, over the garage.

25        On line 25, hiding up there.  We went guy, trying to

425

1    ask him to come out and talk to us.  He wouldn't come out.

2    Who is Mr. Simels referring in this conversation.

3    A    A guy by the name of Ryan.

4    Q    When he says we went by Paul, hit the horn a few times,

5    who do you understand he's referring to by Paul?

6    A    Paul Rodriques.

7    Q    Paul Rodriques?

8    A    Yes, sir.

9    Q    He and Paul went to see Ryan?

10   A    Yes, sir.

11   Q    There is a reference to Mankind.  Prior to hearing Mr.

12   Simels refer to Mankind, had you heard of mankind before?

13   A    Yes.

14   Q    Who is Mankind?

15   A    He's a cousin of Conrad Sanmougan.

16   Q    Conrad dam began also known as Banks?

17   A    Yes.

18   Q    What affiliation, if any, did Conrad Sanmougan have to

19   Roger Khan?

20   A    He does work for him.

21        MR. D'ALESSANDRO:  Let's continue.  Back to page five.

22        (Tape played.)

23        MR. D'ALESSANDRO:  We will stop recording at this time.

24   Q    Mr. Vaughn, there is reference to Kevin and kidnapping.

25   Before Mr. Simels discussed is at this meeting with you, were

426

1  you aware of that previously?

2  A    Yes, sir.

3  Q    What do you understand Mr. Simels to be referring to,

4  who is Kevin?

5  A    Barry Dataram.

6  Q    What happened to Kevin's wife?

7  A    His wife was kidnaped.

8  Q    Therefore was a reference to Venezuelans.

9       Who did you understand the reference to the Venezuelans?

10 A    At the time of kidnapping we believed that there were

11 was some Venezuelans that did the job.

12      MR. D'ALESSANDRO:  Continue.

13      (Tape played).

14      MR. D'ALESSANDRO:  Stopping the recording there on the

15 top of page eight.  Mr. Simels' says, Kevin certainly throws

16 Roger Khan's name all over the place on the telephone. You

17 reply, yeah well I don't, know how, Kevin would lapse like

18 that, you know, I mean, yeah, he would have been the point

19 man, you know, but you expect him, you know, to be much much

20 much more you know.

21      Who is the Kevin that you are speaking about.

22 A    Barry Dataram.

23 Q    What telephone is being discussed?

24 A    A telephone recording that Dataram had with somebody

25 else.

HENRY SHAPIRO     OFFICIAL COURT REPORTER

1    Q    When you say on line six that Kevin, he would have been

2    the point man, what did you mean by that?  What do you mean

3    by the pointman?

4    A    He usually the person who would control any drugs Roger

5    was shipping to the U.S. or Europe.

6         MR. D'ALESSANDRO:  Continue.

7         (Tape played.)

8         (Followed on next page.)

428

1          MR. D'ALESSANDRO:  For the transcript, we are on T13.

2          (The audiotape is played.)

3          (The audiotape is shut off.)

4          (Continued on the next page.)

429

1             THE COURT:   Let's take our morning break.   Don't

2   discuss the case.

3             All rise.   We'll resume in ten minutes.

4

5             (Jury exits the courtroom.)

6

7             THE COURT:   You can step down.

8

9             (Witness leaves the witness stand.)

10

11            (Recess taken.)

12

13            (In open court.)

14            (Judge Gleeson takes the bench.)

15            MR. D'ALESSANDRO:   Judge, would you like us to get

16  the witness?

17            THE COURT:   Please.

18            (Pause in the proceedings.)

19

20            (Witness resumes the witness stand.)

21            THE COURT:   Bring in the jury, please.

22            (Pause in the proceedings.)

23

24            (Jury enters the courtroom.)

25

S. Vaughn - Direct / D'Alessandro                    430

1          (The following occurred in the presence of the

2     jury.)

3          THE COURT:  Please be seated, everyone.

4          Okay, Mr. D'Alessandro.

5          MR. D'ALESSANDRO:  Thank you, judge.

6     BY NR. D'ALESSANDRO:

7     Q    I want to go back over the portion of the recording that

8     we played before the break, if I could.  I'm on page 21 of the

9     transcript.  We're on transcript T13, page 21, line 31.  Mr.

10    Simels says: "Here's a thousand dollars to get started."

11         What, if anything, did you receive at that time?

12    A    Thousand dollars.

13    Q    After this meeting, who, if anyone, did you give that

14    thousand dollars to?

15    A    To the two law enforcement agents, John Mazzella and

16    Cassandra Jackson.

17    Q    On line 35, Mr. Simels says:  "Um, all he says is be

18    careful.  He says 'Don't kill the mother.'"

19         Who do you understand Mr. Simels to be referring to

20    as "he"?

21    A    Roger.

22    Q    He says: "He says 'Don't kill the mother.'"

23         Whose mother do you understand Roger Khan asking you

24    not to kill?

25    A    David Clarke's.

S. Vaughn - Direct / D'Alessandro          431

1    Q    On the next page you ask on line three: "So, what other

2    option would he prefer?"   On line five, Mr. Simels replies:

3    "He doesn't want you anywhere near it."

4              What did you understand Mr. Simels asking you not to

5    be anywhere near?

6    A    Whatever it is that I'm doing.

7    Q    Would you explain that?

8    A    In terms of, you know, these witnesses getting them not

9    to testify, to change their testimony, or harassing the family

10   members or something.

11   Q    And why is it that you personally should not be the one

12   to do it?

13   A    Because I can be easily identified.

14   Q    Why is that?

15   A    I'm known to David Clarke and his entire family.

16   Q    On line eleven, Mr. Simels says:  "Well, he'd like as

17   much pressure being put on Clarke as possible, but he thinks

18   if Clarke's mother gets killed that the government will go

19   crazy."

20             What type of pressure did you understand Mr. Simels

21   to be explaining that Roger Khan wants put on Clarke?

22   A    Pretty much whatever I can do.

23   Q    For what purpose?

24   A    To get him not to testify or change his testimony.

25   Q    On line 23 of page 22, Mr. Simels says:  "Yeah, he wants

S. Vaughn - Direct / D'Alessandro                    432

1   to do whatever has to be done, he said obviously if you can

2   find George, great.  If you can find Leslyn Camacho who was -"

3          Again, who was the "he" that Mr. Simels is referring

4   to?

5   A    Roger Khan.

6   Q    And who is George?

7   A    Brother of Donald Allison.

8   Q    What's his name?

9   A    George Allison.

10  Q    And he has a nickname?

11  A    "Chinaman."

12  Q    (Reading)  "If you can find Leslyn Camacho."

13         Who did you understand Leslyn Camacho to be?

14  A    The girlfriend of David Clarke.

15  Q    On line 33 of page 22, Mr. Simels says:  "With George he

16  said you can deal with George however you think that George

17  has to be dealt with in terms of finding out where he is in

18  this thing.  If he's cooperating, that, it's a bad thing.  Um,

19  if he's not cooperating and he wants to talk about Clarke, um,

20  then we want him to talk to us about Clarke.  I don't think he

21  cares about Chinaman in terms of, cause I don't think they'll

22  put the, the, the heat on him that screwing around with the

23  mother would.  I mean" - continuing on the next page - "doing

24  something violent to her."

25         Just to go back to page 22.  Who is "Chinaman"

S.  Vaughn - Direct / D'Alessandro                    433

1   that's being referred to in this portion?

2   A    George Allison.

3   Q    And what do you understand you're supposed to be doing if

4   "Chinaman" is cooperating?

5   A    I can kidnap him, have him killed.

6   Q    On line 11 of page 23, Mr. Simels says:  "Um, so and

7   Alicia, obviously is somebody that, that we'd like to put

8   pressure on and see if we can figure out whether she would be

9   kind enough to meet with us, ah, in advance of her testimony.

10  She is also somebody we have to tread lightly with because if

11  she calls the prosecutors up and says somebody's trying to get

12  at her, they'll do the same thing.  We have a judge who

13  doesn't like defendants and who doesn't like him and -"

14            Who do you understand is Alicia?

15  A    A girlfriend of Dave Persaud who was killed.

16  Q    Did you have an understanding from your conversations

17  with Mr. Simels how Alicia would be a witness?

18  A    Yes, sir.

19  Q    And what was your understanding?

20  A    She can produce a drug ledger that David had that was

21  written by Dave Persaud.

22  Q    Line 22, Mr. Simels says:  "Okay, well.  You have to

23  understand the way the system up here works, ah, as versus

24  down there.  Things can happen down there that nobody's gonna

25  look twice at, but in the case of Roger who's in jail almost

S. Vaughn - Direct / D'Alessandro                434

1    two years now, ah, they can make his preparation for trial

2    very difficult.  You know, if they think that he had something

3    to do with the harm of a witness, and they put him in the

4    Special Housing Unit, he doesn't get to go to the library, he

5    doesn't get to type up memos, he doesn't get access to his

6    tape recording equipment to be able to listen to the tapes.

7    Ah, it takes us twice as long to get in to see him, so, you

8    know, be mindful of that."

9            In the beginning where Mr. Simels tells you "things

10   can happen down there that nobody's gonna look twice at," did

11   you understand what he was referring to by "down there"?

12   What was your understanding?

13   A    Down there being Guyana.

14   Q    And down there or Guyana "things can happen there that

15   nobody's gonna look twice at."

16           What sort of things did you understand would happen

17   in Guyana, based on your personal experience, that wouldn't

18   get a second look at?

19   A    People would be killed and just die a natural death.  You

20   know, nothing much is being done about it.

21           MR. D'ALESSANDRO:  I'm going to continue the

22   recording.

23           THE COURT:  Where are we?

24           MR. D'ALESSANDRO:  I believe, your Honor, that we

25   ended on the bottom of page 23.

S. Vaughn - Direct / D'Alessandro                435

1              (Audio recording continued.)

2    BY MR. D'ALESSANDRO:

3    Q    At the beginning of your testimony with regards to this

4    meeting, I asked you, Mr. Vaughn, if you recall Arienne Irving

5    being present during this meeting.

6              Do you have a recollection, after listening to the

7    recording now, whether or not she was there?

8    A    Yes, sir, she was.

9    Q    Was she there the entire portion of the meeting?

10   A    No, sir.

11   Q    The part that we just went over where the thousand

12   dollars was handed over, do you have a recollection whether

13   she was in the room or out of the room at that time?

14   A    I don't particularly remember this point in time if she's

15   been in and out of the room.

16              MR. D'ALESSANDRO:   Continuing, your Honor.  I

17   apologize.

18              (Audio recording continued.)

19              MR. D'ALESSANDRO:   Stopping the recording at that

20   time.

21   BY MR. D'ALESSANDRO:

22   Q    On the top of page 26 Mr. Simels says at line one:

23   "Right.  I said, you know Ryan's a problem now.  Leave him to

24   us.  I said," If I leave him to you, he may be on the witness

25   stand in New York."

S. Vaughn - Direct / D'Alessandro                436

1          Who was part of this conversation that Mr. Simels

2   was relaying to you?

3   A    I'm not sure I understand you.

4   Q    Prior to this portion of the conversation, Mr. Simels is

5   talking about his time in Guyana; is that correct?

6   A    Yes, sir.

7   Q    And who was he meeting with while he was in Guyana?

8   A    Paul and some of the guys who worked for Roger.

9   Q    Paul is who?

10  A    Paul Rodrigues.

11  Q    If I could direct you to page 25, line 17:  "I said, I

12  said, you know Paul and Jerry, I said to them, "You're telling

13  me that."  And it continues.

14          Who do you understand Jerry to be?

15  A    Gerald Perera.

16  Q    And Paul is?

17  A    Paul Rodrigues.

18  Q    Going back to line one on page 26 when Mr. Simels is

19  referring to Ryan.

20          Who do you understand Ryan to be?

21  A    Guy in Guyana who might be a possible witness.

22  Q    And you respond to Mr. Simels by saying:  "Well, I mean,

23  alright Paul is the right person you know, you're actually

24  talking in relation to Ryan, because he would be the person

25  who would have to coordinate, you know what.  I mean, anything

S.  Vaughn - Direct / D'Alessandro          437

1    down there for him, alright but then you'll have to poke him."

2           Coordinate, arrange what?

3    A    Get him to either not testify or have him kidnap or

4    something.

5    Q    Who?

6    A    Ryan.

7           MR. D'ALESSANDRO:   Thank you.

8           Continuing.

9           (Audio recording continued.)

10          MR. D'ALESSANDRO:   Your Honor, at this time, the

11   Government will proceed in the recording to 52 minutes.  It's

12   the same line eight on page 27 of the transcript.

13          THE COURT:   Okay.

14          (Audio recording continued.)

15   BY MR. D'ALESSANDRO:

16   Q    Aside from the thousand dollars that you received, did

17   you receive anything else that day?

18   A    Yes, sir.  I got a photograph of a female named Farah.

19   Q    Did you receive anything else that you recall?

20   A    I got some other documents.

21          MR. D'ALESSANDRO:   For the witness, your Honor,

22   it's marked for identification Government Exhibit 302A, 302C,

23   and 302B.

24          (The above-referred to exhibits were published to

25   the witness.)

S. Vaughn - Direct / D'Alessandro                    438

1   Q      Do you recognize these documents?

2   A      Yes.

3   Q      What do you recognize these documents to be?

4   A      Those are documents that I collected when I paid that

5   visit to Mr. Simels office.

6   Q      It's during this meeting that you received them?

7   A      Yes, sir.

8           MR. D'ALESSANDRO:   The Government offers 302A

9   through 302C into evidence, your Honor.

10          MR. SHARGEL:   No objection.

11          MR. SOLANO:   No objection.

12          THE COURT:   Received.

13          (Government's Exhibits 302A, 302B, 302C were

14   received in evidence.)

15          MR. D'ALESSANDRO:   Your Honor, may I proceed to the

16   next portion of the transcript with 302B on the screen for the

17   jury?

18          THE COURT:   Yes.

19          MR. D'ALESSANDRO:   Thank you.

20          (The above-referred to exhibit was published to the

21   jury.)

22          (Audio recording continued.)

23          MR. D'ALESSANDRO:   On the screen for the jury, your

24   Honor, this is 302A.

25          (The above-referred to exhibit was published to the

S. Vaughn - Direct / D'Alessandro                 439

1    jury.)

2    Q    You testified that this is one of the documents that you

3    received during the meeting?

4    A    Yes, sir.

5    Q    Is this one of the pictures that we just heard being

6    handed to you?

7    A    Yes, sir.

8    Q    Whose handwriting is that?

9    A    It's my handwriting.

10   Q    What does this say?

11   A    It says "Farah Alicia's girlfriend."

12   Q    And 302C.

13              (The above-referred to exhibit was published to the

14   jury.)

15   Q    There's some writing on that?

16   A    Yes, sir.

17   Q    Whose handwriting is that?

18   A    It's my handwriting.

19   Q    And what does it say?

20   A    "Farah."

21              MR. D'ALESSANDRO:   Continuing on the recording.

22              (Audio recording continued.)

23              MR. D'ALESSANDRO:   On the screen is Government

24   Exhibit 211 in evidence.

25              (The above-referred to exhibit was published to the

S.  Vaughn - Direct / D'Alessandro                    440

1    jury.)

2    Q    Which e-mail account was this e-mail sent from?

3    A    Robert Simels.

4    Q    When was it sent?

5    A    July 1st, 2008.

6    Q    And to what account was it sent?

7    A    Fine dot man one hotmail dot com.

8    Q    Could you read it into the record, please?

9    A    "He wants you to try and see Clarke.  We are checking to

10   see what you have to do to be able to get in.  When you call I

11   hope to have an answer.  I will explain the approach when you

12   call."

13   Q    Who do you understand is the "he" referred to in "he

14   wants you to try and see Clarke"?

15   A    Roger Khan.

16   Q    Where is David Clarke at this time?

17   A    Supposed to be in prison.

18              MR. D'ALESSANDRO:  At this time, your Honor, we'll

19   play Government Exhibit 401 R14, corresponding transcript is

20   T14.

21              THE COURT:  Okay.

22              (The above-referred to exhibit was published to the

23   jury.)

24              (Audio recording played.)

25              MR. D'ALESSANDRO:  On the screen is Government

S.  Vaughn - Direct / D'Alessandro                441

1    Exhibit 212 in evidence.

2              (The above-referred to exhibit was published to the

3    jury.)

4    BY MR. D'ALESSANDRO:

5    Q    What is the date of this e-mail?

6    A    It's Tuesday, July 8, 2008.

7    Q    What account was it sent from?

8    A    Arienne Irving at Yahoo dot com.

9    Q    What is the subject line?

10   A    "Clarke visits."

11   Q    To what account was it sent?

12   A    Fine dot man one at hotmail dot com.

13   Q    Could you read that e-mail in the record, please?

14   A    "I spoke to the jail where David Clarke is housed to find

15   out about you being able to visit him.  I actually got two

16   different answers, one saying you could just show up any time

17   when they allow visits, Monday to Friday two to four and four

18   to six p.m., just with a picture ID and you can get in.

19   Another person told me the inmate has to put your name on his

20   list first.  So, Robert and I think you should just head over

21   to the jail and try and visit David Clarke" in bracket

22   "without being put on the list.  And act dumb about the list

23   thing, and see if you can get in.  If you can't, you will have

24   to approach David's mother and see if they will contact him

25   about putting you on the list.  Here is the information you

S. Vaughn - Direct / D'Alessandro                442

1    will need on David and on the jail.

2              "David Clarke.

3              "Let me know if any questions or problems.

4              "Regards."

5    Q    I direct your attention to this portion here

6    (indicating).

7              Can you read that into the record?

8    A    It says R-E-G, the number sign, 74621 dash 053.

9    Q    Can you continue?

10   A    "Queens Contract Detention Facility, Wackenhut Detention

11   Center, 182-22 150th Avenue, New York, New York 11413."

12             MR. D'ALESSANDRO:   Thank you.

13             On the screen in evidence is Government Exhibit 213.

14             (The above-referred to exhibit was published to the

15   jury.)

16   Q    I direct your attention to the top portion (indicating.)

17             From what account is that e-mail sent?

18   A    Fine dot man one at hotmail dot com.

19   Q    And when was it sent?

20   A    Wednesday, July 9th, 2008.

21   Q    And to whom was the e-mail sent?

22   A    Sent to Arienne Irving.

23   Q    Is this the reply e-mail to Government Exhibit 21?

24   A    Yes, sir.

25   Q    Can you read it into the record, please?

S. Vaughn - Direct / D'Alessandro                443

1   A    "Tell Mr. Simels I will call him tonight."

2            MR. D'ALESSANDRO:   On the screen in evidence is

3   Government Exhibit 214.

4            (The above-referred to exhibit was published to the

5   jury.)

6   Q    From what e-mail account was this sent?

7   A    Arienne Irving.

8   Q    And when was it sent?

9   A    July 9th, 2008.

10  Q    And to what account was it sent?

11  A    Fine dot man one at hotmail dot com.

12  Q    And is this the reply e-mail to Government Exhibit 213?

13  A    Yes, sir.

14  Q    Can you read it into the record?

15  A    "I will let him know."

16           MR. D'ALESSANDRO:   At this time, your Honor, the

17  Government will play R15.

18           THE COURT:   Okay.

19           MR. D'ALESSANDRO:   Corresponding transcript 401 T15.

20           (The above-referred to exhibit was published to the

21  jury.)

22           (Audio recording played.)

23  BY MR. D'ALESSANDRO:

24  Q    Mr. Vaughn, this like the other recordings that we've

25  been playing was made at the direction of law enforcement; is

S. Vaughn - Direct / D'Alessandro                    444

1    that correct?

2    A    Yes, sir.

3    Q    Had you made approaches to any of the people that you've

4    been mentioning, Farah, Alicia, David, "Chinaman"?

5    A    No, sir.

6    Q    What was the, before having this conversation, did you

7    have discussions with law enforcement on the approach?

8    A    Yes, sir.

9    Q    And that's what you were referring to about the exciting

10   news?

11   A    Yes, sir.

12   Q    What was the exciting news?

13   A    Some time before this I had gotten the thousand dollars

14   from Mr. Simels and some information for me to go out and

15   start work and it was expected that, you know, to get in touch

16   with him and tell him something, you know.  So I was just

17   calling to tell him -- actually, I was calling to tell him

18   that I got in touch with Leslyn Camacho and she would be able

19   to work along with us in relation to David Clarke.

20          MR. D'ALESSANDRO:  Your Honor, at this time, the

21   Government will play 401 R16, corresponding transcript T16.

22          (The above-referred to exhibit was published to the

23   jury.)

24          (Audio recording played.)

25          MR. D'ALESSANDRO:  Now playing R17, corresponding

S. Vaughn - Direct / D'Alessandro                445

1   transcript 401 T17.

2          (The above-referred to exhibit was published to the

3   jury.)

4          One moment, your Honor.

5          (Pause in the proceedings.)

6          (Audio recording played.)

7          MR. D'ALESSANDRO:   Your Honor, may we approach?

8          THE COURT:   Yes.

9          (Sidebar.)

10          (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                                    446

1          (Side-bar conference held on the record out of the

2   hearing of the jury.)

3          MR. D'ALESSANDRO:  We're about to start another long

4   meeting.  I don't know if we would break for lunch early or if

5   you wanted us to start with it.

6          THE COURT:  Any reason we can't break at one?

7          MR. D'ALESSANDRO:  No, there's none.

8          THE COURT:  Let's do that.

9          MR. D'ALESSANDRO:  Very well, judge.

10         (Sidebar end.)

11         (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

S. Vaughn - Direct / D'Alessandro                447

1              (In open court.)

2    BY MR. D'ALESSANDRO:

3    Q    Mr. Vaughn, was there a time that you were able to

4    coordinate another meeting with Mr. Simels?

5    A    Yes, sir.

6    Q    When you had that meeting, was that meeting recorded?

7    A    Yes, sir.

8    Q    Was that done with your consent?

9    A    Yes, sir.

10             MR. D'ALESSANDRO:  At this time, your Honor, the

11   Government will play in evidence 401 R18, corresponding

12   transcript 401 T18.

13             THE COURT:  Okay.

14             (The above-referred to exhibit was published to the

15   jury.)

16             (Audio recording played.)

17             MR. D'ALESSANDRO:  At this time, your Honor, we'll

18   proceed on the recording to eight minutes and 30 seconds,

19   corresponding on the transcript page two, line 23.

20             THE COURT:  Okay.

21             (Audio recording continued.)

22   BY MR. D'ALESSANDRO:

23   Q    Mr. Vaughn, during testimony yesterday, I believe that

24   you testified that Roger Khan had played for you an

25   intercepted phone call with Donald Allison; is that correct?

S.  Vaughn - Direct / D'Alessandro                    448

1   A     Yes, sir.

2   Q     In this portion of the conversation, there's some talk

3   about this equipment, this triangulation equipment.

4         Did you have an understanding what was being

5   referred to?

6   A     Yes, sir.

7   Q     What was that?

8   A     It's a form of laptop computer which uses a special

9   software that is used to tap phone calls and some.

10  Q     And who had that originally?

11  A     Roger Khan.

12  Q     And that was in what country?

13  A     In Guyana.

14  Q     Based on this conversation with Robert Simels, who has it

15  now?

16  A     Mr. Simels.

17            (Audio recording continued.)

18            THE COURT:  Let's interrupt that and break for

19  lunch.  We'll resume at two o'clock.

20            Don't discuss the case.

21            All rise.

22

23            (Jury exits the courtroom.)

24

25            (Continued on following page.)

449

1          THE COURT:  You can step out, Mr. Vaughn.

2          (Witness leaves the witness stand.)

3          THE COURT:  See you at two o'clock.

4          (Luncheon recess taken.)

5

6          (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

450

1              A F T E R N O O N    S E S S I O N.

2              THE COURT:  Bring in the witness.

3    S E L W Y N    V A U G H N

4        called as a witness, having been previously duly

5        sworn, was examined and testified as follows:

6              (Jury present.)

7              THE COURT:  Please be seated.

8              Go ahead Mr. D'Alessandro.

9              MR. D'ALESSANDRO:  Thank you, your Honor.

10             We ended off on page eight of transcript T 18.  We

11   ended on line 22.

12             MR. SHARGEL:  Could I have that page again?

13             MR. D'ALESSANDRO:  Page eight, line 22.

14             MR. SHARGEL:  Thank you.

15   BY MR. D'ALESSANDRO:

16   Q   Mr. Vaugh, before we go back to the recording.  Before

17   lunch you were testifying this is a recording of a meeting

18   you had with Mr. Simels, is that correct?

19   A   Yes, sir.

20   Q   And you had reported to him that you had made contact

21   with David Clark through Leslyn Camacho, is that correct?

22   A   Yes.

23             MR. D'ALESSANDRO:  We will continue with the recording

24   at this time.

25             (Tape played.)

1    Q    Mr. Vaughn, on line 22 of page ten of the transcript you

2    say, I think she would sacrifice him, you know, give him, you

3    know from what I have seen so far. I mean, he's into jail.

4    He can't do anything for her, you know.

5         Who is the she you are referring to?

6    A    Leslyn Camacho.

7    Q    Who is the him?

8    A    David Clark.

9    Q    How would Leslyn Camacho sacrifice David Clark?

10   A    By coming and lie.

11   Q    On line 26 Mr. Simels tells you, if I had my drothers

12   there is a block of silence in the transcript.  Tell the jury

13   what was going on at that time?

14   A    I think, he was probably just thinking --

15        MR. SHARGEL:  Objection.  Move to strike.

16        THE COURT:  Do you recall what was going on?

17        THE WITNESS:  Yes, sir.  He was lighting one of his

18   cigarettes.

19        MR. D'ALESSANDRO:  We're going to move ahead to 30

20   minutes, 22 seconds on the transcript, still on line 26.

21        (Tape played.)

22        Moving ahead the transcript to 36 minutes, 48

23   seconds, line 32 of the transcript.

24        (Tape played.)

25   Q    Mr. Vaughn, on line seven of page eleven of the

1    transcripts, Mr. Simels says:  What you don't read that, see

2    what it says.  Do you recall whether or not he gave you

3    something at that time?

4    A    Yes, sir.

5    Q    What do you recall?

6    A    It was a draft affidavit for Leslyn Camacho to sign.

7         MR. D'ALESSANDRO:  Judge moving ahead to 41 minutes of

8    the recording, should still be at line seven.

9         (Tape played.)

10        At this time we will proceed to 44 minutes. It's page 12

11   of the transcript line 12.

12             THE COURT:  All right.

13             (Tape played.)

14             MR. D'ALESSANDRO:  We will move the recording to

15   five minutes, fifty seconds.

16             THE COURT:  All right.

17             MR. D'ALESSANDRO:  It should be line 19 on page 17.

18             (Tape played.)

19   BY MR. D'ALESSANDRO:

20   Q    Mr. Vaugh, you testified that at this meeting, Mr.

21   Simels gave you a piece of paper, a statement, correct?

22   A    Yes, sir.

23   Q    Who was it for?

24   A    Leslyn Camacho.

25             MR. D'ALESSANDRO:  Your Honor, for the witness.

1    Q    At the end of the recording you ask for an envelope?

2    A    Yes, sir.

3    Q    What do you need the envelope for?

4    A    To put the documents in.

5         MR. D'ALESSANDRO:  On the screen for the witness is

6    Government Exhibit 304.

7    Q    Do you recognize this document?

8    A    Yes.

9    Q    What do you recognize this document to be?

10   A    The document that was given to me by Mr. Simels.

11   Q    As part of 304, do you recognize this?

12   A    Yes, sir.

13   Q    What is that?

14   A    That's the envelope that was given to me.

15        MR. D'ALESSANDRO:  Your Honor the government would offer

16   Government Exhibit 304 into evidence.

17        MR. SHARGEL:  No objection.

18        MR. SALANO:  No objection, your Honor.

19            THE COURT:  Received.

20   Q    That's to far away for you, just let's me know. Can you

21   read this into the record, please?

22   A    David Clarke hates America and is always telling

23   everyone that America is the great oppressor of people and

24   should be overthrown.  He has told me that he used to lecture

25   the military troops of Guayana about his anti American views.

1    David has also had many girlfriends.  Put in the name.  Says

2    terrible things about his wife that he never loved her, et

3    cetera.  He told me that his wife, while working in the

4    military in Guayana, treated the wounded members of the

5    Taliban, so that they could get better and commit more

6    crimes.  That David helped her to do that.  Uses pornographic

7    videos and drugs, alcohol and see to seduce young female

8    military officers.

9        David told me before he came to the U.S. that he was

10   going to lie and tell the prosecutors that Roger Khan was

11   involved with him in drugs, even thought it was a total lie.

12   He told me he was going to frame Roger, because Roger is

13   successful as a businessman and is a supporter of the PPP

14   political party, while David believes the PPP should be

15   thrown out, and the PNC should be in power.  David believed

16   that if enough crime and killings were committed by the

17   Buxton Taliban group that people in Guayana would throw the

18   PPP out of office and elect the PNC to run the government.

19   He also believes that Roger was responsible for ending his

20   military career by telling political leaders that David

21   Clarke was no good.

22       David knows that Roger did not kill Donald Allison and

23   that Fineman was responsible, since he suspected that Donald,

24   who was smuggling in weapons for the Taliban was sealing some

25   of the weapons and was not loyal.  That David knew and tried

1    to help George and David Allison smuggle guns to the Taliban.

2         David supported the Buxton criminals in their efforts to

3    commit crimes in Guayana and supplied them with ammunition,

4    blocked the police from get being into Buxton, and also hated

5    Roger because of his efforts to have the criminals in Buxton

6    seized and put in jail. David once told me that he had sugar

7    cane workers bodies, that had been killed in Buxton, and then

8    burned, transported in his car and dumped the bodies.

9    Q    After leaving the meeting that we just played, what were

10   you supposed to do with this statement?

11   A    Take it to Leslyn Camacho.

12   Q    And what were you supposed to tell her?

13   A    This is what we wanted her to say and she was to fill in

14   the blanks for us.

15   Q    If she did that, what, if anything, did you understand

16   you were permitted to offer her?

17   A    $10,000.  Tell her she'd be given half up front and half

18   after she would testify in court.

19   Q    Who was it that provided you with this document?

20   A    Robert Simels.

21        MR. D'ALESSANDRO:  One moment, your Honor.

22        At this time the government would play R-21

23   corresponding to 401 T 21.

24        THE COURT:  We're going to T 21?

25        MR. D'ALESSANDRO:  Correct, your Honor.  Everybody

456

1    there.

2          (Tape played)

3    BY MR. D'ALESSANDRO:

4    Q    Before you placed this call, had you spoken to Leslyn

5    Camacho?

6    A    No, sir.

7    Q    Had you spoken to David Clark?

8    A    No.

9          MR. D'ALESSANDRO:  One moment, your Honor.

10         (Pause.)

11

12         R 22 according, Transcript T-22.

13         (Tape played.)

14   BY MR. D'ALESSANDRO:

15   Q    Mr. Vaughn, in this conversation there is talk about-- I

16   will reference you to the first page of the transcript on

17   line nine:  I want you to see the guy at Wachenhut this

18   afternoon.

19         Who are you referring to?

20   A    David Clark.

21   Q    Did you actually try and visit David Clark?

22   A    No.

23   Q    On the next page two, line nine, Mr. Simels says:  So

24   are you going to tell her that she should have him send you a

25   form.

HENRY SHAPIRO      OFFICIAL COURT REPORTER

1       Who do you understand Mr. Simels to be referring to?

2    A    Leslyn Camacho and David Clark.

3    Q    On the bottom of the page, line 34, Simels says:  Yeah,

4    we will tell her that obviously she can't get any money until

5    she meets with me, but then I will make the agreement with

6    her, you know, and she will get what she, what, you know, she

7    needs to get, but in order to for that to happen, I'm not

8    giving her anything until I get, until she simultaneously

9    signs the document.

10      Then on line 13:  She got to meet with me first, she got

11   to meet with me. If she does it and signs the document, she

12   gets half then and then gets half when she finishes

13   testifying.

14      What do you understand Mr. Simels to be explaining to

15   you?

16      MR. SHARGEL:  I object to this.  I would like to

17   approach?

18         THE COURT:  Yes.

19         (Followed on next page.)

20

21

22

23

24

25

1        (Sidebar.)

2        MR. SHARGEL:  Judge, in context of the record when

3   Mr. Vaughn first started his testimony I objected and your

4   Honor overruled the objection, the proposition that he

5   shouldn't interpret what doesn't need interpreting.  Here we

6   have the situation --

7        THE COURT:  I don't recall that objection.

8        MR. SHARGEL:  There certainly was an objection.

9        THE COURT:  I don't recall.

10       MR. SHARGEL:  I represent that I made it.

11       My problem with this question is that that is a

12   question for the jury to decide whether Simels intent was a

13   sting operation, or was it a bribe.  To allow the witness to

14   conclude-- where there is no code reference to names-- this

15   question is flat out what did you understand it to be, and he

16   says I understood it to a bribe, and I think that is the

17   jury's question.  He can't opine on that.

18       Judge, there are cases, I'm sorry I can't cite them

19   to you, where the language is not coded and the government

20   will argue, I will argue meaning, and I will have a defense

21   case relative to this.  This witness's opining of what Simels

22   was actually doing is irrelevant.

23       THE COURT:  But his understanding, in my judgment of

24   what Simels, his statement as to what Simels understood him

25   to mean, is admissible, Simels obviously intended this

1    witness to understand something, and it's not crystal-clear,

2    granted some of more obvious than others, but I think his

3    testimony as to what he understood Simels to mean sheds

4    useful light for the jury on this conversation, which isn't

5    one hundred percent accessible.

6            It doesn't mean that you can't argue that Simels,

7    I'm not sure exactly what you are going to argue, doesn't

8    deprive you of the opportunity of what you want to argue.

9            MR. SHARGEL:  If it's relevant it adds weight to the

10   government's case by definition.  If it's not relevant, it

11   shouldn't be there.

12           My point is, if you have a situation where the

13   speaker says something, and the reaction to what the speaker

14   says is relevant, as in an extortion case, instills fear,

15   certainly the witness could say, I was afraid, maybe nervous,

16   scared, afraid.  But they don't have that here.

17           In other words, it's not whether -- in a bribe it's

18   the offer, it's not whether he saw it as an offer.  It's

19   whether the jury will find there was an offer by Mr. Simels.

20   Objective standard.

21           There is no subjectivity involved.  What we're doing

22   here is injecting an element of subjectivity. The jurors

23   deliberating could say well, if Mr. Vaughn thought it was a

24   bribe, then it was a bribe.  It's plainly irrelevant as to

25   what he thought.  His subjective thought processes do not

1    enter into the picture.

2         THE COURT:  I'm going to overrule the objection,

3    because I think if Vaughn understood Simels to be telling

4    Vaughn to offer a bribe, that is circumstantial evidence of

5    what Simels actually intended.  Simels intended him to

6    understand something and if that is what he understood, the

7    government, I think, is allowed to elicit that. You are

8    allowed to argue that understanding may be contrary to the

9    facts, because Simels had other things going on in his mind.

10         I understand the objection, but I overrule it.

11         MR. SHARGEL:  Alternatively, I would ask for an

12   instruction, and my propose instruction is that you are

13   allowing this testimony in, but ultimately, you, the jury

14   will decide whether this was a bribe or whether as the

15   defense posited in the opening statement, it was a sting

16   operation.  I think the jury should know this is their

17   determination and you are letting this in as they may

18   consider it in connection with--.

19         THE COURT:  What's his testimony going to be?  Where

20   is the attribution--.

21         MR. D'ALESSANDRO:  Let me see it, your Honor.

22         THE COURT: -- that your question relates to.

23         MR. SHARGEL:  Actually, there are two attributions.

24         MR. D'ALESSANDRO:  Correct.  It is at the bottom of

25   page two, line 34, and there was another attribution on the

HENRY SHAPIRO       OFFICIAL COURT REPORTER

1   next page.

2           THE COURT:  What is he going to say?

3           MR. D'ALESSANDRO:  She had to agree to sign whatever

4   the document was, if she did that she'd get half the money,

5   and when she came in and testified in conformity with the way

6   they wanted she'd get the other half.

7           MR. SHARGEL:  Further, characterizing the payment,

8   if he's not going to do that is one thing --

9           MR. D'ALESSANDRO:  The nuance of it is the same.

10          MR. SHARGEL:  Judge, what Mr. D'Alessandro put

11  before could not be in plainer English.  This is not

12  something there is the drop of ambiguity in terms of the

13  words. I think it goes to the intent and he-- certainly, what

14  he's doing, what he might testify to, by the proffer, might

15  testify to is essentially, Mr. Simels had a guilty state of

16  mind, to offer a bribe, and that's why, I think, it should

17  sheds very little light. Under 403 it should be excluded and

18  has no probative value.

19          As an alternative I ask for an instruction for the

20  jury to decide the issue.

21          THE COURT:  Your objection is overruled.  I'm not

22  going to instruct the jury, the defense has a different

23  version of the facts.  I think, it's not as plain as you

24  think it might be to the average juror.  It may be plain to

25  us, but I think his understanding as to his fleshing out his

1   understanding of what Simels was telling him, would be useful

2   to this jury.

3           I think we may possibly over estimate what is

4   accessible to the jury in this regard, as to exactly what

5   these phrases mean.

6           I will allow the testimony.  I understand you have a

7   different version of the events-- about a numbering of things

8   that he's testifying about.  I think the jury knows that

9   already.  Your objection is overruled.

10          (Followed on next page.)

463

1          (In open court.)

2          MR. D'ALESSANDRO:  May I have a moment, your Honor.

3          THE COURT:  Yes.

4          (Pause.)

5   BY MR. D'ALESSANDRO:

6   Q    Mr. Vaugh, again on the bottom of the page, line 44, Mr.

7   Simels says:  Yeah, we will tell her obviously she can't get

8   any money until she meets with me, but I will make the

9   agreement with her, you know, and she will get what, you

10  know, she needs to get, but in order to for that to happen,

11  I'm not giving her anything until I get the -- until she

12  simultaneously signs the document.

13         On line seven, I mean she has to do that at the same

14  time otherwise, I'm just giving her money, and she says I

15  changed my mind, she is not going to give me the money back.

16         What do you understand Mr. Simels to be explaining to

17  you there?

18  A    That he needs to meet with Leslyn Camacho so that the

19  final document can be prepared, so she can sign it and he

20  will give her hereafter of the money, she and I agreed to.

21  Q    When will she get the other half the money?

22  A    After she's finishes testifying in court.

23         MR. D'ALESSANDRO:  The government would play R 25

24  corresponding transcript T-25.

25              THE COURT:  Yes.

HENRY SHAPIRO       OFFICIAL COURT REPORTER

1          (Tape played.)

2          (Followed on next page.)

S. Vaughn - Direct/D'Alessandro

1:-28:-56  1        (The audiotape is played.)

1:-28:-56  2        (The audiotape is shut off.)

1:-28:-56  3   BY MR. D'ALESSANDRO:

1:-28:-56  4   Q   Mr. Vaughn, after this telephone call, did you have

1:-28:-56  5   another meeting with Robert Simels?

6   A   Yes, sir.

7   Q   And was that meeting recorded?

8   A   Yes, sir.

9   Q   Was it recorded with your consent?

10  A   Yes, sir, it was.

11        MR. D'ALESSANDRO:  At this time, your Honor, the

1:-28:-56  12  government will play R26, corresponding transcript 401T26.

1:-28:-56  13        THE COURT:  Yes.

1:-28:-56  14        (The audiotape is played.)

1:-28:-56  15        (The audiotape shut off.)

1:-28:-56  16

1:-28:-56  17        MR. D'ALESSANDRO:  At this time, your Honor, we are

1:-28:-56  18  going to move the recording forward to 9 minutes, 55 seconds,

1:-28:-56  19  corresponding transcript, page 4, line 22.  I want to stop on

1:-28:-56  20  page 7, line 36.

1:-28:-56  21        Mr. Simels says:  I'm serious $250, $500?  Just to

1:-28:-56  22  meet with me.  And then upon the signing of the document, she

1:-28:-56  23  gets X more.

1:-28:-56  24        What did you understand Mr. Simels to be explaining

1:-28:-56  25  that he was offering her?

S. Vaughn - Direct/D'Alessandro

1:-28:-56  1        MR. SHARGEL:  Your Honor will note my same

1:-28:-56  2   objection.

1:-28:-56  3        THE COURT:  Overruled.

1:-28:-56  4   A   Yes, a form of inducement for her to come and see him,

1:-28:-56  5   either $250, $500 for her to come see him.  Once she gets

1:-28:-56  6   there and signs the document, she will get what was

1:-28:-56  7   previously agreed to.

1:-28:-56  8   Q   What was that, what was previously agreed to?

1:-28:-56  9   A   That she would get half of the money up front and half

1:-28:-56  10  after she testifies.

1:-28:-56  11  Q   How much money are we talking about?

1:-28:-56  12  A   $5,000 up front and $5,000 afterwards.

1:-28:-56  13        (The audiotape is played.)

1:-28:-56  14        (The audiotape is shut off.)

1:-28:-56  15  BY MR. D'ALESSANDRO:

1:-28:-56  16  Q   On page 11, line 8, you say:  You know, had it been in

1:-28:-56  17  Guyana, where we could have done differently.

1:-28:-56  18        I'm sorry, before that, line 3, you say:  Well, it is

1:-28:-56  19  too early for us to do anything else, you understand, other

1:-28:-56  20  than what we are doing.

1:-28:-56  21        Line 8:  You know, had it been in Guyana, where we could

1:-28:-56  22  have done differently.

1:-28:-56  23        What is going on with regard to Leslyn Camacho?  What

1:-28:-56  24  are you explaining to Robert Simels with regard to Leslyn

1:-28:-56  25  Camacho before you make this statement?

467

S. Vaughn - Direct/D'Alessandro

1:–28:–56  1   A    She doesn't want to go meet him, and I was trying my

1:–28:–56  2   best to go get her to see him.  I was telling him it is too

1:–28:–56  3   early for me to use force.  Had it been in Guyana, I could

1:–28:–56  4   have done things differently.  That means I could have

1:–28:–56  5   probably I think killed her.

1:–28:–56  6   Q    On line 10 of page 11, Mr. Simels says:  No, I

1:–28:–56  7   understand.  In Guyana, we got lots of things can occur and

1:–28:–56  8   what we need here is some cooperation.

1:–28:–56  9        Cooperation with regard to what?

1:–28:–56  10  A    Whatever you want her to do.

1:–28:–56  11       (The audiotape is played.)

1:–28:–56  12       (The audiotape is shut off.)

1:–28:–56  13  BY MR. D'ALESSANDRO:

1:–28:–56  14  Q    Mr. Vaughn, with regard to the $10,000, that's a payment

1:–28:–56  15  that was supposed to go to Leslyn Camacho, correct?

1:–28:–56  16  A    Yes, sir.

1:–28:–56  17  Q    And on line 18, Mr. Simels says:  And he said, "Try to

1:–28:–56  18  get the numbers down"  whatever you save him on the $10,000,

1:–28:–56  19  ah, he'll make up to you.

1:–28:–56  20       Who is the "he" that you understand Mr. Simels to be

1:–28:–56  21  referring to?

1:–28:–56  22  A    Roger Khan.

1:–28:–56  23  Q    And what did you understand to mean, whatever you save

1:–28:–56  24  on the 10,000 he will make up to you?

1:–28:–56  25  A    Try to get her to probably accept 8-, $7,000, a lesser

S. Vaughn - Direct/D'Alessandro

1:-28:-56   1    amount than 10,000, whatever the difference, then I will give

1:-28:-56   2    her myself.

1:-28:-56   3         MR. D'ALESSANDRO:  Thank you.

1:-28:-56   4         (The audiotape is played.)

1:-28:-56   5         (The audiotape is shut off.)

1:-28:-56   6         MR. D'ALESSANDRO:  At this time we'll move forward

1:-28:-56   7    to 26 minutes.  The next page, page 13 - I apologize for not

1:-28:-56   8    following along on the elmo - page 13, line 1.

1:-28:-56   9         (The audiotape is played.)

1:-28:-56   10        (The audiotape is shut off.)

1:-28:-56   11        MR. D'ALESSANDRO:  We'll move ahead in the

1:-28:-56   12   recording.  Before we do.

           13   Q    What is it that you are looking at?

           14   A    Document that was given to me by Mr. Simels.

           15   Q    Did you know what it was?

           16   A    A document from Roger Khan.

           17   Q    What kind of document was it?

           18   A    It was typed, a transcript of a recording.

           19        MR. D'ALESSANDRO:  Moving ahead to 31:43, 31 minutes, 43

           20   seconds into the recording, page 31, line 21 -- I apologize

1:-28:-56   21   page 13, line 21.

           22        (The audiotape is played.)

           23        (The audiotape is shut off.)

           24   BY MR. D'ALESSANDRO:

           25   Q    Mr. Vaughn, there's a reference to Kevin in this part of

469

S. Vaughn - Direct/D'Alessandro

1    the conversation.

2         Who did you understand Kevin to be?

3    A    Barry Dataram.

4    Q    And on line 5 of page 15, Mr. Simels tells you:  That

5    guy mentions Roger during the conversations as "Shortman."

6         Who is that guy?  Who do you understand him to be

7    referring to that guy mentioned Roger?

8    A    Vijay.

9    Q    Is that the person he identified as a potential witness

10   earlier?

11   A    Yes, sir.

12   Q    So we think he's going to be a witness, but we just

13   don't know much about him.  So, I went to see Kevin, and I

14   said, "Kevin, tell me about this guy," and he tells me this

15   other guy down there is the one who introduced him.  I say to

16   Paul, Then you gotta find this guy.  I wanna speak with this

17   other guy, and I wanna know if this guy's got a brother in

18   GT, Vijay.  Who's his brother?  Let's get to his brother.

19        Who do you understand Paul is that Mr. Simels is

20   referring to?

21   A    Paul Rodrigues.

22   Q    Member of the Phantom Squad?

23   A    Yes, sir.

24   Q    What did you understand Mr. Simels to be telling you

25   when he relates a conversation he had with Paul, then you

S. Vaughn - Direct/D'Alessandro

1    gotta find this guy.  I wanna to speak with this other guy,

2    and I wanna know if this guy's gotta a brother in GT, Vijay.

3    Who's his brother?

4         Who did you understand him explaining to you?

5    A    He needs to get in contact with Vijay's brother.

6    Q    For what purpose?

7    A    To see if he can get Vijay up here through him.

8         (The audiotape is played.)

9         (The audiotape is shut off.)

10   BY MR. D'ALESSANDRO:

11   Q    On line 16 of page 15 of the transcript, Mr. Simels

12   tells you:  I was gonna call him, um, Sean and ask him to see

13   if he could find out who this guy is, the brother.  We need

14   the brother to cooperate.  We need the brother, to get his

15   brother to back off.

16        Who do you understand the Sean is that Mr. Simels is

17   referring to?

18   A    Sean Bellfield.

19   Q    What did you understand Mr. Simels to be explaining to

20   you is the reason he needs to get in touch with Sean?

21   A    So that he can find Vijay's brother in Guyana so that he

22   can convince Vijay to back off.

23        (The audiotape is played) .

24        (The audiotape is shut off.)

25        THE COURT:  Why don't we take a break.  We'll resume in

471

S. Vaughn - Direct/D'Alessandro

1:-28:-56   1   ten minutes.  Don't discuss the case.

1:-28:-56   2        (The jurors leave the courtroom for a recess at 3:35

1:-28:-56   3   p.m.).

1:-28:-56   4        (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

472

S. Vaughn - Direct/D'Alessandro

1:-28:-56  1      (Judge Gleeson enters the courtroom at.

1:-28:-56  2           MR. SHARGEL:  Judge, I was going to say, I would

1:-28:-56  3  like to put an evidentiary issue before your Honor.  It is

1:-28:-56  4  with a different witness for tomorrow I would like to put it

1:-28:-56  5  before your Honor at the end of the day.

1:-28:-56  6           THE COURT:  Okay.  BRING in the jury, please.

1:-28:-56  7           Bring in Mr. Vaughn.

1:-28:-56  8           The witness, Selvyn Vaughn, resumes the stand.

1:-28:-56  9           The jury enters the courtroom at 3:50 p.m..

1:-28:-56 10           THE COURT:  Please be seated, everyone.

1:-28:-56 11           Okay, Mr. D'Alessandro.

1:-28:-56 12           MR. D'ALESSANDRO:  Thank you, your Honor.

1:-28:-56 13  MR. D'ALESSANDRO:

1:-28:-56 14  Q    I believe we left off at page 18, line 13, transcript of

1:-28:-56 15  T26.

1:-28:-56 16           (The audiotape is played.)

1:-28:-56 17           (The audiotape is shut off.)

1:-28:-56 18           MR. D'ALESSANDRO:  Your Honor, at this time the

1:-28:-56 19  government will proceed in the recording to 47 minutes, 45

1:-28:-56 20  seconds into the recording.  It should be around line 6, on

1:-28:-56 21  page 20.

1:-28:-56 22  Q    Mr. Vaughn, at the end of that recording there's a

1:-28:-56 23  conversation about a strip club and an address given to you

1:-28:-56 24  at Liberty and 152nd.

           25           Who is supposed to be at that strip club?

473

S. Vaughn - Direct/D'Alessandro

1   A    Farah.

2   Q    Were you given anything at the end of that meeting?

3   A    Yes, a piece of paper with an address.

4        MR. D'ALESSANDRO:  For the witness, your Honor.

5   Q    Showing you what has been marked for identification as

6   Government's Exhibit 305.

7        Do you recognize that?

8   A    Yes, sir.

9   Q    What do you recognize that to be?

10  A    That is what was given to me.

11  Q    After you got this, did you give it to anyone?

12  A    Yes, sir.

13  Q    Who did you give it to?

14  A    John Mazzella and Casandra Jackson.

15       MR. D'ALESSANDRO:  Your Honor, the government offers

16  305 into evidence.

17       MR. SHARGEL:  No objection.

18       MR. SOLANO:  No objection.

19       THE COURT:  Received.

20       (Whereupon, Government's Exhibit 305 was received

21  and marked into evidence, as of this date.)

22  BY MR. D'ALESSANDRO:

23  Q    Do you recall who gave that to you?

24  A    Yes, sir.

25  Q    Who was that?

474

S. Vaughn - Direct/D'Alessandro

1   A    Arienne Irving.

2   Q    In evidence as Government's Exhibit 215 on the screen,

1:-28:-56   3   an e-mail.

4        What is the date of this e-mail, sir?

5   A    Wednesday, the 3rd of July 2008.

6   Q    And from which e-mail account was it sent?

7   A    Arienne Irving.

8   Q    To what e-mail account was it sent?

9   A    Fine.man1@hotmail.com.

10  Q    What if any account was cced to?

11  A    Robert Simels.

12  Q    Read that into the record, please?

13  A    Robert meant to --

1:-28:-56   14        THE COURT:  Keep your voice up, okay.

1:-28:-56   15  A    Robert meant to tell you this today, but he also wants

1:-28:-56   16  you to try and talk to Vijay Jainarine aka Son.  He is living

1:-28:-56   17  down near Washington D.C.  his address is 4011 36th Street,

1:-28:-56   18  Mt. Ranier, MD 20712.  He may be a witness against Roger, and

1:-28:-56   19  is on several wiretap conversations with Dave Persaud.

20  Q    In evidence as Government's Exhibit 216.

21       Is this the reply e-mail that was sent to that, to 215?

22  A    Yes, sir.

23  Q    And from what account was it sent?

24  A    From fine.man1@hotmail.com.

25  Q    On what date was it sent?

S. Vaughn - Direct/D'Alessandro

1   A   July 31, 2008.

2   Q   Who was the e-mail sent to?

3   A   Arienne Irving.

4   Q   Anyone else?

5   A   And copied to Robert Simels.

6   Q   Would you read that into the record, please?

7   A   Got it.

8   Q   On the screen in evidence, Government's Exhibit 217.

9       What is the date of this e-mail?

10  A   August 3, 2008.

11  Q   And from what e-mail account was it sent?

12  A   Robert Simels.

13  Q   And to what e-mail account was it sent?

14  A   Fine.man1@hotmail.com.

15  Q   Read it into the record?

16  A   And, so, did you get to the girl?  Is she going to meet

1:-28:-56  17  me?

1:-28:-56  18  Q   Who did you understand Mr. Simels to be referring to?

1:-28:-56  19  A   Leslyn Camacho.

1:-28:-56  20      MR. D'ALESSANDRO:  One moment, your Honor.

1:-28:-56  21      (Pause)

1:-28:-56  22

1:-28:-56  23      MR. D'ALESSANDRO:  Government will play R28,

1:-28:-56  24  corresponding transcript is 401T28.

1:-28:-56  25          (The audiotape is played.)

476

S. Vaughn - Direct/D'Alessandro

1:-28:-56  1    (The audiotape is shut off.)

1:-28:-56  2  BY MR. D'ALESSANDRO:

1:-28:-56  3  Q    Mr. Vaugn, on page 2 of the transcript, the call, line

1:-28:-56  4  29, Mr. Simels tells you - believe you are speaking about

1:-28:-56  5  Farah at this point - he says:  Yeah.  Ok.  Well then she

1:-28:-56  6  should be interested in whatever it takes to, a, say what we

1:-28:-56  7  need her to say.

1:-28:-56  8    Than on line 34:  And do.

1:-28:-56  9    What did you understand Mr. Simels to be explaining to

1:-28:-56  10  you?

1:-28:-56  11 A    Since Farah is working at the strip club, she could do

1:-28:-56  12 pretty much whatever we wanted her to do and say whatever we

1:-28:-56  13 wanted her to say.

1:-28:-56  14 Q    On page 3 of the transcript, on line 23:  Alright, and

1:-28:-56  15 you can tell Leslyn, and you can tell Leslyn what I said -

1:-28:-56  16 this is Mr. Simels speaking - and you tell Leslyn what I

1:-28:-56  17 said, you know, I'm not trying to be difficult, I just uh,

1:-28:-56  18 uh, you know, somebody, uh, tells me that, that they want to

1:-28:-56  19 sell me a beautiful house, I, I want to look at the house

1:-28:-56  20 first.

1:-28:-56  21    What do you understand him to be explaining to you?

1:-28:-56  22 A    That he needs to see her first before he does any deal

1:-28:-56  23 with her.

1:-28:-56  24 Q    Did you have an understanding why?

1:-28:-56  25    MR. SHARGEL:  Objection.

S. Vaughn - Direct/D'Alessandro

1:-28:-56    1        THE COURT:  Overruled.

1:-28:-56    2    A    So that she can -- the two of them can work out in terms

1:-28:-56    3    of the affidavit and have her sign it.

1:-28:-56    4    Q    Did you have an understanding from your conversations

1:-28:-56    5    with Mr. Simels about what was to be in the affidavit?

1:-28:-56    6    A    Yes, sir.

1:-28:-56    7    Q    What was supposed to be in the affidavit?

1:-28:-56    8    A    She was going to lie on David Clarke.

1:-28:-56    9    Q    On line 16 of page 3, you say:  True.  True.  True.

1:-28:-56   10    Well, what I'm goona do, I'm gonna keep working, um, at

1:-28:-56   11    Farah's end -- I'm sorry, I have the wrong one.

1:-28:-56   12        Line 28:  True, true, true, true, um, what other, um,

1:-28:-56   13    alternative do we have in relation to David.

1:-28:-56   14        Who is David?

1:-28:-56   15    A    David Clarke.

1:-28:-56   16    Q    And Mr. Simels replies:  "Well, I mean, she seems

1:-28:-56   17    obviously the best option."

1:-28:-56   18        Who is she?  Who do you understand him to be referring

1:-28:-56   19    to?

1:-28:-56   20    A    Leslyn Camacho.

1:-28:-56   21    Q    "The other option is, you know, his mother, but, a, I

1:-28:-56   22    don't know how else we can get in to see him or convince

1:-28:-56   23    him."

1:-28:-56   24        What did you understand Mr. Simels to be telling you

1:-28:-56   25    about David Clarke's mother?

478

S. Vaughn - Direct/D'Alessandro

1:-28:-56   1   A    That if they can't get Leslyn to work for us, then I can

1:-28:-56   2   approach his mother?A for what purpose.

1:-28:-56   3   A    To see if she would cooperate with us.

1:-28:-56   4   Q    What form would that cooperation take?

1:-28:-56   5        MR. SHARGEL:  Objection.

1:-28:-56   6        THE COURT:  Overruled.

1:-28:-56   7   A    She can go see him in the prison and tell him what we

1:-28:-56   8   want to discuss with him.

1:-28:-56   9   Q    What was your understanding of what you wanted to

1:-28:-56   10  discuss with him?

1:-28:-56   11  A    To change his testimony or not testify at all.

1:-28:-56   12       MR. D'ALESSANDRO:  R29, your Honor, corresponding

1:-28:-56   13  transcript is 401T29.

1:-28:-56   14       THE COURT:  Yes.

1:-28:-56   15       (The audiotape is played.)

1:-28:-56   16       (The audiotape is shut off.)

1:-28:-56   17  Q    Mr. Vaughn, on page 2 of the transcript, line 30 -- I'm

1:-28:-56   18  sorry, on line 12 you are talking about Son.  You say:  True,

1:-28:-56   19  true, true.  Um, in relation to this guy, Son.

1:-28:-56   20       Who were you referring to?

1:-28:-56   21  A    There's a guy who lives out there that is supposed to be

1:-28:-56   22  a possible witness.

1:-28:-56   23  Q    Mr. Simels reference to that on line 30 says -- I

1:-28:-56   24  apologize again.  On line 26 Mr. Simels says:  Well, it seems

1:-28:-56   25  to me that may be the best way to go about this, right?

S. Vaughn - Direct/D'Alessandro

1      Line 30:  Is, we know that Kevin, uh, and others down

2  below know his brother.

3      Who is Kevin?  Who do you understand him to be referring

4  to by Kevin?

5  A    Barry Dataram.

6  Q    And the others down below, who did you understand that

7  to be?

8  A    The guys who work for Roger Khan.

9  Q    And down below is reference to where?

10  A    Guyana.

11  Q    And know this guy Ricky.  So maybe in the first instance

12  you might have more success than me in speaking to somebody,

13  whether it's Sean or anybody down there and saying to them,

14  "You gotta find the brother."

15      What do you understand Mr. Simels to be asking you to

16  do?

17  A    Sending me to go to Guyana and see if one of the guys in

18  Guyana can help me by getting this guy's brother before I

19  actually go to D.C.

20  Q    Whose son is this?

21  A    Son's brother.

22  Q    See if we can get his brother to back off.

23      Back off from what?

24  A    Being a witness in the case.

25  Q    There's a reference to Sean.

480

S. Vaughn - Direct/D'Alessandro

1:-28:-56   1     Who did you understand that to be?

1:-28:-56   2   A    Sean Bellfield.

1:-28:-56   3       MR. D'ALESSANDRO:  R30, your Honor.

1:-28:-56   4         THE COURT:  Yes.

1:-28:-56   5         (The audiotape is played.)

1:-28:-56   6         (The audiotape is shut off.)

1:-28:-56   7   BY MR. D'ALESSANDRO:

1:-28:-56   8   Q    Mr. Vaughn, on page 2 of the affidavit -- on page 2 of

1:-28:-56   9   the transcript, I apologize, Mr. Simels says, at line 8:

1:-28:-56   10  Right, I understand, well, I mean, I think she, she has to

1:-28:-56   11  decide if that's what she, you know, uh, if she's going to

1:-28:-56   12  come in and we can create this document with the information

1:-28:-56   13  we want, then we'll give her something, you know, we'll give

1:-28:-56   14  her the 5,000.

1:-28:-56   15      Who is the woman being referred to by Mr. Simels?

1:-28:-56   16  A    Leslyn Camacho.

1:-28:-56   17  Q    And what did you understand him to mean when Mr. Simels

1:-28:-56   18  said, well, I mean, i think she has to decide if that's what

1:-28:-56   19  she, um, if she's going to come in and we can create this

1:-28:-56   20  document with the information we want.

1:-28:-56   21      Whose information is it that is going to be in the

1:-28:-56   22  affidavit, do you understand?

1:-28:-56   23  A    The information that Mr. Simels wanted in the affidavit.

1:-28:-56   24  Q    And if she agrees to that information, what, if

1:-28:-56   25  anything, will she get, if you understand?

S. Vaughn - Direct/D'Alessandro

1:-28:-56  1    A    She will get the $5,000.

1:-28:-56  2    Q    Jumping ahead to page 6 of the transcript.

1:-28:-56  3         On line 15 you say -- I apologize.  Starting at line 8,

1:-28:-56  4    Mr. Simels says:  All right, see what this girl says, but you

1:-28:-56  5    haven't heard anything from anybody about, about a way to get

1:-28:-56  6    to this guy, uh.  Line 13, he clarifies, Son I'm talking

1:-28:-56  7    about.

1:-28:-56  8         You respond:  Yeah, what I'm saying here, here's what

1:-28:-56  9    I'm saying, right, I haven't heard anything in relation from

1:-28:-56  10   them down there as to what they intend to do with, you know,

1:-28:-56  11   to do to the brother.  If they can come up with anything, and

          12   then I think, you know, then I just probably got to use, you

          13   know, our methods in dealing with him up here.

          14         Mr. Simels replies:  Right.

          15         What are you explaining to Mr. Simels?

          16   A    That I was waiting for a response from the guys who work

1:-28:-56  17   for Roger in Guyana, whether or not they were able to find

1:-28:-56  18   his son's brother down there, and if they weren't doing

1:-28:-56  19   anything in relation to that, then I probably do what I have

1:-28:-56  20   to up here.

1:-28:-56  21   Q    To whom?

1:-28:-56  22   A    The son.

1:-28:-56  23   Q    You say on line 18:  Just probably gotta use, you know,

1:-28:-56  24   our methods in dealing with him up here.

1:-28:-56  25         What methods are referring to?

S. Vaughn - Direct/D'Alessandro

1   A    Got to force him to go where you want him to go.

2   Q    On page 7 of the transcript, line 14, you say:  You know

3   what, um, I think I'm going to just bypass them, you know,

4   they got some other, um, some other possibly, you know, who

5   be around us, around, around down, you know, down there.  I

6   think it probably time you know that I probably make use of

7   some of them.

8        Mr. Simels replies:  Okay.

9        Who are the people you are referring to Mr. Simels?

10  A    Some other persons in Guyana who work for Roger Khan.

11  Q    On line 27 of page 7 you say:  You got some of the other

12  guys, um, you know, whose been around been around him from

13  inception and I think we should probably make use of some of

14  them.

15       Mr. Simels replies:  With respect, with respect, I agree

16  with you.

17       Who are the people you are referring to?

18  A    The other guys who work for Roger Khan.

19  Q    Line 33 you say:  What I probably just call them up and

20  let them know that well, you know, is it an instruction that

21  is coming from him?  And that is something for me.  It's what

22  he want to have done.

23       Mr. Simels replies:  Right.  That's fine.  That's fine

24  with me.

25       What are you explaining you were going to say?

483

S. Vaughn - Direct/D'Alessandro

1   A    That I was going to call him up and indicate to him what

2   Roger wanted them to do.

3        THE COURT:  Keep your voice up.

4   A    I said I was going to call him up and explain to him

5   what Roger wanted them to do, one of the things that I was

6   going to explain to them that we needed to have done.

7        MR. D'ALESSANDRO:  R35, corresponding transcript 401T35.

8        MR. SHARGEL:  I'm sorry, did you say 35?

9        MR. D'ALESSANDRO:  T35, yes.

10        (The audiotape is played.)

11        (The audiotape is shut off.)

12

13        MR. D'ALESSANDRO:  T37.

14        (The audiotape is played.)

15        (The audiotape is shut off.)

16   BY MR. D'ALESSANDRO:

17   Q    Mr. Vaughn, what meeting are you setting up?

18   A    I was trying to schedule a time for Mr. Simels to meet

19   with Leslyn Camacho.

20        MR. D'ALESSANDRO:  R38, your Honor.

21        (The audiotape is played.)

22        (The audiotape is shut off.)

23   BY MR. D'ALESSANDRO:

24   Q    Mr. Vaughn, what meeting were you talking about setting

25   up with Mr. Simels?

484

S. Vaughn - Direct/D'Alessandro

1:-28:-56  1    A    For him to meet with Leslyn Camacho.

1:-28:-56  2            MR. D'ALESSANDRO:  One moment, your Honor.

1:-28:-56  3    BY MR. D'ALESSANDRO:

1:-28:-56  4    Q    Mr. Vaughn, when did you begin to work for the DEA?

1:-28:-56  5    A    September 2006.

1:-28:-56  6    Q    In addition to the DEA, did you provide any information

1:-28:-56  7    to other law enforcement agencies?

1:-28:-56  8    A    Yes, sir.

1:-28:-56  9    Q    As an informant, have you done things beyond just

1:-28:-56  10   providing information?

1:-28:-56  11   A    Yes, sir.

1:-28:-56  12   Q    And you have been doing that since the time you became

1:-28:-56  13   an informant, September of '06?

         14   A    Yes, sir.

         15   Q    Are you residing in this country lawfully?

         16   A    Yes, sir, I am.

         17   Q    You have a visa?

         18   A    Yes, sir.

         19   Q    Are you in this country alone or are there family

1:-28:-56  20   members with you?

         21   A    I have family members.

         22   Q    Who paid for your family to come here?

         23   A    The United States government.

         24   Q    Why was your family brought to this country?

         25   A    For security reasons.

485

                    S. Vaughn - Direct/D'Alessandro

1    Q    What was the problem?

2    A    They were being threatened in Guyana.

3    Q    Do you have an understanding why?

4    A    People were calling them up and that kind of thing.

5    Q    Was anything going on in the United States in relation

6    to you that prompted them being brought here?

7    A    Yes, sir.

8    Q    What was that?

9    A    I was scheduled to testify in the Roger Khan trial.

10   Q    Are you familiar with the term S visa?

11   A    To have ID.

12   Q    What is your idea of what an S visa is?

13   A    A temporary form that the government gives for you to

14   reside here.

15   Q    Anyone from the government promise you an S visa?

16   A    No, sir.

17   Q    Do you hope to get one for you and your family?

18   A    I'm hoping.

19   Q    What is your understanding of what will be offered or

20   what will be done for you in regards to the S visa?

21   A    I don't know at this point in time.

22   Q    Do you want to live in the United States?

23   A    Not really.

24   Q    Where would you rather be?

25   A    I prefer to be in Guyana.

486

S. Vaughn - Direct/D'Alessandro

1    Q    Could you go back to Guyana with your family?

2    A    Not at this point in time.

3    Q    Why not?

4    A    I will be killed if I go back there.

5    Q    Are you currently working?

6    A    No, sir.

7    Q    Why not?

8    A    Because I no longer have a valid work authorization.

9    Q    Did you apply for a new one?

10   A    Yes, I did.

11   Q    Who is currently supporting your family financially?

12   A    My wife.

13   Q    Over the time that you have been an informant for the

14   government, have you received any money?

15   A    Yes, sir.

16   Q    Do you recall the exact amount?

17   A    I would say to my knowledge it is under $50,000.

18   Q    What was your understanding of the reason for payments

19   to you?

20   A    Those are the monies I have been using for air fares to

21   go on business with the D.E.A.  I have been paying for hotels

22   and other things.  I incurred expenses out of pocket, use of

23   my telephone and so on.

24   Q    Besides reimbursement for air fares, hotels and other

25   expenses, was there any left over money that you out in your

487

S. Vaughn - Direct/D'Alessandro

1    pocket?

2    A    Yes, sir.

3    Q    From when did you start receiving this money?

4    A    November of 2006.

5    Q    Has anyone promised you any payment for your testimony

6    today?

7    A    No, sir.

8    Q    Before testifying here today, you were granted immunity;

9    is that correct?

10   A    Yes, sir.

11   Q    What is your understanding of the immunity that you

12   have?

13   A    That anything that I say here cannot be used against me.

14   Q    Are you immune from prosecution by the United States

15   government?

16   A    No, sir.

17   Q    What about in Guyana, can you be prosecuted there?

18   A    Yes, sir, I can.

19   Q    What happens if you lie?

20   A    I can be charged for that.

21   Q    Could your testimony today if you lie be used against

22   you in a prosecution case?

23   A    Yes, sir.

24   Q    Do you have an understanding how, if you were to lie,

25   that would affect the possibility of you getting an S visa?

S. Vaughn - Cross/Shargel

1    A    Yes, sir.

2         MR. D'ALESSANDRO:  One moment, your Honor.

3    Q    What do you think would happen to your chance of getting

4    an S visa if you lie?

5    A    I wouldn't be able to get it.

6         MR. D'ALESSANDRO:  Your Honor, I have nothing

7    further of this witness.

8         THE COURT:  You want to start your cross now?

9         MR. SHARGEL:  Yes, sir, if I may.

10   CROSS-EXAMINATION

11   BY MR. SHARGEL:

12   Q    Mr. Vaughn, how much did you say you received from the

13   United States government?

14   A    I said I believe it is $50,000, I don't know the exact

15   amount.

16   Q    150,000?

17   A    I said I believe it is under $50,000.

18   Q    Under $150,000?

19   A    I don't know the exact amount.

20   Q    Under $150,000, but you don't know the exact amount?

21   A    I said under 50,000.

22         MR. SHARGEL:  I'm sorry, Judge, I'm having difficulty.

23         THE COURT:  That's all right.

24   Q    One five zero?

25   A    No, sir, five zero.

S. Vaughn - Cross/Shargel

1    Q      Five zero.

2           You don't know the exact amount, but it is under

3    $50,000, correct?

4    A      I said I believe so.

5    Q      What do you base the belief on?

6    A      Just what the I remember receiving.

7    Q      What do you remember receiving?

8    A      Just what I received.

9    Q      Did you discuss with the government before you testified

10   here how much money you received?

11   A      No, sir.

12   Q      You went over your testimony before you came here,

13   right?

14   A      Yes, sir.

15   Q      You sat with government attorneys, did you?

16   A      Yes, I did.

17   Q      Let me ask you a question.  If you add up all of the

18   money that Mr. Simels gave you to give to Leslyn Camacho, how

19   much would that come to?

20   A      So far I only received $1,000 from Mr. Simels.

21   Q      My question to you is a different one.

22          If you add up all of the money that Mr. Simels gave you

23   to give to Leslyn Camacho, how much money would you have?

24   A      He never gave me any money to give to Leslyn Camacho.

25   Q      He never gave you ten cents, did he?

S. Vaughn - Cross/Shargel

1    A    No, sir.

2    Q    But the plan was to get him to give money, right?

3    A    That's what he said he was going to do.

4    Q    The plan -- you had a plan when you went to those

5    meetings with Mr. Simels, didn't you?

6    A    I had no plan, sir.

7    Q    No plan whatever?

8    A    I went merely to see what it was Mr. Simels wanted to

9    talk to me about.

10   Q    Before you went to the meeting, did you meet with any

11   government agent to discuss what it would be that you would

12   be speaking about at the meeting?

13   A    No, sir.

14        MR. D'ALESSANDRO:  Judge, could we have a time, sir,

15   with regard to the meeting?

16        THE COURT:  Overruled.

17   Q    I will ask about the time frame, May 13, 2008 until the

18   last call on September 8, 2008, I ask you, sir, I put the

19   question again, did you meet - and I will be specific - did

20   you meet with this gentleman over here at the table, John

21   Mazzella, and discuss, and discuss, a plan as to what you

22   would talk about?

23   A    Yes, sir, I did.

24   Q    And Mr. Mazzella would give you instructions, correct?

25   A    Yes, sir, at times.

491

S. Vaughn - Cross/Shargel

1:-28:-56   1   Q    And in connection with this matter of Leslyn Camacho,

1:-28:-56   2   you remember what the instructions were, don't you?

1:-28:-56   3   A    Maybe.

1:-28:-56   4   Q    Maybe?  Think for a moment, if you will.

1:-28:-56   5   A    It's been over a year ago, sir.

1:-28:-56   6   Q    Well, you have been testifying here for two days about

1:-28:-56   7   events that happened over a year ago and before that, right?

1:-28:-56   8   A    Actually, I would be using the transcript for that

1:-28:-56   9   purpose to refresh my memory.

1:-28:-56   10   Q    And you were asked at times to recall certain events

1:-28:-56   11   that went back to 2003 and 2004, right?

1:-28:-56   12   A    Yes, sir.

1:-28:-56   13   Q    You were asked to describe events that occurred with

1:-28:-56   14   Roger Khan in Guyana in 2005, correct?

1:-28:-56   15   A    Yes, sir.

1:-28:-56   16   Q    You were asked about meetings with the government in

1:-28:-56   17   2006, correct?

1:-28:-56   18   A    I think so.

1:-28:-56   19   Q    I ask you, sir, you remember in connection with the

1:-28:-56   20   Leslyn Camacho issue receiving instructions from Investigator

1:-28:-56   21   John Mazzella, who is seated over there at the table?

1:-28:-56   22   A    Yes, sir.

1:-28:-56   23   Q    And do you remember Mr. Mazzella saying to you that you

1:-28:-56   24   should do everything that you can to persuade Mr. Simels to

1:-28:-56   25   give you money?

492

S. Vaughn - Cross/Shargel

1:-28:-56   1    A    No, sir.

1:-28:-56   2    Q    You don't remember that at all?

1:-28:-56   3    A    No, sir, I don't.

1:-28:-56   4    Q    May we have, for the witness only -- I have to get used

1:-28:-56   5    to that, for the witness only --

1:-28:-56   6        THE COURT:  You don't have to say this.  I got it

1:-28:-56   7    figured out?

1:-28:-56   8            MR. SHARGEL:  All right.

1:-28:-56   9            THE COURT:  If you say for identification.

1:-28:-56   10           MR. SHARGEL:  I put before you what has been marked

1:-28:-56   11   for identification as 3500-JM-46.

1:-28:-56   12           THE COURT:  I thought he was going to put it on the

1:-28:-56   13   screen there.

1:-28:-56   14           MR. SHARGEL:  We are high-tech over here, Judge.

1:-28:-56   15           THE COURT:  Don't get carried away.  It is only a

1:-28:-56   16   different feed.

1:-28:-56   17   Q    I'm asking you if you could look -- you can look at any

1:-28:-56   18   part of this and read it to yourself, but I'm asking you if

1:-28:-56   19   you would look at the second paragraph of that document,

1:-28:-56   20   3500-JM-46.

1:-28:-56   21       Now, do you remember reading this?  Does this refresh

1:-28:-56   22   your recollection, Mr. Vaughn, that you were given specific

1:-28:-56   23   instructions?

1:-28:-56   24   A    Sir, I'm actually trying to read it.

1:-28:-56   25   Q    Still trying to read it?

493

S. Vaughn - Cross/Shargel

1:-28:-56    1    A    Yes.

1:-28:-56    2    Q    Take your time.

1:-28:-56    3         THE COURT:  It is a little odd, the spacingis odd.

1:-28:-56    4    What is the first word.

1:-28:-56    5         MR. SHARGEL:  I'm planning.

1:-28:-56    6         THE COURT:  Thank you.

1:-28:-56    7         (Pause)

1:-28:-56    8

1:-28:-56    9    Q    Have you read it?

1:-28:-56   10    A    Just a minute, sir.

1:-28:-56   11    Q    I'm sorry?

1:-28:-56   12    A    I'm still reading it.

1:-28:-56   13    Q    Okay.

1:-28:-56   14         (Pause)

1:-28:-56   15         MR. SHARGEL:  Judge, in light of the hour, I will

1:-28:-56   16    continue this tomorrow, with the court's permission.

1:-28:-56   17         THE COURT:  Why don't you finish this question and I

1:-28:-56   18    will break.

1:-28:-56   19         MR. SHARGEL:  Well, I'm waiting for the reading.

1:-28:-56   20    Let me know when you are finished reading it, Mr. Vaughn

1:-28:-56   21         THE COURT:  Just that paragraph.

1:-28:-56   22         (Pause)

1:-28:-56   23

1:-28:-56   24         THE COURT:  Have you read it?

1:-28:-56   25         THE WITNESS:  Yes, sir.

1:-28:-56   1          MR. SHARGEL:  May I put the question?

1:-28:-56   2          THE COURT:  Yes.

1:-28:-56   3   BY MR. SHARGEL:

1:-28:-56   4   Q    Having read that, does that refresh your recollection

1:-28:-56   5   that on the 21st of July, 2008, when you went to see Mr.

1:-28:-56   6   Simels, your instructions were to see if you could get him to

1:-28:-56   7   pay $5,000, right?

1:-28:-56   8   A    I don't remember that, sir.

1:-28:-56   9   Q    And looking at that document - my last question of the

1:-28:-56   10  day, your Honor - looking at that document, your recollection

1:-28:-56   11  is not refreshed, sir?

1:-28:-56   12  A    No, sir.  That document was not addressed to me.

1:-28:-56   13         MR. SHARGEL:  May we continue tomorrow, your Honor?

1:-28:-56   14         THE COURT:  Yes.  We'll break for the day.

1:-28:-56   15         Don't discuss the case.  Don't go looking for any

1:-28:-56   16  information.  I tell you every night.  I tell you not to go

1:-28:-56   17  on the computer and look for information.  Don't communicate

1:-28:-56   18  with others about the case or twitter.

1:-28:-56   19         Have a nice evening, safe home.  Be prompt tomorrow.

1:-28:-56   20  We'll start promptly at 9:30.  Have a nice evening.  Good

1:-28:-56   21  night.  All rise.

1:-28:-56   22         (The jury leaves the courtroom for the evening at

1:-28:-56   23  5:05 p.m.)

1:-28:-56   24         THE COURT:  Okay.  You had an issue you wanted to

1:-28:-56   25  address, and I wanted to get --

1:-28:-56   1          MR. SHARGEL:  I would like the witness to be

1:-28:-56   2   instructed -- I am sorry.

1:-28:-56   3          THE COURT:  Instructed what?

1:-28:-56   4          MR. SHARGEL:  Not to discuss anything with the

1:-28:-56   5   government attorneys or agents.

1:-28:-56   6          THE COURT:  You want to be heard?

1:-28:-56   7          MR. FODEMAN:  No, we wouldn't discuss his testimony.

1:-28:-56   8          THE COURT:  All right.

1:-28:-56   9          MR. D'ALESSANDRO:  I asked Mr. Mazzella to walk him

1:-28:-56   10  out as a security matter and I instructed Mr. Mazzella not to

1:-28:-56   11  speak to him at all.

1:-28:-56   12         THE COURT:  I normally don't do that.  I don't know

1:-28:-56   13  what the authority is.  You can inquire about any discussions

1:-28:-56   14  he has had.

1:-28:-56   15         MR. SHARGEL:  The only authority I have is

1:-28:-56   16  tradition.

1:-28:-56   17         THE COURT:  It is not a tradition.  I have

1:-28:-56   18  experience.  But it sounds like it is not an issue, if they

1:-28:-56   19  are not going to talk to him.

1:-28:-56   20         MR. SHARGEL:  True.

1:-28:-56   21         THE COURT:  What is our three-day audit?  How much

1:-28:-56   22  of tomorrow do you expect to be with this witness, all of the

1:-28:-56   23  day?

1:-28:-56   24         MR. SHARGEL:  No, not at all.  I expect to be --

1:-28:-56   25  well, if this is any indication that it is going to go

1:-28:-56  1    slowly.

1:-28:-56  2            THE COURT:  I understand.  You can't predict.

1:-28:-56  3            MR. SHARGEL:  Probably between one and two hours.

1:-28:-56  4            THE COURT:  And you?

1:-28:-56  5            MR. SOLANO:  Judge, probably 30 to 45 minutes.

1:-28:-56  6            THE COURT:  More evidence coming about Ms. Irving?

1:-28:-56  7            MR. D'ALESSANDRO:  Yes.

1:-28:-56  8            THE COURT:  All right.  So you got your other

1:-28:-56  9    witnesses lined up for tomorrow?

1:-28:-56  10           MR. D'ALESSANDRO:  Yes.

1:-28:-56  11           THE COURT:  You had an evidentiary issue?

1:-28:-56  12           MR. SHARGEL:  I do have an evidentiary issue.

1:-28:-56  13           Pursuant to the search of the Simels law office,

1:-28:-56  14   there were IMs - you are familiar with instant messages -

1:-28:-56  15   taken from the computer.  I have no objection to the

1:-28:-56  16   document.  There was a certain redaction that we agreed on,

1:-28:-56  17   the government lawyers and I agreed, but there is one

1:-28:-56  18   redaction that I am seeking under 403 grounds.  I'm not quite

1:-28:-56  19   certain of the relevance of this being in at all, but here

1:-28:-56  20   are the facts very simply.

1:-28:-56  21           Mr. Simels is going to Washington D.C. to see a

1:-28:-56  22   potential client in another case, unrelated to this case.  He

1:-28:-56  23   goes -- the individual, as I understand it, was arrested and

1:-28:-56  24   was going to court on the day that Mr. Simels went down.  He

1:-28:-56  25   brought with him a translator, a Spanish translator.  When he

arrived at the marshals pen, he was told that the defendant
had been brought to the D.C. jail.

He went over to the D.C. jail, and he hadn't made
arrangements in advance to go into the jail with the
translator, and the translator hadn't been cleared.  So --
and I think I could tell you, I think it is relevant outside
the presence of the jury.  It is not unusual to persuade in a
situation like that the authorities to let you come in,
proper identification and so on.  So he did accomplish that.
And he interviewed the client then in the IM with Ms. Irving.
He said in substance, I have a silver tongue; I was able to
get in.  I have a silver tongue.  And then he said - not
knowing that this would ever see the light of day - he said,
in words or substance, if you give me -- I will give you the
exact phrase.

THE COURT:  Which exhibit is it?

MR. FODEMAN:  802.

MR. SHARGEL:  "Just give me a short time with a
black woman and I could usually get into most places."

Now, is the government suggesting that there was no
false statement involved?  This woman gave her
identification.  If they put it in evidence, I would call the
translator as a witness.  I mean, this is, I think, classic
403.  There's no suggestion that he did anything improper.
He just persuaded the authorities to let him in because he

1  didn't know that he would be making a visit in the jail.

2          THE COURT:  Where is it?

3          MR. FODEMAN:  Page 3, top of page 3, about six or

4  seven lines down.  15:18 is the time.

5          Pause.

6          THE COURT:  What is it that you seek to have

7  redacted from that page, lines what?

8          MR. SHARGEL:  From the page before, the whole

9  discussion of getting into the jail.  And could I put another

10  fact before you?

11          The government's witness at the facility, your

12  Honor, the subject of Count Eleven, is an African-American

13  woman.

14          THE COURT:  Okay.

15          MR. FODEMAN:  Judge, what I would propose is that we

16  hear the cross of that woman.  This is relevant to that

17  issue.  I think Mr. Shargel understands that.  That the

18  government is alleging that Mr. Simels talked his way into

19  the GEO prison to see David Clarke by lying his way in.  And

20  it is based on an opening statement by Mr. Shargel's

21  understanding that he's going to allege that it is completely

22  not true.  It is a lie.  It is not made up.  That's his

23  defense to the 1001 count.

24          THE COURT:  Let me interrupt you there.

25          Are you offering this evidence?

1:-28:-56  1          MR. FODEMAN:  Yes.

1:-28:-56  2          THE COURT:  What do you mean way into the cross?

1:-28:-56  3  Wait until the cross of some later witness?

1:-28:-56  4          MR. FODEMAN:  Exactly.  The witness who is going to

1:-28:-56  5  come in from the GEO Facility, the corrections officer who

1:-28:-56  6  will testify that on March 27, 2008, Mr. Simels came to her

1:-28:-56  7  facility and said that he represented --

1:-28:-56  8          THE COURT:  I understand, this is David Clarke.

1:-28:-56  9          MR. FODEMAN: Exactly.

1:-28:-56  10          THE COURT:  But what happened here?  He talked his

1:-28:-56  11  way into -- what are you claiming happened down in

1:-28:-56  12  Washington?

1:-28:-56  13          MR. FODEMAN:  He talked his way into a facility.

1:-28:-56  14          THE COURT:  By telling a lie?

1:-28:-56  15          MR. FODEMAN:  By working his way into the facility.

1:-28:-56  16          THE COURT:  By how?

1:-28:-56  17          MR. FODEMAN:  By talking his way into the facility.

1:-28:-56  18          THE COURT:  By telling a lie?

1:-28:-56  19          MR. FODEMAN:  I don't know.

1:-28:-56  20          THE COURT:  Well --

1:-28:-56  21          MR. FODEMAN:  I mean, that's the inference.

1:-28:-56  22          THE COURT:  Well, I will wait to rule on it until

1:-28:-56  23  you offer it, but ask for a side bar.  We got an extremely up

1:-28:-56  24  hill battle on 403 grounds.

1:-28:-56  25          MR. FODEMAN:  So that you know, Judge, that's the

500

1    relevant portion of the document.  Beyond that, it is not a

2    question of redacting.  It is either in or out.

3         THE COURT:  It is even easier if I rule it out.

4    Good night.

5         MR. D'ALESSANDRO:  Good night, Judge.

6         MR. SHARGEL:  Thank you.

7         (The trial is concluded for the evening at 5:10

8    p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

501

I N D E X

WITNESS                                            PAGE


S E L W Y N   V A U G H N                            406

DIRECT EXAMINATION (Cont'd.)

BY MR. D'ALESSANDRO:                                409

Government Exhibit 304                              453

CROSS-EXAMINATION

BY MR. SHARGEL:                                     488

502

1                          E X H I B I T S

2

3

4          Government's Exhibit 1 was received and

5          marked into evidence                          409

6

7          Government's Exhibit 2 was received and

8          marked into evidence                          409

9

10         Government's Exhibit 301-A and 301-B were

11         received and marked into evidence             417

12

13         Government's Exhibits 302A, 302B, 302C         438

14

15         Government's Exhibit 305 was received and

16         marked into evidence                          473

17

18

19

20

21

22

23

24

25