503

1

2                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
3
- - - - - - - - - - - - - - X
4
UNITED STATES OF AMERICA,    :
5                                 :
                Plaintiff,   :    08-CR-640
6                                 :
           -against-         :    United States Courthouse
7                                 :
                             :    Brooklyn, New York
8
ROBERT SIMELS,               :
9  ARIENNE IRVING,              :
                             :
10               Defendants.  :    July 30, 2009
                             :    9:30 a.m.
11 - - - - - - - - - - - - - - X

12                    TRANSCRIPT OF TRIAL
              BEFORE THE HONORABLE JOHN GLEESON
13         UNITED STATES DISTRICT JUDGE, and a jury

14 APPEARANCES:

15 For the Plaintiff:      BENTON J. CAMPBELL, ESQ.
                          United States Attorney
16                        BY:  STEVEN L. D'ALESSANDRO, ESQ.
                              MORRIS FODEMAN, ESQ.
17                            DANIEL BROWNELL, ESQ.
                          Assistant United States Attorneys
18
   For the Defendant:      GERALD SHARGEL, ESQ.
19                        EVAN L. LIPTON, ESQ. ESQ.
                          For:  Robert Simels
20
                          JAVIER A. SOLANO, ESQ.
21                        LAWRENCE BERG, ESQ.
                          For:  Arienne Irving
22

23 Court Reporter:         FREDERICK R. GUERINO, C.S.R.
                          225 Cadman Plaza East
24                        Brooklyn, New York
                          718-330-7687
25 Proceedings recorded by mechanical stenography, transcript
   produced by CAT.

504

1          Case on trial:  United States of America v. Simels,

2    et al.

3          (Judge Gleeson enters the courtroom at 9:35 a.m.)

4          THE COURT:  Please be seated, everybody.

5          Are we ready to go?

6          MR. FODEMAN:  Judge, just a couple of issues, if we

7    could.

8          MR. D'ALESSANDRO:  First, Steve D'Alessandro, Morris

9    Fodeman, Daniel Brownell.  Good morning, your Honor.

10          I wanted to put on the record, we said that we were

11   not going to talk to the cooperating witness because of

12   threats made against his family and him.  We did have contact

13   with him.  We discussed those contacts and steps to make him

14   and his family safe.  I just wanted to put that on the record

15   so that it's a complete record.

16          THE COURT:  All right.

17          MR. FODEMAN:  Less significantly, Judge, there's

18   somewhat of a scheduling issue.  I don't anticipate it to be

19   a problem.  We have a witness that has been here now a full

20   day and is leaving tonight to go back to his home country of

21   Great Britain.  He's short.  I think we can do him this

22   afternoon, assuming the cross goes as planned, a couple of

23   hours.

24          In the event it goes, longer we may take him out of

25   order because we assured him we would get him out of here by

S. Vaughn - Cross/Shargel

1   end of the day.

2           THE COURT:  Okay.

3           MR. SHARGEL:  I don't see a problem with that.

4           MR. FODEMAN:  Has your Honor received a motion that

5   the government filed late last night?

6           THE COURT:  I did.

7           Do you want to respond to it in writing?

8           MR. SHARGEL:  I could, or I could respond orally and

9   I'm prepared to do that.

10          THE COURT:  Why don't we do that.  You can respond

11  to it orally late.

12          MR. SHARGEL:  Sure.

13          THE COURT:  Someone find and bring in the witness.

14  S E L W Y N    V A U G H N,

15          called as a witness, having been first duly sworn,

16          testifies as follows:

17          THE COURT:  Who is the witness that you were

18  referring to earlier that you have to get off the stand

19  today?

20          MR. D'ALESSANDRO:  Peter Myers

21          MR. SHARGEL:  In connection with Counts 12 and 13.

22          THE COURT:  What are they?

23          MR. SHARGEL:  The electronic equipment.

24          MR. FODEMAN:  Wiretapping.

25          THE COURT:  What is the count number that was

S. Vaughn - Cross/Shargel

1  dismissed as of Ms. Irving?

2          MR. D'ALESSANDRO:  Judge, I believe it was Count

3  Six.

4          THE COURT:  Okay.

5          When do you think you will rest?

6          MR. WEINSTEIN:  I believe Monday.  It looks like

7  we'll be finished by Monday, possibly the morning or before

8  the end of the day.

9          THE COURT:  All right.

10          (The jury enters the courtroom at 9:42 a.m.)

11          THE COURT:  Good morning, everybody.

12          THE JURY:  Good morning.

13          THE COURT:  Welcome back.  Have a seat.  We are

14  ready to resume.

15          Mr. Shargel.

16          MR. SHARGEL:  Yes, sir.

17  CROSS-EXAMINATION (Cont'd.)

18  BY MR. SHARGEL:

19  Q    Mr. Vaughn, good morning.

20  A    Good morning, sir.

21  Q    Before you started your testimony here in front of the

22  jury, you remember being asked a question by Mr. D'Alessandro

23  outside the presence of the jury?

24  A    Yes, sir.

25  Q    Do you remember him asking you whether you took part in

S. Vaughn - Cross/Shargel

1   any violent acts that were performed on behalf of Roger Khan;

2   do you remember him asking you that question?

3   A    Yes, sir.

4   Q    And do you remember, in response to that question,

5   saying that you avail yourself of your rights under the Fifth

6   Amendment to the United States Constitution?

7   A    Yes.

8   Q    And you refused to answer the question?

9   A    I did.

10  Q    And do you remember -- and, by the way, you had a lawyer

11  here, didn't you?

12  A    Yes, sir.

13  Q    The lawyer was standing right next to you, right?

14  A    Right.

15  Q    Is that a lawyer you retained or was he a lawyer

16  provided by the government?

17  A    I'm not paying him.  I think he was provided by the

18  state.

19  Q    By the state, by the authorities, correct?

20  A    All right.

21  Q    And you understand that the government is paying his

22  legal fees, correct?

23  A    I don't know who's paying them.

24  Q    But you know he's being paid by someone other than you?

25  A    Yes, sir.

S. Vaughn - Cross/Shargel

1   Q    And after you asserted your Fifth Amendment privilege

2   and refused to answer Mr. D'Alessandro's question, the Judge

3   asked whether -- perhaps addressed this to your lawyer,

4   whether you would invoke your Fifth Amendment privilege and

5   refuse to answer any questions relevant to this case,

6   remember that?

7   A    Yes, sir.

8   Q    And then the Judge conferred immunity upon you, right?

9   A    Yes, sir, he did.

10  Q    And you -- by the way, you are saying yes, sir, you did.

11       Did anyone mention, between the time you left the stand

12  last night and this morning, did anyone mention that in your

13  testimony you should appear more cooperative with questions

14  or anything like that?

15  A    No, sir.

16  Q    Did anyone say anything about your demeanor or how you

17  acted in the last five minutes of testimony yesterday

18  evening?

19  A    No, sir.

20  Q    Did anyone suggest that you be more deferential in your

21  answers?

22  A    Sorry, I didn't speak to anybody yesterday after I left

23  here.

24  Q    No one?

25  A    No, sir.

S. Vaughn - Cross/Shargel

1    Q    You were escorted out of the building by whom?

2    A    By one of the agents.

3    Q    Who was that agent?

4    A    Casandra Jackson.  We never discussed anything that

5    transpired here.

6    Q    You didn't leave the building with John Mazzella

7    yesterday?

8    A    I left with Casandra Jackson.

9    Q    Did you see or speak or exchange any words with John

10   Mazzella before you left the building and went home

11   yesterday, sir?

12   A    I don't recollect that, sir.

13   Q    You don't recollect it?

14   A    No, sir, I don't.

15   Q    Well, would you think all the way back to last evening

16   and take a moment to see whether you can recollect or bring

17   it to mind as to whether you had any interaction with Agent

18   Mazzella after you got off the stand yesterday?

19   A    Sir, when I left this building yesterday, Agent Mazzella

20   was still in this room here.

21   Q    Now, getting back to where I was before.

22        After you were conferred with immunity, you were asked

23   whether you understood what the immunity meant, right?

24   A    Yes, I was.

25   Q    And you understand that that puts you in the same place

S. Vaughn - Cross/Shargel

1   as you if asserted your Fifth Amendment privilege because you

2   wouldn't be prosecuted on the basis of any statements.

3       Do you understand that?

4   A    I understand that anything I say cannot be used against

5   me.  It doesn't exempt me from being prosecuted otherwise.

6   Q    That was explained to you by counsel, right?

7   A    Yes, sir.

8   Q    And immunity from what, Mr. Vaughn, immunity from what?

9   A    Immunity from anything I say here.

10  Q    Anything you say here.  Whatever you said here.

11       You said you were acting as a government agent, right?

12  A    I didn't hear you clearly, sir.

13  Q    You were acting as a cooperating witness with the

14  government when you were recording this conversations,

15  correct?

16  A    Yes, sir, I was.

17  Q    And from the inception, when you told us about crimes

18  that you had committed, you told us about crimes that you

19  committed in the country of Guyana, right?

20  A    Yes, sir.

21  Q    And you understand, as you sit here now, that the

22  immunity you received from the United States does not extend

23  to Guyana, right?

24  A    Yes, sir.

25  Q    In fact, you said yesterday that you could still be

S. Vaughn - Cross/Shargel

1  prosecuted in Guyana, right?

2  A     Yes, sir.

3  Q     Did you commit any crimes in the United States?

4  A     Not that I am aware of, sir.

5  Q     Not that you are aware of, sir?

6  A     That's what I'm saying.

7  Q     Do you believe that you may have committed some crimes

8  that you are not aware of?

9  A     No, sir.

10 Q     Do you understand what the purpose was of you getting

11 immunity for your testimony yesterday; do you understand

12 that?

13 A     Sir, I understand that whatever I say here will not be

14 used against me.

15 Q     Where you expecting -- you want to finish?

16 A     I'm okay.

17 Q     Were you expecting that the United States government

18 would prosecute you for what it was that you said here

19 yesterday and the day before yesterday and today?

20 A     Sir, I don't know that because it was made clear to me

21 that if I lie, I can be prosecuted.

22 Q     Did you receive any assurances that you wouldn't be

23 extradited to the country of Guyana?

24 A     No, sir.

25 Q     No assurances at all?

512

S. Vaughn - Cross/Shargel

1   A    No, sir.

2   Q    You are living here in the United States, correct?

3   A    Yes, sir, for the time being.

4   Q    You have a visa, correct?

5   A    Yes, sir.

6   Q    That visa was secured by the authorities, in this case

7   the U.S. Attorney's office, right?

8   A    Sir, I filled out an application in 2006 and I paid for

9   it in Bridgetown, Barbados.

10  Q    I ask you again, sir, your ability to stay in the United

11  States and the visa you currently have is the direct result

12  from help from the United States government, correct, sir?

13  A    Yes, sir.

14  Q    Not only did you get a visa, you got a visa for your

15  mother as well, right?

16  A    Yes, sir.

17  Q    Not only your mother, but your wife and three children,

18  right?

19  A    Yes, sir.

20  Q    And you understand -- I think you were asked questions

21  yesterday about an S visa.

22       You understand what that is, right?

23  A    I have a fair idea.

24  Q    It's a visa that is given to someone who cooperates with

25  the government, right?

513

S. Vaughn - Cross/Shargel

1  A    Yes, sir.

2  Q    And that could eventually lead to citizenship here,

3  right?

4  A    I'm not aware of that, sir.

5  Q    You are not aware of that?

6  A    No, sir.

7  Q    You have never discussed with anyone on this earth that

8  you would be eligible to a chief citizenship in this country,

9  not only you - I will broaden the question - not only you,

10  but your mother, your wife, and your three children?

11  A    No, sir, I never discussed with anybody.  I did my own

12  research on line as to that, because I heard about an S visa

13  and I did my own research on line, and the research there is

14  very limited.

15  Q    Very limited.

16      Based on the limited information you received, did that

17  cause you or prompt you to clarify it with any of the

18  prosecutors in this case or agents in this case?

19  A    No, sir, I had no need to because my desire all along is

20  to return to Guyana some day.

21  Q    Some day?

22  A    Yes, sir.

23  Q    You haven't bought tickets, have you?

24  A    Not at this point in time.

25  Q    Let me ask you this question:  You came here actually

S. Vaughn - Cross/Shargel

1   two days ago, and you were asked questions by Mr.

2   D'Alessandro regarding your past history in Guyana.

3       Do you remember that?

4   A    Yes.

5   Q    And, by the way, if you know, is there a statute of

6   limitations in the country of Guyana for the crime of murder

7   or participation in a murder?

8   A    I don't know, sir.

9   Q    Is that something you intend to research before you go

10  back to the country of Guyana?

11  A    I don't know what I might do at this point in time

12  before I go back to Guyana.

13  Q    You told us at the beginning of your testimony that you

14  participated or actually were involved in some crimes back in

15  Guyana, right?

16  A    Yes, sir.

17  Q    The crimes go back to what, 1994?  When did you start

18  engaging in criminal activity as best you can recall in the

19  country of Guyana?

20  A    Sir, in 1994 I was charged with forging a driver's

21  license.

22  Q    A relatively petty crime, right?

23  A    I would presume so.

24  Q    Were you charged with a felony or misdemeanor, a serious

25  crime or lesser use crime in Guyana?

                       S. Vaughn - Cross/Shargel

1    A      I don't know, sir.

2    Q      What happened with that case?

3    A      It was dismissed.

4    Q      Was that dismissed because of some trickery of someone

5    you knew?

6    A      Sir, I didn't forge a driver's license and I was charged

7    with forgery.

8    Q      That charge was dismissed?

9    A      Yes, sir.

10   Q      Then there was a question of a phony birth certificate,

11   that goes into the next decade, into the 2000's, Roger Khan

12   asked you to forge a birth certificate?

13   A      Yes, sir.

14   Q      Or obtain a forged birth certificate?

15   A      Yes.

16   Q      And you knew someone who could help you accomplish that,

17   a government official or someone who worked in the

18   appropriate office, right?

19   A      Yes, sir.

20   Q      Did you ever tell Bob Simels that you had been involved

21   in this criminal activity?

22   A      I had no need to, sir.

23   Q      I didn't ask you that.  My question to you, sir, did you

24   ever tell Robert Simels about this criminal activity,

25   specifically the phony birth certificate?

S. Vaughn - Cross/Shargel

1    A    No, sir.

2    Q    You told us in your testimony about false

3    identification.  This is again in the 2000's, right?

4    A    Yes, sir.

5    Q    The 21st century, false passports, right?

6    A    Yes, sir.

7    Q    And you were able, through your own efforts, knowing

8    people, perhaps, to obtain false passports, right?

9    A    Yes, sir.

10   Q    And you did that for who?

11   A    For some guys who wanted to remove some money from the

12   Citibank.

13   Q    For some guys who wanted to commit a financial crime,

14   right?

15   A    Yes, sir.

16   Q    Did you tell Robert Simels about the false passports,

17   tell him anything about that?

18   A    No, sir.

19   Q    You told us that there was a time in 2003 and 2004, I

20   believe, when you were working indirectly for Roger Khan

21   through your cousin Myrven, right?

22   A    Yes, sir.

23   Q    Is that correct?  Do I have that right?

24   A    It was 2002, 2003.

25   Q    2002, 2003.

S. Vaughn - Cross/Shargel

1    What did you do for Myrven?

2    A    My cousin Myrven was involved with the Guyana Police

3    Force at that point in time and he would ask me from time to

4    time -- they were looking for any individuals, if I know the

5    person, if I know where they might be hiding out, and so on,

6    and I did it at the time because I knew he was a member of

7    the Guyana Police Force.

8    Q    So, during that period of time, 2002/2003, you were

9    actually finding people, and the police themselves -- your

10   cousin was a police officer at the time, right?

11   A    Yes, sir.

12   Q    So when the police department -- was this in Agricole or

13   Buxton?

14   A    I don't understand that, sir.

15   Q    Which town was this, where was your cousin Marvin or

16   Myrven?

17   A    Myrven.

18   Q    When your cousin was the police officer, which town?

19   A    The Georgetown Police station.

20   Q    Georgetown is the capital of Guyana?

21   A    Yes, sir.

22   Q    Georgetown is a fair size city, is it?

23   A    I believe so.

24   Q    Population what, 100,000, something like that?

25   A    Something like that.

518

S. Vaughn - Cross/Shargel

1   Q    And it had a regular police force.  There were no

2   volunteers, just a regular police force?

3   A    There's a regular police force and also one with like

4   civilians.

5   Q    What was Myrven?

6   A    He was a member of the Guyanese Police Force.

7   Q    He was actually a policeman, right?

8   A    Yes, sir.

9   Q    When he wanted to find someone -- was he a detective or

10  regular uniform police officer?

11  A    He was a police officer, sir.

12  Q    When this detective, the police officer wanted to find

13  somebody, he turned to you, is that your testimony?

14  A    If he wasn't able to locate that person.

15  Q    You were successful in finding people that the police

16  department couldn't find, right?

17  A    At times.

18  Q    Did you know what happened to these people after you

19  found them, if you know of your own personal knowledge?

20  A    Well, I don't know from my own personal knowledge, sir.

21  Q    I'm not asking for a guess.

22       There came a time when you met Roger Khan in 2005,

23  correct?

24  A    Yes, sir.

25  Q    What month in 2005, if you recall?

S. Vaughn - Cross/Shargel

1    A    I believe it is sometime between June or July of 2005.

2    Q    Summer of 2005, yes?

3    A    I said sometime between June and July of 2005.

4    Q    And he asked you, among other things, he asked you if

5    you could do some intelligence work and penetrate Buxton,

6    right?

7    A    Yes, sir, he did.

8    Q    And gather information about what was happening in

9    Buxton, right?

10   A    Yes, sir.

11   Q    Because Buxton was the location where political enemies

12   of Roger Khan were stationed, correct?

13   A    I don't know anything about political enemies, sir.  I

14   know there were criminals hiding out in Buxton.

15   Q    Enemies of Roger Khan, right?

16   A    I presume so.

17   Q    Did you ever -- I know you told us there came a time

18   when you got two matching Glock pistols because it was

19   dangerous to go there.

20   A    I never said I got two matching pistols.  I said I was

21   given a pistol with two matching rounds.

22   Q    Matching rounds, meaning the rounds fit in the gun,

23   right?

24   A    Yes, sir.

25   Q    Meaning that the gun was fireable, correct?

S. Vaughn - Cross/Shargel

1    A    I presume so.

2    Q    Meaning that it could be used to shoot someone, right?

3    A    Yes, sir.

4    Q    Did you tell Robert Simels, when you met him in 2008,

5    and I recognize it is years later, did you tell Robert Simels

6    in 2008 that Roger Khan had given you a Glock?

7    A    No, sir.

8    Q    You told us that there was an incident about a forged

9    driver's license that you obtained in Guyana, right?

10   A    Sir, I never said I obtained a forged driver's license.

11   I had a genuine driver's license.

12   Q    Right.

13   A    And I asked a friend of mine who was a cop to help me to

14   get an enforcement so that I could drive a mini bus.

15   Q    I see.  And you were charged with an offense as result

16   of that, right?

17   A    Yes, sir.

18   Q    And the offense was dismissed, correct?

19   A    Yes, sir.

20   Q    And that was through the help of Roger Khan, wasn't it?

21   A    No, sir.  I didn't know Roger Khan at that time.

22   Q    I see.

23        So who helped you?

24   A    The magistrate dismissed it because I should have

25   applied to the magistrate.  I should have been charged with

521

S. Vaughn - Cross/Shargel

1  being in possession of a forged document and not forgery.

2  Q    You told us the other day that Roger Khan was shipping

3  cocaine to the United States -- from Guyana to the United

4  States and Europe, correct?

5  A    Yes, sir.

6  Q    Did you ever tell Robert Simels that Roger Khan was

7  shipping cocaine to the United States and Europe?

8  A    No, sir.

9  Q    You started talking to the American authorities in 2006,

10  correct?

11  A    Yes, sir.

12  Q    In 2006, you didn't even tell the American authorities

13  about all of the criminal activity you had been involved in,

14  did you?

15  A    I believe I did, sir, but I'm not certain.

16  Q    So, your testimony is that you told them about all of

17  your criminal activities in 2006?

18  A    Sir, I believe that --

19         MR. D'ALESSANDRO:  Objection.

20         THE COURT:  Overruled.

21  Q    Well, let's remind ourselves about your earlier

22  testimony.

23      There was a time when you said there was a bomb that was

24  placed in a television set, correct?

25  A    Yes, sir.

522

S. Vaughn - Cross/Shargel

1   Q    And that this happened when, 2005, correct?

2   A    Yes, sir.

3   Q    As a matter of fact, you gave a specific date for when

4   it happened, correct?

5   A    I don't remember if I did that, sir.

6   Q    Do you remember saying that it was November 20, 2005

7   when you had this bomb that was placed in a TV set?

8   A    It is possible that I might have said that.

9   Q    And you were supposed to deliver the TV set to Buxton so

10  it would blow up and destroy or kill some of Khan's enemies,

11  correct?

12  A    Yes, sir.

13  Q    Do you remember being asked in September of 2006 that

14  you had no significant non-drug information to report to the

15  American authorities?

16  A    I don't remember that, sir.

17  Q    Well, then, let me show you -- let's have SV-1, page 3,

18  for identification.

19       THE COURT:  What position are you using over there?

20       A VOICE:  Number two.

21         MR. SHARGEL:  Could we just make it a little larger

22  on the screen or actually the first subsection that is

23  underlined, if you can blow it up.  It might be easier for

24  the witness to see.

25  BY MR. SHARGEL:

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

523

S. Vaughn - Cross/Shargel

1   Q    Now, reading those two sentences that are before you

2   that have been blown up from that document, I ask you to read

3   it to yourself, then I will put a question to you.

4        (Pause)

5

6   Q    Sir, you see this is two sentences.  Are you done

7   reading it?

8   A    Yes, sir.

9   Q    Having read that, does that refresh your recollection

10  that you were specifically asked by the authorities in

11  September of 2006 whether you had any significant non-drug

12  information to report; do you remember being asked that?

13  A    Sir, I might have been.  I don't remember.

14  Q    Well, do you remember telling the authorities that you

15  had no non-drug related activity to report, nothing more than

16  drugs to report; do you remember that?

17  A    I don't remember that, sir.

18  Q    Well, do you remember, sir, that it was not until

19  February 11, 2008, February 11, 2008, well more than a year

20  later, that you first told the authorities about the bomb and

21  the TV set?

22  A    That's not true, sir.

23  Q    That's not true.

24       Well, then, I ask you, sir, to look at the following

25  document.  I would like to show you what has been marked for

524
S. Vaughn - Cross/Shargel

1   identification as SV-10, page 5.

2       Actually, if you could look at page 1.  I would like to

3   show the witness one reference that appears on page 1.

4       If you look at line 10, you see that, sir, it is

5   highlighted in yellow?

6   A    Yes, sir.

7   Q    Read that one line to yourself.

8       (Pause)

9

10  Q    Have you read it?

11  A    Yes, sir, I have.

12  Q    Does that, sir, refresh your recollection that you were

13  interviewed on February 11, 2008 by authorities in

14  Port-au-Spain, Trinidad, right?

15  A    Sir, on February 11, 2008, I would have been in the

16  United States.

17  Q    Isn't it a fact, sir, that you came to the United States

18  in October of 2008?

19  A    Yes, sir, and I haven't left since.

20  Q    In October of 2008, you came to the United States.

21      I'm asking you, sir, whether this refreshes your

22  recollection that you were interviewed in Port-au-Spain --

23  where is Port-au-Spain?

24  A    Sir, that's in Trinidad.

25  Q    That you were interviewed in Port-au-Spain, Trinidad on

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

525
                    S. Vaughn - Cross/Shargel

1   February 11, 2008?

2   A     Sir, I was not in Trinidad on February 11, 2008.

3   Q     So, your testimony, sir, is that, or are you actually

4   denying that you were interviewed?

5   A     Sir, you asked me whether I was interviewed in

6   Port-au-Spain Trinidad in 2008.  I'm telling you I was not

7   there in 2008.

8   Q     Do you remember being debriefed -- putting aside

9   Trinidad, Port-au-Spain.

10        Do you remember being debriefed on or about February 11,

11  2008?

12  A     No, sir.  I have been talking to agents continually

13  since 2006.

14  Q     May we have page 5.

15        Sir, I put the question to you again.  Do you remember,

16  sir, that it was in February of 2008, February 11, 2008, to

17  be exact, when you first told United States federal agents

18  about this bomb in a TV set?

19  A     I don't recollect that, sir.

20  Q     Sir, let me show you, then, or call your attention to

21  the document before you, paragraph four.

22        I ask that it be blown up or highlighted.

23        I would ask you to read this to yourself, if you would.

24        (Pause)

25

526

SIDE BAR

1   Q    Now, having read that, sir, does that refresh your

2   recollection that it was during this interview in February

3   2008 when you first told government agents - and when I say

4   government, so that we understand each other, I'm only

5   talking about the United States government - when you first

6   told the United States government agents that you carried a

7   bomb to Buxton in a TV set for the purpose of killing people?

8   A    I don't remember that, sir.

9   Q    You don't remember it?

10  A    I know I told them I did it, but I don't remember

11  exactly when I did it.

12  Q    How many times were you interviewed by the United States

13  agents?  You said a lot of times.

14      How many times do you recall being interviewed by a

15  United States agent?

16  A    Could be a lot of times.  I haven't been keeping count

17  of it.

18      THE COURT:  Could you come up for a second.

19

20

21

22

23

24

25

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

527

S. Vaughn - Cross/Shargel

1        (Side bar)

2

3            THE COURT:  What you highlighted says that he told

4   the agents he didn't take the TV set to Buxton.  He took it

5   home.

6            MR. SHARGEL:  I was going to get to that.

7            THE COURT:  Okay.

8            MR. SHARGEL:  He was given it to go to Buxton.  I

9   don't want to mislead the jury that it went off in Buxton,

10  but.

11           THE COURT:  I just had a different impression from

12  your questions of him.  I realize the essence of your

13  question.  It is the timing of the disclosure.

14           MR. SHARGEL:  I will be more careful.

15           (Side bar ends)

16

17

18

19

20

21

22

23

24

25

528

S. Vaughn - Cross/Shargel

1   .

2   Q    Sir, I was asking you -- sir, I was asking you about the

3   number of times, and I believe that the number of times that

4   you were interviewed by agents either on the telephone or in

5   person, and you said you don't have any specific idea, right?

6   A    Yes, sir.

7   Q    Was it more than 50 times?

8   A    Sir, I don't know.  As I said, could be a lot of times.

9   I haven't been keeping count of it.

10  Q    But keeping count of it or not, can the jury have a

11  sense of how many times you met with government agents?

12  A    I would say between 50 and 60 times.

13  Q    Fifty to 60 times.

14       In connection with this case, obviously you were

15  involved in speaking to Mr. Simels between May and September

16  of 2008, right?

17  A    Yes, sir.

18  Q    And then there came a time when your undercover work was

19  finished, right?

20  A    Yes, sir.

21  Q    During the time, as we had it yesterday, you were

22  working I will say undercover, you were reporting to the

23  agents, right?

24  A    Sir, I was reporting to the agents and I had other stuff

25  going on.

529

S. Vaughn - Cross/Shargel

1   Q     There then came a time when you were preparing for

2   trial, right?

3   A     Yes, sir.

4   Q     And when did that start, if you recall?

5   A     Sometime in this month here.

6   Q     And before this month, you never met with any of the

7   prosecutors or agents in connection with this case?

8   A     Not --

9   Q     to prepare for trial?

10  A     Not that I can remember, sir.

11  Q     In the past month, how many times have you met with the

12  prosecutors?

13  A     A couple of days well.

14  Q     A couple of days as well?

15  A     I said a couple of days well.

16  Q     What is the last word you are using?

17  A     Well.

18  Q     Well.  During those couple of days, how many hours did

19  you spend with them?

20  A     Sometimes five or six.

21  Q     And you went over your testimony?

22  A     Yes.

23  Q     And the testimony was rehearsed, was it?  I will explain

24  what I mean by that, I will break it down.

25        You were asked questions, right?

S. Vaughn - Cross/Shargel

1    A    Sir, I barely went over conversations that I had with

2    Mr. Simels and persons in Guyana.

3    Q    My question is, were you asked questions in preparation

4    as if you were in a courtroom, did you go through your direct

5    testimony?

6    A    Yes, sir.

7    Q    And when you went through your direct testimony, you

8    would be asked questions and you would give answers, right?

9    A    Yes, sir.

10   Q    And sometimes answers were discussed, right?

11   A    Maybe, sir.

12   Q    What does maybe mean?  Were answers discussed or not?

13   A    I don't quite remember.

14   Q    Well, we are talking about within the last month, right,

15   sir?

16   A    Yes, sir.

17   Q    And --

18   A    -- sir, over the last month I have had a lot on my mind

19   because I was --.

20   Q    Sir, there's no question before you.

21   A    Excuse me.  My family has been --

22         MR. SHARGEL:  I ask for an instruction, your Honor.

23   I ask for an instruction.

24         THE COURT:  Mr. Vaughn, listen to the question and

25   just answer the question that is posed.  Don't adds

S. Vaughn - Cross/Shargel

1  additional information.  The prosecutors are going to have a

2  chance to examine you on redirect.  If they want to bring out

3  something they think is relevant and useful, they will do it

4  then, but Mr. Shargel has a right to insist that you answer

5  only the questions he poses and not volunteer additional

6  information.

7          Understood?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Go ahead.

10  BY MR. SHARGEL:

11  Q    Sir, I'll put the question to you again.  Do you recall

12  instances where, in response to a question, you would give an

13  answer, and the answer would then be discussed with the

14  lawyers?

15  A    I don't remember that, sir.

16  Q    Do you remember, during the course of your preparation,

17  lawyers suggesting that there may be a better way to answer a

18  question?  Do you remember anything like that?

19  A    No, sir.

20  Q    Do you remember whether any of the agents suggested that

21  there might be a better way for you to answer the questions?

22  A    No, sir.

23  Q    Were you instructed to keep the same demeanor on

24  cross-examination as you do on direct examination, receive

25  any instructions like that?

S. Vaughn - Cross/Shargel

1   A    Sir, all I was told was to answer the question

2   truthfully.

3   Q    That was it?

4   A    Yes, sir.

5   Q    Was there a time when cross-examination was discussed?

6   A    I don't understand your question.

7   Q    Were you told that a lawyer was going to be asking you

8   questions or lawyers would be asking you questions on

9   cross-examination?

10   A    Yes, sir.  I was told that there would have to be

11   cross-examination.

12   Q    Did you ever appear as a witness, whether it is in

13   Guyana or any country in the world, including this one, did

14   you ever appear as a witness, other than your appearance here

15   in this courtroom?

16   A    No, sir, I never had.

17   Q    In preparation for your testimony, sir, my question is,

18   did someone give you information about how the

19   cross-examination would go?

20   A    No sir.  A few questions I asked and I tried to answer

21   them the best I can.

22   Q    Did someone -- forgive me.  Did someone pretend to be a

23   defense lawyer and ask you questions as if on

24   cross-examination, did that happen?

25   A    Yes, sir, that happened.

S. Vaughn - Cross/Shargel

1   Q     And how long was that exercise?

2   A     I think it was like on one occasion, I might have been

3   asked maybe two or three question, as far as I can recollect.

4   Q     Two or three questions as far as you can recollect?

5   A     Yes, sir, from that person who was pretending to be a

6   defense lawyer.

7   Q     Well, did this happen in the last week or so?

8   A     It might have, sir.

9   Q     Well, can you remember, as you sit here now, whether it

10  did?   Can you say with certainty that it happened in the

11  last week or so?

12  A     No, I can't say with certainty it happened.

13  Q     How about the last two week, the last two weeks, did

14  happen within the last two weeks?

15  A     It could have happened.

16  Q     Is that the best answer you could give that it could

17  have happened?

18  A     Yes, sir.

19  Q     When you told them about the bomb, was that the same

20  occasion -- let's make this clear.

21        You got this TV with a bomb in it that someone else had

22  built, right?

23  A     Yes, sir.

24  Q     Built the bomb I mean, right?

25  A     Yes, sir.

534

S. Vaughn - Cross/Shargel

1   Q    And I think you said it was a Spanish-speaking

2   individual, he made the bomb, correct?

3   A    Yes, sir.

4   Q    And placed it in the TV set, right?

5   A    Yes, sir.  That is what I was told by Roger.

6   Q    And you, sir, that's what you were told by Roger?

7   A    Yes, sir.

8   Q    Did you know the name of the man?

9   A    Which man, sir?

10  Q    The man who built the bomb?

11  A    Yes, sir.

12  Q    What was the man's name?

13  A    A guy by the name of Millard.

14  Q    M-i-l-l-a-r-d?

15  A    Yes, sir.

16  Q    So he put the bomb in the TV set.  Roger Khan and you

17  had been working for him just for a couple of months at that

18  time?

19  A    Yes, sir.

20  Q    Because you started in June or July and this was

21  November, right?

22  A    Yes, sir.

23  Q    And Roger Khan, who you knew to be a fearsome

24  individual, right?

25  A    Yes, sir.

S. Vaughn - Cross/Shargel

1   Q    And a violent and tough individual, as you described in

2   your testimony, right?

3   A    Yes, sir.

4   Q    He would kill at will or at whim, right?

5   A    Yes.

6   Q    Yes?

7   A    Yes.

8   Q    And your testimony is that you decided that it might

9   harm children, so you weren't going to deliver it; is that

10  your testimony?

11  A    Yes, sir.  That's a fact.

12  Q    That's a fact?

13  A    Yes, sir, I decided it was going to kill many kids.

14  Q    So, you went back to Roger Khan and you said, I'm out of

15  this game, I'm done, I'm not involving myself in any bomb in

16  blowing up people in Buxton.  Did you say that?

17  A    I could not have done that, sir.

18  Q    Because you would have been killed, right?

19  A    Yes, sir.

20  Q    And then there was another -- by the way, you testified

21  that the bomb was diffused by whom?

22  A    A friend of mine.

23  Q    A friend of yours.

24       What was the friend's name?

25  A    Nigel.

S. Vaughn - Cross/Shargel

1   Q    Nigel is his first name, right?

2   A    Yes, sir.

3   Q    What is his last name?

4   A    Lucky.

5   Q    Lucky is his last name?

6   A    Yes, sir.

7   Q    So Nigel Lucky, your friend, defused the bomb?

8   A    He and I opened the TV and removed it.  Never thought it

9   was something that Guyanese had that capability of.

10  Q    On the February 11, 2008, did you tell the United States

11  agents that it was you who took the bomb -- took off the back

12  of the TV, and you, yourself, figured out - and you are from

13  Guyana - you, yourself, figured out how to defuse the bomb;

14  did you tell that to the United States agents?

15  A    I don't remember that, sir.

16  Q    If you told it to the agents, would it have been a false

17  story?

18  A    Sir, I don't think -- I said I don't remember telling

19  them that.

20  Q    You don't remember telling them that?

21       May we have SV-10, page 6.

22       Actually, you can start at the end of page 5, the last

23  sentence, or actually the last two sentences on 5, going up

24  to the paragraph on the next page.  It is a long paragraph,

25  but I would ask, respectfully, that you read it to yourself.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

S. Vaughn - Cross/Shargel

1      (Pause)

2

3   Q     Let me know when you are finished reading it.

4   A     I'm finished.

5   Q     Does that, sir, refresh your recollection that you

6   portrayed yourself to the agents as a person who opened the

7   back of the TV, recognized the wires of a bomb, took out the

8   two wires attached to a device, and removed the bomb

9   components from the TV and kept the TV for yourself; do you

10  remember telling the agents that?

11  A     No, sir, I don't.  It is my view that the agents might

12  have made a mistake when they were preparing this report.

13  Q     Your view is that the federal agents made a mistake?

14  A     Probably sir, because there was a time when the agents

15  and I had problems communicating because of the way I would

16  speak.

17  Q     So, because of the way you would speak -- by the way,

18  were there subsequent conversations about the same topic?

19  A     There might have been.

20  Q     And, by the way, having read these paragraphs in this

21  report, does that refresh your recollection that you didn't

22  say a word about a friend or Mr. Lucky?

23  A     Sir, as I said, I don't remember.

24  Q     Is it your testimony, sir, that -- by the way, the

25  agents who came to see you, were any of the agents from the

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

538

S. Vaughn - Cross/Shargel

1    Caribbean or the West Indies?

2            MR. D'ALESSANDRO:  Objection, your Honor.

3    A    I don't know, sir.

4            THE COURT:  Overruled.

5    BY MR. SHARGEL:

6    Q    Well, did you recognize an accent on the part of any of

7    the American agents who came to see you?

8    A    No, sir, I didn't.

9    Q    These were DEA agents, weren't they?

10   A    Yes, sir.

11           MR. D'ALESSANDRO:  Judge, can we approach?

12           THE COURT:  Yes.

13

14

15

16

17

18

19

20

21

22

23

24

25

539

                    S. Vaughn - Cross/Shargel

1          (Side bar)

2

3          THE COURT:  Yes.

4          MR. D'ALESSANDRO:  Two problems.  One, the witness

5   never testified that the agent interviewed him in person.  In

6   fact, the ROI specifically says at the beginning he was

7   interviewed telephonically.

8          MR. SHARGEL:  That's why I went back.

9          MR. D'ALESSANDRO:  You said it twice, when the agent

10  were there.

11         MR. SHARGEL:  He never saw an agent in two years.

12         MR. D'ALESSANDRO:  It seems to me you are talking

13  straight about the report, about the creation of the report.

14  If you are talking about a different topic, I didn't catch

15  it.

16         MR. SHARGEL:  Even if it is on the telephone, he

17  would recognize a West Indian accent.

18         THE COURT:  You can ask whether, since he said he

19  had a communication problem, you can go down this road.  But

20  I'm not going to let you litigate the accuracy of the

21  reports.  I mean, he's straight now.  The question was

22  whether that report refreshed his recollection.  You got him

23  to go into a difficult area, which is whether they do reports

24  properly.  I will not try that case.

25         MR. SHARGEL:  I understand, although I would be

540

S. Vaughn - Cross/Shargel

1    entitled under 613 to have the agent.

2            THE COURT:  The agent is not here right now.  He's

3    here right now.  I'm not suggesting that you don't have some

4    recourse later on, prior inconsistent statement, but once you

5    elicit his statement and confront him with the prior one, you

6    are done.  Let's not be going into whether these reports are

7    accurate.

8            MR. SHARGEL:  Got it.

9            (Side bar ends)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

541

S. Vaughn - Cross/Shargel

1   BY MR. SHARGEL:

2   Q    So the bottom line is, reading this report, your

3   recollection is not refreshed anyway?

4   A    No, sir.

5   Q    All right.

6        So the next issue -- and, by the way, when you met Mr.

7   Simels, did you tell him about the time that Khan asked you

8   to put a bomb in a TV set and bring it to Buxton?

9   A    No sir, that is not something I think I would have

10  wanted to tell about Mr. Khan.

11  Q    Then there came a time when the plan was changed and a

12  bomb was supposed to be put into a CD player, right?

13  A    Yes.

14  Q    Like a console CD player or portable CD player?

15  A    One that you have in your house.

16  Q    Like a boom box or something?

17  A    Right.

18  Q    There was in fact a bomb placed in the CD?

19  A    I think so.  I was told by a friend there was a bomb

20  inside.

21  Q    You were supposed to deliver it to Buxton?

22  A    Yes, sir.

23  Q    Once again, you didn't deliver it to Buxton because of

24  the harm it may cause?

25  A    I was told that by the leader of the Buxton gang I had

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

S. Vaughn - Cross/Shargel

1   to take it to another location because there were a few

2   villages away from.

3   Q    You didn't want to do that, right?

4   A    I took it there.

5   Q    You took it there?

6   A    Yes, sir.

7   Q    Did there come a time when you were asked to place a

8   bomb in your car?

9   A    Yes, sir.

10  Q    And when was that?

11  A    Sometime in 2005.

12  Q    Was it the same bomb that had been in the CD player?

13  A    No, sir.

14  Q    This is a different bomb?

15  A    Yes, sir.

16  Q    And there was a bomb placed in your car?

17  A    Flow.

18  Q    You refused to have a bomb placed in your car?

19  A    Yes, sir.

20  Q    Did you ever tell Mr. Simels - and this calls for a yes

21  or no - did you ever tell Mr. Simels about the bomb in the CD

22  player, yes or no?

23  A    No, sir.

24  Q    Did you ever tell Mr. Simels about a plan to put a bomb

25  in your car and bring it into Buxton, yes or no?

543

S. Vaughn - Cross/Shargel

1   A    No, sir, I haven't.

2        (Continued on the next page.)

FREDERICK R. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

544

1   BY MR. SHARGEL:

2   Q      Now you told us also about your participation in your

3   presence at a kidnapping.   Do you remember that?   The torture

4   of a woman?

5   A      Yes, sir.

6   Q      When did that happen?

7   A      In February 2006.

8   Q      Remember the date?

9   A      I think it was the 22.

10  Q      The 22nd of February 2006?

11  A      Yes, sir.

12  Q      And we're not going into any details.   This is in

13  connection with a young girl at that time who was kidnaped

14  from school?

15  A      A child that was kidnaped.

16  Q      That was Dean Belfield's, daughter?

17  A      Sean Belfield.

18  Q      Sean Belfield's daughter?

19  A      Yes, sir.

20  Q      Did you play any part in the actual abduction of the

21  woman?

22  A      No, sir, I didn't.

23  Q      But you were present in the place to which she had been

24  brought, right?

25  A      Yes, I was present looking on while she was being

1    interrogated.

2    Q    Interrogated-- she was being tortured?

3    A    Yes, sir.

4    Q    I think, you said in your direct testimony it started at

5    7:30 in the evening and didn't end until like early morning

6    hours, right?

7    A    Yes, sir.

8    Q    Did this take place in a small room or large room?

9    A    It's a small room.

10   Q    You are looking around the courtroom, you are not

11   suggesting anywhere near the size of the courtroom?

12   A    No.

13   Q    How many men were present?

14   A    There were lots of guys there.

15   Q    How many, please?

16   A    I don't have an exact number.  Quite a lot.

17   Q    Could you give the jury an idea how many men?

18   A    I would say in excess of 20.

19   Q    And of the 20 men that were there you came forward at

20   the time and you said no more torture, I believe what she's

21   saying?

22   A    I never said no more torture.

23   Q    What did you say?

24   A    That she had no knowledge of the kidnapping.

25   Q    You were responsible for taking her home, or taking her

1   away?

2   A     Eventually, sir.

3   Q     You were at this place with her until five clocks in the

4   morning?

5   A     Yes.

6   Q     It's your testimony by your oath in front of this jury

7   that you, sir, never participated in any of the torture?

8   A     I have never said I never participated.  I said I was

9   present, I was looking on.

10  Q     Other than being an onlooker-- this is the last question

11  on the subject, I don't want details.

12        In those hours between 7:30 p.m., that day in effect,

13  between 7:30 p.m. until the early morning when it ended, as

14  you described it the other day, did you, sir, participate in

15  the torture of this unidentified, as you say, woman?

16  A     I was there to save her life.

17  Q     You were there -- you were a member of Roger Khan's gang

18  at this point?

19  A     Yes, sir.

20  Q     Vicious people as you say?

21  A     Well, those guys are vicious people.

22  Q     And you were there merely to save her life?

23  A     Yes, sir, because I believe they was telling the truth.

24  Q     Did you ever-- this calls for a yes or no-- did you ever

25  tell Roger Simels about the torture of a woman?

1   A    No, sir.

2   Q    Now, you told us also about murder that you participated

3   in, right, actually two, but the one was Donald Allison,

4   right?

5   A    Yes, sir.

6   Q    And Donald Allison was, he owned a gym, right?

7   A    Yes, sir.

8   Q    An exercise facility, right?

9   A    A boxing gym.

10  Q    A boxing gym as you said the other day.  At this boxing

11  gym that you were at on a particular day, do you remember

12  when it was?

13  A    No, sir, I don't remember the exact date.

14  Q    Do you remember the month or year?

15  A    I have believe October 2005.

16  Q    In October of October of 2005, you were waiting outside

17  the boxing goes gym, correct?

18  A    I was not waiting outside the boxing gym.

19  Q    Where were you?

20  A    I was in Georgetown, I received a telephone call from

21  Roger asking me to drive by, drive past the boxing gym.

22  Q    When you drove by the boxing gym you knew what your

23  purpose was, right?

24  A    Sir, he asked me to drive by and see if Allison was

25  there.

1   Q    You knew why he asked?

2   A    I didn't know, no.

3   Q    It's your testimony, sir, that you-- withdrawn.

4        You get to the boxing gym and there comes a time when

5   you see Donald Allison, right?

6   A    Yes, sir.

7   Q    You see Donald Allison and there is a telephone call,

8   correct?

9   A    Yes, sir.

10  Q    You receive that call or made that call?

11  A    I made the call, that is what I was told to do.

12  Q    You were told to do it and you did it.  You said Donald

13  Allison just came out of his gym, in words or substance?

14  A    I was told to drive by and see if he was there and

15  indicated to Roger whether or not he was there. That's what I

16  did.

17  Q    Did you see inside the gym at first or outside?

18  A    He was standing outside.

19  Q    You got on the phone, followed instructions, and told

20  the boss, Roger Khan, that you were, you saw him, right?

21  A    Yes, sir.

22  Q    Did you start to get an idea what might happen next?

23  A    Not at that time, sir.

24  Q    No.  You were asked what kind of clothes he was wearing?

25  A    Yes, sir.

1    Q    You identified the articles of clothes that he was

2    wearing for Roger Khan on the telephone?

3    A    Yes, sir, I did that.

4    Q    And you had no idea what was going to happen next?

5    A    No, sir.

6    Q    But there came a time, a short time, matter of seconds,

7    of minutes that he was murder, right?

8    A    Yes, sir, he was.

9    Q    A car came by, right?

10   A    Yes, sir.

11   Q    And you recognized the people, right?

12   A    Yes, sir.

13   Q    And you recognized them to be part of that gang as you

14   describe it, right?

15   A    Yes, sir.

16   Q    And they opened fire and they killed Donald Allison,

17   right?

18   A    Yes, sir.

19   Q    And you didn't know it was going to happen until it

20   happened?

21   A    I didn't no, not everything Roger can tell.

22   Q    What?

23   A    I said Roger don't tell you everything.

24   Q    Roger Khan doesn't tell you everything.  Were you one of

25   the closest people to Roger Khan in the late 2005 and into

1    2006 before he was arrested?

2    A    I wouldn't say closest, we were close, but I wouldn't

3    say closest.

4    Q    Was that before or after the murder of Ronald Waddell?

5    A    He was killed in 2006, sir.

6    Q    That was the next year, right?

7    A    Yes, sir.

8    Q    By the way, you got some kind of reward for identifying

9    Donald Allison, didn't you?

10   A    I don't remember that, sir.

11   Q    You don't remember that?

12   A    No.

13   Q    You don't remember getting a kilogram of cocaine after

14   Allison's death?

15   A    I never got a kilogram of cocaine, sir.

16   Q    If I may finish the question, sir?

17        You don't remember getting a kilogram of cocaine after

18   Allison's death that Banks gave you half the profit of the

19   sale of that kilogram, you don't remember that?

20   A    I remember Roger giving Banks one kilogram of cocaine to

21   ask him to sell it and give me half the proceeds. He never

22   said it is was reward for anything.

23   Q    Let's go to SV-22, page two, this paragraph right there.

24   Do you see this paragraph I put a green, not so neat, a green

25   mark on it?

1          THE COURT:  Beginning with "after".

2          MR. SHARGEL:  "After".

3          THE COURT:  Those three lines, but one word.

4          MR. SHARGEL:  Yes.

5          THE COURT:  Read that to yourself, please, and let

6     us know when you are finished.

7     Q    After reading that, does that refresh your

8     recollection -- I'm not asking whether you were handed a

9     kilogram of cocaine --

10         MR. D'ALESSANDRO:  Objection?

11         THE COURT:  Sustained.

12    Q    Well, in connection with the Waddell murder can you tell

13    us what you did there?

14    A    I was asked to go around where he was living and to

15    report his activities.

16    Q    Yes.

17         Similar to what happened with Donald Allison?

18    A    No, sir.

19    Q    Who did the call come from about this situation?

20    A    I was told that by Khan and in this instance he asked me

21    to go around where he was living.

22    Q    And then what?

23    A    And to report his activity.  I should say movement.

24    Q    Then what happened?

25    A    Sometime later, some guys came and shot him.

1    Q    How much later?

2    A    Two or three hours after.

3    Q    Were you in the vicinity?

4    A    Yes, I was.

5    Q    Did you actually see it happen?

6         You told us that you saw it happen?

7    A    Yes.

8    Q    You saw who opened fire on him?

9    A    Yes.

10   Q    He died in your presence, right?

11   A    I wouldn't be able to say that, sir.

12   Q    When you were asked to trace the movements of Ronald

13   Waddell, did you think it had something to do him getting

14   murder?

15   A    No, sir.

16   Q    You thought just wanted to trace his movement?

17   A    No, sir, I think they probably beat him up a little bit.

18   Q    You were surprised-- this followed Allison's death-- you

19   were surprised that he was shot, correct?

20   A    Yes, sir.

21   Q    Did you ever -- this is a yes or no-- did you ever tell

22   this to Roger Simels, the information about the murder of

23   Waddell?

24   A    No, sir.

25   Q    You told us the another day about a conversation you

1  say had with Roger Khan about the death of David Persaud,

2  right

3  A    I never said, sir.

4  Q    You never had any discussion with Roger Khan about it?

5  A    No, I never said that.

6  Q    Did you have any discussion with anyone in Guayana or

7  anywhere else about the murder of David Persaud?

8  A    Yes, sir.

9  Q    Who was that?

10  A    That was the guy called "Ninety", I believe, was

11  Sanmoougan.

12  Q    He had discussions with you about the murder?

13  A    Yes.

14  Q    What was the discussion, remind us?

15  A    Just that he did the job.

16  Q    And who did he do the job for?

17  A    For Roger Khan.

18  Q    So you knew, at least so far as his admissions was

19  correct, you had information about the murder, right?

20  A    Yes, sir.

21  Q    And here is the yes or no question:  Did you ever tell

22  what you knew about the Persaud murder to Roger Simels?

23  A    No, sir.

24  Q    Now, in this situation, after it was over -- let me just

25  take a moment to check the material or double check it -- in

554

1  connection with the murder of Ronald Waddell, did you receive

2  a kilogram of cocaine as a reward for your participation as

3  you described it in that murder?

4  A    For which murder you say, sir?

5  Q    Ronald Waddell?

6  A    No, I received nothing for that.

7  Q    Nothing for that?

8  A    No, sir.

9  Q    I ask you to look at if you would SV-2, page four and I

10 ask you to go to the second full paragraph, the third

11 paragraph on the page, but it's the second full paragraph,

12 and I ask --

13         THE COURT:  Do you see that green spot on the

14 screen.  If you touch the lower right --

15         MR. SHARGEL:  Yes.  This is the portion that I would

16 like the witness to read.

17 Q    You read that, right?

18 A    Yes, sir.

19 Q    Having read that, does that refresh your recollection

20 that you told federal agents that -- I will put the date on

21 the record --

22         MR. D'ALESSANDRO:  Objection, to the question, your

23 Honor?

24         THE COURT:  Because there was no failure of

25 recollection?

HENRY SHAPIRO     OFFICIAL COURT REPORTER

1          MR. D'ALESSANDRO:  May I approach?

2          THE COURT:  No.  Rephrase it.

3    Q    Having look at that, I will put the question to you

4    again, sir, did you tell federal agents -- I will put it a

5    different way.

6          Did you receive as a profit, as a reward

7    for your help in locating Ronald Waddell, who was

8    murdered, did you receive one kilogram of cocaine as a

9    reward

10   A    No, sir.

11   Q    Do you remember telling federal agents that you received

12   one kilogram of cocaine as a reward.

13         Do you remember that?

14   A    I don't remember that.

15   Q    You don't remember that?

16   A    No.

17   Q    Having looked at the paragraph that I just put before

18   you, sir, does that refresh your recollection?

19   A    No, sir.

20         THE COURT:  He just said it.

21         MR. SHARGEL:  I said having looked at it.

22         THE COURT:  Pose it again.

23   Q    Having looked at it, does that refresh your recollection

24   that you told federal agents that you received a kilogram of

25   cocaine as a reward?

1    A    No, sir, it doesn't.

2    Q    Sir, have you ever in your life trafficked in cocaine?

3    A    No, sir.

4    Q    Never?

5    A    No, sir.

6    Q    I want to switch to a different topic.  I ask you these

7    questions:

8        In April of 2008, before you met Mr. Simels, you had

9    conversations that were with other people in Guayana,

10   concerning contact with Mr. Simels, right?

11   A    Yes, sir.

12   Q    And you recall that these were put in evidence and

13   played for the jury.  There were eight conversations, were

14   there not?

15   A    At least, sir.

16   Q    And the evidence itself, the conversation with --

17   appeared on a CD or DVD, a disc, right?

18   A    Yes, sir.

19       MR. SHARGEL:  May I have that exhibit number.

20       Government Exhibit 400 was the disk.  Do you remember

21   looking at it on the screen and you identified your initials

22   or your writing on the disk.

23       Do you remember that.

24   A    Yes, sir.

25   Q    Those were recordings that you made yourself, right?

HENRY SHAPIRO        OFFICIAL COURT REPORTER

1   A    Yes, sir.

2   Q    There was no agent like Agent Mazzella or anyone else

3   with you at the time that you made the recording, right?

4   A    No, sir.

5   Q    They were made here in the United States by you?

6   A    Yes, sir.

7   Q    They were telephone call in each instance to Guayana,

8   right?

9   A    Yes, sir.

10  Q    No one from Guayana.  You don't have a recording of

11  anyone from Guayana calling you, right?

12  A    I don't remember if I have, sir.

13  Q    When did you turn these recordings over to the

14  authorities?

15  A    When I reported to them when I heard Mr. Simels wanted

16  to see me.

17  Q    When did you give this to them?

18  A    Sometime in April.

19  Q    Of 2008?

20  A    Yes.

21  Q    They asked you whether you had those recordings?

22  A    I told them what I had.

23  Q    You brought the recordings to the prosecutors, right?

24  A    Yes, sir, to the investigator.

25  Q    The investigators.

1      Did you leave anything behind?

2  A    I don't understand.

3  Q    Were there recordings that were made that you didn't

4  bring to the prosecutors?

5  A    I took all that I had recorded.

6  Q    All that you recorded were, as I said before, calls that

7  you made to Guayana, right?

8  A    I believe so, sir.

9  Q    Let me draw your attention to the conversation -- these

10  have no dates on them, correct?

11  A    I believe so.

12  Q    You didn't take any notes of the date on which they were

13  recorded?

14  A    Actually, I had notes made and misplaced when I was

15  moving from one apartment.

16  Q    You had the notes but you have them no longer?

17  A    I don't have them no longer.

18  Q    You were not able to turn them over the authorities, the

19  invest gay attorneys?

20  A    Yes, sir.

21  Q    These conversations have no date, right?

22  A    No, sir, they haven't.

23  Q    No dates.

24      I would ask that we put on the screen already in

25  evidence 400-T-3, the one Judge with the original English

1    translation.

2         This is page two. We want page three.  This pagination

3    is off. I will respectfully ask the jury use the book, your

4    Honor, on some of these, because they were given to us

5    electronically, the pages don't match?

6              THE COURT:  Okay.

7              MR. SHARGEL:  If we turn, if I may say that, Judge,

8    to 400T-3, I will start on page two, line six.  We're not

9    playing them.

10             THE COURT:  If it's going to be lengthy may be you

11   could have your assistant put it on the screen next to you.

12             MR. SHARGEL:  The problem, I have marks.

13             THE COURT:  Not yours, but what the jurors are

14   looking at, so the people in the back can observe.

15             MR. SHARGEL:  This is going to happen with a few

16   conversations.

17             THE COURT:  You are fighting this I can tell.  You

18   are fighting the 21st century approach here.  But I will let

19   you get away with it at this time.

20             Go ahead.

21             MR. SHARGEL:  You are killing me. I had notice of a

22   Medicare card.

23             THE COURT:  I'm trying to help all of these people

24   in the back.  You can blame him.

25   BY MR. SHARGEL:

1    Q    I'm on page two and you say line six that nobody has

2    called nothing, those down there didn't call me, the man up

3    here is not calling me.

4         Just for context you identified the man up here as Mr.

5    Simels?

6    A    Yes, sir.

7    Q    You are saying to -- you are having this conversation

8    with Banks, the nickname Banks, Conrad Sanmougan,

9    right

10   A    Yes, sir.

11   Q    And you are telling him that Mr. Simels hasn't called,

12   right?

13   A    Yes, sir.

14   Q    Then you go on and you say on line ten:  I went to

15   Martin. Is that St. Martin?

16   A    Yes, sir.

17   Q    Down in Guayana, the Caribbean, St. Martin is Martin?

18   A    Yes, sir.

19   Q    We're not talking about an individual, but we're talking

20   about St. Martin, correct?

21   A    Yes, sir.

22   Q    The country?

23   A    Yes, sir.

24   Q    Then you go on to say at line 12: Matter of fact, I only

25   almost got deported to Guayana's skunkt.  That is a vulgar

1  term?

2  A    Yes, sir.

3  Q    Now, why were you using language like that?

4  A    Because that's the way these guys and I speak.

5  Q    Okay.

6       You say, the man had to pay money so that I would not

7  get deport to Guayana, right. Then you go on the next page,

8  page three, and you say or Mr. Banks asks, called Banks, you

9  were arrested and you say, yes, this is a completely false

10 story, right?

11 A    Which line?

12 Q    On line 18.

13      You didn't get arrested, did you?

14 A    No, sir.

15 Q    This was a made up story?

16 A    Yes, sir.

17 Q    You made it up for a reason, right?

18 A    Yes, sir.

19 Q    You made it up to keep the conversation going, right?

20 A    Sir, the impression that the guys in Guayana I was

21 working for a drug dealer in New York.

22 Q    I think, you said on your direct testimony you made up

23 this story so that you could keep the conversation going, do

24 you remember saying that?

25 A    Yes, I might have.

1    Q    And you wanted to keep it going because you warranted to

2    find out, your words, what was going on down there, right?

3    A    Yes, sir.

4    Q    So you make up this story again just to get the other

5    person to talk, right?

6    A    Sir, all I was doing was forming conversation.

7    Q    Just forming conversation. You controlled who and when

8    to -- who to record and when to record the conversation,

9    right?

10   A    I don't think I understand the question.

11   Q    You decided when you use a recorder in connection with

12   your conversation in April of 2008, right?

13   A    Sir, I use it whenever it was convenient for me to do

14   so.

15   Q    You made the determination as to whether it was

16   convenient.  It was your decision, right?

17   A    Yes, sir.

18   Q    The tape that is 400T-4 -- I don't need on the screen --

19   if we look at it, it starts in the middle of the

20   conversation, correct, page one.  You see that on page one,

21   here the number are you ready?

22   A    Yes, sir.

23   Q    And that's the English translation and that's because as

24   you told us you messed up with the pause button?

25   A    Yes, sir.

563

1    Q    We have your word it wasn't done deliberately or

2    intentionally?

3    A    Sir, because it wasn't done deliberately.

4    Q    So on May 13, 2008, you go to the first time -- now

5    we'll be able to use the screen, your Honor.  High tech way?

6         THE COURT:  Good, we like high tech.

7         MR. SHARGEL:  Okay.

8    Q    May 13, 2008, is the first time you meet Mr. Simels,

9    right?

10   A    Yes, sir.

11   Q    You never met him before in your life, right?

12   A    No, sir, I never.

13   Q    You never had any correspondence, e-mail, memo, nothing,

14   correct?

15   A    I spoke to him before in 2007.

16   Q    2007 you called him on the telephone?

17   A    Yes, sir.

18   Q    Based on information that you received, from the lawyer

19   down there, you were asked to call him by one of the agents,

20   right?

21   A    Yes, sir.

22   Q    And that call was recorded, correct?

23   A    I believe so.

24   Q    This took place in March of 2007, right?

25   A    Yes, sir.

1    Q    You asked him if you could get to see his client, if you

2    could go visit his client, Roger Khan, correct?

3    A    Yes, sir.

4    Q    And he said what as far as you recall?

5    A    It wasn't possible at that time, since he was in

6    isolation.

7    Q    That was the end of the call?

8    A    He told me he was preparing to travel to Guayana.

9    Q    Do you know who the agent was who was with you?

10   A    Sandra Jackson was with me.

11   Q    That's the same woman you said that took you out

12   yesterday?

13   A    Yes, sir.

14   Q    She's here in the courthouse?

15   A    I don't know, sir.

16   Q    Did you ever have the tape of that conversation played

17   for you?

18   A    I don't remember, sir.

19   Q    In preparation for this case, did they ever play that

20   tape?

21   A    I don't remember, if they did, sir.

22   Q    In the ensuing months, between March 2007 and May of

23   2008, more than a year later, did you have any contact

24   whatever with Mr. Simels, other than on March 3 arranging by

25   telephone call to meet him?

1    A    I don't remember if I had any contact with him before

2    may 13 when I met him.

3    Q    You just don't remember?

4    A    Yes, sir.

5    Q    Do you remember we saw a picture of an office building,

6    nice tall office building on 90th in Manhattan and the

7    entrance to the office building?  Do you remember going there

8    at any time between March 2007 and May 13, 2008?

9    A    Sir, I never been there prior May 13, 2008.

10   Q    Any recollection meeting Mr. Simels anywhere in any

11   office prior to two thousand eight?

12   A    No.  I haven't met him anywhere prior to May 2008.

13   Q    Let's look at transcript 401T-3, page six.

14        Mr. Simels, this early in the conversation, is talking

15   to you about Roger Khan and what he learned about the events

16   in Guayana, correct?  Is that a fair statement?

17   A    Which line?

18   Q    On page six.  To set the context this is the first

19   meeting and your discussing events in Guayana, right?

20   A    Sir, could I have a moment to read?

21   Q    Of course, you can.

22        You can read before that, we get to the paragraph that

23   starts at line 21.

24        (Pause.)

25

1   Q    Do you have that?

2        Again, the context is that you are discussing events in

3   Guayana and the reputation of Khan?

4   A    You are giving me an inside to what is going on.

5   Q    Say again?

6   A    I understand this to mean he was giving me what was

7   going on at Roger's trial.

8   Q    With Roger Khan's trial and what Roger Khan had been

9   telling him, correct?

10  A    To an extent, yes, sir.

11  Q    So this paragraph that I highlighted, it says

12  essentially, we think that Roger was brought here for all the

13  wrong reasons, but the prosecutors were building a case that

14  was based upon a few people and very little evidence.

15       Do you see that?  Did you ever say to him anywhere in

16  connection with this issue, that -- did you ever correct him

17  and say, what are you talking about the wrong reasons?  Did

18  you ever say anything like that, yes or no?

19  A    No, sir.

20  Q    Than he goes onto to say one of the people they were

21  seeking to build a case on is a woman named Alica Jagnarian,

22  she was the girlfriend of a fellow named David Persaud.

23       Do you see that?

24  A    Yes, sir.

25  Q    Do you ever tell Mr. Simels anything about the

1  circumstances of David Persaud's death or who was responsible

2  for it?

3  A    No, sir.

4  Q    Let's go on to page eight. This has already been played

5  to the jury. We needn't repeat it. Down at the bottom of

6  page -- actually the bottom of page seven first there Mr.

7  Simels is talking about the evidence in the case and then

8  going back -- going onto the top of the next page, the

9  attribution continues to the top of page eight. Mr. Simels

10  says the last three lines, because we say that this is the

11  same time that you say that Roger was sending these drugs, he

12  was in the midst of helping the FBI and the State Department

13  agents with respect to Desniak and with respect to -- you say

14  that was the kidnapping-- and Mr. Simels goes on to say,

15  right, and the other events.

16       So either you are saying he is sitting down at the

17  Pegasus meeting with the FBI agents and the State Department

18  people and as he would walk out he would then say, let me

19  send a shipment of drugs to New York because I'm a devious

20  guy.

21       Do you see that

22  A    Yes, sir.

23  Q    You weren't asked any questions on direct examination

24  about this, were you, sir?

25  A    I don't remember if I was, sir.

1    Q    Since you say that was the kidnapping in the middle,

2    would you explain what kidnapping is being referred to?

3    A    I was asking a question there, if that was the

4    kidnapping, because he mentioned Desniak's name.

5    Q    Did you know who Desniak was?

6    A    Not personally, sir.

7    Q    I'm not asking you about personally, do you have any

8    knowledge of what he was talking about?  What did you

9    understand him to be saying?

10   A    The kidnapping of the U.S. diplomat.

11   Q    Mr. Desniak was a U.S. diplomate that was kidnaped in

12   Guayana?

13   A    According to the newspapers reports that I read.

14   Q    According to the newspaper report, because I'm asking

15   about what you understood Mr. Simels to mean.  That's the

16   question.  Did you understand him to mean that Mr. Khan was

17   helping the United States government retrieve, or get

18   Mr. Desniak back from the kidnappers?

19   A    Yes, sir.

20   Q    And did you understand that someone who was in the know

21   do you know in Guayana -- by the way -- if you know, did you

22   understand who Mr. Simels was saying kidnaped him, the U.S.

23   diplomat?

24   A    I don't think he say anything from what I'm reading

25   here, sir.

1    Q      Understanding the situation as you do, did you

2    understand who was claimed that kidnapped him?

3    A      I think he was inferring the Buxton gang did it.

4    Q      The Buxton gang?

5    A      Yes, sir.

6    Q      Did you have any direct or personal knowledge that Roger

7    Khan was speaking to the FBI during this period of time and

8    the State Department agent in an effort to find and bring

9    back Mr. Desniak?

10   A      No, sir, I haven't personal knowledge of that.

11   Q      Did you understand what Mr. Simels was saying to you at

12   this point?

13   A      Sir, all he was saying, according to what Roger told him

14   he participated.

15   Q      And in the next attribution, when Mr. Simels says, right

16   and the other events, so either you are saying he's sitting

17   do at the you know Pegasus meeting with the FBI agents and

18   with the State Department-- I think I had read this already--

19   and as he would walk out, and he would then-- I'm

20   paraphrasing, go out and sell drugs or ship drugs to New

21   York.

22          Do you see that?

23   A      Yes, sir.  I saw that.

24   Q      Did you ever correct him and say-- this is a yes or no--

25   did you ever correct him and say, Bob, we're here in your

1   office, in words, you know, Bob we're here in your office,

2   this isn't true?

3       Did you ever say anything like that?

4   A    No, I never did.

5   Q    Going onto line 28:  Because we were supposed to go to

6   trial in April they came up with a whole new theory of the

7   case, the new theory of the case, everything about Roger's

8   phantom gang as they put it should be in evidence because

9   they want to prove while he started out as a patriot that he

10  then used that phantom force to help him in the drug

11  business, and that he would murder his drug rivals. One of

12  the people they claim I murdered is David Persuad at the Palm

13  Court and one of the people that they claim he murdered was

14  George Allison and you correct him and you say, Donald

15  Allison got murdered, right?

16  A    Yes, sir.

17  Q    Going to the next page.  Look at his attribution that is

18  started on the page before.  Mr. Simels raises the subject of

19  David Clarke, right?  Do you see that?

20  A    I would like to read it first.

21  Q    Yes, please.

22      MR. SHARGEL:  I will do it this away, rather than

23  reading a long paragraph, everyone has it.

24          THE COURT:  Yes, this is better.

25  A    Yes, sir, he was talking about David Clarke.

1    Q    And the political divide between the Buxton people and

2    as you described yesterday the various political parties, the

3    two political parties, competitors in Guayana, right?

4    A    Yes, sir.

5    Q    And you say at the end of this as he was describing, you

6    say true, true, right?

7    A    Yes, sir.

8    Q    Was this true, what Mr. Simels was saying?

9    A    No.  My truth was merely something that I would see

10   regularly when talking to people, let them know I'm listening

11   to them.

12   Q    We shouldn't even count on the truth, it doesn't mean

13   it's accurate.  That is your statement?

14   A    Yes.

15   Q    Instead of using your tick or whatever, that it's not

16   true?

17   A    Sir, I don't remember if I ever say.

18   Q    Sorry?

19   A    I don't recollect I ever say that to him.

20   Q    But you do say further down the page at line 25, but how

21   important really, is David Clarke to this case. Do you see

22   that?

23   A    Yes, sir, I did ask that question.

24   Q    And then you say, in your next attribution, after Mr.

25   Simels says, he's everything to the case now, there is

1  nothing which can be done about their gay or something.  Do

2  you see that?

3  A    Yes, sir.

4  Q    What were you intending to insinuate, Mr. Vaughn?

5  A    Sir, I wasn't real insinuating nothing, I was asking a

6  question.

7  Q    What was the meaning behind the question?

8  A    Sir, I was merely trying to find out anything can be

9  done to him.

10  Q    What kind of done did you have in mind?

11  A    Whatever.

12  Q    What does "whatever" mean?

13  A    Just that, sir.

14  Q    Well, whatever it takes, sir?

15  A    Sir, my understanding that I went to Mr. Simels is that

16  Clarke possess -- most says a serious treat to his client's

17  case.

18  Q    You understood that Clarke presented a serious threat to

19  his client's case?

20  A    That was my understanding.

21  Q    He told you that Clarke was presently a witness for the

22  government?

23  A    Yes.

24  Q    He told you in the conversation and later conversation

25  that he believed that Clarke was a liar, correct.  Yes or no?

1   A    He's been saying that, yes.

2   Q    He said that repeatedly he believed that Clarke was a

3   liar, right?

4   A    Yes.

5   Q    Yes or no?

6   A    Yes, sir.

7   Q    He told you that Roger Khan told him that Clarke was a

8   liar, yes or no?

9   A    Yes, sir, he told me that.

10  Q    He told you that more than once?

11  A    Yes, he was trying to get me to interfere with Clarke

12  while he was telling me that.

13       THE COURT:  Don't do that.  Don't add additional

14  information.

15       Just listen not question and answer the question.

16  The prosecutors will have a chance to examine up again on

17  redirect.  All right.

18  A    Yes, sir.

19  Q    Mr. Vaughn, several times during your direct testimony,

20  perhaps dozens of times during your direct testimony, you

21  would, when the tape was stopped you were asked questions

22  about what was meant, right?

23  A    Yes, sir.

24  Q    And you testified a number of times that what Mr. Simels

25  meant was that witnesses should be taken care of in some

1    nasty or corrupt fashion, right?

2    A    Sir, I was merely giving my understanding.

3    Q    You were giving your understanding.

4         Now, I'm asking for your intention.  It's a different

5    side of the question.

6         I'm asking for what you had in mind.  This is the

7    question:  When you said there is nothing should be done

8    about this guy or something, weren't you trying to insinuate

9    in the conversation that may be something could be done that

10   is underhanded?  Weren't you trying to do that, sir?

11   A    Sir, I didn't --

12   Q    Can you answer that, yes or no?

13   A    Sir, I merely going back to what you are driving at.

14   Q    I'm asking --

15   A    Sir, you are asking me something but I'm not seeing

16   here.

17   Q    You said on line twenty-nine:  There is nothing which

18   can be done about this guy or something. My question to you,

19   sir, is were you not in fact attempting to insinuate the idea

20   of doing something wrong, yes or no?

21   A    Yes, sir.  If Mr. Simels need to have anything done.

22   Q    And you knew that during this conversation from this

23   first conversation on May 3, 2008, that Mr. Simels was

24   describing a political, cultural divide between David Clarke

25   and Roger Khan, correct?

1  A    Sir, that is what he started to tell me on my first

2  meeting.

3  Q    He told you that in subsequent meetings, did he not?

4  A    Yes.

5  Q    We'll get to details at a later time.  The view was that

6  Mr. Clarke and Mr. Khan were on different sides of politics

7  and culture in Guayana, correct?

8  A    That's what Mr. Simels told me he believed.

9  Q    Did you ever correct him?

10 A    Pardon me?, sir.

11 Q    Did you ever correct him and say, you got it wrong, yes

12 or no -- yes or no, did you ever correct him?

13 A    No, sir, I never did.

14 Q    Was it true, was there anything to correct -- to be

15 more-- more specific. Was it true that Clarke was part of

16 the Buxton gang and Roger Khan was supporting the

17 government

18 A    Sir, I don't know if Clarke was part of the Buxton gang.

19 Q    You don't know that?

20 A    No, sir, I don't.

21 Q    When you were discussing with Mr. Simels in this

22 conversation on May 13, 2008, and later, you thought that Mr.

23 Simels had it wrong, was that your belief, yes or no?

24 A    Sir, that is my belief. I had no personal knowledge of

25 Clark's involvement with the Buxton gang.

1    Q    You never told him that Clarke was not part of the

2    Buxton gang, did you, yes or no?

3    A    No, sir, I didn't.

4    Q    Now, the next page, page ten, the attribution at line

5    20.  This is early in the conversation, page ten of the

6    conversation that went on for we will over an hour.  This is

7    shorter. Mr. Simels says to you:  It would be helpful if you

8    can, can sort of tell me about what you know about him. Who

9    is him?

10   A    I presume it was Roger he's talking about.

11   Q    How you came to meet David Clarke or what you came to

12   know about Roger, how did you meet Roger, can you give me --

13   your version, Roger's version, which is sometimes a little,

14   and it doesn't say anything after that, right?

15   A    No, sir, it doesn't.

16   Q    Does he ever say to you, you know, for the record I know

17   you are wearing a tape so give me your version of what

18   occurred, wink wink, anything like that?

19   A    No.

20   Q    In other words, you understood him to mean, did you not,

21   that he wanted your true version of the facts?

22   A    Sorry, my understanding asking me what I know about

23   Roger Khan and how I came to meet David Clarke and that I

24   believe I told him.

25   Q    Did you believe he was asking you for the truth?

1    A    Sir, I believe, I told him, you know, what was true

2    then.

3    Q    That wasn't my question. My question to you, sir, did

4    you believe when you heard him say that he was asking you to

5    tell him the truth?

6    A    No.

7    Q    No.  What led you in this attribution, sir, what led you

8    to the belief that there was some hidden meaning in this

9    attribution where he didn't want the truth?

10   A    Sir, in subsequent conversation -- from the beginning

11   much the meeting when I went and started to talk about David

12   Clarke and David Clarke is important to the case, and then I

13   think that he would have known prior to that, I was working

14   for Roger Khan before.

15   Q    You didn't think, sir-- you didn't think that he was

16   telling you the truth because of what occurred in the first

17   nine -- I'm not going back to it -- we'll have a summation --

18   in the first nine pages of this meeting, when you just meet

19   him after you are asked if you want coffee and water and you

20   sit-down there is some introductory conversation, you believe

21   from what happened in that ten minutes, that he wanted a

22   false story here, is that your testimony, yes or no?

23   A    Sir, it's quite possible.

24   Q    Did you tell -- it's quite possible?

25   A    You know, he just needed someone to tell him as I see

1    it--.

2    Q    There is no question before you.  You go onto tell him

3    about how you know Roger and how you met Roger right?

4    A    Yes, sir, I believe I do.

5    Q    You go on and look at page eleven, you go on to tell him

6    the truth. Some of this is true, isn't it?

7    A    I'm still reading.

8    Q    All right, keep reading.

9         (Pause.)

10

11   A    Yes, sir.

12   Q    Having read that, are you telling him in the truth in

13   answer to his question?

14   A    Yes, I was.

15   Q    Let's go to page 15 -- by the way, before we get to page

16   15, you were trying to tell him that or telling him at this

17   point that you were -- you with doing surveillance of the

18   Buxton gang, Roger Khan asked you to do that, right?

19   A    I was telling him, according to how I get to know Roger

20   and what I started to do for Roger.

21   Q    What you started to do for Roger, find out what was

22   doing in Buxton, get information for him?

23   A    Yes.

24   Q    You toll him that, but you left out the part about the

25   bombs and other things, you were asked to do including about

1    Waddelle and Allison?

2    A    I was not asked anything about that.

3    Q    You were not asked.

4         Let's go to page 15, line 19:  So what did that mean to

5    you, I'm just looking for information. Do you hear Mr. Simels

6    say that?

7    A    Yes, sir.

8    Q    Did you think that -- what did you take that to mean,

9    did you think there was some hidden message there, just

10   looking for information?

11   A    Just saying he was looking for information.

12        (Followed on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

S. Vaughn - Cross / Shargel                    580

1   BY MR. SHARGEL:

2   Q    And what was he looking for information for?   Why, as

3   you understood it?

4   A    He didn't tell me anything why he was looking for it

5   then.   He just said he was looking for information.

6   Q    When he puts the question, in the same attribution:

7   "What did it mean to you that you knew he was in charge of the

8   military?"  you knew what he was talking about, right?

9   A    I had a feeling I did, sir.

10  Q    Well, you have a good idea if you look at the first line,

11  Mr. Simels, he's talking about David Clarke, right?

12  A    Yes, sir.

13  Q    This is all about dealing with David Clarke, isn't it?

14  Yes or no?

15  A    Sir, he spoke about that and Donald Allison here also.

16  Q    But Donald Allison is dead, right?

17  A    Yes, sir.

18  Q    So when Mr. Simels asked you in that line 19 about

19  looking for information and then talking about he was in

20  charge, in the next line, he was in charge of the military, he

21  was talking about David Clarke, right?

22  A    Yes, sir.

23  Q    And he said:   "You had to know that he was probably

24  favorable to the people from Buxton."

25          And you say on line 23:   "Well, yeah, I would take

1  it that way because he was in charge."

2        Right?

3  A    Yes, sir.  I said that.

4  Q    "And these guys were able to come out, you know, do

5  certain things and get back into Buxton."

6        Those are the Buxton criminals, right?

7  A    Yes, sir.

8  Q    That gang who had escaped, the five people who had

9  escaped from jail in Buxton, right?

10 A    Yes, sir.

11 Q    And reeked havoc all over Buxton and made it into a

12 violent, dangerous place, right?

13 A    Yes, sir.

14 Q    And Mr. Simels is describing what he heard from other

15 people, right?

16 A    Yes, sir, he was.

17 Q    You knew that Mr. Simels had no connection to Guyana,

18 right?

19 A    Yes, sir.

20 Q    He was learning, he was getting his information from

21 other people?  You knew that from these conversations, right?

22 A    Yes, sir.

23 Q    One of the sources of information was Roger Khan, right?

24 A    Yes, sir, it was.

25 Q    I'm sorry?

1   A    I said yes, it was.

2   Q    You also knew that he had traveled to Guyana, right?

3   A    Yes, sir.

4   Q    And from conversations that you had with him, you know

5   that he had spoken to government officials, right?

6   A    Yes, sir.

7   Q    And later there's talk about Mr. Ramsammy, right?

8   A    Yes, sir.

9   Q    And he's the commissioner or the head of the health

10  department in Guyana, at least at the time, right?

11  A    Yes, sir.

12  Q    And Mr. Simels told you that he had met with government

13  officials, right?

14  A    Yes, sir.

15  Q    And it appeared to you from your conversation with Mr.

16  Simels that Mr. Simels was trying to find out all he could

17  about the situation in Guyana, right?

18  A    Sir, but until this point in time, I don't really believe

19  Mr. Simels had ever tell me that he met with any government

20  official.

21  Q    Good point, but I didn't ask you that question.

22        My question is over time, because I'm trying to do

23  this as concisely as possible, over time, you remember the

24  conversations were just played for you over the last two days,

25  and we'll get to them, but there were meetings with Ramsammy,

S. Vaughn - Cross / Shargel                    583

1  right?

2  A    Yes, sir.

3  Q    And other government officials, right?

4  A    Yes, sir.

5  Q    In fact, Mr. Simels was trying to sit down with the

6  president of Guyana, right?

7  A    Yes, sir, he said so.

8  Q    And you understood that to mean that he was gathering all

9  the information that he could gather about the situation,

10 right?

11 A    Yes, sir.

12 Q    And, in large part, to demonstrate to a jury one day that

13 there was, that the relationship that's alleged between Clarke

14 and Khan made no sense.  That's what he was telling you,

15 wasn't he?

16      MR. D'ALESSANDRO:  Objection.

17      THE COURT:  Overruled.

18 Q    Do you have the question?

19 A    Could you repeat the question for me, sir?

20 Q    Yes.

21      He was telling you what he knew and what he learned

22 because he wanted to demonstrate to a jury on Roger Khan's

23 behalf that there was such a divide between Clarke and the

24 Buxton people and Khan and the government people that --

25      THE COURT:  Excuse me, I'm sorry.  You mean to ask

S. Vaughn - Cross / Shargel                    584

1   whether this was his understanding of what Simels was --

2            MR. SHARGEL:  Yes.

3            THE COURT:  Phrase it that way.

4            That's your objection, I take it?

5            MR. D'ALESSANDRO:  Yes, judge.

6            THE COURT:  Phrase it in that way, please.  I think

7   it makes a difference.

8   Q    Did you understand that the conversations that you had

9   with Mr. Simels, and just so you know I'm asking this in a

10  broad way because we can talk about specifics later, in a

11  broad way, did you understand that Mr. Simels had already

12  gathered information that would be able -- where he'd be able

13  to demonstrate to a jury that there was such a divide between

14  David Clarke and Roger Khan that it was very unlikely that the

15  two of them would be co-conspirators?

16  A    Sir, my understanding in a broad way is that Mr. Simels

17  was trying to get information so that he can sort of tarnish

18  his, Clarke, or twist or whatever you want to do with Clarke's

19  testimony.

20  Q    Tarnish Clarke's testimony, right?

21  A    Yeah.

22  Q    Well, you understand, you now understand what

23  cross-examination is, I think.

24            What did you understand back then?

25  Cross-examination was specifically discussed, wasn't it?

1  A    Yes, sir.

2  Q    And you knew that on cross-examination, a lawyer, when

3  you were listening to these conversations, you knew that on

4  cross-examination a lawyer seeks to attack the credibility or

5  believability of a witness?   You know that, right?

6  A    That, Mr. Simels told me that.

7  Q    He explained that to you, right?

8  A    Yes, sir.

9  Q    I go back to this question because I don't think I have

10  an answer.   There will be an objection if I did.

11            THE COURT:   There will be a ruling on it.

12            MR. SHARGEL:   A ruling, all right.

13  Q    Wasn't your understanding, and I think you said this a

14  moment ago and forgive me if you did, wasn't there --

15            THE COURT:   Just get to the question.

16            MR. SHARGEL:   All right.   I'm winding around here.

17  Q    It was your understanding, as you said a moment ago, that

18  Mr. Simels was seeking to gather evidence to discredit, if you

19  will, Mr. Clarke, correct?   Yes or no?

20  A    Yes, sir.

21  Q    What did you mean on page 16 of the same conversation on

22  May 13th, you tell Mr. Simels at that point that you are, this

23  is line 21:   "I'm just a little guy.   Right."

24            What did you intend to mean by that?

25  A    Sir, I believe I was explaining to him that Clarke's

1  brother went back to Guyana with his whatever his drugs

2  profit.  He was living a large life.  I wasn't living that

3  lifestyle.  My lifestyle was much simpler to Clarke's brother.

4  Q    And it had nothing to do with your relation with Roger

5  Khan or anything like that?

6  A    No, sir.

7  Q    On page 17 --

8           MR. SHARGEL:  Withdrawn.  I'm going to withdraw

9  that.

10  Q    See if I can move on to page 18, line 27, that

11  attribution.  Mr. Simels is telling you, this is May 13th,

12  still May 13th: "So tell me how you got involved and what you

13  actually did in connection with Roger?"

14           Did you understand from your conversation with Mr.

15  Simels on that day that he wanted you to give a truthful

16  account of what you actually did in connection with Roger?

17  A    That might have been the case, and I believe that I did

18  that, yeah.

19  Q    Well, you tell him right after about the penetration of

20  the Buxton group, right?

21  A    Yes, sir.

22  Q    You just leave out your participation in any act of

23  violence, right?

24  A    Yes, sir, I did.

25  Q    Then in the next page 19 at line 15, Mr. Simels asked

1  you, he asks you:  "So how did you get involved with doing the

2  work for them in terms of infiltrating Buxton?"

3          Did you understand him to be wanting the truth as to

4  how you got involved; yes or no?

5  A    Yes, sir.

6  Q    And on the next page, line 4 page 20, he asks you:  "Was

7  this information that you were getting, was this information?"

8          Do you see that, lines 4 and 5?  Do you see that?

9  A    Yes, sir, I did.

10  Q    And he's asking you a question about what your role was

11  and what you were doing, and he wanted a truthful answer, as

12  you understood it; isn't it right, sir?  Yes or no?

13  A    Sir, I know he wanted an answer.  Whether truthful or not

14  I won't be able to say that.

15  Q    You won't be able to say that?

16  A    No, sir.

17  Q    So you won't be able to say that because why, because

18  what you're getting from the Government?

19          MR. D'ALESSANDRO:   Objection.

20          THE COURT:   Sustained.

21  Q    Is your testimony that you won't be able to say that

22  influenced by the $50,000 that you've gotten from the

23  Government?

24  A    No, sir.

25  Q    Do you think that you're on one side or another here,

1    sir?

2    A    No, sir.

3    Q    In other words, that you're aligned, in your own mind, do

4    you think that you're someone aligned with the Government?

5    A    Sir, I'm not aligned to anyone.  I'm merely here to

6    repeat what transpired during the period that I was meeting

7    with Mr. Simels and Miss Irving.

8    Q    Can you say, sir, that --

9            MR. SHARGEL:  Withdrawn.

10   Q    At page 20, line 20, Mr. Simels says was that based --

11   there's conversation about guns that got to Guyana, and what

12   happened to guns, and how they got to the Buxton group.

13           Do you see that in lines 14 through 18?    Yes?

14   A    I'm reading it, sir.

15   Q    Okay.

16   A    (Perusing document.)

17           I finished reading, sir.

18   Q    Mr. Simels:  "Was that based on information that you

19   developed or Roger developed or that both of you developed?"

20           Are you able to say, Mr. Vaughn, are you able to say

21   whether he was seeking, as you understood him to be seeking,

22   truthful information or not?

23   A    Sir, he asked the question which I believe I answered

24   after.

25   Q    Did you answer it truthfully?

S. Vaughn - Cross / Shargel                    589

1   A    To the best of my knowledge, sir.

2   Q    Do you see on page 22, line one Mr. Simels asks you:

3   "Specifically what would you do for Roger?"

4           Do you see that question?

5   A    Yes, sir.

6   Q    I'm reading part of it, but "Specifically what would you

7   do for Roger?"

8           And you really didn't answer truthfully, did you?

9   A    Sir, I did answer.  I told him what I did for Roger.

10  Q    It was part true, wasn't it?

11  A    Sir, I'm not aware of that.  I know I told him about, you

12  know.

13  Q    Yeah.  You say:  "I go to Buxton pretty much wherever I'm

14  allowed to go," right?   You told him about going to Buxton,

15  right?

16  A    Yes, sir.

17  Q    But you don't tell him about your participation in

18  violence, and you don't tell him about your knowledge of

19  violence on Roger's part, right?

20  A    Sir, he never asked that.

21  Q    Is it your testimony, sir, that what you would do for

22  Roger wouldn't encompass that topic?

23           MR. D'ALESSANDRO:  Objection, your Honor.

24           THE COURT:  Overruled.

25           MR. D'ALESSANDRO:  Can we approach?

S. Vaughn - Cross / Shargel                    590

1          THE COURT:   Yes.

2          (Sidebar.)

3          (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                         591

1         (Side-bar conference held on the record out of the

2    hearing of the jury.)

3              THE COURT:   Yes.   How much longer do you have,

4    about?

5              MR. SHARGEL:   I don't know how much.   When we take a

6    break at 11:30 I'll see what I can do.

7              MR. D'ALESSANDRO:   The problem with the questioning

8    right now is it's leaving a false impression with the jury.

9    The question that was being asked in context was specifically

10   what he was doing with regards to in Buxton, and he started to

11   answer by saying I was coming and going.   There's an

12   impression that 'that's what I mean in general and that's all

13   I said' and that's not going on.

14             THE COURT:   You can deal with that on redirect.

15             Roughly how much longer?   You don't know?

16             MR. SHARGEL:   Well, I know that if I keep going at

17   this pace it will be the rest of the morning, but I don't

18   really want it to be.   So let me take a break.   When we come

19   back from the break I'll have a better idea.

20             Is that fair?

21             THE COURT:   All right.

22             (Sidebar end.)

23             (Continued on following page.)

24

25

592

1            (In open court.)

2            THE COURT:  Let's take our break now.  Don't discuss

3    the case.  We'll resume in ten minutes.

4            All rise.

5

6            (Jury exits the courtroom.)

7

8            (Continued on following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

593

1          THE COURT:  You can step out.

2          (Witness leaves the witness stand.)

3

4          (Recess taken.)

5

6          (In open court.)

7          (Judge Gleeson takes the bench.)

8          MR. SHARGEL:  I'll be at least until one.

9          THE COURT:  Do you expect a long cross, Mr. Solano?

10         MR. SOLANO:  It depends how far Mr. Shargel goes.

11         THE COURT:  How well or how far?

12         MR. SOLANO:  Both.  I assume it's going to be well.

13         THE COURT:  All right.  Bring in the jury, please.

14         (Pause in the proceedings.)

15

16         (Witness resumes the witness stand.)

17

18         (Continued on following page.)

19

20

21

22

23

24

25

S.  Vaughn - Cross / Shargel                594

1              (Jury enters the courtroom.)

2              (The following occurred in the presence of the

3     jury.)

4              THE COURT:   Please be seated, everyone.

5              Go ahead, Mr. Shargel.

6              MR. SHARGEL:   Thank you, judge.

7     BY MR. SHARGEL:

8     Q    Mr. Vaughn, I direct your attention to the screen.  We're

9     going to put page 23 of 401T on the screen.

10             (The above-referred to exhibit was published to the

11    jury.)

12    Q    At line 13, we have your attribution where you say:

13    "From what I heard is that like, it was Fineman, Allison, this

14    other guy, um, David, you know it was like, they had a own, a

15    separate group.  I mean it was common knowledge that Roger had

16    a group because he even mentioned it.  He didn't deny it.  He

17    had mentioned it eventually."  Mr. Simels says:  "Right."  You

18    go on to say:  "Yeah, I help fight crime.  You know, I got my

19    group.  But then you now end up with two opposing groups."

20             What are you talking about?

21    A    I was maybe referring to Roger when he admitted that he

22    had -- that he had assisted the Guyana government and the

23    police force by getting rid of the five escapees.

24    Q    Were you serious when you said that "I help fight

25    crimes"?

S. Vaughn - Cross / Shargel                    595

1  A    I wasn't referring to me, sir.  I was referring to Roger.

2  Q    Miss Irving says:  "The David you are talking about is

3  David Clarke?"

4          Do you see that?

5  A    Yes, sir.

6  Q    And you go:  "Yeah, so you end up with two opposing

7  groups."

8          Right?

9  A    Yes, sir.

10 Q    Did you intend to convey to Mr. Simels that he was right,

11 that Clarke and Khan were on opposite sides, two groups?

12 A    Sir, I was merely conveying to Mr. Simels whatever

13 information I had at the time.

14 Q    Well, did you believe what you were saying to Mr. Simels

15 was true or not true?

16 A    Might have some truth in it.

17 Q    Some truth in it?  Can you tell us looking at this which

18 parts were true and which parts are not true?

19 A    Sir, when I was talking about Fineman, Allison and the

20 other guy Clarke had a group, that was merely information that

21 was given to me by Roger Khan.  I had no first-hand knowledge

22 of it.

23 Q    So Roger Khan told you this?

24 A    Yes, sir.

25 Q    The attribution that starts on line 29 where you say:

1    "Depends on how you look at it."  I'm going to paraphrase a

2    little to move along.  "You know, it depends on how you look

3    at it.  I truly believe what Roger was doing was a good thing

4    for the country because there we had policemen."

5           By the way, where is there?

6    A    Pardon me?

7    Q    Where is there?  You say "there."

8    A    In Guyana.

9    Q    "There we had policemen who were being killed, you know.

10   Lots things.  The whole place was chaos.  The police station,

11   you know, they lock the gates six o'clock.  You call them

12   you're being robbed.  You call them for the police and they

13   say we don't have any vehicles or sometimes you hear wrong

14   number.  Somebody had to do the job."

15          What did you intend to convey to Mr. Simels when you

16   were telling him this?

17          He says:  "Okay."

18   A    Sir, early in the conversation with Mr. Simels, he had

19   mentioned that Roger provided assistance to the Guyana

20   government, to the police, and it was in that context I was

21   saying this, that I believe what he was doing in terms of

22   providing assistance to the police and the government.

23   Q    The next page, page 24.

24          THE COURT:  Could you press the screen to get rid of

25   that little green dot?

1            MR. SHARGEL:   Sure.

2            THE COURT:   Thanks.

3    Q    On the next page:  "So, when you say to me we came to

4    know that David and Allison" --

5    A    Which line are we, sir?

6    Q    This is line four.

7            Mr. Simels is saying:  "So, when you say to me we

8    came to know that David and Allison and Fineman had this

9    group.  I mean, how did you hear this?"

10           Do you see that?

11   A    Yes, sir.

12   Q    Did you understand him to mean that he wanted to know

13   your source of information?

14   A    Yes, sir.

15   Q    And you went on to tell him that you had "lots of sources

16   out there and people that we pay to look out and be on the

17   look out and gather information, whatever they bring me, I

18   pass on to Roger," right?

19   A    Yes, sir.

20   Q    Line 19 Mr. Simels says:  "So your sources are telling

21   you that they have their own separate group to fight, whether

22   it's Roger or it's the other forces by the minister of foreign

23   affairs, Gadraj," right?   And you say:   "True."

24           Is that "true" as a tick or just a reaction or a

25   habit, or does that mean "yes, that's true"?

1  A    Sir, as I said, it's just a bad habit that I have.

2  Q    That also is a bad habit?

3  A    Yes.

4  Q    But you go on:  "The thing, I don't know, I don't know,

5  just get out of hand."

6        Things were getting out of hand, right?

7  A    Yes, sir.

8  Q    The next page, page 25, Mr. Simels puts the question to

9  you at line 5:  "What, what, did you know if anything about

10  Donald Allison dying?"  He puts the question to you.

11        Did you understand him to mean that he wanted a true

12  answer?

13  A    And I did give him a true answer, sir.

14  Q    You say you know he was killed, right?

15  A    Yes, sir, that's what I said.

16  Q    Apparently by a drive-by?

17  A    Yes, sir.

18  Q    But you didn't add that you pointed him out to Roger

19  Khan?  You didn't say that?

20  A    No, sir.  I did not get into the details.

21  Q    At the bottom in line 37, Mr. Simels raises the subject

22  again by saying:  "Okay, so Allison gets killed.  Do you speak

23  to Roger after he gets killed?"  And you answer the next

24  page, 26, line 1, you say:  "Yeah.  I spoke to him after."

25        That was true, right?

S. Vaughn - Cross / Shargel                    599

1   A     Yes, sir, it was.

2   Q     And then Mr. Simels says:  "Did Roger say I did it?"

3   Meaning did he confess to you.

4          Did you understand that?

5   A     Yes, sir, I understand that.

6   Q     You interrupted, you said:  "We just talked brief, you

7   know.  I called him, yeah, you know.  I hear this."  Then Mr.

8   Simels puts question again, or says this:  "I mean did he say

9   to you, I took him out, or was it somebody unknown who shot

10  him?"  Your answer is:  "I don't know.  That's not part of

11  what I want to get into too much."

12         Do you see that?

13  A     Yes, sir, I did say that.

14  Q     That wasn't true;  you did know, right?

15  A     Yes, sir, I did know, but at the time I was --

16  Q     Sir, I ask you again did you know how Mr. Allison was

17  killed?

18  A     Yes, sir.

19  Q     Mr. Simels goes on:  "After Allison is killed, does

20  anything happen?   I mean, does Rawlins."

21         That's the Fineman in the Buxton group, right?

22  A     Yes, sir.

23  Q     "Does Rawlins talk to you about it?"

24         Do you see that?

25  A     Yes, sir.

S. Vaughn - Cross / Shargel                600

1   Q    Do you think that Mr. Simels is trying to gather
2   information from you?
3   A    Sir, he merely asked me a question if Rawlins spoke to me
4   about it, about Allison being killed.
5   Q    He goes on to say, this is line 24:  "Between you and I
6   did you think you have information as to who killed him?"
7   And the reference is to Donald Allison.  And you ultimately
8   say, you say:  "I might have, but" at line 24 "that's a dead
9   issue now.  You know, I mean it's like three years ago."
10          Do you see that?
11  A    Yes.
12  Q    You were asked at page 27, line 23, Mr. Simels asks you:
13  "When you were with them, did you ever see them actually kill
14  someone or was it always the police who did the killing?"
15  You say:  "No one actually knew."
16          Right?
17  A    Yes, I said that.
18  Q    The fact is, sir, and I ask you this for a yes or no
19  answer, you actually do, correct?
20  A    Yes, sir.
21  Q    Now on page 28, Mr. Simels is asking you about the murder
22  of Ronald Waddell.
23          Do you see that?   Line six.
24  A    Yes, sir.
25  Q    And you start discussing Ronald Waddell.  You say in the

S. Vaughn - Cross / Shargel                601

1    next attribution that he got killed, right?   Correct?

2    A    I'm just trying to read this one.

3    Q    Go ahead.

4    A    (Perusing document.)

5         Yes, sir.

6    Q    While you were being asked these questions about Ronald

7    Waddell, when this murder comes up, you say nothing about

8    knowing who killed him, right?

9    A    No, sir, I didn't say anything.

10   Q    There came a time when you were filling out a form to

11   visit Roger Khan, correct?

12   A    Yes, sir.

13   Q    And it was being done during this meeting, right?

14   A    Yes, sir.

15   Q    And you were being asked questions.   Miss Irving was

16   helping you fill out the form, right?

17   A    I was reading the form, and I believe I was asking for a

18   few questions so I can get direction in terms of filling it

19   out.

20   Q    Well, when you were asked on the form, when the form

21   asked where you ever convicted of a crime, what was the

22   answer?

23   A    I put no because I think it's being convicted of a crime

24   in the U.S.

25   Q    Did the question ask if you were convicted of a crime in

S. Vaughn - Cross / Shargel                    602

1    the U.S.?

2    A     No, sir, it didn't ask.

3           And if I may, sir, I was --

4    Q     No, sir, there's no question before you, sir.

5           THE COURT:   Don't volunteer information.

6           Understood?

7           THE WITNESS:   Yes.

8    Q     Now, the next time that you met with Mr. Simels was on

9    June the 11th, right?

10   A     I believe so.

11   Q     That was almost a month later.   You might refresh your

12   recollection if you want to look at 401 T10.

13   A     Yes, sir.

14   Q     Now, by the time this meeting occurred, you had received

15   that e-mail that gave you permission to speak freely to Mr.

16   Simels, right?

17   A     Yes, sir.

18

19           (Continued on following page.)

20

21

22

23

24

25

603

S. Vaughn - Cross/Shargel

1    CROSS-EXAMINATION (Cont'd.)

2    BY MR. SHARGEL:

3    Q    Could we have Government's Exhibit 206 on the screen,

4    this is in evidence, your Honor, and the attachment to 206.

5    Q    There were two e-mails, were there not?  We saw those in

6    evidence?

7    A    Yes, sir.

8    Q    In other words, one had been sent to a different account

9    and finally you had received this e-mail?

10   A    Yes, sir.

11   Q    And the e-mail had the attachment, right?

12   A    Yes, sir.

13   Q    And the jury was told the story that led to the events,

14   events that led to this note coming from Roger Khan, right?

15   A    Yes, sir.

16   Q    And you identified this handwriting on this exhibit as

17   Roger Khan's handwriting, right?

18   A    Yes, sir.

19   Q    And just to remind us all, it is dated May 19, 2008.

20        It says, thank you again for everything, correct?

21   A    Yes, sir.

22   Q    And I really need you to help, right?

23   A    Yes, sir.

24   Q    Do not be afraid to tell all, and "all" is underlined

25   twice, right?

S. Vaughn - Cross/Shargel

1   A    Yes, sir.

2   Q    All that you know.  These are my lawyers and you can

3   trust them?

4   A    Then he goes on to say:  I speak to Paul often.  He will

5   confirm and says Mr. Khan's signature, right.

6   A    Yes, sir.

7   Q    You recognize it to be, correct?

8   A    Yes, sir.

9   Q    So before you got to the meeting on June 11th, you had

10  this note -- you received this note that says specifically

11  and directly that you could tell Mr. Simels all, right?

12  A    Yes, sir.

13  Q    So on June 11th -- in that long meeting that was held on

14  June 11th, you still didn't tell Mr. Simels that you were

15  involved in the murder of Waddell, correct?

16  A    I don't know if I did, sir.  I probably have to go back

17  through the entire conversation.

18  Q    Do you think you may have told him -- you may have

19  identified Mr. Waddell and told him of this?  You think you

20  may have told Mr. Simels that?

21  A    I don't know if I did, sir.

22  Q    And do you think you told him about identifying the

23  clothing that Donald Allison was wearing that day; do you

24  think you might have told him that?

25  A    No, sir, I don't think so.

S. Vaughn - Cross/Shargel

1    Q    Did you tell him about what you were asked to do by

2    Roger Khan in connection with the Buxton gang?

3    A    I believe I told him some of that, sir.

4    Q    Which parts did you tell him?

5    A    I don't know, sir.  I said I have to go back into the

6    taped conversation.

7    Q    Did you tell him about the bomb in the television set or

8    anything like that?

9    A    I don't remember if I did.

10   Q    The bomb in the CD player, did you tell him that?

11   A    I don't remember if I did, sir.

12   Q    What you did on June 11th, Mr. Vaughn, is that you

13   raised the subject of Donald Allison's mother in a way that

14   insinuated you might want to harm her or something like that?

15   A    Could you show me where I say that, sir?

16   Q    Yes, page 13.

17        THE COURT:  The question was Allison.  Did you mean to

18   say Clarke?

19        MR. SHARGEL:  Yes, I did.  I misspoke.  David

20   Clarke.

21   BY MR. SHARGEL:

22   Q    Line 25, you see the conversation a few lines just

23   before that that Clark is being discussed, right?

24   A    Yes, sir.

25   Q    And you say at line 25:  I think if you know key people,

S. Vaughn - Cross/Shargel

1  you get a certain key people, it would cause him to rethink

2  his position.  One thing I've learned is that a man, whether

3  he's a criminal, he's a preacher, he always values his

4  mother, because if you are not certain with anyone else that

5  could be on your side, your mother very likely will be there.

6  You don't want, you don't ever want anything to happen to

7  her.

8       Do you see that attribution?

9  A    Yes, sir.

10 Q    Well, what did you intend to imply or mean when you said

11 this?

12 A    Well, sir, I was merely indicating to Mr. Simels, based

13 on past conversations that he and I had, that in personal

14 visits or on the telephone, because during those visits it

15 was his desire to -- his desire not to have -- it was his

16 desire to have either contact his mother or change his

17 testimony.  So I was merely indicating to him one of the

18 options.

19 Q    So you were indicating to him one of the options, yes?

20 A    Yes, sir.

21 Q    And one of the options was what, to harm the mother?

22 A    I'm just saying that no one ever wants to -- wants any

23 harm to come to their mother.

24 Q    So it was the insinuation that you wanted to do harm to

25 the mother?

S. Vaughn - Cross/Shargel

1    A    If need be.  If she objected, Mr. Simels wanted me to

2    achieve this based on prior conversations.

3    Q    This was your idea, wasn't it, Mr. Vaughn, it was your

4    idea?

5    A    Sir, it was my idea.  As I said --

6    Q    Sir, I asked you previously --

7         THE COURT:  No, let him answer.

8         MR. SHARGEL:  Okay?

9    A    As I said previously, Mr. Simels and I had discussed

10   persuading Clarke I think to change his testimony or not

11   testify.

12   Q    On this occasion, sir, it was your idea -- I put the

13   question again, it was your idea to introduce the subject of

14   the mother, yes or no?

15   A    Yes, sir, it was my idea.

16   Q    Mr. Simels was telling you, at page 19 of this

17   conversation, line 15, he says:  Beyond that, I want Barrett.

18        Who is Mr. Barrett?

19   A    He was the president of Guyana.

20   Q    He's talking about the president of the country, right?

21   A    Yes, sir.

22   Q    He said, what I want Mr. Barrett to do for me is a

23   couple of very simple, simplistic things.  See that I want

24   him to make a protest of the United States of Roger being

25   kidnapped.

608

S. Vaughn - Cross/Shargel

1    What did you mean?

2    A    He wanted the president to come and speak on Rogers

3    behalf.

4    Q    What did you understand the reference of kidnapped?

5    A    He was alleging that Roger was kidnapped and brought to

6    the United States.

7    Q    Maybe he will do it, maybe he won't.  I need him to

8    direct the government officials to give me the documents I

9    need on Clarke.

10        See there?

11   A    Yes.

12   Q    What did you understand him to mean, what document?

13   A    Whatever document might exist on Clarke, I don't know.

14   Q    Well, what did you take as the meaning of the word

15   document?

16   A    Whatever information the government might have on

17   Clarke.

18   Q    And the information to do what with Clarke, go after his

19   mother, is that what you understood?

20        It was documents to cross-examine Clarke, wasn't it, Mr.

21   Vaughn?  You knew that.

22   A    Sir, at that point in time.  But as I said before --

23   Q    Sir --

24   A    I'm basing my prior --

25   Q    This is not called for.

FRED GUERINO, CSR

609

S. Vaughn - Cross/Shargel

1    THE COURT:  No, let him answer.  Go ahead.

2  A    From the inception I met with Mr. Simels, my

3  understanding was that Clarke was the main witness against

4  for the government issue against Roger Khan and that he

5  needed to be neutralized.

6  Q    To neutralize him --?

7  A    If I may, sir.  I also left with the understanding that

8  I'm to find, you know, ways and means to achieve that

9  objective.

10  Q    Mr. Vaughn, did you understand Mr. Simels to be saying

11  in this attribution that one of the ways and means would be

12  that he would use documents to impeach or attack the

13  credibility of David Clarke, yes or no?

14  A    No.

15  Q    Did you have an understanding, based on this

16  conversation, what documents were being referred to, yes or

17  no?

18  A    No, sir.

19  Q    Did you have an understanding that Mr. Simels was

20  seeking documents in connection with the military service of

21  David Clarke?

22  A    That's what it says here.

23  Q    Well, it goes on to say -- and Mr. Simels goes on to say

24  why he was fired from the Army.  He explains what document,

25  doesn't he?

FRED GUERINO, CSR

S. Vaughn - Cross/Shargel

1    A    Yes, sir.

2    Q    He goes on to say, the official documents.

3         Do you see that?

4    A    Yes, sir.

5    Q    And after he added those words, did you have an

6    understanding during this conversation that he wanted these

7    official documents relating to Clarke being fired from the

8    Army to do physical harm to someone, was that your thinking?

9         MR. D'ALESSANDRO:  Objection.

10   A    No.  This was the conversation that I had with Mr.

11   Simels.

12   Q    He said I need the letter that he, Clarke, wrote to

13   Roger Luncheon.

14        Who is Roger Luncheon?

15   A    I think he's a government official.

16   Q    Begging to get back in.  You, you know, these are the

17   things that Barrett can, like can do like that, right.

18        Do you see that?

19   A    Yes, sir.

20   Q    Did you have an understanding of what Mr. Simels, as a

21   result of this attribution, was seeking to have Mr. Barrett

22   do?

23   A    Sir, he said he was trying to get documents, government

24   documents on Clarke.

25   Q    It was during this conversation that you received

611

S. Vaughn - Cross/Shargel

1  documents, speaking of documents, it was during this

2  conversation that you referred a document from Mr. Simels,

3  right?

4  A    Might have been.

5  Q    Could we have government 60 301 and 301 a on the screen.

6  This is government Exhibit 3-O one.

7        You testified that you referred this actually, you said

8  you had marked it up in green, but this is what you received

9  on that day, on June 11th?

10  A    It seems like I had marked the documents I received from

11  Mr. Simels.  I didn't see a mark on this one.

12        MR. SHARGEL:  May we have the government exhibit

13  live.  The highlighting doesn't show up on that.

14        Is it possible to turn on the elmo?

15        THE COURT:  Sure. There you go.

16        MR. SHARGEL:  Could I have a moment, Your Honor?

17        THE COURT:  Yes.  Take all the time you need.

18  BY MR. SHARGEL:

19  Q    Let me ask you a question in the meantime.

20        On the copy of 301 - the highlighting doesn't show up on

21  this system - but there was a name on the top.

22        Do you remember that name?

23  A    Sir, I would be happy if could see the document.  I'm

24  familiar with it because it has my handwriting on it.  I

25  don't remember what name appears there.

612

S. Vaughn - Cross/Shargel

1    Q    Okay.

2         Now you recognize the document?

3    A    Yes, sir.

4    Q    I said green before, but it is yellow.

5         That's all your handwriting, right?

6    A    Yes, sir.

7    Q    As the discussion goes on on June 11th, you make notes

8    on here, right?

9    A    Yes, sir.

10   Q    And this is the general list of things to do or people

11   who Mr. Simels was interested in finding and talking to,

12   right?

13   A    This was a list of names that he had an interest in me

14   finding.

15   Q    We heard a lot about Farah.  This is the club on

16   Rockaway.  We heard a discussion about that yesterday, right?

17   A    Yes, sir.

18   Q    Now, do you see the name on the top where it says Frost?

19   A    Sir, I see a word.  I don't know whether or not it is a

20   name.

21   Q    You are unfamiliar with that altogether?

22   A    Yes, sir.

23   Q    Did you receive a copy of the e-mail?

24   A    I believe I might have.

25   Q    And let me show you what has been marked as 301-A.

613

S. Vaughn - Cross/Shargel

1        THE COURT:  Is this in evidence.

2        MR. SHARGEL:  Yes, it is, Judge.

3

4    A    I'm only seeing part of the it, not all of it.

5        THE COURT:  Slide it down.

6        MR. SHARGEL:  The reason I slid it, it starts at the

7    bottom then I was going to slide it in the order the e-mails

8    were received and sent.

9        THE COURT:  Okay.

10        MR. SHARGEL:  That's why I'm raising it.

11   Q    So, do you see this is a document that you took with

12   you?

13   A    Yes, sir.

14   Q    Because there's your X over there on the right side,

15   yes?

16   A    Yes, sir.

17   Q    So you took this with you and you had it, then turned it

18   over to the government, right?  Yes?

19   A    Sir, actually I believe this is one of the e-mails that

20   was sent to me.

21   Q    That was sent to you?

22   A    Yes, sir.

23   Q    So it is starts off on the bottom where it says, from

24   Robert Simels to Larry Frost, right?  Do you see that?

25   A    Which area are you looking at, sir?

S. Vaughn - Cross/Shargel

1   Q    I'm looking at this part right here, (indicating)?

2   A    Yes, sir.

3   Q    See that?

4   A    Yes, sir.

5   Q    And then there's another a message on top form Simels to

6   Larry Frost, right?  Actually, first from Larry Frost.  This

7   is a continuous e-mail, Larry Frost, Wednesday, 21st of May

8   2008:  Finally back from upstate.

9        Do you see that?

10  A    Which area are you looking at, sir?

11  Q    We are looking at this area (indicating) on the e-mail.

12  A    Yes, sir.

13  Q    And this address as well.

14       My question simply is this:  You know that Larry Frost

15  was an investigator working for Mr. Simels in connection with

16  efforts to interview people?

17  A    I heard him mention the name Larry a few times.

18  Q    Never Frost?

19  A    Never Frost.

20  Q    But you had possession of this mail, right?

21       Let me slide this down.

22       This e-mail was given to you on June 11th, wasn't it?

23  A    Yes, sir, it was given to me.

24  Q    It was given to you, not e-mailed to you, right?

25  A    Sir, I would like to see the top of the document,

615

S. Vaughn - Cross/Shargel

1    please.

2    Q    Here's the top of the document.

3         Let me show you something else that might help you.

4         Do you see the bottom of this document?  The date it was

5    printed is 6/11/08.

6    A    Yes, sir.  That's the day I met with Mr. Simels.

7    Q    At 5:32 p.m. In the afternoon you were in Mr. Simels'

8    office, correct?

9    A    Yes, sir.

10   Q    So, does this now refresh your recollection that you

11   didn't receive this in the e-mail; this was handed to you,

12   right?

13   A    Gave it to me.

14   Q    So, both of these documents that were handed to you on

15   that date had Mr. Frost or Larry Frost's name on it, right?

16   A    Seems so.

17   Q    Do you recall that Mr. Simels was checking certain facts

18   with you during this conversation on June 11th?

19   A    Such as, sir?

20   Q    Such as asking about a story that he's hearing about

21   Rondell, remember that?

22   A    No, sir, I don't.

23   Q    Look at page 10 of 401T13.

24        MR. LIPTON:  Judge, could we switch back to the laptop.

25        THE COURT:  Yes.  What position?

616

S. Vaughn - Cross/Shargel

1      MR. LIPTON:  Two?

2          MR. SHARGEL:  Page 10 -- page 13.

3  BY MR. SHARGEL:

4  Q    Do you see on that page - and I'm not going to read it,

5  read it to yourself, if you wish - do you see on that page

6  that Mr. Simels is checking stories that he heard from

7  others?

8  A    Yes, sir, he was.

9  Q    And he's trying to find out from you whether this is

10 true or whether it is a story, if you look at page 10, when

11 Mr. Simels says:  Well, okay, maybe he's giving us a story.

12 A    Which line are we at, sir?

13 Q    Page 10, line 32.

14 A    Yes, sir.

15 Q    And do you tell him or give an opinion as to whether the

16 story is true or not?

17 A    Yes, sir, I did.

18 Q    What was your position?

19 A    I told him I feel that the guy might be making up

20 something.

21 Q    That was your true assessment?

22 A    Yes, sir, at that time.

23 Q    He was given you a bunch of facts that he heard about

24 Clarke and the military, and he wanted to find out from you

25 whether or not it is true, right?

FRED GUERINO, CSR

617

S. Vaughn - Cross/Shargel

1  A    At times, yes.

2  Q    Page 11, the next page, he's telling you about a story

3  and you ultimately say, at line 20, that you can't say

4  anything about that, but he's checking out information that

5  he has, starting at line 3, in an effort -- withdrawn.

6      Did you understand that he was trying to find out

7  whether --?

8  A    Sir, I would like an opportunity to read what you are

9  saying.

10  Q    Sure.

11      (Pause)

12

13  A    I finished.

14  Q    You are finished reading?

15  A    Yes, sir.

16  Q    Is it your understanding that Mr. Simels was trying to

17  check out stories with you that he heard about Clarke?

18  A    Yes, sir, at that time he was.

19  Q    And you were saying to him that because of your age, you

20  didn't know anything about that?

21  A    Yes, sir, I did.

22  Q    That was true, correct?

23  A    Yes, sir, that was.

24      MR. SHARGEL:  May we have 3500-SB1.

25      THE COURT:  You mean on the screen?

618

S. Vaughn - Cross/Shargel

1        MR. SHARGEL:  On the screen.  This is in evidence.

2        THE COURT:  If you touch that screen.

3   Q    Sir, if we can turn to the page that mentions Fine Man.

4        Now, you went over this with the government lawyer

5   yesterday, did you not?

6   A    Yes, sir.

7   Q    And this is a letter that Mr. Khan wrote to his lawyer,

8   correct?

9   A    It was a document Mr. Simels showed me, said he got it

10  from Khan.  I don't know if that was a letter or what.

11  Q    Did you read any portion of this, other than the part

12  that pertains to you?

13  A    I didn't read the entire document.  I just briefly

14  skimmed through it.

15  Q    Did you carefully read the part that had to do with you?

16  A    Yes, sir, I did.

17  Q    You testified in front of this jury about each line of

18  this section of the document that deals with you, Fine Man,

19  right?

20  A    Yes, sir.

21  Q    And you said that the first line was true, right, Fine

22  Man was recruited by Khan because he was the childhood friend

23  of Rondell Rawlins, one of the leaders of the Buxton gang,

24  right?

25  A    Yes, sir.

619

SIDE BAR

1  Q    And then you said that the rest of it wasn't true?

2  A    I never said the rest of it.  I said part was true and

3  part wasn't, part was untrue.

4  Q    Which parts were false?

5  A    May I have a moment to read the document, sir?

6        MR. SHARGEL:  Sure.

7        (Pause)

8        THE COURT:  Can you come up, please.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

620

SIDE BAR

1          (Side bar)

2          THE COURT:  A couple of things.  One is just the

3     timing of it.  If there are certain things on there you want

4     to ask him if they are true, that's fine.  This process isn't

5     going to work.

6          There's another problem.  I had the same problem on

7     his direct.  It talks in there about what he will testify to

8     and it's a little confusing.  Is the question whether he will

9     testify to X or whether X is true?

10         Do you understand what I mean?

11         MR. SHARGEL:  I understand exactly what you mean.

12    But when the government elicited -- here's what I will do.  I

13    will give you the proffer.  The proffer, I will establish,

14    that he carefully went over it line by line, not to say about

15    his testimony, but my recollection is to say what is not

16    true, my recollection is he said everything after the first

17    sentence wasn't true.  But he said wasn't true, and the

18    proffer that there I will put before the jury that he never

19    corrected it, when shown this document by Mr. Simels, never

20    corrected it to say it wasn't true.

21         THE COURT:  So, there are some things in there that

22    are false and he didn't correct the false things.  That's the

23    point?

24         MR. SHARGEL:  That's the point.  He's trying, you

25    know, trying to read the gaps here.  Wants to take his time

S. Vaughn - Cross/Shargel

1    to read it.  And he's the one that keeps interjecting that my

2    recollection is - everything after the first sentence,

3    correct me if I'm wrong - everything after the first sentence

4    is essentially false.

5              Next sentence is, Agricole is one of the dangerous

6    places in Guyana.  He said, oh, that's false.  Then he says

7    he I don't feel there's anything true, according to him, and

8    the rest of it.  My point is, Mr. Simels made a diligent

9    effort to get the true facts and he did nothing to suggest to

10   him --

11             THE COURT:  Let me just ask you this, start picking

12   out a factual assertion because he will sit here and read it.

13             MR. LIPTON:  Just a paragraph in the document.

14             THE COURT:  I can't tell because it ends --

15             MR. SHARGEL:  It is just on that page, and I'm sure

16   now at this side bar he's read it.

17             THE COURT:  I want you to be more eficient about it.

18             MR. SHARGEL:  Your concern is my concern.

19             THE COURT:  Let's go back to work, then.

20             MR. SHARGEL:  Maybe I will be finished earlier.

21             THE COURT:  All right.

22             (Side bar ends)

23

24

25

622

S. Vaughn - Cross/Shargel

1   BY MR. SHARGEL:

2   Q    You've read it, correct?

3   A    Yes, sir.

4   Q    So let me see if I can do this quickly.

5        You testified about this yesterday, right?

6   A    Yes, sir.

7   Q    So Fine Man lived in Agricole where they both grew up

8   and is considered one of the most dangerous villages in

9   Guyana.  You said that was false, right?

10  A    Yes, sir.  I agreed with that.

11  Q    You told us yesterday in your testimony that it was a

12  pleasant place, not dangerous, right?

13  A    I never said it was a pleasant place.  I said it wasn't

14  the most dangerous village in Guyana.

15  Q    Fine Man will testify of his relationship with Khan and

16  the reason he was recruited.

17       Was that something that you could testify to that

18  truthfully?

19  A    Yes, sir.

20  Q    He will testify at many meetings he attempted in Buxton

21  and Agricole, David Clarke, Rondell Rawlins discuss the plan

22  to kill Khan, Shortman.

23       Did you say that yesterday?

24  A    Yes, sir.

25  Q    He will testify that he believed Khan worked for the

FRED GUERINO, CSR

623

S. Vaughn - Cross/Shargel

1  government and that Khan was killing -- I'm sorry.  He will

2  testify that Clarke believed Khan to be working for the

3  government and that Khan was killing African Guyanese.

4       Did you testify to that?

5  A    I couldn't have done that, sir.

6  Q    He will testify surrounding the death of George Allison.

7       That's true, right?

8  A    I'm sorry, it didn't stop there.

9  Q    I will continue.

10      It was literally true you knew the event.

11  A   To that part.

12  Q    You didn't intend to testify to that, right?

13  A   Sorry.  The sentence went on to say other stuff, not

14  just that.

15  Q    He will testify, okay, of the many meetings -- I'm

16  sorry.  He will testify that Clarke believed Khan to be

17  working for the government.  We have that already.  He will

18  testify that he personally knew the events surrounding the

19  death of the brother of George Allison and the death was due

20  to the drug dealing involving Clarke.  You testified it was

21  not true?

22  A    Yes.

23  Q    He will testify that the brother of George Allison

24  picked up a shipment of guns in September from the United

25  States and Clarke was the one responsible for the

624

S. Vaughn - Cross/Shargel

1   distribution of guns.  Is that true?

2   A    Part of it is true and part of it is not.

3   Q    Fine Man will testify that Khan took him to a meeting

4   with Dr. Leslie Ramsammy, Minister of Health, to explain the

5   inner workings of the Buxton gang and the role of David

6   Clarke's wife, an Army medical technician, true or not?

7   A    Part is true and part is not.

8   Q    Fine Man was a high-ranking member of the PNC, will

9   testify at many meetings he attempted strategy discussions to

10  eliminate Khan.  You said not true?

11  A    Not true.

12  Q    My question to you is this:  Did you, during any of the

13  meetings with Robert Simels, explain to him, as you have

14  explained to us today, and to the jury yesterday as well,

15  which parts are true and which parts are not?

16  A    No, I didn't.  As I said before --

17  Q    No, sir.

18       THE COURT:  Yes.  Don't volunteer additional

19  information, just answer the question.

20  BY MR. SHARGEL:

21  Q    Now, after the meeting in June, you had a phone call

22  with Mr. Simels in July of 2008, correct?

23  A    Might have been.

24  Q    Well, look at 401T15.

25       Here you call Mr. Simels and you say that on July 9th

FRED GUERINO, CSR

625

S. Vaughn - Cross/Shargel

1  you say that you've penetrated the heart of that guy.  This

2  is page 1, line 39.

3      Do you see that?

4  A    Yes, sir.

5  Q    And is this something that you discussed with Agent

6  Mazzella before you made the call?

7  A    I might have, sir.

8  Q    But do you remember any discussion with Investigator

9  Mazzella before you made this call?

10 A    Not really, sir. I know, if I may, during the time of

11 this investigation, I had been receiving instructions from

12 Mr. Mazzella and Ms. Jackson.

13 Q    Sir, when you made the call, you knew what it was you

14 were going to say to him, right?  It was a plan, wasn't it,

15 wasn't it?

16 A    Pardon me, sir?

17 Q    Wasn't there a plan when you made this call?

18 A    Sir, all I was trying to find out is what shall I do

19 with these people.

20 Q    Sir, on line 39, page 1 of this exhibit, 401T15, you

21 record that you were able to penetrate the heart of that guy,

22 you know, so he got some exciting news, exciting news there.

23 So I wanted to sit to discuss it, right?

24 A    Yes.

25 Q    This wasn't to find out what Mr. Simels wanted to do.

626

S. Vaughn - Cross/Shargel

1  You wanted to introduce the subject of a new development in
2  the case, right?
3  A    Might have been.
4  Q    Well, when you look at this, is your best testimony it
5  might have been?
6  A    Yes, sir.  I'm just looking at part of this
7  conversation.
8  Q    What did you mean when you said penetrate the heart of
9  that guy, what did you mean to convey?
10 A    I was merely trying to tell Mr. Simels.
11 Q    This was the exciting news that you go on to talk about?
12 A    Yes, sir.
13 Q    And you want to make a meeting with Mr. Simels, right?
14 A    If possible.
15 Q    And he's unable to meet with you that day or the next
16 day, right?
17 A    I believe so.
18 Q    And there comes a time, July 11th, when you have another
19 conversation with Mr. Simels on the telephone, correct?
20 A    I might have, sir.
21 Q    401T16.
22      You see that, sir?
23 A    Yes, sir.
24 Q    You are still having trouble arranging a meeting with
25 Mr. Simels, right?

FRED GUERINO, CSR

627

S. Vaughn - Cross/Shargel

1    A    Sorry, I didn't go through the entire document.

2    Q    Do you know the next time you met with Mr. Simels?

3    A    Sir, I would like an opportunity to go through this

4    document.

5    Q    I mean, you can have the opportunity to go through the

6    document, but if you would look at July 18, 2009, which is in

7    401T18, does that refresh your recollection as to the next

8    time you meet with Mr. Simels?

9    A    Yes, sir.

10   Q    And you announce, at page 3, line 28, you announce that?

11   A    Which document are you looking at, sir?

12        THE COURT:  You were back on T18.

13        MR. SHARGEL:  T18.

14        THE COURT:  Okay.

15   Q    T18, page 3, line 28.

16        Paragraph do you see that, sir?

17   A    Yes.

18   Q    And do you see that you introduced the subject of Clarke

19   being willing to play?

20   A    Yes, sir.

21   Q    Mr. Simels didn't call you to say that Clarke was

22   willing to play.  You found that out, according to what you

23   told us, right?

24   A    Sir --

25   Q    Sir, could you answer that question?

FRED GUERINO, CSR

628

S. Vaughn - Cross/Shargel

1      He's not being responsive, Judge.

2  A    Sir --

3          THE COURT:  Stop, stop.

4          THE WITNESS:  I need to explain myself.

5          THE COURT:  What was the question?  Pose it again.

6  Q    On July 18th, at a meeting at Mr. Simels' office, you

7  tell him -- you report to him that Clarke's willing to play,

8  right?

9  A    Yes, sir.

10  Q    And Mr. Simels says:  He's willing to take a plea and

11  not cooperate, you mean?   Do you see that?

12  A    Yes, sir.

13  Q    And you go on and say:  He's willing, he's willing to

14  play.

15      What did you intend to convey by his willing to play?

16  A    Well, as I said, sir, based upon prior conversations

17  that I had with Mr. Simels, my function was to find ways and

18  means to get Clarke not to testify or to change his

19  testimony, and I was now explaining to Mr. Simels I had

20  communication with Clarke through his girlfriend, and that he

21  was prepared to do what we want him to do.

22  Q    They would accept money to change Clarke's testimony,

23  right?

24  A    Yes, sir, I was told to offer him that.

25  Q    And that's the topic that you began discussing, right,

FRED GUERINO, CSR

629

S. Vaughn - Cross/Shargel

1   right?

2   A    Might have been, sir.  I'm on page 3.  I don't know what

3   was discussed previously.

4   Q    Did you receive any discussion about obtaining money

5   from Mr. Simels?

6   A    Instructions from whom, sir?

7   Q    Investigator Mazzella or Ms. Jackson?

8   A    I don't recall that sir.

9   Q    I'm sorry, I don't recollect that?

10  Q    You don't recollect that?

11  A    No.

12  Q    But were you told on that day, prior to meeting with

13  Mr. Simels, that the object would be to get Mr. Simels to pay

14  money, correct?

15  A    I don't recollect if I was told that, sir.

16  Q    Do you recollect whether you were told that at a later

17  time, yes or no?

18  A    No, sir, I don't.

19  Q    No recollection at all?

20  A    No, sir.

21  Q    By the way, on this conversation, the beginning of this

22  conversation, there's reference to equipment.

23       Do you see that?

24  A    Yes, line 25, I believe I asked the question.

25  Q    You asked questions about the equipment, correct?

S. Vaughn - Cross/Shargel

1   A    I asked questions based on what Mr. Simels told me prior

2   to that.

3   Q    And you go on to say, because you knew that Mr. Khan had

4   recorded certain conversations in Guyana.  You knew that,

5   right?

6   A    I didn't know that.  Fortunately he said so, but I never

7   witnessed him doing that.

8   Q    You never witnessed him doing it.

9        Did you ever witness any of the computer equipment?

10  A    I saw him with that.

11  Q    You saw who with the computer equipment?

12  A    Roger Khan.

13  Q    When you saw him with computer equipment, do you happen

14  to remember what kind of computer equipment it was?

15  A    To the best of my recollection, it looks like a normal

16  laptop computer which he said you was being fitted with

17  special software.

18  Q    He said that to you?

19  A    Yes.

20  Q    Did he tell you anything about what the special software

21  does?  Did he have any further conversations with you, yes or

22  no?

23  A    Yes, sir, he did.

24  Q    And did you ever see this laptop equipment operate?

25  A    Yes, sir.

631

S. Vaughn - Cross/Shargel

1  Q    What did you see it do?

2  A    During the period Sean Bellfield's daughter was

3  kidnapped, it was being used to track the cell phone numbers

4  that the kidnappers were calling from.

5  Q    Did you know that there were conversations of David

6  Clarke that were recorded on that equipment?

7  A    No, sir, I didn't know that.

8  Q    Never discussed that with Roger Khan?

9  A    No sir I didn't.

10 Q    Did he ever say there were recordings made of

11 conversations by members of the Buxton group?

12 A    No, sir, he never said that.

13 Q    Did he ever tell you that the equipment was purchased

14 under the auspices of the Guyanese government?

15 A    No, sir, he never did.

16 Q    Did he tell you how or what the circumstancess were of

17 the purchase of the equipment?

18 A    No, sir.

19 Q    There came a time during this meeting that you were

20 discussing what it was that the Leslyn Camacho could say,

21 right?

22 A    Might have been, sir.

23 Q    Well, look at page 8.  Look at the attributions starting

24 on line 34, as an example.

25      THE COURT:  What was the question.

FRED GUERINO, CSR

632

S. Vaughn - Cross/Shargel

1   Q    The question is, do you remember discussion about

2   Clarke's reported anti-American feelings; do you remember

3   those discussions?

4   A    Yes, sir.

5   Q    Do you remember Mr. Simels saying, page 8, line 34, or

6   actually that's what is up there:  If any of that is true, if

7   Leslyn were to tell us that he is an anti-American guy, hates

8   America, speaks against America.  Do you see where he says,

9   if any of that is true.  Do you see that?

10  A    Yes, sir.

11  Q    Now, did you think, based upon your many conversations

12  with Mr. Simels, that he had some sort of tip where he said,

13  true, true, just automatically, did you think that?

14  A    Sir, no.

15  Q    Sir, did you think that, yes or no?

16  A    I said no.

17  Q    Mr. Simels was preparing a draft affidavit when you were

18  in the office that day, right?

19  A    Yes, sir.

20  Q    And when he was preparing the draft affidavit, he was

21  asking you questions about it, wasn't he?

22  A    I believe he might have been.

23  Q    Well, look at page 11.

24  A    I know he was also telling me a few things.  They could

25  be in there.

633

S. Vaughn - Cross/Shargel

1    Q    What?

2    A    Which could still be in the affidavit.

3    Q    And you were saying, on this page 11, line 16, line 20,

4    it makes sense, it makes sense, right?

5    A    Yes, sir, I said that.

6    Q    Is that something you say automatically, just a knee

7    jerk reaction, makes sense, makes sense?

8    A    No, sir.  At that time I was under the impression that

9    Mr. Simels was preparing a document which he wanted, you

10   know, this young lady to lie about.

11   Q    To lie about.

12        When you looked at this document, you actually made

13   corrections, didn't you?

14   A    A few of them.

15   Q    Because things that were not accurate you corrected,

16   right?

17   A    Yes, sir.

18   Q    Do you remember having a conversation with Investigator

19   Mazzella before you called Mr. Simels on July 25th?

20   A    I'm sorry July -- I'm sorry, one second, I want to

21   correct something.

22        Do you remember having a conversation with Mr. Mazzella

23   on July 25, 2008.

24   A    No, sir, not at this point in time.

25   Q    Well, do you remember Mr. Mazzella coming up with a new

FRED GUERINO, CSR

S. Vaughn - Cross/Shargel

1   plan to try to have Mr. Simels pay money?

2   A    I don't remember, sir.

3   Q    But you do remember Mr. Mazzella or Investigator

4   Mazzella saying that you should say to Mr. Simels that you

5   didn't tell Leslyn Camacho about him being involved, you

6   would deliver the money and get the affidavit; do you

7   remember that?

8   A    No, sir, I don't remember that.

9   Q    No recollection of that.

10       Do you remember Mr. Simels saying over and over again

11  that she's got to meet with me?

12  A    Yes, sir, he's been saying that.

13  Q    And we had it yesterday afternoon that Mr. Simels never

14  gave you any money, correct?

15  A    That is not true, sir.

16  Q    He gave you $1,000 for your expenses, right?

17  A    Yes, sir.

18  Q    So $1,000.  Putting that thousand dollars aside, did he

19  give you any money - I asked you this yesterday afternoon and

20  I will put it to you once more - did he give you any money in

21  connection with Leslyn Camacho?

22  A    No, sir.

23  Q    And, by the way, did you have an understanding as to

24  whether you had an obligation to pay taxes on the money that

25  you received from the government, on the $50,000?

635

S. Vaughn - Cross/Shargel

1   A    I believe I might have.

2   Q    And were you supposed to pay taxes on that money?

3   A    I'm not sure if I was supposed to.

4   Q    You are not sure if you were supposed to.

5        Did you sign an agreement with the government?

6   A    I signed several agreements with the government.

7   Q    Did any of the agreements require you to pay taxes on

8   the money that you received?

9   A    I don't recollect the contents of the agreement, sir.

10       MR. SHARGEL:  Could I have one moment, your Honor?

11       THE COURT:  Yes.

12       (Pause)

13

14       MR. SHARGEL:  Your Honor, this document may have to

15  be worked the old fashion way because we just received it

16  yesterday.

17       This is for identification 630.

18  Q    I show you the fourth page of Defense Exhibit 630 for

19  identification.

20  A    What page is that, sir?

21  Q    Fourth page, up here on the screen.

22  A    It is marked here page 3.

23  Q    Yes, but it is the next page, page 4, item ten, would

24  you read it to yourself.

25       THE COURT:  Can you enlarge it a little bit, please.

636

S. Vaughn - Cross/Shargel

1          (Continued on the next page.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. SHARGEL:

2    Q    Now, read that one sentence to yourself?

3    A    I already read it, sir.

4    Q    Does that refresh your recollection that you were liable

5    and needed to pay taxes for the money that you received from

6    the government?

7    A    I need to file?

8    Q    Have you filed any tax returns reporting the income that

9    you received from the government?

10   A    Not at this point of time.

11   Q    Sorry?

12   A    Not in this point of time.

13   Q    Not to this point of time?

14   A    Yes, sir.

15   Q    You've been receiving money from the government since

16   2006?

17   A    Yes.

18   Q    Are you familiar with the obligation to file a tax

19   return for each tax year, unless you get an extension on

20   April fifteen of the follow year?

21   A    No, I'm not.

22   Q    Has anybody from the government discussed this provision

23   that you agreed to in the agreement that you have in front of

24   you?

25   A    Not that I can recollect.

1    Q    No one mentioned the words after you agreed that you

2    would pay taxes on this, right?

3    A    No.

4    Q    In addition to the money that you received, you didn't

5    receive it all at ones the $50,000?

6    A    No, sir.

7    Q    You received is spread out over time?

8    A    Yes.

9    Q    And is it true when you come to this courthouse or the

10   United States Attorney's office next-door, you get reimbursed

11   for expenses that you incur, correct?

12   A    In the United States attorneys office.

13   Q    Yes?

14   A    The only thing that I be reimbursed so far what I pay to

15   park my car.

16   Q    To park your car?

17   A    Yes, sir.

18   Q    You receive from the government in 2000 and 2009, four

19   hundred and seventeen dollars and fifty cents for parking

20   your car?

21   A    Yes, sir, I don't know the exact amount.

22        MR. SHARGEL:  May I have a moment?

23        (Pause.)

24        I have no further questions.

25             THE COURT:  Thank you Mr. Shargel.

639

Vaughn-cross/Solano

1        Mr. Solano.

2            MR. SALANO:  Just a second.  I need to collect my

3    things.

4            THE COURT:  Take your time.

5    CROSS EXAMINATION

6    BY MR. SALANO:

7    Q    Good afternoon, Mr. Vaughn?

8    A    Good afternoon, sir.

9    Q    Mr. Vaughn, you testified on direct examination as well

10   as on cross by Mr. Shargel that you meet Roger Khan sometime

11   in July of 2005?

12   A    Yes, sir.

13   Q    And that was after your cousin Marvin Vaughn was

14   arrested in Suriname?

15   A    Yes, sir.

16   Q    You quickly began working for Roger Khan at that time?

17   A    Yes.

18   Q    He quickly gained your trust, right?

19   A    Yes, sir.

20   Q    So far so that he started to tell you all of the

21   intimate details of his drug business?

22   A    Not all, sir.

23   Q    But he told you so?

24   A    Yes, sir.

25   Q    And he told you that as you testified on direct

Vaughn-cross/Solano

1   examination that in order to for him to keep his business

2   going he had to sell, approximately, 500 kilogram or doors as

3   you called it of cocaine, right?

4   A    Yes, sir.

5   Q    Now, do you remember when you spoke to the government

6   back in 2006, when you first cooperated that you told them

7   something different about that?

8   A    I don't recollect that, sir.

9        MR. SALANO:  3500 SV-1.

10       When you started speaking to the government in September

11  of '06, you were being as truthful and honest as possible,

12  correct.

13  A    I was trying to be as truthful as possible.

14       MR. SALANO:  May I have page two.

15  Q    If you look at paragraph five on page two.  Just read

16  that first -- those first three lines and tell me if it

17  refreshes your recollection as to whether or not you told the

18  government back in 2006 that in fact you-- Khan had to sell

19  at least fifteen hundred kilos of cocaine?

20  A    I don't remember saying that.  I believe, that might be

21  a mistake.

22  Q    Now, you also told them back in 2006 that he had to sell

23  about $20,000 per kilo, correct?

24  A    U.S. currency.

25  Q    You did?

HENRY SHAPIRO      OFFICIAL COURT REPORTER

Vaughn-cross/Solano

1    A      I might have, sir.

2    Q      Do you recall speaking to some prosecutors back in

3    March, March 12th of 2008, interviewed by some AUSA or

4    assistant United States attorneys that were handling the Khan

5    matter.  Do you recall that interview you had with them?

6    A      Yes.

7    Q      Two woman, one by the name Jones and the other one of

8    Petersen?

9    A      Yes, sir.

10   Q      You were being honest and truthful with them, correct?

11   A      I was to the best of my knowledge.

12   Q      You were being prepared to testify on the Khan case,

13   right?

14   A      Yes, sir.

15   Q      And when you spoke to them, isn't it a fact that you

16   told them that Khan had informed you that he needed to 500 to

17   a thousand kilos of cocaine at thirty-two hundred to

18   thirty-three hundred dollars per kilo, correct?

19   A      I don't recollect that, sir.

20   Q      Now, you testified a little earlier, both on cross and

21   yesterday on direct about a couple of these bombs that you

22   either helped make or helped Roger deliver to the Buxton

23   group. Do you recall that testimony?

24   A      Never said I helped him to make anything, sir.

25           THE COURT:  Please don't go over the same ground

Vaughn-cross/Solano

1   that Mr. Shargel covered.

2           MR. SOLANO: I will not, your Honor.

3   Q    You said that you were told by Mr. Khan that there was a

4   CD bomb that was made, but that Mr. Khan told you and you

5   never observed it, correct?

6   A    Yes, sir.

7   Q    But in fact you did speak to the government back in 2006

8   and you informed them that you actually observed it being

9   built, correct?

10  A    I don't remember if I said that, sir.

11          MR. SALANO:  One second, your Honor.  If I could have

12  SV-10, page six, paragraph six.

13  Q    If you would read the first four lines of that

14  paragraph.

15          Mr. Vaughn, having taken a look at that paragraph --

16  A    I'm still reading.

17  Q    Sorry.

18  A    Yes, I'm finished.

19  Q    Doesn't that refresh your recollection when you spoke to

20  the government that was back in February of '08, that you had

21  explained to them that you observed the Spaniard make this

22  bomb with a CD player and include ten pounds of C-4 explosive

23  and five to six pounds of ballbearings, didn't you tell them

24  that?

25  A    I--.

643

Vaughn-cross/Solano

1    THE COURT:  The question is, having read it, does that

2  refresh your recollection that you said what Mr. Solano asked

3  you about.  Do you understand?

4    THE WITNESS:  Yes, sir.

5    THE COURT:  Does it?

6    THE WITNESS:  Yes, sir.

7    THE COURT:  What's your recollection?

8    THE WITNESS:  What I said here is that I saw him

9  make it, I never said that I saw him install it.

10 Q    When you say you said you saw him make it, what part of

11 making it did you observe?

12 A    Just happened past the office and seeing him putting a

13 few wires and things together.

14 Q    You understood is to be a C-4 explosive?

15 A    That is what Khan told me.

16 Q    You saw him putting something together and Khan told you

17 it was a C-4 explosive?

18 A    Yes, sir.

19 Q    Do you have any idea what the power --

20    THE COURT:  We covered the bombs enough.  Move off

21 to another subject.

22 Q    In any event, you started to cooperate with the federal

23 government in September of 2006?

24 A    Yes, sir.

25 Q    And when was Khan arrested, by the way?

644

Vaughn-cross/Solano

1   A     Sometime in 2006.

2   Q     He was arrested a couple of month before you started to

3   cooperating with the government, correct?

4   A     Yes, sir.

5   Q     And you testified earlier the reason that you started to

6   cooperate because you didn't want to see innocent children

7   being killed anymore?

8   A     I never said children, I believe I said got tired of

9   innocent being killed --

10  Q     Killed or tortured?

11  A     Yes.

12  Q     You immediately paying dividends to the government by

13  tipping off certain things that you believed that Roger Khan

14  and his people were going to do?

15  A     I don't understand the question.

16  Q     Back in 2007, early 2007, I believe, you testified to

17  this on direct examination, you informed the federal

18  government that you had information that Khan was going to

19  attempt to escape from prison?

20  A     Yes, sir, I did.

21  Q     And then you gave them additional information that you

22  believe that members of Khan's group were going to kidnap a

23  member of the United States embassy in retaliation for him

24  being arrested?

25  A     Yes, that was information I had while in Guayana.

HENRY SHAPIRO     OFFICIAL COURT REPORTER

645

Vaughn-cross/Solano

1  Q    You gave that to the government?

2  A    Yes.

3  Q    You additionally gave to the government information that

4  you had that Khan's group was going to kidnap the embassy

5  members wife, correct?

6  A    I don't remember if I said so.

7  Q    But this information about the kidnappings was being

8  given to you by Paul Rodriguez?

9  A    Yes, I believe so.

10  Q    As a result of that, as a result of that cooperation you

11  started to get threats to your life in January of '08 into

12  February of '08, correct?

13  A    Yes, sir.

14  Q    And the threats you were getting were specifically from

15  and members of the Khan organization, correct?

16  A    Yes, sir.

17  Q    In fact, you then started to cooperate and speaking to

18  the prosecutors on Khan's underlying matter, or Khan's drug

19  case in March of '08, correct?

20  A    Yes, sir.

21  Q    I believe you testified on direct examination that as a

22  result of your cooperation on Khan's drug case, that there

23  were further threats to your life and, I believe, you said to

24  the lives of your family, correct me if I'm wrong?

25  A    I don't remember if I said that, sir.

Vaughn-cross/Solano

1   Q    You certainly thought that because of your testimony or

2   perspective testimony that you were being threatened by

3   Khan's people?

4   A    I don't think I understand your question, sir.

5   Q    Well, you gave information to the government about what

6   the Khan organization is doing, correct?

7   A    Yes.

8   Q    In January of '08 and February of '08 you have

9   information that Khan's people are looking for you, correct?

10  A    Yes, sir.

11  Q    And you believe it to be a threat on your life,

12  correct

13  A    Yes, sir.

14  Q    Then in March, a couple of month after that, in March

15  when you are preparing to testify in the Khan case, you get

16  additional information that people from the Khan organization

17  are looking for you, correct?

18  A    Might have been.

19  Q    And the might have been was to do harm to you, right?

20  A    Yes, sir.

21  Q    And some of those people are, I think, mentioned them

22  before, Collin Moore?

23  A    Might have been.  I don't remember if I mention it.

24  Q    Don't you remember having a conversation in early 2008

25  with Clayton Hudson telling you that Colen Moore is looking

647

Vaughn-cross/Solano

1   for you?

2   A   Sir, I don't recollect having that conversation with

3   Clayton Hudson.

4        MR. SALANO:   One second, your Honor.

5   Q   In any event, by March of 2008, these threats are so

6   serious that the U.S. government brings you and your family

7   from Guayana to the U.S.?

8   A   Sir, I don't think that was the case then.

9   Q   Well, what were the reasons why your family was brought

10  to the U.S.

11  A   I was talking then with the U.S. Attorney's in relation

12  to me testifying, and I expressed concern for the safety of

13  my wife and kids back in Guayana.

14  Q   Your concern there would be retaliation from the Khan

15  members, correct?

16  A   Yes.

17  Q   Right before that, some members from the Khan group you

18  believe were looking for you?

19  A   Yes, that is the information I was getting.

20  Q   A month after that, a month after you believe that

21  Khan's group was looking to harm you, you are telling this

22  jury that those same Khan members are recruiting you to help

23  Khan look for, tamper with and corrupt witnesses?

24  A   Yes, sir, because that's how they operate.

25  Q   How is that?

Vaughn-cross/Solano

1    A    At that time they needed me.

2    Q    Let me understand your testimony correctly.  They needed

3    you-- they knew you were going to testifying for Khan?

4    A    I don't know if they knew that, sir.

5    Q    You believe that they suspected that?

6    A    That's my belief, but I don't know that for a fact, sir.

7    Q    Now, let me bring you to May 13 of 2008.

8         The first meeting that you had with Mr. Simels and Ms.

9    Irving, you had never met Arienne Irving, correct?

10   A    No.

11   Q    Unlike Mr. Simels when you said you spoke to him the

12   year before, you never heard her name?

13   A    No, I never did.

14   Q    The first time that you actually set eyes on her when he

15   walked into the meeting?

16   A    Yes.

17   Q    She walked in with a pad?

18   A    Yes.

19   Q    And she started to take notes with regards to the

20   meeting, correct?

21   A    Yes.

22   Q    She was writing down the things you were saying?

23   A    Might have been. I don't know exactly what she was

24   writing.

25   Q    And she appeared to be writing down the things that Mr.

Vaughn-cross/Solano

1   Simels was saying?

2   A    I don't know what she was writing.

3   Q    You testified on direct examination you weren't sure

4   which meetings she was in and which meetings she wasn't in,

5   correct?

6   A    I don't remember saying that.

7   Q    You are sure she was on the May 13 meeting?

8   A    Yes.

9   Q    She would walk in and out of the meeting, correct?

10  A    At times.

11  Q    And, I believe, you testified on direct examination that

12  you weren't sure at what parts she walked in and out of?

13  A    Sir, I believe that question was in relation when I

14  received the thousand dollars from Mr. Simels whether or not

15  she was in the room at that time.

16  Q    As you sit here today, do you recall whether she was in

17  the room or not in the room?

18  A    Sir, remain the same.  I don't recollect much, she be in

19  and out at that particular meeting.

20  Q    You had an opportunity when playing the playing the

21  transcript to hear when she would walk in and walk out of the

22  room, correct?

23  A    I don't know.  I heard steps, there were a lot of people

24  in and out of that room.

25  Q    In the May 13th meeting how many people came in and out

Vaughn-cross/Solano

1   of the room, other than Mr. Irving or Mr. Simels?

2   A    I think there was a guy that came halfway in the room,

3   he might have been a handyman.

4   Q    Halfway into the room?

5   A    Might have been.

6   Q    Did he have heals on?

7   A    I don't know.

8       MR. SALANO:  If I could have you look at 41-T-3, page

9   four, line 21.

10          THE COURT:  It's on the screen.

11  A    Which page again?

12          THE COURT:  Mr. Vaughn, it's on the screen if it's

13  helpful.

14          MR. SALANO:  Page four, line 21.

15          THE COURT:  Do you see it.

16  A    Yes.

17  Q    When you have that, just let me know, I would like to

18  play the actual piece of the recording at that point?

19  A    Yes, sir, I saw it.

20          THE COURT:  Go ahead.

21  Q    Did you hear her heels when she came in right before she

22  introduced herself?

23  A    I didn't hear anything, can you replay it.

24      MR. SALANO:  Yes, play it one more time.

25      (Tape played.)

Vaughn-cross/Solano

1  Q    Did you hear it at that point?

2  A    Sir, I heard what seems to be footsteps.

3  Q    Right before she says, hello I'm Arienne, correct?

4  A    Yes, sir.

5       MR. SALANO:  If I could have page 13, line 26 of the

6  same transcript.  If you could play the corresponding

7  recording.

8       (Tape played.)

9       MR. SALANO:  Stop right there.

10 Q    Did you hear those footsteps?

11 A    Yes, I heard footsteps.

12 Q    Does that help you refresh your recollection whether or

13 not she walked out of the meeting at that point?

14 A    Sir, as I said she be in and out of those meetings.

15      MR. SALANO:  Go to page fifteen, line 13.  If you could

16 play that corresponding piece right there.

17      (Tape played.)

18 Q    Did you hear the footsteps at that point?

19 A    I heard what appears to be footsteps, don't know who it

20 is.

21 Q    Does that refresh your recollection whether or not

22 anybody entered the meeting again at this point?

23 A    No, sir.

24 Q    But clearly you hear the footsteps when she's coming in

25 and out of meeting?

652

Vaughn-cross/Solano

1  A    Sir, I heard footsteps, I don't know whom it is.

2       MR. SALANO:  If I could just turn your attention to the

3  June 20th meeting.  Page thirty-two, line five at 41 R 13 to

4  41 T 13.  This is the meeting where you claim that $1,000 is

5  given to you, correct.

6  A    Might have been, sir.

7  Q    What do you mean might have been.  Didn't you get $1,000

8  or did you not get $1,000?

9  A    Yes, sir, I got $1,000. I don't recollect the exact

10 date.

11      MR. SALANO:  If I could backup a second, your Honor. If

12 I could have page thirty-two, line 23.  If you could play it

13 for us, please.

14      (Tape played.)

15      MR. SALANO:  Stop please. If you could take us to page

16 17, line the 34. I apologize.  If you could play that.

17      (Tape played.)

18      MR. SALANO:  You could stop it right there.

19 Q    You hear the footsteps at that point, Mr. Vaughn?

20 A    Yes, sir.

21 Q    Did you hear Ms. Irving say who is it?

22 A    Yes, sir.

23 Q    And then she responded on line -- page 17, line 38. The

24 person you asked for Regan?

25 A    Yes, sir.

653
Vaughn-cross/Solano

1  Q    At that point you heard the footsteps, correct?

2  A    Yes.

3  Q    At that point it's your understanding that she left the

4  room?

5  A    I remember that because she was sitting right next to me

6  at that time.

7            THE COURT:  Let's break for lunch.

8            MR. SALANO:  Excuse me?

9            THE COURT:  Let's break for lunch.  Don't discuss

10 the case.  We'll resume the 2:00 o'clock.  All rise.

11           (Jury leaves courtroom.)

12           THE COURT:  You may step out, Mr. Vaughn.

13           THE COURT:  I'm just thinking about this witness

14 that we discussed this morning. How much longer?

15           MR. SALANO:  Probably another few minutes.

16           THE COURT:  Your redirect.

17           MR. FODEMAN:  We haven't discussed it with defense.

18 Perhaps the best thing to do--.

19           THE COURT:  You're going to take the whole afternoon

20 with the redirect and recross?

21           MR. FODEMAN:  I don't know.  This guy is from out of

22 the country.

23           THE COURT:  How long is the direct?

24           MR. FODEMAN:  20 minutes.

25           THE COURT:  How long is the cross?

654

Vaughn-cross/Solano

1        MR. SHARGEL:  I think it would be best if we had the

2   recross and redirect.

3        THE COURT:  Let's see where we are at 3:00 o'clock.

4   It should not be that lengthy redirect.

5        MR. FODEMAN:  I agree.

6        (Luncheon recess taken.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Ready.

2           MR. FODEMAN:  We're ready.

3    S E L W Y N    V A U G H N,

4        called as a witness, having been previously duly

5        sworn, was examined and testified as follows:

6           THE COURT:  All rise.

7           (Jury present.)

8           THE COURT:  Please be seated, everyone.

9           Mr. Solano.

10          MR. SALANO:  Thank you, your Honor.

11   CROSS EXAMINATION

12   BY MR. SOLANO:

13   Q    When we least you testified that at the portion that we

14   played, which was page 17, line 34, that you recall Ms.

15   Irving and this is from the June 20th meeting, that you

16   recall

17   Ms. Irving had left the room because she had been sitting

18   next to you.

19       Do you recall where we are

20   A    I'm not sure that I understand your question.

21   Q    Before we broke for lunch, I was asking you questions

22   about whether Ms. Irving was in the meeting or out of the

23   meeting at certain times, correct?

24   A    I believe owe.

25   Q    The last point where we left was on page 17, line 34,

656

1    you were played a portion and shown a portion of the

2    transcript, and you testified that you recall her leaving at

3    that point, do you recall?

4    A    Yes, sir.

5    Q    Okay.

6         Now, it's soon after that, shortly after that, on that

7    meeting that you are given $1,000 to start this investigation

8    or gather materials, correct?

9    A    Yes, sir, some time after that.

10   Q    Sometime after that.

11        MR. SALANO:  If we could go to page 21, line 31.

12   According to the transcript if you could read that, it's,

13   approximately, five pages later, correct?

14   A    Yes, sir.

15   Q    Now, do you recall, sir, during this meeting when she

16   leaves, Ms. Irving leaves at this time, she's out of the

17   meeting for, approximately, 30 to 40 minutes.

18        Do you recall that?

19   A    No, sir, I don't.

20   Q    Page thirty-two, line five threw fifteen, if you could

21   play that.

22        (Tape played.)

23        MR. SOLANO:  You can stop right there.

24   Q    Do you recall at this point Ms. Irving returned into the

25   meeting?

HENRY SHAPIRO     OFFICIAL COURT REPORTER

1  A    No, I don't.  As I said before she's been in and out.

2       MR. SOLANO:  If you could go to page thirty-two, 23 and

3  just let me know if this refreshes your recollection as to

4  whether or not she leaves at this point, which is five lines

5  further.

6       (Tape played.)

7       MR. SOLANO:  Stop right there.

8  Q    Does that refresh your recollection that she then leaves

9  again from the meeting?

10  A    Yes, sir.

11  Q    Now, at no time when you were at the meetings, on any of

12  the dates, do you recall the door to the conference room or

13  to Mr. Simels' office not being locked, people going in back

14  and fourth?

15  A    Yes, sir.

16  Q    One of those people that would go back and forth was the

17  secretary that Mr. Simels had at the time, correct.  Do you

18  remember her?

19  A    Yes, sir, and a cleaning lady would be back and forth.

20  Q    Back and forth.  Do you recall that young secretary --

21  the young woman's name?

22  A    No.

23  Q    She's Guyanese, right?

24  A    I believe so.

25  Q    She was the one who in subsequent meetings gives you

658

1    information about this Fara person, right?

2    A    Yes.

3    Q    She tells you at some point she had been looking for

4    Fara at this particular tavern, right?

5    A    Yes, sir.

6    Q    And we actually heard part of that conversation where

7    she gives you the address or she gives you the location where

8    she leaves it, correct?

9    A    She was telling me where she believe it is.

10   Q    How to get there?

11   A    Yes.

12   Q    You testified on direct examination yesterday about a

13   gentleman by the name of Regan.  Do you recall that?

14   A    Yes, sir.

15   Q    Regan is one of Roger Khan's employees of his timber

16   company, right?

17   A    Yes, sir.

18   Q    And you testified on direct examination that you had

19   seen Regan give Khan a gun, which was then in turn given to

20   you, right?

21   A    Yes, sir.

22   Q    Do you recall having a conversation with prosecutors on

23   the Khan case, Ms. Jones and Ms. Petersen and asked

24   specifically about Regan?

25   A    No, I don't.

659

Vaughn-redirect/D'Alessandro

1    MR. SOLANO:  If he could be shown SV-21, page seven.  If

2  you could highlight the portion that starts Regan.

3  Q    Mr. Vaugh, once you read that, let me know when your

4  done?

5  A    Yes, I'm finished.

6  Q    Does that refresh your recollection that at no point in

7  the meeting that you had with the prosecutors in March when

8  they asked you specifically about Regan, did you ever tell

9  them that Regan had given you or Khan a Glock 44 pistol?

10 A    I don't remember if I tell them that, sir. Just part of

11 the conversation I'm seeing here.

12    MR. SOLANO:  I have nothing further.

13      THE COURT:  Any redirect?

14      MR. D'ALESSANDRO:  Yes.

15 REDIRECT EXAMINATION

16 BY MR. D'ALESSANDRO

17 Q    Good afternoon, Mr. Vaughn?

18 A    Good afternoon.

19 Q    Now, Mr. Shargel was asking you some questions about the

20 meetings that you had with Mr. Simels and whether you ever

21 told him about this or that. I'll be specific.

22    Whether you ever told him about a kidnapping, whether

23 you told him about your past arrest,, do you remember those

24 questions?

25 A    Yes, sir.

HENRY SHAPIRO      OFFICIAL COURT REPORTER

Vaughn-redirect/D'Alessandro

1    Q     And your answer was, no, I didn't tell them about those

2    things?

3    A     Yes, sir.

4    Q     Do you recall if Mr. Simels ever asking, were you

5    involved in a kidnapping?

6    A     No, he did never did.

7    Q     Did he ask you, have you been convicted of a crime?

8    A     No.

9    Q     But he did ask you specific questions on the first

10   meeting, do you recall?

11   A     Yes, sir, he asked me questions.

12   Q     And part of the questions he was asking you is how you

13   got involved with Roger Khan, do you recall that?

14   A     Yes, sir, he did.

15   Q     And you started out your answer by explaining to Mr.

16   Simels that you got involved because of your cousin,

17   correct

18   A     Yes, sir.

19   Q     And if you recall the conversation, if not we can refer

20   you to the transcript, what did you tell Mr. Simels about

21   your cousin in relation to Roger Khan?

22   A     That he was working for Roger, he was one of the

23   founding members of that group.

24   Q     What group?

25   A     The phantom squad.

Vaughn-redirect/D'Alessandro

1   Q    Specifically, did you tell Mr. Simels where your cousin

2   was?

3   A    Yes, sir.

4   Q    Where did you tell him he was?

5   A    He was in prison in Suriname.

6   Q    For what?

7   A    A drive by shooting.

8   Q    Was it drive by shooting to what exactly?

9   A    To a transaction.

10  Q    You also explained to him, he asked you questions about

11  your job, whether you are working in the United States. Do

12  you recall that?

13  A    Yes, sir.

14  Q    Do you recall what your answer was?

15  A    Yes, sir.

16  Q    What did you say?

17  A    I said I was entrepreneur.

18       MR. SHARGEL:  I did not hear that.

19  A    I said I was an entrepreneur.

20  Q    Did Mr. Simels, if you recall, ask you any follow up

21  question, what do you mean by that?

22  A    No, sir, I don't remember him asking me questions.

23  Q    Now, did there come a time that Mr. Simels gave you any

24  instructions about what -- strike that.

25       Did you have an understanding in that meeting what role

Vaughn-redirect/D'Alessandro

1   you were personally going to play, if any, in Roger's trial?

2   A    Yes.

3   Q    What was that?

4   A    I might be a possible witness.

5   Q    Did you receive any instructions from the defendant,

6   Robert Simels, about your job, what you should say?

7   A    Yes, sir.

8   Q    What did he tell you, you were supposed to say?

9   A    Said I should not say I'm an entrepreneur, I'm a laborer

10  something.

11  Q    Do you recall him telling you anything about Roger, what

12  you were supposed to say about Roger?

13  A    Yes, sir.

14  Q    What do you recall he told you you were supposed to say

15  about Roger?

16  A    That he wasn't a drug dealer, I know him to have his own

17  a timber business, he build houses, that he does charitable

18  work.

19  Q    And prior to this, did you explain to the defendant,

20  Robert Simels, and Arienne Irving, where Roger was in

21  relation to the organization?

22  A    Yes.

23  Q    How did you describe him?

24  A    He was the boss.

25  Q    Did you receive any instructions, if you were supposed

663

Vaughn-redirect/D'Alessandro

1    to testify, as to what you were supposed to say about that?

2    A    Yes, sir.

3    Q    What did Mr. Simels say you were to say?

4    A    I should never say he was the boss.

5         MR. D'ALESSANDRO:  One moment, your Honor.

6    Q    There was some questions about Mr. Simels efforts to get

7    you to tell him the truth, for you to tell him things.  Do

8    you recall that line of questions?

9    A    Yes, sir.

10        MR. D'ALESSANDRO:  This is in evidence, 401 T-13. Your

11   Honor, can we publish it?

12            THE COURT:  Yes.

13            MR. D'ALESSANDRO:  Page ten, line 22.

14   Q    This is a portion of the transcript, line 22, he said

15   you used Clark's wife, who was injured then, was it Rondell

16   that was injured, she used to come in and treat Rondell with

17   other nurses at night.

18        This is Mr. Simels relating to you a conversation that

19   he had with another person, is that correct?

20   A    Yes, sir.

21   Q    And then you respond, I don't think that, I think that

22   he's trying to give you a story, because when Rondell was

23   injured, Rondell was in a house that was provided by me and

24   that was in Bricks and not in Buxton?

25   A    The only person from Roger's group that had access to

664

Vaughn-redirect/D'Alessandro

1   Rondell in that house and so on was me.  That was something

2   that Roger himself would be able to confirm, you know. Mr.

3   Simels, maybe he's giving us a story.

4       On page 21, this is Mr. Simels relating to you

5   somethings that he heard about David Clarke, well I mean, I

6   have heard so many stories, Clarke stories, you don't know,

7   because people are trying to help Roger, whether they are

8   true or not true, frankly, I actually don't care. I mean

9   people telling me stories. I meet with a guy who actually in

10  the army right now, he told me a story about an officer,

11  female officer that came into Clark's office at the airport,

12  he was naked when she came in, playing a pornography.  Is it

13  true. I have no idea.

14      You reply, I don't know. I have never heard about it

15  quit honestly, I never heard about that.

16      Do you recall those portions of the transcript -- of it

17  recording.

18  A    Yes, sir.

19  Q    There came a point when Mr. Simels you testified created

20  an affidavit, a statement for Leslyn Camacho.  Do you recall

21  that?

22  A    Yes, sir.

23  Q    What was the plan?

24  A    For her to come and say things which weren't true about

25  Clarke.

Vaughn-redirect/D'Alessandro

1   Q    For what?

2   A    Could be used in court against him.

3   Q    You had just told him in those two instances that the

4   things about David Clark's wife going to help out Rondell was

5   not true and that you never heard anything about this

6   pornography thing by David Clarke, is that correct?

7   A    Yes.

8        MR. D'ALESSANDRO:  In evidence 304.  Can you read this

9   portion for us.

10  A    David Clarke was always had many girlfriends. Put in

11  names. Says terrible things about his wife that I never loved

12  her, et cetera, he told me that his wife, while working in

13  the military in Guayana, treated the wounded members of the

14  Taliban, so that they could get better and conmmit more

15  crimes, that David helped her to do that.

16  Q    Can you ride this portion, please?

17  A    Used pornographic videos and drugs slash alcohol to

18  seduce young female military officers.

19  Q    This affidavit, was created, the recording that we read

20  the transcript was from June 20, 2008.

21       Do you recall if you do when this affidavit was --

22       MR. SHARGEL:  I will object to this. This is not an

23  affidavit?

24          THE COURT:  Sustained as to form.

25          MR. D'ALESSANDRO:  Government Exhibit 304.

HENRY SHAPIRO       OFFICIAL COURT REPORTER

666

Vaughn-redirect/D'Alessandro

1    Q    Do you recall whether the was created after the meeting

2    on June 20, 2008?

3    A    I don't remember, sir.

4    Q    Do you see this date on the upper right-hand corner of

5    the document, 304?

6    A    Yes, sir.

7    Q    Can you read that date for us?

8    A    July 18, '08.

9    Q    Does that refresh your recollection on the date that you

10   received this statement, sir?

11   A    Yes, sir.

12   Q    It was July 18?

13   A    Yes, sir.

14   Q    After you told the defendant, Simels, that David Clark's

15   wife doesn't treat Rondell Rawlins and Ronald Waddell was

16   from group?

17   A    The Buxton group.

18   Q    That is the Taliban that is described here?

19   A    Yes.

20   Q    Doesn't, to your knowledge, use pornographic videos to

21   seduce officers, is that correct?

22   A    Yes, sir.

23   Q    This is Government Exhibit 401 T-10-- H-10, line 24.

24   Mr. Simels tells you everything is going to be see in

25   Guayana, I'm going to go and talk about, clearly the

HENRY SHAPIRO     OFFICIAL COURT REPORTER

Vaughn-redirect/D'Alessandro

1    prosecutor can say, well, do you know Ricardo. It would be

2    too much of a stretch for people to say that they don't know

3    Ricardo, so, I think, to the extent people know Ricardo, they

4    have to say that they do, to the extent that you can say how

5    do you know Ricardo or do you see Ricardo with Roger, the

6    answer would be Guayanba is a small community, particularly

7    Georgetown, you run into the same people all the time at

8    various places. There are only so many restaurants in

9    Guayana. If you're going to go out at all at night, you will

10   run into them.

11       Is this Simels asking you what relationship in this

12   portion of the transcript, is he asking you what

13   relationship, if any, Ricardo has with Roger Khan?

14   A    No, sir.

15   Q    What is he doing, what is your understanding what he's

16   doing?

17   A    I understand it to mean, should I testify I keep right

18   to a part, they might meet in the same places, but there was

19   no relationship between them.

20   Q    Mr. Shargel in his cross-examination suggested that you

21   were the one who came up with the idea of approaching David

22   Clark's mother.

23       Do you recall that line of questions?

24   A    Yes, sir.

25   Q    I believe, specifically, he was referring to-- this is

Vaughn-redirect/D'Alessandro

1    R-10 in evidence -- 401 T-10 in evidence, line 25.  You say.

2    I think, if you know key people you get certain key people it

3    would cause him to rethink his position. One thing I've

4    learned a man, whether he's a criminal, he's a preacher, he

5    always values his mother, because if you're not certain with

6    anyone else to be at your side, your mother very likely will

7    be there. You don't want anything ever to happen to her.

8        Do you recall Mr. Sharing asking you questions with

9    regard to that portion of the transcript?

10   A    Yes, sir.

11   Q    Let's go back before then, page nine, line 17.  Mr.

12   Simels says, Roger needs, Roger needs, Roger either needs

13   Clarke not to testify, to agree to say I'm throwing away my

14   deal, I don't want to testify, or we need to know every

15   little detail of his life, as we need people, I would take

16   his mother who would get on, put her on the witness stand, if

17   she would do it to say my son hates Roger Khan and told me he

18   was going to lie about Roger Khan, I mean that is the

19   ultimate example, if not what do you understand Robert Simels

20   to be telling you?

21   A    That we can use Clarke's mother against him.

22   Q    And who is Robert Simels talking for, who is he telling

23   you to do this for?

24   A    Roger Khan.

25   Q    Mr. Solano was asking you some questions about threats

Vaughn-redirect/D'Alessandro

1   that you received from the phantom squad, the gang members in

2   Guayana.

3       Do you recall the line of questions?

4   A   Yes, sir.

5   Q   There was some questions about the timing, about you

6   receiving threats before you had contact with either the

7   defendant, Robert Simels, in person or the defendant Arienne

8   Irving.

9       Do you recall that?

10  A   Yes, sir.

11  Q   What is your understanding -- let me stop right there

12  for a second.

13      What is your understanding of what would happen to you

14  if you said, no, to people in Roger's gang?

15  A   I would be penalized.

16  Q   They would give you a $50.00 fine. What do you mean

17  "penalized"?

18  A   I could be killed.

19  Q   It would just be you?

20  A   Me and anyone concerned.

21  Q   You received threats from the gang members before you

22  contacted the defendant the beginning in May of '08,

23  correct

24  A   Yes, sir.

25  Q   And then you testified what happened in between then?

HENRY SHAPIRO      OFFICIAL COURT REPORTER

Vaughn-redirect/D'Alessandro

1   A     I started talking with the prosecutors in the Khan trial

2   of me being a possible witness.

3   Q     Because of that, what happened with your family, what

4   was done for your family?

5   A     They were brought to the U.S.

6   Q     Prior to, I guess, you have been on the stand three

7   days, prior to Tuesday, had you ever testified on behalf of

8   the government before?

9   A     No.

10  Q     To your knowledge was your identity as a cooperator

11  publicly known?

12  A     I wasn't aware of that, sir.

13  Q     So you had not testified.  In preparation for testifying

14  in the Khan case that your family was brought?

15  A     Yes, sir.

16  Q     What would happen -- what is your believe what would

17  happen if your family remained in Guayana and you testified

18  in the Roger Khan case?

19  A     They would have been killed.

20  Q     I understand that you are acting at the direction of law

21  enforcement when you contacted the defendant, Robert Simels

22  and Arienne Irving, you testified to that on Monday, is that

23  correct?

24  A     Yes, sir, Tuesday.

25  Q     Tuesday.  What prompted your contacting them?

HENRY SHAPIRO        OFFICIAL COURT REPORTER

Vaughn-redirect/D'Alessandro

1   A    Because I contacted by some of the guys that were in

2   Guayana.

3   Q    What did they want you to do?

4   A    Meet with Mr. Simels up here.

5   Q    For what purpose?  Did you have an understanding at that

6   time?

7   A    It was mentioned to me that David Clarke --

8        MR. SHARGEL:  I object to this.

9        THE COURT:  Overruled. I think it's a fair response

10  to Mr. Solano's cross-examination.

11       Go ahead.

12  A    Yes, sir.  Was mentioned to me that David Clarke was up

13  here and he might be cooperating.

14  Q    What is your understanding of how you could help, why

15  would they contact you?

16  A    Because I was part of the group and I was up here.

17  Q    Who did they want you to contact, knowing that David

18  Clarke was cooperating against their boss?

19  A    Robert Simels.

20  Q    Who were you getting instruction from?

21  A    Some of the guys that work for Roger down there.

22  Q    After you met Robert Simels and Arienne Irving, who was

23  giving you instructions what to do?

24  A    Robert Simels.

25  Q    Let me just stop for a second. There was a time at

Vaughn-redirect/D'Alessandro

1    the first meeting that you were asked certain questions,

2    correct, by Mr. Simels

3    A    Yes, sir.

4    Q    And you at one point said, I don't want -- in words or

5    substance -- I don't want to get into that right now,

6    correct

7    A    Yes, sir.

8    Q    And what did you ask for in order to really open up?

9    A    I said, I would like have a note from Roger Khan.

10   Q    For what purpose?

11   A    To clair up a few things.

12   Q    Did you get that note?

13   A    Yes, sir.

14   Q    And the note said you could talk to my lawyers, tell

15   them everything?

16   A    Yes, sir.

17   Q    After you got that note, do you recall Mr. Simels coming

18   back to you about any questions that you didn't answer

19   specifically?

20   A    He might have.

21   Q    There was a suggestion that you are testifying saying

22   the things you are because the government gave you $50,000.

23        When did the first payment start -- it's about $50,000.

24   When did you start cooperating with the government?

25   A    In September 2006.

HENRY SHAPIRO      OFFICIAL COURT REPORTER

Vaughn-redirect/D'Alessandro

1    Q    And the $50,000, was it a lump sum?

2    A    No, sir.

3    Q    It was paid in increments, I think you testified?

4    A    Yes, sir.

5    Q    During the span of your time as a cooperator, correct?

6    A    Yes, sir.

7    Q    And how much of this amount, let's say $50,000, how much

8    of that you estimate went into your pocket, that didn't cover

9    what you were talking about, you testified about hotel

10   reimbursements, phones, traveling, things like that. How much

11   went into your pocket?

12   A    I would say may be about $15,000.

13   Q    When was the last time you received any pavement from

14   the government, any form of money from the government?

15   A    Yesterday.

16   Q    What did you get that money for?

17   A    To transport my mother and sister in another part of

18   Guayana, they're being threatened almost a daily basis.

19   Q    There is talk about the money brought your family here,

20   the money you gave your family that is being threatened, the

21   potential for an S Visa,, what else have you gotten out of

22   testifying and coming to court.

23       MR. SHARGEL:  I object to the form of the question?

24       THE COURT:  Sustained as to form.  Don't sum up. You

25   can ask questions. Don't sum up as you go.

674

Vaughn-redirect/D'Alessandro

1          MR. D'ALESSANDRO:  I apologize.

2     Q    What else have you gotten out of cooperation?

3     A    I've been threatened, particularly since last Saturday,

4     up to last night, people from I know calling my grandmother.

5     As a matter of fact, a female called her last night and told

6     her --

7          MR. SHARGEL:  I object to this.

8          THE COURT:  Come up to sidebar.

9          (Followed on next page.)

Vaughn-redirect/D'Alessandro

1      (sidebar).

2      THE COURT:  Yes.

3      MR. SHARGEL:  I object.  There was no door opened as

4  to receiving threats, number one.

5      Number two, it's not attributable to the two

6  defendants, and I would ask for an instruction, that the jury

7  shouldn't attribute it to these defendants.  There is not a

8  scintilla of evidence to suggest that it came from the

9  defendants on trial.

10      THE COURT:  What's the government theory, coming

11  from Khan?

12      MR. D'ALESSANDRO:  Yes. We can't point our fingers

13  back to the defendants.

14      THE COURT:  Why are you bringing this up?

15      MR. D'ALESSANDRO:  They opened the door, he's up

16  here, he's lying, he wants all of the stuff.

17      THE COURT:  How do you propose that I separate the

18  defendants on trial from the spectre of those that threatened

19  him last night?

20      You want to elicit it from him or do you want me to

21  tell the jury there is no evidence that these defendants have

22  anything to do the threats?

23      MR. FODEMAN:  I don't know what the answer is.

24      MR. D'ALESSANDRO:  I don't know what the answer is

25  going to be. I don't have evidence that they were involved.

Vaughn-redirect/D'Alessandro

1   Does he feel like they had something to do it?  I'm sure he

2   feels they did.  I would not feel comfortable proffering to

3   the Court--.

4           THE COURT:  Why don't I tell the jury the parties

5   agree that any threats he received can't be attributed by

6   this jury to the defendants on trial.

7           MR. SHARGEL:  I'm trying to think.  In Mr. Solano's

8   cross-examination and my cross-examination, there was nothing

9   to suggest that disclosures made by the government, the

10  monies expended were expended for protection.  He's not in

11  the witness protection program.  To put this before the

12  jury-- I don't think that instruction is enough. I move for a

13  declaration of a mistrial.

14          MR. SOLANO:  I join.

15          THE COURT:   I completely disagree. In the context

16  of this case, with the evidence that both sides have brought

17  out about the people in Buxton and the people around Roger

18  Khan, this is hardly surprising, let alone earth shaking.

19          I do think it's important to separate the defendants

20  on trial from this. A big deal was made about payments made

21  to this witness, benefits received from the government.  Some

22  of those benefits, I think, the jury ought to know properly

23  were conferred on him because of the danger that he's in.

24          Your application for a mistrial is denied. I will

25  give that instruction.

Vaughn-redirect/D'Alessandro

1        MR. SHARGEL:  Judge, the thought is, perhaps this

2   instruction should be given in an empathic tone, not just a

3   limitation of everyday's use of an exhibit--.

4        MR. LIPTON:  The instruction would say that the

5   government has no evidence of treats attributable to the

6   defendants--.

7        MR. D'ALESSANDRO:  We'd be fine with that

8   instruction.

9        MR. SHARGEL:  Wait--.

10        THE COURT:  I will just do the emphatic part.

11        MR. SHARGEL:  The emphatic part.

12        (Followed on next page.)

Vaughn-recross/Shargel

1          (Open court).

2          THE COURT:  We will move away from this testimony

3   about threats.  Let me emphasize to you that there is no

4   suggestion here that the two defendants on trial have any

5   role whatsoever in these threats on the witness or to his

6   family about which you heard testimony.

7          All right.

8          MR. D'ALESSANDRO:  Nothing further, your Honor.

9          THE COURT:  Any recross?

10          MR. SHARGEL:  I have a brief recross.

11   RECROSS EXAMINATION

12   BY MR. SHARGEL:

13   Q    Mr. D'Alessandro asked you a question a short time ago--

14   I'm not revisiting the bombs-- he asked you a question about

15   whether you were penalized by Roger Khan or talking about

16   being penalized.  You remember his using that word in his

17   question to you?

18   A    I don't remember.

19   Q    Was there any penalty to be suffered for disrespecting

20   or disobeying Roger Khan while you were with him?

21   A    Yes, sir.

22   Q    And that was something that would be a serious matter,

23   right?

24   A    Yes, sir.

25   Q    When you reported back to Roger Khan that you objected

Vaughn-recross/Shargel

1   to putting a bomb in your car, remember your testimony about

2   that, was there any penalty that you paid at that point?

3   A    I never said that I objected, I expressed concern.

4   Q    And after expressing concern was there any penalty that

5   you had to bear, yes or no?

6   A    No, sir.

7   Q    Now, you were asked several questions by Mr.

8   D'Alessandro about Mr. Simels conversation with you about

9   testimony if you were to be a witness in the case, right?

10  A    Yes, sir.

11  Q    Now, Mr. Simels also told you that it was Roger Khan who

12  wanted you to be a witness in the case, correct?

13  A    Yes, sir.

14  Q    He did not tell you that he made a decision about

15  putting you on the stand in any courtroom, correct?

16  A    I don't remember that he said that.

17  Q    Finally, the talk about Mr. Clarke's mother.  Do you

18  remember the questions that Mr. D'Alessandro asked about

19  that

20  A    Yes, sir.

21  Q    He put -- he referenced the conversation where you

22  brought up the topic of everyone loves his mother, that has

23  been said in words or substance?

24  A    Yes, sir.

25  Q    He said let's go back and he went back to another

Vaughn-recross/Shargel

1   attribution and it was about Mr. Clarke's mother testifying,

2   correct?

3   A    I don't remember him saying that, sir.

4        MR. SHARGEL:  That is T 13, page nine, line 17. May I

5   check that reference.

6        My last questions.

7        MR. D'ALESSANDRO:  T-10, page line, line 17.

8            THE COURT:  I don't think that is it.

9            MR. SHARGEL:  Line 17.  Roger needs, Roger needs,

10  Roger either needs Clarke not to testify, to agree to that,

11  to say I'm throwing away my deal, I don't want to testify, or

12  we need to know every little detail of his life as to we need

13  people who I would take his mother who gets on, put her on

14  the witness stand, if she would do it, to say my son hates

15  Roger Khan and told me he was going to lie about Roger Khan.

16  That is the ultimate example.

17            Mr. Vaughn, what Mr. Simels is saying about David

18  Clarke's mother is an extreme example of using her as a

19  witness, correct.

20  A    As a witness who can lie about her son.

21  Q    Sir, I asked you, I will say it again, it was about a

22  witness, it's your testimony that it's a lie, correct?

23  A    My testimony is not a lie, Mr. Simels go back to the

24  previous conversation.

25            MR. SHARGEL:  No further questions.

681

Myers-direct/Fodeman

1      MR. SOLANO:  Nothing further.

2          THE COURT:  You are excused.

3          THE WITNESS:  Yes, your Honor.

4          THE COURT:  Call your next witness.

5          MR. FODEMAN:  The government calls Peter Myers..

6          (Sworn).

7  P E T E R    M Y E R S,

8       having been first duly sworn, was examined

9       and testified as follows:

10         THE CLERK:  State your full name and spell it for

11  the record

12         THE WITNESS:  Peter Myers, M Y E R S.

13  DIRECT EXAMINATION

14  BY MR. FODEMAN:

15  Q    Mr. Myers, where are you from?

16  A    I'm from the United Kingdom.

17  Q    What do you do for a living?

18  A    I'm a co-director of an election electronics company.

19  Q    What is the name of that company?

20  A    Smith/Myers Myers Communications.

21  Q    If you could put that mike closer to your mouth so that

22  can all hear you in court.

23      You are telling us that you are a co-director of

24  Smith/Myers, is that correct?

25  A    That is correct.

HENRY SHAPIRO      OFFICIAL COURT REPORTER

682

Myers-direct/Fodeman

1    Q     Where is Smith/Myers located?

2    A     We're located just north of London in the U.K.

3    Q     What types of products does your company sell?

4    A     We design and manufacture radio based equipment, some

5    of the applications are for protocol analysis, looking at

6    cell phone protocols and law enforcement intelligence

7    applications

8    Q     Part of your business has to do with protocols related

9    to cell phones?

10   A     Yes.

11   Q     What does that mean?

12   A     A cell phone communicates with a cell tower, using

13   radio, and it has a certain protocol.  There are electronic

14   signals that are digital and from the cell tower and the

15   phone.  To understand what is going on, there are different

16   types of protocols, and we develop equipment to look at the

17   protocols to see if there is a problem or to basically ease

18   drop into the protocols.

19   Q     Who buys that kind of products, what is the nature of

20   your customers?

21   A     On which type?

22   Q     The first type, cell phone?

23   A     It would be cell phone manufacturers or a cell phone

24   network.

25   Q     And then you said there is another area of your

683

Myers-direct/Fodeman

1    company's work that has to do with law enforcement, is that

2    correct?

3    A    Correct.

4    Q    What sort of product do you make, does your company make

5    for law enforcement?

6    A    Over the years the products have evolved and changed

7    because the cellular networks have evolved and changed and

8    initially provided intercept equipment, which would allow the

9    enforcement officers to listen into cell phone conversations.

10   Q    A wiretap?

11   A    A wiretap implies something else, but it basically

12   allows you to listen to the conversation.

13   Q    Understood.

14        You continue to make those sorts of products for law

15   enforcement?

16   A    Those products have changed because the cellular

17   protocol has changed.

18   Q    Are you familiar with all of your -- how long have you

19   worked at the company?

20   A    The company?  I cofounded the company, 23 years ago.

21   Q    Have you worked there ever since?

22   A    Yes.

23   Q    Are you familiar with system called the CSM-7805?

24   A    Yes, sir.

25   Q    Is that a Smith/Myers or was it?

684

Myers-direct/Fodeman

1   A      It was and is a Smith/Myers product.

2   Q      And is that particular product still in production?

3   A      Not in production, no.  It's supported.

4   Q      What type of product is the CSM-7806?

5   A      It's a product designed for law enforcement.

6   Q      And it permits the operator to do what?

7   A      To listen in on a cellular conversation.

8   Q      Does it also, when fully setup, allow the operator to

9   record those conversations?

10  A      Yes, sir.  The audio is recorded onto the hard drive.

11  Q      You sold that system?

12  A      Yes.

13  Q      Where was it manufactured -- where is system

14  manufactured or was?

15  A      In the United Kingdom.

16  Q      Approximately, how much did that system cost?

17  A      It would generally speaking in U.S. dollars about

18  seventy-five thousand dollars.

19  Q      A could a private citizen buy a system like that?

20  A      No.

21  Q      If someone called up your company and said, I want to

22  listen to my girlfriend's cell phone conversations, would you

23  sell them a system like that?

24  A      No.

25  Q      You mentioned the CSM-7806 is not still in production,

HENRY SHAPIRO      OFFICIAL COURT REPORTER

Myers-direct/Fodeman

1   is that correct?

2   A     That is correct.

3   Q     And is there a reason why you no longer produce that

4   particular system?

5   A     That particular system or the system you are referring

6   to was for also types of cellular systems, which very few

7   countries in the world are still using.

8   Q     The technology is not being used?

9   A     It has been replaced by GSM and CDMA.

10  Q     And you said that the type of technology as it the

11  CSM-7806 was called--

12  A     Amps and deamps, which is a later versus of digital amps

13  also.

14  Q     Was it ever utilized in the United States if you know?

15  A     Yes.

16  Q     What about Guayana, was it ever utilized in Guayana?

17  A     Yes, sir.

18  Q     Do you know if itself still utilized anywhere in the

19  United States?

20  A     I don't know.  It was possible some remote place would

21  have it.

22  Q     How about in Guayana.

23        MR. SHARGEL:  I did not hear the end of the answer?

24        THE COURT:  What was the last thing you said.

25  A     I didn't think so.

Myers-direct/Fodeman

1   Q    What about other parts of the world is it utilized?

2   A    I'm not aware of any.

3   Q    Do you know when it started being phased out and other

4   technology came into existence, approximately?

5   A    Probably starting almost eight or ten years ago

6   possibly.

7   Q    When was it that you stopped selling the 7806, do you

8   know approximately?

9   A    Well, I can't remember the date of the last one.  More

10  than five or six years ago.

11  Q    What are the general components of such a system?

12  A    The components is a receiver or a group of reserves--

13  reading reserves, which are control by a lap top.

14  Q    You said a lap top, is that a regular computer, the kind

15  of computer that we use today?

16  A    It's a lap top, sometimes we may use a literally rugged

17  lap top, but a standard lap top would work.

18  Q    You have a base, is that correct -- a computer and what

19  else?

20  A    A computer, and the computer is connected by USB leads

21  into a chaise, which contains a number of modules. Simplest

22  chaise is the 7001, which just has one module.

23  A    7806 had six modules.

24       (Followed on next page.)

25

Myers - Direct/Fodeman

1:-11:-28 1   DIRECT EXAMINATION (Cont'd.)

1:-11:-28 2   BY MR. FODEMAN:

1:-11:-28 3   Q    And in layman's terms so that we can all understand, how

1:-11:-28 4   does system basically work?

1:-11:-28 5   A    Basically there are radio signals that go from cell

1:-11:-28 6   tower to a phone, and also from the phone to the cell tower.

1:-11:-28 7   This equipment would receive both those signals and decode

1:-11:-28 8   the audio from the signals, and record the standard so that

1:-11:-28 9   you can get one channel transmission from the phone and one

1:-11:-28 10  channel transmission from the cell phone.

1:-11:-28 11  Q    And those recordings would then be recorded or stored

1:-11:-28 12  where?

1:-11:-28 13  A    Onto the laptop.

1:-11:-28 14  Q    As audio files?

1:-11:-28 15  A    As audio files.  Different types of protocols use

1:-11:-28 16  different types of encoding from the audio.  So the type of

1:-11:-28 17  encoding is preserved and it is stored as that type of coding

1:-11:-28 18  that is transmitted.

1:-11:-28 19       MR. FODEMAN:  If I could approach, your Honor, with some

1:-11:-28 20  items?  They can't fit on the Elmo.

1:-11:-28 21       THE COURT:  Yes.

1:-11:-28 22  Q    Let me show you those items, sir.

1:-11:-28 23       Do you recognize the items that have been shown to you,

1:-11:-28 24  sir?

1:-11:-28 25  A    Yes.  This is a 7806.

688

Myers - Direct/Fodeman

1:-11:-28  1    MR. SHARGEL:  Judge, may I stand over here?

1:-11:-28  2    THE COURT:  Yes.

1:-11:-28  3  Q    For the record, you are referring to Government Exhibit

1:-11:-28  4  614 for identification.

1:-11:-28  5    Have you had a chance to look at that before coming to

1:-11:-28  6  court today?

1:-11:-28  7  A    Yes, I have.

1:-11:-28  8  Q    And Government's Exhibit 613 and 612, have you seen

1:-11:-28  9  those items?

1:-11:-28  10  A    I have seen these before.

1:-11:-28  11  Q    What are they or what do they appear to be?

1:-11:-28  12  A    A Panasonic Tough Goose (ph), which is a trade name.  It

1:-11:-28  13  is a laptop of the type that we would sell if required with

1:-11:-28  14  this type of system.

15  Q    Okay.

16    What is this type of system again?

17  A    This is an intercept system.

18  Q    Okay.  The kind that you were describing earlier?

19  A    Yes.

20    MR. FODEMAN:  Your Honor, I would move into evidence

1:-11:-28  21  614, 612, and 613, subject to connection.

22    MR. SHARGEL:  No objection.

23    MR. SOLANO:  No objection, your Honor.

24    THE COURT:  Received.

25    (Whereupon, Government's Exhibits 612, 613 and 614

Myers - Direct/Fodeman

1    were received and marked into evidence, as of this date.)

2    BY MR. FODEMAN:

3    Q    Mr. Myers, you said prior to coming to court today you

4    had a chance to look at those items?

5    A    That's correct.

6    Q    Is there any part of the CSM 7806 system that is missing

7    from that setup?

8    A    There should be a USB cable which physically connects

9    this to the laptops.

10   Q    Meaning the chassis you are referring to?

11   A    Connector.  This a connector on the front panel and one

12   of the laptops would be connected to that.

13   Q    By an USB cable, you mean the kind of cable we pick up

14   at Radio Shack to connect to a printer?

15   A    Exactly the same.

16   Q    Anything else missing?

17   A    Also an aerial connector onto this front part picking up

18   radio waves.

19   Q    Indicating the top of 614; is that correct?

20   A    Yes.

21   Q    And you said it is an aerial or antenna?

22   A    Aerial.  The American term is antenna.

23   Q    Sorry.

24        Could you describe that item, how it might look?

25   A    Well, either the small right angle connector, which

Myers - Direct/Fodeman

1    screws into here and short rubber aerial, about six inches

2    long, or it would be a long one with an aerial with a

3    magnetic end which would go under the car.

4    Q    And where can you buy something like that?

5    A    They are really standard cellular antennas.  You can buy

6    them at Radio Shack.

7    Q    For how many, about?

8    A    I suppose about 10- or $20.00.

9    Q    Let me show you Government Exhibit - and I can do this

10   on the elmo, your Honor - 615 for identification.

11       Let me show you the inside.

12       Do you recognize that, sir?

13   A    Yes.

14   Q    Have you seen that item before?

15   A    Yes, I have.

16   Q    What does it appear to be?

17   A    It is the CD that holds the control program that runs on

18   the laptop.

19   Q    Okay.

20       Which operates this system?

21   A    Which operates the system, yes.

22   Q    And this appears to be something that your company would

23   have produced?

24   A    Yes.  Not every customer would buy a laptop from us.  A

25   customer may want to load the software on his open system.

691

Myers - Direct/Fodeman

1   Q    Understood.

2         MR. FODEMAN:  At this time the government moves into

3   evidence Government's Exhibit 615 subject to connection.

4         MR. SHARGEL:  No objection.

5         MR. SOLANO:  No objection.

6         THE COURT:  Received.

7         (Whereupon, Government's Exhibit 815 was received

8   and marked into evidence, as of this date.)

9   BY MR. FODEMAN:

10  Q    What's the name of your company sir, Smith & Myers?

11  A    That's right.

12  Q    This says CSM 7800 installation.

13       What is the significance?

14  A    It is really a 7800 series.  There's a 7801, 7801, 7806.

15  Q    Would this be compatible with the system that is in

16  front of you, sir?

17  A    Yes.

18  Q    And what we are looking at here what appears to be a CD;

19  is that correct?

20  A    Yes.

21  Q    What is the date on here?

22  A    2002.

23  Q    Now, you told us that you looked at these items, before?

24  A    Yes.

25  Q    Can you tell if anything has ever been removed from the

692

Myers - Direct/Fodeman

1    chassis, the thing to your left?

2    A    On previous inspection, there were certain seals on top

3    of the screws which have been worn, but they haven't been

4    removed, so that the chassis itself doesn't appear to be

5    taken part.

6    Q    Okay.

7    A    The modules in the back, can't tell from it being taken

8    out, but if you did take a module out, there are seals on the

9    original modules.

10   Q    Have you attempted to power up that item?

11   A    I did put power on it, yes.

12   Q    What was the result?

13   A    There was an LED that didn't come on, which indicated

14   there maybe something with the power supply.

15   Q    LED?

16   A    Yes.

17   Q    That's one of the lights we see on it?

18   A    Yes.

19   Q    You said that might indicate what?

20   A    There's a problem with the power supply.

21   Q    What do you mean by that?

22   A    It could be a blown fuse.  It could be a component

23   broken or something doesn't work.

24   Q    It wouldn't work as it sits here today?

25   A    No.

693

Myers - Direct/Fodeman

1:-11:-28  1   Q    How about the laptop, have you attempted to power up the

1:-11:-28  2   laptop?

1:-11:-28  3   A    Yes.  The laptop powered up.  It required a password

1:-11:-28  4   which I didn't have.

1:-11:-28  5   Q    To be clear, even if it was in operational condition,

1:-11:-28  6   would it work today in the United States?

1:-11:-28  7   A    Unlikely because you need to have the cellular system

1:-11:-28  8   that it requires.  Without that cellular system, is probably

1:-11:-28  9   no where in America.

1:-11:-28  10  Q    Understood.

1:-11:-28  11       If I could show you Government's Exhibits - on the Elmo,

1:-11:-28  12  your Honor - 116, 124, 117, and 125, no particular order.

1:-11:-28  13       Have you seen these photographs before?

1:-11:-28  14  A    Yes, I have.

1:-11:-28  15  Q    And what appears to be depicted on these photographs?

1:-11:-28  16  A    It looks like the Smith & Myers software that controls

1:-11:-28  17  the 7806 running on those laptops.

1:-11:-28  18  Q    So it is laptop computer screens and it appears to have

1:-11:-28  19  Smith & Myers software running on it?

1:-11:-28  20  A    Yes.

1:-11:-28  21       MR. FODEMAN:  Your Honor, I would introduce these

1:-11:-28  22  exhibits 116, 117, 124, and 125 into evidence, again subject

1:-11:-28  23  to connection.

1:-11:-28  24       THE COURT:  Any objection to these?

1:-11:-28  25       MR. SHARGEL:  No, Your Honor.

694

Myers - Direct/Fodeman

1:-11:-28  1      MR. SOLANO:  No, your Honor.

1:-11:-28  2      THE COURT:  Received.

1:-11:-28  3      (Whereupon, Government's Exhibits 116, 117, 124 and

1:-11:-28  4  125 were received and marked into evidence, as of this date.)

1:-11:-28  5      MR. FODEMAN:  If I could publish these to the jury.

1:-11:-28  6      THE COURT:  Sure.

1:-11:-28  7      MR. FODEMAN:  First 116.

1:-11:-28  8  Q    Just orient us here.  Where my finger is, that's the

1:-11:-28  9  laptop computer?

10  A    Yes.

11  Q    This is the item that appears to be on your left; is

12  that correct?

13  A    That's correct.

14  Q    The bottom part of the screen, you mention it appears to

15  be running your company's software; is that right?

16  A    Yes.

17  Q    And, in fact -- let me show you 117.

18      What kind of computer does this to be?

19  A    Panasonic.

20  Q    Could you tell if that's -- there appears to be two in

1:-11:-28  21  front of you.

1:-11:-28  22      Is that the big one or small one or can you tell?

1:-11:-28  23  A    It is the small one.

1:-11:-28  24  Q    Okay.

1:-11:-28  25      So that's the one you just opened?

695

Myers - Direct/Fodeman

1    A    This one here.

2    Q    What is the number on that one there?

3    A    Exhibit 612.

4    Q    So what we are looking at in 116 appears to be the same

5    kind of computer that is that exhibit there; is that correct?

6    A    That's correct.

7    Q    Okay.

8              MR. SHARGEL:  May we have the number of that

9    photograph that was just on the elmo?  We can't see the

10   number.

11             MR. FODEMAN:  116.

12             MR. SHARGEL:  Thank you.

13   BY MR. FODEMAN:

14   Q    Now I will show you 117.

15        You said you took a look at this before?

16   A    Yes.

17   Q    All right.

18        What does it say there where my finger is?  Is that of

19   any significance to you?

20   A    Well, it says -- it's got a company logo and says Series

21   SM 1700 Program.  So that's the program that was loaded from

22   the CD.

23   Q    And does this appear to be a screen that would be --

24   that would come up if you were operating the software that we

25   looked at before?

Myers - Direct/Fodeman

1  A    That's correct.

2  Q    Okay.

3       What is this -- by the way I'm looking at 117.

4       What is this list down on the left-hand side?

5  A    This manual is for targets, so this is specific mobile

6  phones, dialed numbers that you would like to intercept.

7  Q    Telephone numbers, cell phone numbers?

8  A    Well, some of them would be cell phone numbers, but

9  dialed numbers could be added by cell phone number.

10  Q    All right.

11       Take look at 124.  It appears to be, says here,

12  Panasonic Series F 28.

13       Is that the type of laptop that the other exhibit before

14  you is?

15  A    That's the larger one.

16  Q    What is the exhibit number on that?

17  A    613.

18  Q    Okay.  Showing you 125.

19       What does that appear to be?

20  A    Again, that's a target list.

21  Q    Could you tell if this is Smith & Myers software on

22  here?

23  A    Yes.

24  Q    How do you know?

25  A    Well, it's got our logo at the top, SM 7800 Series

697

Myers - Direct/Fodeman

1    Control Program, version three.

2    Q    Couple of more questions, sir.

3         By the way, before I move on, you mentioned that you can

4    store audio files of telephone conversations in the laptop in

5    the system; is that right?

6    A    That's correct.

7    Q    Are any phone calls or is there any storage capabilities

8    in that other item there, the chassis part of the system?

9    A    No.

10   Q    That doesn't store anything?

11   A    No, it doesn't store anything.

12   Q    Can one retrieve the phone calls without having the

13   base, for lack of a better word?

14   A    Yes.

15   Q    So, if you just have the laptop and it was working and

16   the password, you can go on and retrieve calls?

17   A    That's correct.

18   Q    And could you download those calls and store them?

19   A    You could, just data files.  You can store them anywhere

20   you want to.

21   Q    So, your company, if I'm correct, designed that system;

22   is that right?

23   A    That's correct.

24   Q    Your company manufactured that system?

25   A    Yes, that's correct.

698

Myers - Cross/Shargel

1   Q      You marketed it?

2   A      That's correct, yes.

3   Q      Did you ever service that type of equipment?

4   A      We service that type.

5   Q      And of course you told us before you sold that type of

6   equipment; is that right?

7   A      That's correct.

8   Q      What is the design of that system as a whole?  What does

9   it make a device primarily useful for?

10         MR. SOLANO:  Objection.

11         THE COURT:  Overruled.

12  A      It's been designed to intercept cellular telephone

13  calls.  This particular model has been designed to intercept

14  sent telephone calls on a system.

15  Q      Just one more area, sir.

16         The people that are actually on the telephone, when they

17  are being intercepted, is there anything that tells them that

18  they are being recorded?

19  A      No.

20  Q      Why is that?

21  A      This system is what you call totally passive.  It just

22  receives information.  It doesn't send anything.

23  Q      Was that done intentionally in the design of the system?

24  A      Most logical way to do it.

25  Q      What do you mean by that?

Myers - Cross/Shargel

1:-11:-28  1    A    Well, if you are using it to gain intelligence and you

1:-11:-28  2    don't want someone to know that you heard it.

1:-11:-28  3         MR. FODEMAN:  Nothing further, Judge.  Thank you.

1:-11:-28  4         THE COURT:  Thank you, Mr. Fodeman.

1:-11:-28  5              MR. FODEMAN:  Thank you, Judge.

1:-11:-28  6              THE COURT:  Mr. Shargel.

1:-11:-28  7              MR. SHARGEL:  Thank you, Judge.

1:-11:-28  8    CROSS-EXAMINATION

1:-11:-28  9    BY MR. SHARGEL:

1:-11:-28  10   Q    Mr. Myers, good afternoon.

1:-11:-28  11   A    Good afternoon.

1:-11:-28  12   Q    You've come a long way.

1:-11:-28  13   A    Yes.

         14   Q    The laptops that you have in front of you are Panasonic?

         15   A    Yes.

         16   Q    Can they by themselves record conversation?

         17   A    No.

         18   Q    They by themselves cannot intercept anyone's

1:-11:-28  19   conversation?

1:-11:-28  20   A    No.

1:-11:-28  21   Q    Am you accurate in saying what is happening is that the

1:-11:-28  22   -- I think we called it the base, the item that is to your

1:-11:-28  23   left, the larger item, that actually processes the

1:-11:-28  24   conversations?

1:-11:-28  25   A    It processes the radio waves and then presents the data

Myers - Cross/Shargel

1   that is added to the laptop and the laptop then would extract

2   the audio and save it.

3   Q   So, maybe a better word is captures the conversations in

4   the base.  And then -- if I may just finish the question?

5   A   Sorry.

6   Q   Trying to put it in lay terms for my own benefit.  And

7   then communicates with the laptop, in other words, the

8   information that is obtained in the base goes to the laptop?

9   A   The laptop controls the radio receivers, and the radio

10   receivers basically capture the radio waves, and the raw

11   protocol is sent to the laptop.  The laptop processes the

12   protocol and extracts the audio.

13   Q   In other words, the laptop converts it from radio waves

14   into actual text?

15   A   No.  The laptop receives data.  Only this box receives

16   radio waves and conducts the radio waves into data.  The data

17   is then sent to the laptop and the laptop extracts the audio

18   and saves that separately.

19   Q   That takes the form of any computer desktop or laptop

20   where the files are on the computer, correct?

21   A   Any laptop that was running, Windows I think at that

22   time before XP, whatever the standard was, and had a USB

23   connection capable.

24   Q   Let me show you what has been marked in evidence as

25   Government's Exhibit 116.

Myers - Cross/Shargel

1    You came to the United States once before to view this

2  equipment?

3  A    I was already in the states.

4  Q    You were asked to view the equipment?

5  A    Yes.

6  Q    And you went to a government office to look at the

7  equipment?

8  A    I didn't go to a government office at that time.

9  Q    Well, when you viewed the equipment, did you see the

10  equipment in this exact way?

11  A    No.  I was just shown the equipment as I would show it

12  here.

13  Q    Separate and apart?

14  A    Yes.

15  Q    Is there anything on the equipment that indicates what

16  the purpose or design of the various pieces are for?

17  A    No.

18  Q    So that there's nothing whatever on that equipment to

19  your left.

20        What is the exhibit number on that, again?

21  A    That is 614.

22  Q    Okay.

23        Government Exhibit 614, which we have been describing as

24  the base, is there any identifier on there?

25  A    There's the product number, Series SM 7806, in the front

702

SIDE BAR

1    panel.

2    Q    Beyond that, there's nothing more, correct?

3    A    That's correct.

4    Q    Now, your firm maintains a website; is that correct?

5    A    That's correct.

6    Q    And the firm website identifies the products that are

7    used by or sold by your company, right?

8    A    It shows some of the products.

9    Q    Some of the products.

10        So, your products have been used or you have sold

11   products that test and measure equipment?

12   A    That's right, yes.

13   Q    And does the equipment that you have in front of you

14   have any capability other than interception of conversations?

15   A    No.

16   Q    Can it be adopted for any other purpose other than

17   intercepting?

18        MR. FODEMAN:  I am sorry, your Honor, may we

19   approach? I have just been handed something that you haven't

20   seen before.

21        THE COURT:  Yes.

22

23

24

25

703

SIDE BAR

1     (Side bar)

2

3          THE COURT:  You mean adapted.

4          MR. SHARGEL:  What did you say?

5          THE COURT:  Adopted.

6          MR. FODEMAN:  My objection, as the cross-examination

7     was going on, Mr. Lipton handed me I guess a printout of the

8     website which was provided earlier and you haven't had a

9     chance to look at this.  I don't think it will pose a

10    problem, but in the future, I would ask if I could have a few

11    minutes to look at this.

12         MR. SHARGEL:  These documents are not discoverable.

13    This is the way you always do it.

14         THE COURT:  There's a reciprocal -- if it is just

15    impeachment, then he doesn't have a claim, I don't think.

16         MR. SHARGEL:  Right.

17         THE COURT:  If you offer it in evidence, it does,

18    that's my point.

19         MR. FODEMAN:  Yes.

20         MR. SHARGEL:  Wait.  You don't want to spend any

21    time arguing this, but the rule says that it can be

22    introduced in my case in chief.  It is discoverable.  My

23    application, impeachment documents are not discoverable.

24         THE COURT:  Are you intending to offer it in

25    evidence?

704

Myers - Cross/Shargel

1:-11:-28    1          MR. SHARGEL:  Not in my case in chief.  Actually,

1:-11:-28    2   this document I don't intend to offer it into evidence

1:-11:-28    3   because of the answer you got.

1:-11:-28    4          THE COURT:  We can postpone this argument whether

1:-11:-28    5   the rules govern cross-examination.

1:-11:-28    6          MR. SHARGEL:  All right.

1:-11:-28    7          (Side bar ends.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

705

Myers - Cross/Shargel

BY MR. SHARGEL:

Q    The equipment that you have comes with a user manual, does it not?

A    That's correct.

Q    And the user manual refers to cellular or mobile phone tracking.  You are obviously familiar with that concept, right?

A    Yes.

Q    Could you describe for the jury or tell the jury what cellular mobile phone tracking is?

A    Tracking generally means direction finding, actually locating the source of the calls, actually tracking down the phone.

Q    And in order to do that, you need other equipment, do you not?

A    That's correct.

Q    And that other equipment is not among the items that have been shown to you?

A    The equipment is not here, no.

Q    And on the question of whether the equipment works, the proverbial bottom line is, you tried to see whether it did work, particularly the base, right?

A    Yes.  You took a cursory look at it.

Q    And when you took the cursory look at it, the power, the LED, was not lit, correct?

706

Myers - Cross/Shargel

1:-11:-28    1    A    That's right.   It looked like there was a fault.

1:-11:-28    2    Q    If there were a fault in the base, as we are calling it,

1:-11:-28    3    that would disable the usability to communicate with the

1:-11:-28    4    laptop; is that correct?

1:-11:-28    5    A    That's correct.

1:-11:-28    6    Q    And you made an offer to the government lawyers, the

1:-11:-28    7    U.S. lawyers in this case, and that was to bring the

1:-11:-28    8    equipment to your laboratory in the U.K. to see if it was

1:-11:-28    9    actually working?

1:-11:-28   10    A    Yes, because you can't personal conduct an

1:-11:-28   11    investigation.

1:-11:-28   12    Q    Did that ever happen?

1:-11:-28   13    A    No.

1:-11:-28   14    Q    Now, one other topic I would like to ask you about.

1:-11:-28   15        Did there come a time that you received a subpoena in

1:-11:-28   16    connection with the equipment that you have up there?

1:-11:-28   17    A    Me personally?

1:-11:-28   18    Q    Not you personally, your company?

1:-11:-28   19    A    Yes.

1:-11:-28   20    Q    Do you recall that there was communication that --

1:-11:-28   21    withdrawn.

1:-11:-28   22        Do you recall that the subpoena was issued by the law

1:-11:-28   23    offices of Robert Simels?

1:-11:-28   24    A    You can't recall that.

1:-11:-28   25    Q    Well, let me put on the screen Government Exhibit

Myers - Cross/Shargel

1    3500-MB-1 for identification.

2         Taking at look at MB-1, the first page of MB-1.  It is a

3    document of several pages.  If you look at the first page of

4    MB-1, could you read that to yourself, Mr. Myers, as our

5    rules dictate, and then I will put a question to you.

6         (Pause)

7

8         THE COURT:  Okay.

9    Q    Having read that, does that refresh your recollection

10   that you - and when you say you, I mean your company in this

11   case, as well as you personally - that you received a copy of

12   an e-mail from Robert Simels?

13   A    Yes, you got an e-mail, but you asked if I received a

14   subpoena.

15   Q    I'm sorry, forgive me.

16        Does the e-mail refresh your recollection that your

17   company had received the subpoena?

18   A    We did receive a subpoena in our U.S. office.

19   Q    You have an office in Florida; is that correct?

20   A    That's correct.

21   Q    And ultimately there was an order from a judge in this

22   courthouse that you comply with the subpoena?  When I say

23   you, I mean the company.

24   A    Yes.

25   Q    And there was some communication going back and forth

Myers - Cross/Shargel

1   between Mr. Simels and your company via e-mail about the

2   enforcement of that subpoena?

3   A    You received a number of them, e-mails.

4   Q    That had to do with Mr. Simels with the subpoena

5   requesting information about this equipment?

6   A    Yes, that's possible.

7   Q    And he also wanted some information with regard to a

8   Mr. Chapman.

9        Do you know who Mr. Chapman is?

10  A    Yes.

11  Q    Would you tell the jury who Mr. Chapman is?

12  A    Mr. Chapman was a trainer that we used occasionally.  He

13  wasn't an employee, but a freelancer.

14  Q    Independent contractor?

15  A    Yes.

16  Q    And did Mr. Chapman, as an independent contractor, go to

17  Guyana to train people on the use of this equipment that had

18  been sold?

19  A    Yes.

20  Q    And this equipment was sold to the Guyanese government,

21  was it not?

22  A    That's correct.

23        MR. FODEMAN:  Objection, Judge.

24        THE COURT:  Overruled.

25  Q    Sold to the Guyanese government?

709

SIDE BAR

1    A    That's correct.

2    Q    Now, you show you -- actually, I am going to introduce

1:-11:-28   3    into evidence or offer into evidence the document marked

1:-11:-28   4    3500-MB-1 and the e-mails that accompanied that.

1:-11:-28   5        THE COURT:  Any objection?

1:-11:-28   6            MR. FODEMAN:  If I could have a moment.

1:-11:-28   7            THE COURT:  You are offering that document and the

1:-11:-28   8    e-mails attached to it as one exhibit, I think?

1:-11:-28   9            MR. SHARGEL:  3500-MB-1 is one exhibit.

1:-11:-28   10           MR. FODEMAN:  Objection, your Honor, hearsay.

1:-11:-28   11           THE COURT:  Come to side bar and show me what the

1:-11:-28   12   exhibit is.

13

14

15

16

17

18

19

20

21

22

23

24

25

710

SIDE BAR

1:-11:-28    1          (Side bar)

1:-11:-28    2

1:-11:-28    3          THE COURT:  Tell me what is in the memo and what you

1:-11:-28    4    are offering it for

1:-11:-28    5          MR. SHARGEL:  It shows that Mr. Simels in 2007/2008

1:-11:-28    6    was out in public, because there's another exhibit where

1:-11:-28    7    Judge Irizarry -- it is clear that Judge Irizarry so ordered

1:-11:-28    8    the subpoena, and there was communication between his company

1:-11:-28    9    and Judge Irizarry that he was out there in the open trying

1:-11:-28    10   to find information about this equipment, and wanted to find

1:-11:-28    11   out about the circumstances in which it was sold.  I have a

1:-11:-28    12   copy of the subpoena itself that I could put into evidence

1:-11:-28    13   and the fact it was said.

1:-11:-28    14          These weren't assertions where he was trying to make

1:-11:-28    15   some self-serving declarations of innocence.  This is a

1:-11:-28    16   situation where I'm offering this to show that he was making

1:-11:-28    17   an effort to get the information and pressing to get the

1:-11:-28    18   information concerning the equipment, because the government

1:-11:-28    19   would have it that his law office --

1:-11:-28    20          THE COURT:  You understand.  Sorry to interrupt, but

1:-11:-28    21   you understand.

1:-11:-28    22          Is there any dispute about the fact he was making an

1:-11:-28    23   effort to get this equipment?

1:-11:-28    24          MR. FODEMAN:  None.

1:-11:-28    25          THE COURT:  Do we need -- you want to be heard

SIDE BAR

1:-11:-28  1    further on your objection because there's a lot of stuff in

1:-11:-28  2    here?

1:-11:-28  3            MR. FODEMAN:  That's our problem.

1:-11:-28  4            THE COURT:  Might be considered for the truth and

1:-11:-28  5    seems to pass in the night for the purpose you are offering

1:-11:-28  6    it.

1:-11:-28  7            MR. SHARGEL:  I will not argue that.

1:-11:-28  8            MR. D'ALESSANDRO:  There's a reference to wiretap

1:-11:-28  9    and triangulation equipment.  Part of the problem is that the

1:-11:-28  10   defense is going to be arguing that he doesn't know that this

1:-11:-28  11   was wire intercepted equipment.  That he thought it was

1:-11:-28  12   triangulation equipment, and the witness testified that there

1:-11:-28  13   is a difference.  Mr. Shargel on cross-examination just

1:-11:-28  14   brought that out.

1:-11:-28  15           MR. SHARGEL:  Judge --

1:-11:-28  16           THE COURT:  There are these statements in here.  It

1:-11:-28  17   strikes me things like, I'm trying to accomplish this task in

1:-11:-28  18   the least way, you say you are not offering it for the truth,

1:-11:-28  19   but these are statements made purportedly by Simels to Myers,

1:-11:-28  20   and it sounds like for the purpose you are offering them.

1:-11:-28  21   You understand, you understand what you said about the burden

1:-11:-28  22   of proof, but they are hearsay statements throughout these.

1:-11:-28  23           MR. SHARGEL:  They are hearsay, but I'm offering

1:-11:-28  24   them not for the truth.  You want to be able to show he was

1:-11:-28  25   acting in an intelligent way.  Reading this will demonstrate

Myers - Cross/Shargel

1    that.  You am not going to attack anything that is not

2    offered for the truth and say, look, it is triangulation.

3         First of all, it is not the question.  I would say

4    he didn't have the knowledge.  This was primarily used for

5    wiretap, but I'm not going to say, well, he thought it was

6    triangulation equipment, the fact he put this in there.  You

7    won't hear me say a single word, other than he was diligent.

8    But the government seems to be arguing this was like some

9    sneaky plot to have this equipment in his office, coupled

10   with the statements Selwyn testified about, he's out in the

11   open at the very same time where he's saying don't worry, it

12   is in good hands; I am in control of it.

13        THE COURT:  Who is Mark Baker, by the way?

14        MR. FODEMAN:  His employee.

15        MR. SHARGEL:  There's all kinds of court documents

16   about this.

17        THE COURT:  The objection is overruled.

18        (Side bar ends.)

19

20

21

22

23

24

25

Myers - Cross/Shargel

1:-11:-28  1      THE COURT:  I will admit Defendant's Exhibit

1:-11:-28  2   3500-MB-1.

1:-11:-28  3      (Whereupon, Defendant's Exhibit 3500-MB-1 was

1:-11:-28  4   received and marked into evidence, as of this date.)

1:-11:-28  5      MR. SHARGEL:  Your Honor, you want to do this as

1:-11:-28  6   quickly as possible.  I know there are several of them.

1:-11:-28  7   Could you publish this to the jury?

1:-11:-28  8      THE COURT:  Yes.

1:-11:-28  9   BY MR. SHARGEL:

1:-11:-28  10  Q    So, the first page of 3500-MB-1, this is an e-mail that

1:-11:-28  11  was sent to you - subject, Carl Chapman, on November 13,

1:-11:-28  12  2007.

1:-11:-28  13     You've seen this before, haven't you?

1:-11:-28  14  A    That's right, yes.

1:-11:-28  15  Q    Because there's a subsequent e-mail where you send an

1:-11:-28  16  e-mail to another member of your firm acknowledging that you

1:-11:-28  17  received it, right?

1:-11:-28  18  A    You sent a copy of it to our U.S. office, who I think

1:-11:-28  19  put it together, the package, for the subpoena.

1:-11:-28  20  Q    Right.

1:-11:-28  21     THE COURT:  I'm sorry, Mr. Shargel.  In light of the

1:-11:-28  22  side bar, there seems to me a limiting instruction is

1:-11:-28  23  appropriate.

1:-11:-28  24     MR. SHARGEL:  That's fine.

1:-11:-28  25     THE COURT:  These are out of court statements that are

Myers - Cross/Shargel

1 being received in evidence, and that makes them hearsay.  You

2 can't consider these as proof of the assertions made in these

3 e-mails.  But the fact that these e-mails were sent, separate

4 and apart from the truth of the assertions made in them, the

5 fact that they were sent back and forth to Mr. Myers and to

6 others - I'm not even sure who the others are - the fact that

7 this e-mail -- this string of e-mails was sent is relevant,

8 and you can consider the fact that these messages were sent,

9 but not as proof of the individual.

10      The one that is on the screen, for example, it is a

11 statement by Simels, according to this document.  It says,

12 among other things:  I'm trying to accomplish this task in a

13 least onerous way.

14      Well, if offered to prove that that is exactly what he

15 was doing, it is not proof of that.  That statement can't be

16 considered by you as proof of that fact.  But the fact that

17 he was engaging in these communications with Mr. Myers and

18 others is relevant and admissible and I am going to allow you

19 to consider this evidence for that purpose and that purpose

20 alone.

21      You were nodding graciously as though you understand the

22 limiting instruction.  You take it you do.  If you don't,

23 raise your hands.

24      Sorry for the interruption.

25      MR. SHARGEL:  Not a problem.

Myers - Cross/Shargel

BY MR. SHARGEL:

Q     As I described to you on the telephone, I am looking to

speak to Mr. Chapman, and would look you to provide his

contact information.  I have been in touch with the Minister

of Health in Guyana, Leslie Ramsammy, Nancy Salvador from the

Spy Shop in Miami, Florida.

By the way, you know the Spy Shop in Miami, Florida?

A     I know of it.

Q     Do you know whether they sell your equipment?

A     They don't sell our equipment.

Q     Did they service your equipment or have anything to do

with your company?

A     We had one transaction with that company.

Q     Is that in connection with this matter?

A     Exactly.

Q     Continuing:  And have determined that your company

provided certain triangulation equipment to the government of

Guyana in 2003.  You represented an individual, Shaheed Khan,

a citizen of Guyana who operated the equipment on behalf of

the Guyanese government.  We know that Mr. Chapman trained my

client in the use of said equipment and need to confirm same

with Mr. Chapman.

I am trying to accomplish this task in the least onerous

way avoiding your company's involvement in same.  However, as

you can imagine, while I am willing to back door my approach

716

SIDE BAR

1   by simply communicating with Mr. Chapman, an option would be

2   to take steps that would require your company to produce any

3   records and a witness with regard to that transaction.

4        You do not wish to take the latter steps, and would

5   appreciate your assistance in locating Mr. Chapman.

6        May we have the second page, please?

7        THE COURT:  Come on up.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDE BAR

(Side bar)


THE COURT:  I think your use of this document is
undermining the limited purpose for which you are offering it

MR. SHARGEL:  You don't want to do it.  I will
accept the instruction.

THE COURT:  You are reading this.  I think the jury
is going to use this for precisely the improper purpose that
he did all of these things.  Your point is he's out in the
open, at least with Smith Myers about this, which undermines,
as you say, the government's assertion that there's something
secretive about it.  By having these in evidence, you
establish this point.  The way you are using it exacerbates,
I think, the risk that always inures.  In evidence, admitted
for a limiting purpose.  It seems to me the way you are
reading it enhances the risk that they will use it for --

MR. SHARGEL:  You will repair the problem.  I can
repair the problem.  I won't read it.

THE COURT:  That's what I was going to get at.

MR. SHARGEL:  The only reason I was going slow was
for the record.  I will just offer it in evidence.

THE COURT:  It is in evidence.

MR. SHARGEL:  I offered it already.  It is available
to the jury and to me, in anticipation of anything the
government says.  The only argument I will make - and there

718

Myers - Cross/Shargel

1:-11:-28   1    will be other steps along the way - the only argument you

1:-11:-28   2    intend to make is that he was out in the open about this

1:-11:-28   3    trying to secure it.

1:-11:-28   4            THE COURT:  You understand and that's been

1:-11:-28   5    established already.

1:-11:-28   6            MR. SHARGEL:  Done.

1:-11:-28   7            THE COURT:  And the way you are reading it in

1:-11:-28   8    enhances the risk of any improper use.

1:-11:-28   9            Yes, Mr. Fodeman.

1:-11:-28   10           MR. FODEMAN:  I think it is fine, Judge.  The

1:-11:-28   11   proposal is fine.

1:-11:-28   12           MR. SHARGEL:  Do you mind if I simply say these will

1:-11:-28   13   be available to the jury?

1:-11:-28   14           THE COURT:  No, just move on.

1:-11:-28   15           MR. SHARGEL:  Don't want to look awkward..  could I

1:-11:-28   16   just gracefully --

1:-11:-28   17           THE COURT:  You never look awkward, don't worry

1:-11:-28   18   about it.

            19           (Side bar ends)

            20

            21

            22

            23

            24

            25

Myers - Cross/Solano

1    .

2              THE COURT:  All right.  Sorry for the interruption.

3              Move on, Mr. Shargel.

4              MR. SHARGEL:  Not a problem.

5              These are in evidence.

6              THE COURT:  Yes.

7

8              MR. SHARGEL:  This may be all I have on the subject.

9    I'm sorry, one other thing.

10   BY MR. SHARGEL:

11   Q    Do you recall a letter being sent from your company to

12   the Judge in the Khan case?

13   A    From the U.K. or from the U.S.?

14   Q    Apparently from the U.S.?

15   A    I would imagine it would be.  Only fact you remember is

16   we sent a letter saying we complied and given all of the

17   paperwork that we had.

18   Q    Did you actually have an office in Florida, by the way?

19   A    Yes.

20   Q    And that was a sales office?

21   A    Yes.

22        MR. SHARGEL:  I have no further questions, your Honor.

23        MR. SOLANO:  Some, briefly.

24        THE COURT:  Thank you, Mr. Shargel.

25        Mr. Solano.

720

Myers - Cross/Solano

1  CROSS-EXAMINATION

2  BY MR. SOLANO:

3  Q    Good afternoon, Mr. Myers.

4  A    Good afternoon.

5  Q    Mr. Myers, on direct you explained the component of the

6  series SM 7806 and I believe you described some modules that

7  are inserted into this 7806, correct?

8  A    That's correct.

9  Q    And those are considered the 7801?

10 A    That's correct.

11 Q    Okay.

12      When you inspected the unit, did you have an opportunity

13 to take the modules out of the 7806?

14 A    No.

15 Q    Did you have an opportunity to inspect the internal

16 components of those modules?

17 A    No.

18 Q    Did you have an opportunity to inspect the internal

19 components of the 7806 in general?

20 A    You had not.

21 Q    And you said that the seals appear -- that they have not

22 -- I'm sorry, withdrawn.

23      That the seals appear to be intact?

24 A    You said that they are worn, but it doesn't seem to be

25 any indication that the screws have been removed.

Myers - Cross/Solano

Q     It is possible, though, correct?

A     Not really.  If you look at the actual seals, these are tamper proof seals.  The tamper proof module, tamper proof seals, seem to be intact.  They are worn, but they are intact.

Q     It's separate and apart from the modules the 7801; is that correct?

A     That's correct.  The modules are taken out from the back.

Q     And when you offered to have the equipment inspected back at your laboratory, the laboratory would have been able to determine whether or not the module itself is completely intact?

A     That's correct.

Q     The way, essentially, it came off of the factory floor?

A     That's correct.

Q     Now, you also described laptops that are in evidence.

      Did you have an opportunity to inspect the laptops internally?

A     No.

Q     And you also describe that this unit uses a commercially available computer or laptop; is that correct?

A     That's correct.

Q     Could you tell by that, just looking at the computer, the laptop, whether that was the original laptop that the

722

1   recordings were stored on?

2   A    You couldn't.

3   Q    So it could have been copied onto that laptop; is that

4   correct?

5   A    It is possible.  I didn't see any recordings.

6         MR. SOLANO:  Thank you.  I nothing further.

7         THE COURT:  Any redirect?

8         MR. FODEMAN:  No, Your Honor.

9         THE COURT:  You are excused.

10         THE WITNESS:  Thank you.

11         THE COURT:  Have a good day.  Have a nice trip home.

12         Let's take our break.  Don't discuss the case, all

13   rise.

14         There are tamper proof seals.  The tamper proof

15   module, tamper proof seals seem to be intact.  They are worn,

16   but intact.

17         (The jury leaves the courtroom for a recess at 3:40

18   p.m.)

19         (Continued on the next page.)

20

21

22

23

24

25

723

1          (Judge Gleeson enters the courtroom room at 3:50

2     p.m.)

3

4          THE COURT:  Who is next, by the way?

5          MR. FODEMAN:  Ms. Waite, Nicole Waite.

6          MR. SHARGEL:  Judge, you wanted to put one thing on

7     the record

8          I would like your Honor to consider that the

9     document 3500-MB-1, that I would like to offer those under

10    the state of mind exception to the hearsay rule, which they

11    were offered for the truth of the matter asserted.  It does

12    reflect Mr. Simels then existing state of mind.  I offer it

13    under the authority of U.S. v. DiMaria, a Second Circuit case

14    which spoke to that issue, which contained content in

15    substance of statements made to Mr. DiMaria to the F.B.I.

16    agents that arrested him

17         THE COURT:  DiMaria was minutes away from being at

18    the place where he picked up stolen cigarettes, and he said

19    he didn't know they were stolen.  These are backward looking

20    statements that extend much backwards in time than the

21    e-mails to Mr. Simels.  DiMaria's statement is kind of on the

22    cusp.  That temporal proximity between his statement and what

23    he spoke is pitting here

24         MR. SHARGEL:  The DiMaria state of mind exception,

25    at a minimum, he was placed under arrest in the back seat of

Waite - Direct/Fodeman

1    the F.B.I. car when he made the statements.  But, as we both

2    know, the traditional application for a state of mind

3    exception is the time.  At the time that Mr. Simels wrote

4    those e-mails, this reflects his state of mind.  At that time

5    it did

6    reflect --

7              THE COURT:  That he did those things

8              MR. SHARGEL:  Yes.

9              THE COURT:  It kind of swallows up the hearsay rule,

10   doesn't it?

11             MR. SHARGEL:  I don't think it does.  I would ask

12   your Honor to consider it.

13             THE COURT:  What is the government's position?

14             MR. FODEMAN:  You don't -- temporally removed now,

15   there's a motive and incentive to shade those e-mails, and

16   the fundamental principles behind that exception are not

17   there.  There's probably a reason, you suggest, why he used

18   the word "triangulation," because he didn't want to openly

19   talk about wiretap equipment.  So I don't know if it

20   necessarily reflects his actual state of mind or not.  So

21   there's no trustworthiness there.

22             THE COURT:  Anything further?

23             MR. SHARGEL:  No, sir.  I will stick with the

24   limiting instruction.  I think it is appropriate to add a

25   limiting instruction that you initially agreed to.  Your

Waite - Direct/Fodeman

1:-11:-28   1   application is overruled.

1:-11:-28   2             MR. SHARGEL:  Very well.

1:-11:-28   3             THE COURT:  Bring in the jury, please.

1:-11:-28   4             (The jury enters the courtroom at 3:55 p.m.)

1:-11:-28   5             THE COURT:  Would everyone but the witness please be

1:-11:-28   6   seated.

1:-11:-28   7                   Andrew, would you please swear the witness.

1:-11:-28   8   N I C O L E    W A I T E,

1:-11:-28   9             called as a witness, having been first DULY sworn,

1:-11:-28   10             testifies as follows:

1:-11:-28   11            THE LAW CLERK:  Have a seat.

1:-11:-28   12            Please say your name and spell it

1:-11:-28   13            THE WITNESS:  Nicole Waite, N-i-c-o-l-e, W-a-i-t-e.

1:-11:-28   14   DIRECT EXAMINATION

1:-11:-28   15   BY MR. FODEMAN:

1:-11:-28   16   Q    Ms. Waite, what do you do for a living?

          17   A    Corrections officer.

          18   Q    Where do you work, Ms. Waite?

          19   A    Queens Private Detention Facility.

          20   Q    And what is that, a private company that you work for?

          21   A    Yes, it is.

          22   Q    What is the name of the private company that owns that

1:-11:-28   23   facility?

1:-11:-28   24   A    GEO.

1:-11:-28   25   Q    G E O?

Waite - Direct/Fodeman

1    A    Yes.

2    Q    And that company, GEO, does that operate facilities

3    throughout the world?

4    A    Yes.

5    Q    Detention facilities, jails?

6    A    Yes, it does.

7    Q    You mentioned that you specifically work at the Queens

8    Private Detention Facility; is that right?

9    A    Yes, sir.

10   Q    And where in Queens is that located, generally?

11   A    182-22 158th Avenue in Jamaica.

12   Q    How long have you been a corrections officer, MS. Waite?

13   A    Eight years.

14   Q    How long have you worked at the Queens Private Detention

15   Facility, the GEO Facility?

16   A    Eight years.

17   Q    Tell the jury a little bit about your job

18   responsibilities?

19   A    Custody and control of the detainees.

20   Q    You mean the prisoners?

21   A    Yes.

22   Q    And approximately how many inmates does that facility

23   hold?

24   A    About 230.

25   Q    Was it always called the Queens Private Detention

Waite - Direct/Fodeman

1  Facility?

2  A    No.  It used to be -- WACC is the abbreviation,

3  Wackenhut (ph).

4  Q    Now, does the Queens facility where you work, does it

5  have state inmates, generally, or federal?

6  A    Federal.

7  Q    And those inmates, at the Queens facility, are they are

8  permitted visitors?

9  A    Yes, they are.

10  Q    Now, could just anyone show up at the door of the Queens

11  facility and see an inmate?

12  A    No.  Under regular social visits they have a list for

13  the visitors.  If they are not on the list, they are not

14  allowed in.

15  Q    Okay.  So let me just break that down.

16      You say they have a list.  Who has a list?

17  A    The detainee.

18  Q    The inmates make a list?

19  A    Of who is coming to visit them.

20  Q    Okay.

21      This list can include who?

22  A    Up to 12 people, family, friends.

23  Q    And once that person is on the list, can they come and

24  visit the inmate?

25  A    Yes.

Waite - Direct/Fodeman

1    Q    Now, can a person change that visitor list, if he or she

2    wants?  Could they make additions and subtractions during the

3    course of their incarceration?

4    A    Yes, they can.

5    Q    Does an inmate have to have his attorney on the list if

6    he wants his attorney to visit him?

7    A    No.

8    Q    So that's separate and doesn't have to be on the visitor

9    list?

10   A    No, it doesn't.

11   Q    Now, when attorneys come to the facility, --

12   A    Yes?

13   Q     -- are attorneys permitted to bring other members of

14   their staff with them, either paralegals or investigators?

15   A    Yes.

16   Q    How do they go about doing that?

17   A    They have to send a memo through the Warden.

18   Q    Regarding bringing other people?

19   A    Yes, that they are coming.

20   Q    When a visitor comes to the facility, where does he or

21   she go?

22   A    To the front entrance.

23   Q    And what happens once they get in through the front

24   entrance?

25   A    We usually ask them who you are here to visit, and they

Waite - Direct/Fodeman

1  tell us the name, and we ask them if that's their client.

2  Q    Let me stop you there.

3       The area that is behind -- that they walk into, what is

4  that area called?

5  A    The visiting area.

6  Q    Have you ever worked in that area?

7  A    Yes.

8  Q    Have you ever been involved in checking visitors into

9  the facility?

10  A    Yes.

11  Q    How often do you work in that area?

12  A    Maybe three or four times a month.

13  Q    Three or four times a month?

14  A    Yes.

15  Q    Okay.

16       Do you work there for the whole visit or on relief, how

17  does it work?

18  A    On relief.

19  Q    You fill-in for other people?

20  A    Yes.

21  Q    You started to tell us what happens when a visitor

22  arrives at the facility.

23       Is it different for social visitors versus attorneys,

24  are the questions different?

25  A    Yes.

Waite - Direct/Fodeman

1    Q    Let's first talk about a social visitor.

2         What happens on Sundays when girlfriends, friends, wives

3    show up, what do you do as a correctional officer?

4    A    We usually ask them who they are there to visit.  Once

5    they tell us, we take their ID and look on the list to see if

6    they are on the list.

7    Q    The list for the particular inmate they are going to

8    see?

9    A    Yes.

10   Q    Assuming they are, what is the process?

11   A    Then we let them in and we process them.  They go

12   through the x-ray and we scan them, and we have them seated,

13   and then we call the inmates down.

14   Q    Okay.

15        And they are allowed to meet with the visitor -- the

16   inmate is allowed to meet with the visitor?

17   A    Yes.

18   Q    And you said it was a little different with attorneys?

19   A    Yes.

20   Q    If an attorney shows up at the door, you are working at

21   the visitor's area, what happens?

22   A    We ask them for ID.  We ask them who they are there to

23   visit.  They tell us.  Once they tell them, we process them.

24   We ask them, is that your client?  They say yes or no.

25   Q    Now, first let's talk with respect to the ID.

731

Waite - Direct/Fodeman

1:-11:-28  1       Is there any ID if I'm an attorney, can you show my

1:-11:-28  2   driver's license?

3   A    No, it has to be their attorney's ID.

4   Q    And does that have to have a photograph on it?

5   A    Yes, it does.

6   Q    And a specific number that is on the ID?

7   A    Yes.

8   Q    Okay.

9       Then you ask them for their name, and you ask them for

1:-11:-28  10   the name of the inmate they are going to visit?

1:-11:-28  11   A    Yes, sir.

1:-11:-28  12   Q    And what else you ask them?

1:-11:-28  13   A    If that's their first time there.  If that's their

1:-11:-28  14   client.  Once they say yes, we let them through.

1:-11:-28  15       (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

N. Waite - Direct / Fodeman                    732

1   DIRECT EXAMINATION (continued)

2   BY MR. FODEMAN:

3   Q    What if they say "it's my first time at the facility,

4   I've never been here before"?

5   A    As long as they have their attorney ID.  In certain

6   cases, the warden, they have to get approval first from the

7   warden.

8   Q    How about you said you ask them 'if that's your client,'

9   meaning "Is the inmate you're here to see your client, do you

10  represent them?"

11          Is that right?

12  A    Yes.

13  Q    If the attorney says, "No, I actually don't represent

14  that person," what do you do?

15  A    Can't let them in.  I have to call for a supervisor and

16  he has to decide that.

17  Q    Now, if they say, the attorney says, "I do represent that

18  person," you take their word for it, or do you go and do

19  something to check it out and confirm it?

20  A    No, as long as they have their ID, we take their word for

21  it.

22  Q    Now, were you working at the GEO Group facility in Queens

23  on March 27th, 2008?

24  A    Yes.

25  Q    And were you working there at around eleven a.m. that

N.  Waite - Direct / Fodeman                          733

1   day?

2   A      Yes.

3   Q      Where were you stationed at about that time?

4   A      Right at the front desk, in the front area.

5   Q      The area you were just describing to the jurors?

6   A      Yes.

7   Q      Were you working with anyone else in that area at the

8   time, or were you working alone?

9   A      No, alone.

10  Q      What, if anything, happened at about eleven a.m.?

11  A      Repeat that.

12  Q      What happened at eleven a.m. while you were there?

13  A      A lawyer came in with a investigator.

14  Q      How did you first notice that they had arrived?

15  A      'Cause I was facing the door, sitting facing the door.

16  Q      Now, when you saw this lawyer and this investigator, did

17  you recognize them?

18  A      No.  It was my first time seeing them.

19  Q      What did you do when you saw the lawyer and the

20  investigator?

21  A      I went to the door.  I asked them, "How can I help you?"

22  They told me they're here to see the inmate.

23  Q      Now, you said it was a lawyer and an investigator; is

24  that right?

25  A      Yes.

N. Waite - Direct / Fodeman                 734

1    Q    When you first saw them through the door, did you know

2    who they were?

3    A    No.

4    Q    Did you know what their jobs were, whether they were in

5    fact lawyers or investigators?

6    A    No.

7    Q    That was something you learned later in your interaction?

8    A    Yes.

9    Q    And you said that you had a discussion with them.

10         Did you later learn which one was the lawyer and

11   which one was the investigator?

12   A    Yes.

13   Q    Who was it that you were talking to at this point?

14   A    The lawyer.

15   Q    Again, what were your questions initially at the door?

16   A    "Who are you here to visit?"   They told me who they're

17   there to visit.  I asked them 'if that's your client.'  They

18   said yes.

19   Q    When you said "he," who is that?

20   A    The lawyer.

21   Q    Do you recall the name of the inmate that the lawyer said

22   that he was there to see?

23   A    I believe it was Clarke David.

24   Q    Did you know that inmate?   Did you know who he was?

25   A    Yeah.

1    Q    When he told you the name David Clarke and that he was

2    the lawyer, that Mr. Clarke was his client, what did you do

3    next?

4    A    I process them, put them in the area where they're going

5    to meet the detainee, but prior before he went in I asked him

6    again, "Is that your client?"

7    Q    Well, walk us through it from the beginning.  They walk

8    in the door, you have this initial conversation.

9             What happens immediately next?

10   A    I process them.

11   Q    What does that involve?

12   A    X-rays, scan them through the machine.  Then I ask them

13   again once I'm signing them in, "Is that your client?"   And

14   his answer was, "Yes."

15   Q    When you say "his answer," which one gave you the answer?

16   A    The lawyer's answer.

17   Q    You said you were signing them in.

18             Does the Queens facility have a logbook?

19   A    Yes, we do.

20   Q    Is there a logbook for all visitors, or is it separate

21   lawyers and social visitors?

22   A    No, separate for lawyer and social visitors.

23   Q    Was the logbook there on March 27th, 2008 for your use?

24   A    Yes, it was.

25   Q    Did you use the logbook to sign in the lawyer and the

N. Waite - Direct / Fodeman                    736

1    investigator that we're talking about today?

2    A     Yes.

3              MR. FODEMAN:  If I could show just the witness

4    Government Exhibit 700 for identification.

5              (The above-referred to exhibit was published to the

6    witness.)

7    Q     Have you seen this document before, Ms. Wait?

8    A     Yes.

9    Q     What is that document?

10   A     The attorney visitors sign-in sheet.

11   Q     Is that the attorney visitor sign-in sheet from March

12   27th, 2008?

13   A     Yes.

14   Q     Is that the one that you used to sign in this attorney

15   and this investigator?

16   A     Yes.

17   Q     In fact, is your handwriting reflected on that document?

18   A     Yes.

19             MR. FODEMAN:  Your Honor, at this time, the

20   Government moves into evidence Government Exhibit 700.

21             MR. SHARGEL:  No objection.

22             THE COURT:  Received.

23             (Government's Exhibit 700 was received in evidence.)

24             (The above-referred to exhibit was published to the

25   jury.)

N.  Waite - Direct / Fodeman                    737

BY MR.  FODEMAN:

Q    We're looking at Government Exhibit 700.  I see a number
of lines there.

     Which line was it that you used to sign in the
lawyer and the investigator we're speaking about this
afternoon?

A    The first two lines.

Q    So that would be here and here (indicating); is that
right?

A    Yes.

Q    What questions do you need to fill out to complete this
form?

A    What kind of ID they have, their name, the detainee
they're visiting, their attorney ID or investigator ID and the
number and the time we sign them in.

Q    I see here that in the time in, what time does it
indicate?

A    Eleven o'clock.

Q    It looks like it's crossed -- well, I don't know.

     Was it ten o'clock or eleven o'clock?

A    No, eleven.

Q    There's a name for the visitor.

     Can you tell us what that name is right here
(indicating)?

A    Matteson?

1    Q    And what's below that?

2    A    I can't see it.

3              (Pause in the proceedings.)

4              Simels, Robert.

5    Q    This line here (indicating), does it indicate who the

6    inmate is?

7    A    Yes.

8    Q    Who was the inmate?

9    A    Clarke David.

10   Q    And that next column?

11   A    That's the attorney's ID number.

12   Q    I see it says "signature."

13             Is that where the visitor signs?

14   A    Yes.

15   Q    That handwriting, up until the signature line, this area

16   here (indicating), whose handwriting is that?

17   A    That's my handwriting.

18   Q    How did you get the names and the -- how did you get the

19   names?

20   A    From his ID.

21   Q    So you literally looked at the ID and copied it down?

22   A    Yes.

23   Q    Is that where you also got the ID number there?

24   A    Yes.

25   Q    By the way, did these two people, I think you said it

N. Waite - Direct / Fodeman                    739

1    before, but they came together?   It appeared they came

2    together?

3    A    Yes, they did.

4    Q    If you could for the record, I don't know if you can, can

5    you read the first name at least of the other visitor?

6    A    Lawrence.

7    Q    I don't know if you can make out the last name.

8    A    I think it's Front.

9    Q    Now, what happened once you took down their

10   identification, you sign them in, what do you do next?

11   A    I asked them while he's going in, "Is that your client?"

12   He said, "Yes."  I placed them in the room where the detainee

13   is going to meet him for the visit.

14   Q    When you said, "Is he your client?" who are you referring

15   to?

16   A    The lawyer.

17   Q    That's who you're speaking to?

18   A    Yes.

19   Q    When you said "he," who are you talking about?

20   A    The detainee.

21   Q    Which in this case was who?

22   A    Clarke David.

23   Q    So then what happened next once that was done?

24   A    I placed him inside the room.

25   Q    What room is that?

1   A    The legal room where the lawyers meet the inmate.

2   Q    And then what did you do?

3   A    I put him in.  He had a seat.  And I went back to the

4   front.

5   Q    Who's responsible for getting the inmate into that area,

6   the visiting area?

7   A    The escort officers.

8   Q    Was any effort made to contact the escort officer?

9   A    Yeah, I usually call from the front desk to the dorm, and

10  then the dorm officer has to call the escort officer to bring

11  the detainee down.

12  Q    Meanwhile while that's going on, where do you go?

13  A    Back to the front.

14  Q    What, if anything, happened as you were in the front

15  there?

16       How long did you stay?

17  A    Thirty minutes.

18  Q    Thirty minutes total, that's how long your relief was?

19  A    Yes.

20  Q    Did there come a time when you saw the attorney and the

21  investigator again after you had signed them in and put them

22  in the visitor room?

23  A    No.

24  Q    Did you have any discussions afterwards, without telling

25  us what those discussions were, but did you have any

1    discussions with any other staff members about what happened

2    inside the visiting room?

3    A    Yeah.

4    Q    Based on that, what did you do after you had that

5    discussion?

6    A    Called the tour commander.

7    Q    Did you report the substance of what was told to you --

8         MR. FODEMAN:   Withdrawn.

9    Q    What did you tell the tour commander?

10   A    That a lawyer and an investigator came -- the officer in

11   the back told me that the inmate --

12        MR. SHARGEL:   I object to what the officer -- excuse

13   me.  I object.

14        THE COURT:   Sustained.

15   Q    Did you report the incident to your supervisor?

16   A    Yes.

17   Q    This happened on March 27th, right?

18   A    Yes.

19   Q    Did there come a time that you were interviewed by

20   someone from the United States attorney's office in connection

21   with this incident?

22   A    Yes.

23   Q    Approximately how long was it when this first time you

24   were interviewed occurred?

25   A    Two to three days after the incident.

N. Waite - Direct / Fodeman                    742

1   Q     Was this over the phone, or was this in person?

2   A     Over the phone.

3   Q     Do you know the name of the person who interviewed you?

4   A     I'm not sure of the name.

5   Q     But they wanted to speak to you about what had occurred

6   two or three days earlier; is that right?

7   A     Yes.

8   Q     When they wanted to talk to you, did you know what they

9   were talking about, the incident they were talking about?

10  A     Yes.

11  Q     Did you tell them what happened?

12  A     Yes.

13              MR. SHARGEL:  Judge, I object.

14              THE COURT:  No, it's a yes or no.  It's overruled.

15              You can answer it yes or no.  You answered yes?

16              THE WITNESS:  Yes.

17              THE COURT:  All right.

18  BY MR. FODEMAN:

19  Q     Now, recently have you had occasion to meet with members

20  of the United States attorney's office?

21  A     Yes.

22  Q     Without telling us what those discussions were, did you

23  have discussions about what happened back on March 27th?

24  A     Yes.

25  Q     Were you asked, among other things, were you asked to

N. Waite - Direct / Fodeman                    743

1    provide if you could recall a description of the lawyer and

2    the investigator, like what they looked like?

3    A    Yes.

4    Q    Let me just ask you do you remember what these people

5    looked like?

6    A    No.

7    Q    Were you able to give any description at all?   Do you

8    remember any aspect of them, their physical characteristics at

9    all now as you sit here today?

10   A    No.

11   Q    Have you told the United States attorney's office

12   something about their appearance?

13   A    Yeah.

14   Q    What is it that you recall?

15   A    I think the investigator was a taller guy and the lawyer

16   was a shorter white guy.

17   Q    You think now, what are we, we're in July, end of July.

18   Would you recognize these people if you saw them today?

19   A    No.

20   Q    Why is that?

21   A    See over a dozen lawyers come into the facility.

22   Q    Let me ask you this.   If the lawyer had told you that he

23   did not represent Mr. Clarke, would you have let him into the

24   facility?

25   A    No, I wouldn't have.

1    Q     What would you have done?

2    A     Called the tour commander.

3    Q     By the way, in the course of your duties having worked

4    there at the front desk, have you ever had occasion to turn a

5    visitor away?

6    A     Yes.

7    Q     Not to let them into the facility?

8    A     Yes.

9              MR. SHARGEL:  I'm going to object.

10             Are we talking about a legal visitor?

11             MR. FODEMAN:  I can clarify.  That's my fault.

12   Q     Were there any legal attorneys that you've turned away?

13   A     No.

14   Q     Have you turned away social visitors?

15   A     Yes.

16   Q     For what sorts of things?

17   A     They don't have the proper ID, or they're not on the

18   list, or they're not dressed the proper dress code.

19   Q     There's a sort of dress code that you enforce?

20   A     Yes.

21   Q     By the way, the attorney visiting room where you put the

22   attorney and the investigator at the facility, is that a area

23   that's public or private?

24   A     Private.

25   Q     Private?

Case 1:08-cr-00640-JG   Document 235   Filed 12/08/10   Page 243 of 343

1   A     Yes.

2               MR. FODEMAN:  If I could just have a moment.

3               THE COURT:  Yes.

4               (Pause in the proceedings.)

5   Q     That description you gave where you talked about what you

6   recalled about the lawyer and the investigator, when was that

7   given?

8   A     Repeat it.

9   Q     Like approximately, was it a year ago, a month ago, a

10  week ago, approximately?

11  A     Can you repeat that?

12  Q     You talked about how you gave, you were asked about the

13  description that you gave about these people during an

14  interview.

15              Do you recall me asking about that?

16  A     Yeah.

17  Q     When did that interview take place?  When were you asked

18  those questions?

19  A     Maybe about a year ago.

20  Q     A year ago is when you said that, when you said they were

21  short?

22  A     Yeah.

23  Q     Let me start again so it's clear.

24              You were interviewed two or three days after the

25  incident, is that what you told us?

N. Waite - Direct / Fodeman                746

1    A    Yes.

2    Q    And then you said -- when was the next time you remember

3    being interviewed?

4    A    About three weeks ago, two, three weeks ago.

5    Q    So the conversation that we talked about where you were

6    asked to provide a description of what these people looked

7    like, was it three days after the incident which would have

8    been the beginning of April of 2008, or was it more recently?

9    A    Recently.

10             MR. FODEMAN:  I have nothing further.

11             THE COURT:  Thank you, Mr. Fodeman.

12             Mr. Shargel?

13   CROSS-EXAMINATION

14   BY MR. SHARGEL:

15   Q    Good afternoon.

16   A    Good afternoon.

17   Q    My name is Jerry Shargel, and I'm the defense lawyer.  I

18   just have a few questions for you.

19             You've been working at the facility for how long?

20   A    Eight years.

21   Q    Was this your first job as a correction officer?

22   A    Yes.

23   Q    You said on direct examination that the facility is

24   privately owned, correct?

25   A    Yes.

N. Waite - Cross / Shargel                    747

1   Q     So it's a private company owned by individuals or

2   shareholders that run the jail?

3   A     Yes.

4   Q     Under contract with the Bureau of Prisons, correct?

5   A     Yes.

6   Q     Or the Justice Department?

7   A     Yes.

8   Q     There are certain rules and regulations, correct?

9   A     Yes.

10  Q     And you know that there's a contract between your

11  employer, the Geo company, and I think it's the Justice

12  Department, yes?

13  A     Yes.

14  Q     And certain requirements are in place to run the facility

15  in a certain way, right?

16  A     Yes.

17  Q     And it's important to do it by the rules, correct?

18  A     Yes.

19  Q     Very important, right?

20  A     Yes.

21  Q     Because a contract, like any contract, is subject to

22  being lost if not adhered to, correct?

23  A     Yes.

24  Q     Not satisfactorily performed, fair statement?

25  A     Yes.

1   Q    So this occurred, as you've testified, this incident

2   occurred on March the 27th, 2008, more than a year ago,

3   correct?

4   A    Yes.

5   Q    You said that the first time that you were interviewed by

6   any prosecutor or assistant United States attorney from the

7   Eastern District of New York was a few days later, right?

8   A    Yes.

9   Q    In those days between the incident and the interview, and

10  I think you said the interview was on the telephone, correct?

11  A    Yes.

12  Q    In those days between the incident and the interview, did

13  you have any discussions about the incident with your

14  supervisors at the jail?

15  A    Yes.

16  Q    Did you learn that an inquiry was being made?

17  A    Yes.

18  Q    And did you learn that there would come a time that you

19  were interviewed, right?

20  A    Yes.

21  Q    Did you expect the call?   What I mean to say is did you

22  believe that you would be speaking on the telephone to a

23  prosecutor that day?

24  A    No.

25  Q    Do you recall the telephone call at all in any way?

1   A    Excuse me?

2   Q    Do you recall the telephone call?   Do you recall the

3   interview?

4   A    Yes.

5   Q    And do you remember it taking place on April 1st, 2008,

6   that's just a few days after March 27th?

7   A    Yes.

8   Q    Did you review any of the interview statements before you

9   came here to testify?

10  A    No.

11  Q    On April the 1st, 2008, do you remember the individuals

12  who you spoke to on the phone?   Did you make any notes of it?

13  A    No, I don't remember the name.

14  Q    The fact is that there was someone from your facility who

15  was on the phone as well, correct?

16  A    Yes.

17  Q    And that was Bill Zerillo, right?

18  A    Yes.

19  Q    Bill Zerillo at the time, and maybe he is now, the warden

20  of the facility, correct?

21  A    Yes.

22  Q    The boss, right?

23  A    Yes.

24  Q    When you talked about supervisors before, you were

25  talking about the lieutenants, correct?

N. Waite - Cross / Shargel                           750

1    A    Yes.

2    Q    You were talking about tour commanders, correct?

3    A    Yes.

4    Q    But this is a man who is higher than the rank of captain,

5    right?

6              There are captains there, correct?

7    A    No, just tour commander.

8    Q    Tour commander, and then the warden's the boss, right?

9    A    Yes.

10   Q    The warden was on an extension phone when you were

11   speaking to the investigators from the U.S. Attorney's office,

12   right?

13   A    Yes.

14   Q    You knew that day when you were interviewed that there

15   was a requirement that you ask the lawyer whether the lawyer

16   is an attorney -- the attorney for the inmate?  I was going

17   to say the attorney of record, but the attorney for the

18   inmate, right?

19   A    Yes.

20   Q    So you knew that that was something you were required to

21   do, right?

22   A    Yes.

23   Q    You knew also that the front desk was not your regular

24   tour, right?

25   A    Yes.

N. Waite - Cross / Shargel                          751

1    Q    You did it a few times a month, right?

2    A    Yes.

3    Q    In fact, on this day you were covering for someone who

4    was on a meal break, right?

5    A    Yes.

6    Q    And that lasted for what, an hour or so?

7    A    Thirty minutes.

8    Q    Thirty minutes, 30 minutes of that day.

9         Did Warden Zerillo, forgive me for asking this, but

10   did he seem upset about this incident in any way?   Was he

11   upset toward you in any way?

12   A    No.

13   Q    Had you actually filed a report?

14   A    Yes, I did.

15   Q    In writing?

16   A    Yes, I did.

17   Q    I believe that one copy of that report goes to the tour

18   commander, correct?

19   A    Yes.

20   Q    And you keep one copy?

21   A    Yes.

22   Q    Did you supply the report to the prosecutors?

23   A    No.

24   Q    Did they ever ask you for the report?

25   A    Yes, they did.

N. Waite - Cross / Shargel                        752

1    Q    What was your answer?   Did you supply it to them?

2    A    No, I didn't.

3    Q    Is that because it couldn't be found?

4    A    I couldn't find it.

5    Q    Do you know whether there was an effort, and if you know

6    you can answer this, do you know whether there was an effort

7    to find the copy that went to the tour commander?

8    A    Well, I guess so.   I'm not sure.

9    Q    But as far as you know, no report was ever turned over to

10   the prosecutors?

11   A    No.

12   Q    So there came a time -- by the way, let me ask you this

13   question about the regulation.   Let me ask you this.

14        Is there a procedure where a lawyer is not the

15   lawyer for the inmate to visit, to be allowed into the

16   facility?

17   A    If he's not the lawyer, we don't let him in.   The tour

18   commander has to decide on that.

19   Q    Exactly.   I think you said on direct examination that you

20   turned down social visitors, there were times in your career

21   when social visitors wouldn't be allowed in, but you said, I

22   believe, that you don't recall an incidence where a lawyer

23   wasn't allowed in, right?

24   A    No.

25   Q    Meaning I'm right; I'm correct?

1   A    Yes.

2   Q    When the tour commander is called under a circumstance,

3   as you understand the regulations, when the tour commander is

4   called, the discussion then takes place between the lawyer and

5   the tour commander?

6   A    Yes.

7   Q    Do you know what happens in a situation where an inmate

8   wants to interview lawyers to decide which lawyer will

9   represent him or her?

10          Are there women at this facility?

11  A    Well, they have to put it in writing to the warden.

12  Q    They put it in writing to the warden to get permission,

13  right?

14  A    Permission, yes.

15  Q    Are there other instances where an attorney might speak

16  to the tour commander and gain access to the institution,

17  correct?

18  A    No.  No, the warden has to decide that.

19  Q    The warden decides.

20          And what about a situation where a lawyer wants to

21  interview an inmate because the inmate may be a witness?

22  What about a situation like that, write to the warden?

23  A    Yes.

24  Q    And then it's up to the warden whether to allow that to

25  go forward, right?

1    A      Yes.

2    Q      Same situation as if the lawyer wants to be interviewed

3    by a potential client, right?

4    A      Yes.

5    Q      So your recollection is, as you reported on that

6    telephone conversation where the warden was on the call, was

7    that you asked whether, you asked this lawyer whether he was

8    the attorney for the inmate, right?

9    A      Yes.

10   Q      And your recollection is that he answered yes he was,

11   right?

12   A      Yes.

13   Q      Now, there is a list that's maintained, I think you said

14   this on direct examination, of approved visitors, right?

15   A      Yes.

16   Q      And sometimes the attorneys' names are on the list,

17   right?

18   A      In certain cases.

19   Q      And you maintain, when I say "you" I mean the

20   institution, maintains those visitor lists at the reception

21   area; is that correct?

22   A      Yes.

23   Q      So if a visitor comes, you can check to see whether that

24   visitor is on the list, right?

25   A      Yes.

N. Waite - Cross / Shargel                    755

1  Q    And that is part of the calculus as to whether the
2  visitor gets in, right?
3  A    Yes.
4  Q    The visitor has to be dressed appropriately and so on,
5  right?
6  A    Yes.
7  Q    And once you ascertain that that person is on the list
8  and meets all the other requirements for entry, then you can
9  sign the visitor in and go forward, right?
10 A    Yes.
11 Q    Do you recall whether in this case, this event, you
12 checked the visitor list?
13 A    Well, they don't have a list for the lawyers.
14 Q    They don't?
15       Let me show you, if I may, what's been marked for
16 identification as Defense Exhibit Simels 631.
17       (The above-referred to exhibit was published to the
18 witness.)
19 Q    Now, looking at Defense Exhibit 631, do you recognize
20 that?
21 A    That's a regular visitors list.
22 Q    Is this a document, and this pertains to David Clarke,
23 correct?
24 A    Yes.
25 Q    Is this a document that the facility keeps in the regular

1    course of its business?

2    A    Yes.

3    Q    And it's the regular course of the business to keep a

4    document like this?

5    A    Yes.

6              MR. SHARGEL:   I offer it into evidence.

7              MR. FODEMAN:   No objection.

8              THE COURT:   Received.

9              (Defendant's Exhibit 631 was received in evidence.)

10   BY MR. SHARGEL:

11   Q    Now, these rules at the institution are obeyed in a very

12   careful way, right?

13   A    Yes.

14   Q    Let's look at this document that's now in evidence.

15             (The above-referred to exhibit was published to the

16   jury.)

17   Q    This visitor list was filled out on a day in August 2007,

18   August the 27th, 2007.

19             Do you see that?

20   A    Yes.

21   Q    And Leslyn Camacho is the first name on the first line,

22   Queens, New York, right?

23   A    Mm-hm.

24   Q    And the relationship is spouse, right?   Yes?

25   A    Yes.

1   Q     And then there's another name, Ms. Fraser-Clarke from

2   Brooklyn, New York, and she's a spouse too?

3   A     Yes.

4   Q     Well, who's checking the list, checking it once, checking

5   it twice?   Who's checking the list?

6   A     Well, we don't have a list for the lawyer.   So he has his

7   attorney here, it's not supposed to be on this list.

8   Q     Well, how is it that two spouses can be on there at the

9   same time?

10              MR. FODEMAN:   Objection.

11  A     I have no idea, sir.

12              THE COURT:   Overruled.

13  Q     And on this list you have an attorney, right?

14  A     Yes.

15  Q     Mr. Schoner from New Jersey, right?

16  A     Yes.

17  Q     Did you check this list at all before, as you can recall,

18  if I may finish the question one more moment, did you check

19  this visitor list at all before you admitted the attorney into

20  the facility?

21  A     No, because we don't check the regular visitors list.   It

22  doesn't say attorney.   It has visitors list.

23            So he wrote his lawyer on here.   For what reason?

24  I can't answer why he has his lawyer on there.

25  Q     Did you describe the lawyer who came to see you or was a

1   visitor that day as short with possibly blonde hair?

2   A    Yes.

3   Q    And you were interviewed not only twice, but you were

4   also interviewed in June of 2009, correct?

5   A    Yes.

6   Q    Were you able to observe what occurred when David Clarke

7   came down?

8   A    No.  I was at the front and getting ready to go to the

9   back of the facility.

10  Q    Did you ever learn that Clarke never even went into the

11  room?

12  A    Yes.

13           MR. SHARGEL:  All right.  I have no further

14  questions.

15           THE COURT:  You have nothing, correct, Mr. Solano?

16           MR. SOLANO:  That's correct.

17           THE COURT:  Any redirect?

18           MR. FODEMAN:  Very briefly, judge.

19           THE COURT:  Thank you, Mr. Shargel.

20           MR. SHARGEL:  Thank you.

21  REDIRECT EXAMINATION

22  BY MR. FODEMAN:

23  Q    Looking at Defense Exhibit 631.

24           This is what?   What type of form is this?

25  A    A regular social visitors list.

1    Q    And for what inmate?

2    A    Clarke David.

3    Q    Who fills it out?   Does a member of the staff at Geo

4    fill this out, or is this something filled out by the inmate?

5    A    Something filled out by the inmate.

6    Q    Do you have any idea why Mr. Clarke characterized these

7    two women as spouses?

8    A    I have no idea.

9    Q    Did you ever discuss that with him?

10   A    No.

11   Q    Do you know anything about that?

12   A    No.

13   Q    You were asked why you didn't check this particular

14   document when the attorney and the investigator came to the

15   door.

16        Do you recall being asked about that by Mr. Shargel?

17   A    Yes.

18   Q    Tell us why didn't you bother to look at this.

19   A    'Cause it's a regular visitors list.   It doesn't say

20   attorney.   It's a regular visitors list.

21   Q    By the way, while we're on the topic, you see Mr. Simels'

22   name anywhere on this?

23   A    No.

24   Q    Do you see an investigator named Lawrence anywhere on

25   this?

N. Waite - Redirect / Fodeman                 760

1    A    No.

2    Q    And you were asked about whether you described this

3    person, the lawyer, as being short and having blonde hair; is

4    that correct?

5    A    Yes.

6    Q    And this description you gave some time in the last month

7    or so; is that correct?

8    A    Yes.

9    Q    More than a year after the incident; is that right?

10   A    Yes.

11   Q    Is there any doubt in your mind that the person that you

12   signed in and wrote their name that we're talking about are

13   the people right here (indicating)?

14   A    Yes.

15   Q    Those are definitely the people that we're talking about,

16   right?

17   A    Yes.

18   Q    There's no doubt about that?

19   A    No, 'cause I wrote the name myself.

20   Q    And we're not confusing this with some other lawyer and

21   investigator that --

22   A    No.

23   Q    It's these people, eleven a.m. on the 27th; is that

24   right?

25   A    Yes.

1    Q    By the way, the name Robert Simels, did you ever know

2    anyone by the name Robert Simels?

3    A    No.

4    Q    Did you ever meet him in any capacity, as far as you

5    know?

6    A    No.

7    Q    The people that came through that door on March 27th, do

8    you have anything against them?   Do you know them in any way?

9    A    No.

10                MR. FODEMAN:   I have nothing further, your Honor.

11                THE COURT:   Is there anything further?

12                MR. SHARGEL:   Just one question.   I can ask from

13   here.

14                THE COURT:   If it's just one, and I'll be counting.

15                MR. SHARGEL:   What if it has several parts?

16                THE COURT:   Go ahead.

17   RECROSS EXAMINATION

18   BY MR. SHARGEL:

19   Q    Is there a list of approved investigators?

20   A    As long as the warden approve it.   We don't have a list

21   list.   They send a memo over to the warden and he approves it

22   or not.

23                MR. SHARGEL:   I'm going to step over here.

24                THE COURT:   All right.

25                (Pause in the proceedings.)

N. Waite - Recross / Shargel                762

1  Q    What I mean is unlike an attorney, investigators

2  distinguished from an attorney, does an investigator have to

3  write to the warden, write to the facility to get approved to

4  come into the facility?

5  A    The lawyer has to do that.

6  Q    The lawyer does it for the investigator?

7  A    I guess so.

8  Q    Well, is there a way to tell whether an investigator has

9  been cleared?

10       You have an entry here.  Is that Robert Frost?   Not

11  Robert Frost.

12       Lawrence Frost?

13       THE COURT:  It's not on the screen.

14       MR. SHARGEL:  Okay.

15       This is Exhibit 700, Government Exhibit 700.

16       (The above-referred to exhibit was published to the

17  jury.)

18       THE COURT:  There you go.

19       MR. SHARGEL:  Forget the Robert Frost deal.

20  Q    You're looking at the second line.

21       You recognize your own handwriting, do you recognize

22  that to be a Lawrence Frost?

23  A    Yeah.

24  Q    And when a lawyer shows up with the investigator, and as

25  you said an investigator requires approval from the warden, do

1   you check any list to see if this is an approved, in this case

2   Mr. Frost, whether this is an approved investigator?

3   A    If they have the list there, yes.

4   Q    But they didn't have the list that day?

5   A    No.

6   Q    So you weren't able to follow that procedure, right?

7   A    No.

8            MR. SHARGEL:   No further questions.

9            Thank you, very much, ma'am.

10           THE COURT:   There's nothing further, right?

11           MR. FODEMAN:   No, your Honor.   Thank you.

12           THE COURT:   All right.   You're excused.

13           THE WITNESS:   Okay.

14           THE COURT:   Have a nice day.

15           THE WITNESS:   Okay.

16           (Witness is excused and leaves the witness stand.)

17           THE COURT:   Call your next witness, please.

18           MR. BROWNELL:   Agent Edward Maher.

19           (Pause in the proceedings.)

20

21           (Edward Maher enters the courtroom and takes the

22   witness stand.)

23           THE COURT:   Good afternoon.   Come up here, please.

24           Andrew, would you swear the witness, please?

25           THE CLERK:   Please raise your right hand.

E. Maher - Direct / Brownell                    764

1

2    EDWARD MAHER,

3              called by the Government, having been first duly

4    sworn, was examined and testified as follows:

5

6              THE CLERK:  Please have a seat.  State your name for

7    the record, and spell it.

8              THE WITNESS:  My name is Edward Maher, M-A-H-E-R.

9    DIRECT EXAMINATION

10   BY MR. BROWNELL:

11   Q    Mr. Maher, are you employed?

12   A    Yes, I am.

13   Q    And how are you employed?

14   A    By Drug Enforcement Administration, which is the DEA.

15   Q    And what is your position with the DEA?

16   A    I'm a special agent.

17   Q    How long have you been a special agent with the DEA?

18   A    Approximately eleven years.

19   Q    In general, what kinds of cases have you worked on as a

20   DEA agent for eleven years?

21   A    Generally the cases are drug trafficking organizations

22   which import/distribute narcotics in the United States, also

23   money laundering cases involving wiretap investigations.

24   Q    Have you been involved in conducting search warrants in

25   your capacity as a special agent for the DEA?

E.  Maher - Direct / Brownell                    765

1   A     Yes.

2   Q     And approximately how many search warrants have you

3   either conducted yourself or participated in in your capacity

4   as a DEA agent?

5   A     Over 50.

6   Q     I'm going to direct your attention to September 10th of

7   2008.

8           Were you working that day as a DEA agent?

9   A     Yes.

10  Q     And were you involved in conducting a search warrant that

11  day?

12  A     Yes.

13  Q     Was that search warrant a court-approved search warrant?

14  A     Yes.

15  Q     What was your particular role in the execution of that

16  search warrant on September 10th?

17  A     I was the team leader.

18  Q     Can you briefly tell the members of the jury what that

19  means to be the team leader?

20  A     The team leader manages the search, verifies items to be

21  seized, and also seizes the items.

22  Q     Were there other agents of the DEA that were assisting

23  you on September 10th?

24  A     Yes.

25  Q     Approximately how many other agents were assisting you in

E.  Maher - Direct / Brownell                766

1    the execution of the warrant that day?

2    A    Six others beside myself.

3    Q    And where was that warrant being executed?   What was the

4    location or the premises?

5    A    1735 York Avenue, Apartment 35C.

6    Q    And where is that particular address?

7    A    Manhattan, New York.

8    Q    What is located at that particular address?   What were

9    the premises?

10   A    It was the law offices of Robert Simels.

11   Q    I'm going to show you what's been received in evidence as

12   Government's Exhibit 101.

13              (The above-referred to exhibit was published to the

14   jury.)

15   Q    Is that the building where a search warrant was executed

16   that day where the law offices of Robert Simels were located

17   where the warrant was executed?

18   A    Yes.

19   Q    Approximately what time was it that you got to that

20   particular building on September 10th?

21   A    We got there approximately at two o'clock in the

22   afternoon.

23   Q    Did there come a time when you and the other six agents

24   that you've indicated actually entered the premises that day?

25   A    Yes.

E.  Maher - Direct / Brownell                      767

1   Q      Before you entered the premises that day, did you observe

2   any individuals leaving the premises?

3   A      Yes, I did.

4   Q      Who did you observe leaving the premises?

5   A      Robert Simels and Arienne Irving.

6   Q      In fact, were they placed under arrest that day by other

7   agents of the DEA and other law enforcement agents as well?

8   A      Yes.

9   Q      So after they left the premises, you and the other six

10  agents entered?

11  A      Yes.

12  Q      I'm going to show you what's been marked as Government's

13  Exhibit 100 for identification.

14          (The above-referred to exhibit was published to the

15  witness.)

16  Q      Agent Maher, do you recognize what that floor plan is?

17  A      Yes.

18  Q      And what do you recognize it as?

19  A      As the location where we executed the search warrant,

20  which is Robert Simels' law office.

21  Q      Now, there are some titles or names for some of the rooms

22  on that particular floor plan.

23          Do those names correspond with what you observed

24  when you executed the warrant that day?

25  A      Yes.

1              MR. BROWNELL:  Your Honor, I'm going to ask that

2     this be received in evidence as Government 100.

3              MR. SHARGEL:   No objection.

4              MR. SOLANO:   No objection, your Honor.

5              THE COURT:   Received.

6              (Government's Exhibit 100 was received in evidence.)

7              (The above-referred to exhibit was published to the

8     jury.)

9     BY MR. BROWNELL:

10    Q    If you can, Agent Maher, I believe you can do it.  Well,

11    you can do it with your finger and make a mark on the screen.

12    Can you indicate where it was that you and the other members

13    of your search execution team actually entered those offices

14    that day?

15    A    We entered through the front door which is here

16    (indicating), right by that arrow.

17    Q    Is that what's been marked the reception area on the

18    floor plan?

19    A    Yes.

20    Q    Was there a particular plan or organization that you were

21    going to use that day in executing the search warrant?

22    A    Yes.

23    Q    Can you briefly describe for the members of the jury what

24    your plan was in executing the warrant that day?

25    A    When we entered into the location to execute the search

1  warrant, we first went through the rooms just to see if there

2  was any other individuals inside the location just so we can

3  ask them to step aside so they wouldn't interfere in the

4  search.

5           There was one individual there inside the location

6  when we walked through, and that was the reception.

7  Q    It was a receptionist?

8  A    Receptionist there sitting at the reception table, or at

9  the desk, and we asked her to move to sit in a couch located

10  directly across from the reception desk.

11          After that, there was an agent that went room to

12  room and took photos of all the locations, all the rooms in

13  the location before the search warrant was conducted.

14          After that, we then conducted our search warrant by

15  all agents going starting in one room, and after that room was

16  finished, everybody left that one room and conducted a search

17  in another room.

18  Q    So the seven of you acted as a group, so to speak?

19  A    Yes.

20  Q    Okay.  And what happened after that, if anything?

21  A    After the whole location was then searched, before we

22  left, there was photographs taken again before we left.

23  Q    After the search had been executed?

24  A    After the search had been executed, yes.

25  Q    So, you indicated that a series of photographs were taken

1    by the agent with the camera before anything was moved in the

2    office, is that correct, in terms of executing the warrant?

3    A    Yes.

4    Q    And you indicated that when items were seized, if any

5    were and we'll get to that in a moment, that photographs,

6    after photographs so to speak, were taken; is that correct?

7    A    There was photographs -- yes, there was photographs also

8    taken during the search warrant of certain items that were

9    seized.

10   Q    And what were the reason, if you know, that during the

11   execution of the warrant some photographs were taken?

12   A    Some of the items that were seized were found in drawers

13   and also in closets.  So those photos weren't taken before the

14   search was conducted.  Those photos were taken while the

15   search was being conducted.

16   Q    Now, you indicated that the group, the seven of you,

17   acted together, so to speak.

18         Who was it that would make the determination as to

19   whether items would be seized?

20   A    Me.

21   Q    After an item was seized, would there be some way to

22   catalog or mark that particular item or the way that it was

23   being stored?

24   A    Yes.

25   Q    And how was that?

E.  Maher - Direct / Brownell                771

1  A     That was we used an exhibit number to identify items that

2  were seized and where they were located.

3  Q     Who was it that made the determination as to what number

4  would be used?

5  A     I did.

6  Q     When you made that determination, did you have anything

7  with you that you were writing anything down, writing things

8  down in as you were conducting the search?

9  A     Yes.

10  Q     What was that?

11  A     It was a green notebook.

12  Q     Do you have that green notebook with you?

13  A     I do.

14  Q     Was it labeled in any form or fashion?   Does it have a

15  number on it?

16  A     Yes, it does.

17  Q     Can you tell us what that is?

18  A     It says Government Exhibit Number 3500-EM-3.

19          MR. BROWNELL:  Your Honor, could I just have a

20  second?

21          THE COURT:  Yes.

22          (Pause in the proceedings.)

23  Q     What was the order, looking at Government Exhibit 100,

24  what was the order in which the rooms were searched on

25  September 10th?

E. Maher - Direct / Brownell                772

1   A    The order was the first room we went to was Robert

2   Simels' office.  After that we went to the conference room.

3   After that we went to Arienne Irving's office.  Then we went

4   to the reception area, and then we went to the copy room.

5            MR. BROWNELL:  Your Honor, if I could just have a

6   moment.

7            THE COURT:  Yes.

8            (Pause in the proceedings.)

9   Q    You indicated that you went into Robert Simels' office

10  first?

11  A    Yes.

12  Q    I'm going to show you what's been received in evidence as

13  Government's 128.

14           (The above-referred to exhibit was published to the

15  jury.)

16  Q    Do you recognize what's shown in this particular photo?

17  A    Yes.

18  Q    And what do you recognize that as?

19  A    That's the -- that's Robert Simels' office.

20  Q    You indicated that there were before photographs taken;

21  in other words, photographs taken before you or any of the

22  other members of the group actually started to seize or move

23  anything.

24           Do you know whether Government's Exhibit 128 was a

25  before photograph?

E. Maher - Direct / Brownell                        773

1   A      Yes.

2   Q      In other words, that's the way that office looked, or at

3   least that portion shown in the photograph looked before you

4   or any agents in your group touched anything?

5   A      Yes.

6   Q      I'm going to show you what's been received in evidence as

7   Government's 129.

8            (The above-referred to exhibit was published to the

9   jury.)

10  Q      Do you recognize this particular photograph?

11  A      Yes.

12  Q      What do you recognize that as?

13  A      Also Robert Simels' office.

14  Q      This is another view, so to speak, in that office?

15  A      Yes.

16  Q      And that was taken on September 10th, 2008?

17  A      Yes.

18  Q      Again, is this also a before photograph?   In other

19  words, this is the way the office looked when you and the

20  other agents first walked in?

21  A      Yes.

22  Q      In Simels' office, did you have an occasion to seize any

23  documents?

24  A      Yes.

25  Q      I'm going to show you a series of documents marked for

E.  Maher - Direct / Brownell                    774

1    identification.  I'm going to show you Government's Exhibit

2    522.

3                (The above-referred to exhibit was published to the

4    witness.)

5    Q    Was that document seized on September 10th of 2008 from

6    Robert Simels' office?

7    A    Yes.

8    Q    How do you know that?

9    A    The government exhibit number tells me this.

10   Q    Is there any writing that you put on that particular

11   exhibit number?

12   A    Yes.

13   Q    What writing did you put on that number?

14   A    My initials which is EM, the date of 7/14/09, and also

15   Exhibit Number N-40.

16   Q    I'm first going to ask you about N-40.

17              What does that mean, and why did you put it on that

18   label?

19   A    N-40 is a location where this document was seized, and

20   that tells me, I wrote that N-40 down in my notebook to let me

21   know where it was seized.

22   Q    And where was N-40 seized?

23   A    N-40 was seized on the top of Robert Simels' desk.

24   Q    What is the meaning of the date of July 14th of 2009, or

25   '09?

E. Maher - Direct / Brownell                775

1   A     7/1/09 lets me know that I took this document out of our

2   non-drug exhibit vault which is located in the DEA office in

3   Manhattan.   Took this evidence out of its bag, unsealed the

4   bag, took it out of the bag, and attached this government

5   exhibit sticker to the document.

6   Q     That's something that you and I did together on July

7   14th?

8   A     Yes.

9   Q     And that's the date that these exhibit stickers were

10  affixed to this and other documents and you wrote on it?

11  A     Yes, the stickers.

12            MR. BROWNELL:  I'm going to ask that this be

13  admitted into evidence as Government's Exhibit 522.

14            MR. SHARGEL:  I object to it.

15            THE COURT:  Come up.

16            (Sidebar.)

17            (Continued on next page.)

18

19

20

21

22

23

24

25

Sidebar                              776

1           (Side-bar conference held on the record out of the

2    hearing of the jury.)

3           THE COURT:  What is it, 522?

4           MR. BROWNELL:  Yes, your Honor.

5           MR. SHARGEL:  This is a document about which there

6    was no testimony.  It's an affidavit that was submitted to a

7    Guyanese court, and there's no relevance that's been

8    established other than the fact it was seized in his office.

9           THE COURT:  Well, let me hear from the proponent of

10   the evidence what's the relevance of it?

11          MR. FODEMAN:  Let me just have a moment, judge.

12          (Pause in the proceedings.)

13          MR. D'ALESSANDRO:  It shows, it's an affidavit by

14   Gerald Perera and Sean Bellfield.  Your Honor will recall from

15   the testimony of Selwyn Vaughn that those are two members of

16   the Phantom Squad and it references they were escorting him.

17   It shows connection and it corroborates the cooperating

18   witness.

19          THE COURT:  That they were with whom?

20          MR. D'ALESSANDRO:  Shaheed Khan.

21          It says "In March 2006 we were employed by Shaheed

22   Khan."  So it corroborates the cooperating witness's testimony

23   that these individuals Gerald Perera and Sean Bellfield were

24   working for Shaheed Khan.  It's corroborative of that.

25          THE COURT:  Well, there's your relevance.

Sidebar                                                777

1          MR. SHARGEL:  There it is, but it seems to me that

2    they're just putting the document in.  This wasn't prepared by

3    Mr. Simels.  He had nothing at all to with it.

4          The problem is -- I mean, I understand the

5    relevance.  No one's denying that they were connected to him,

6    but this is going to allow confusion by the jury that Mr.

7    Simels, that since it was recovered in his room that somehow

8    he has something to do with it.

9          THE COURT:  The relevance objection is overruled.

10         Proceed.

11         (Sidebar end.)

12         (Continued on following page.)

E.  Maher - Direct / Brownell                778

1              (In open court.)

2              THE COURT:   522 is received.

3              (Government's Exhibit 522 was received in evidence.)

4              THE COURT:   Go ahead.

5    BY MR. BROWNELL:

6    Q    By the way, Agent Maher, in the last couple of days, you

7    and I have been through a number of these exhibits, is that

8    correct, that you recovered on September 10th?

9    A    Yes.

10   Q    Did you mark all of them in a similar fashion, giving

11   them the date that they were removed from the vault at the DEA

12   and the N number; in other words, the location within Simels'

13   law office where the documents were recovered?

14   A    Yes.

15   Q    I'm going to show you what's been marked for

16   identification as Government's 523.

17              (The above-referred to exhibit was published to the

18   witness.)

19   Q    Do you recognize that particular document?

20   A    Yes.

21   Q    Again, was this marked in the same fashion as we just

22   discussed, yourself marking it with the N number of N-40?

23   A    Yes.

24              MR. BROWNELL:   I'm going to ask that this be

25   admitted into evidence as Government's 523.

E. Maher - Direct / Brownell                779

1          MR. SHARGEL:  I have no objection.

2          THE COURT:  Received.

3          (Government's Exhibit 523 was received in evidence.)

4    BY MR. BROWNELL:

5    Q    For identification, I'm going to show you Government's

6    524.

7          (The above-referred to exhibit was published to the

8    witness.)

9    Q    Again, was this marked in a similar fashion, marked by

10   yourself N-40?

11   A    I can't see the bottom of the sticker.

12         (Pause in the proceedings.)

13   A    Yes.

14         MR. BROWNELL:  I'm going to ask that this be

15   received in evidence as Government's 524.

16         THE COURT:  Any objection?

17         MR. SHARGEL:  No objection.

18         THE COURT:  Received.

19         (Government's Exhibit 524 was received in evidence.)

20         MR. SHARGEL:  Judge, I'm not objecting to these

21   series of documents unless something strikes me that makes it

22   different.

23         THE COURT:  All right.  Why don't we try to expedite

24   it.

25         MR. BROWNELL:  This is Government's 529.

1              THE COURT:  How many are there?

2              MR. BROWNELL:  I would say probably 40.

3              THE COURT:  Okay.

4              MR. BROWNELL:  I'll talk fast.

5              THE COURT:  Well, why don't we mention their exhibit

6    numbers.

7              I assume we can dispense with the need for the

8    witness to say separately that each of these 40 was seized.

9              You agree with that?

10             MR. SHARGEL:  Correct.

11             MR. BROWNELL:  I'll just put them on the screen with

12   your Honor's permission then.

13             THE COURT:  All 40 of them?

14             MR. BROWNELL:  Well, one at a time.

15             THE COURT:  Why don't you just mention their exhibit

16   numbers?  You don't have to put them all on the screen.

17             MR. SHARGEL:  Judge, may I suggest that this will

18   just be subject to a motion to strike if one of the 40, if

19   there's a basis for objection, and this way it can all go in?

20   Whatever your Honor wishes, but I think that might be the most

21   expeditious way.

22             THE COURT:  How likely is there going to be a motion

23   to strike?

24             MR. SHARGEL:  Unlikely.

25             THE COURT:  Let's do the 40 numbers.  Start reading

E. Maher - Direct / Brownell                781

1    them.  I don't have them.

2          MR. BROWNELL:  529, 531, 532.

3          THE COURT:  Is it all sequential?

4          MR. BROWNELL:  Not exactly.

5          THE COURT:  That's too bad.

6          Go ahead.

7          MR. BROWNELL:  534, 535, 537, 538, 540, 541, 547,

8    548, 553, 554 and 555.

9    BY MR. BROWNELL:

10   Q    Agent Maher, these are all marked with the designation of

11   N-40 indicating that they were located where when you seized

12   them on September 10th?

13   A    On the top of Robert Simels' desk in his office.

14   Q    Then I'm going to show you what's been marked as

15   Government's 514 for identification.

16         THE COURT:  The ones already mentioned are received

17   subject to a very small window of opportunity to object to

18   them, Mr. Shargel.  You'll let me know.

19         MR. SHARGEL:  I recognize the smallness.

20         THE COURT:  Go ahead.

21         (Government's Exhibits 529, 531, 532, 534, 535, 537,

22   538, 540, 541, 547, 548, 553, 554 and 555 were received in

23   evidence.)

24   BY MR. BROWNELL:

25   Q    Agent Maher, can you see Government Exhibit 514?

E.  Maher - Direct / Brownell                782

1    A    Yes.

2    Q    Can you see the N number that you gave this particular

3    exhibit?

4    A    Yes.

5    Q    And what's that?

6    A    N-42.

7    Q    And what does that indicate to you?

8    A    That indicates that this document was seized in Robert

9    Simels' office.  If I can look at my notes to refresh my

10   recollection I can tell you where it was seized.

11            MR. BROWNELL:  With the Court's permission?

12            THE COURT:  Sure.  Go ahead.

13            (Pause in the proceedings.)

14   A    It was seized from the top of the computer stand behind

15   Robert Simels' desk in his office.

16            MR. BROWNELL:  Judge, I'm going to ask that this be

17   admitted into evidence as Government Exhibit 514.

18            THE COURT:  Any objection?

19            MR. SHARGEL:  No objection.

20            THE COURT:  Received.

21            (Government's Exhibit 514 was received in evidence.)

22   BY MR. BROWNELL:

23   Q    Did you have an occasion to recover anything from a

24   locked drawer in Mr. Simels' office?

25   A    Yes.

E.  Maher - Direct / Brownell                783

1    Q    I'm going to show you what's been marked for

2    identification as Government's 130.

3              (The above-referred to exhibit was published to the

4    witness.)

5    Q    I'll ask if you recognize that particular photograph?

6    A    Yes, I do.

7    Q    What do you recognize that as?

8    A    I recognize that as the drawer that was located under

9    Robert Simels' desk that was opened.

10   Q    It was opened during the course of the search, or it was

11   open when you first walked into the room?

12   A    During the course of the search.

13   Q    Does that photograph show the way that drawer appeared

14   before anything was moved in that particular drawer by

15   yourself or any other agents during the execution of the

16   search?

17   A    Yes.

18             MR. BROWNELL:  I'm going to offer that in evidence

19   as Government's 130.

20             MR. SHARGEL:   No objection.

21             MR. SOLANO:   No objection.

22             THE COURT:   Received.

23             (Government's Exhibit 130 was received in evidence.)

24             (The above-referred to exhibit was published to the

25   jury.)

E.  Maher - Direct / Brownell                    784

1    BY MR. BROWNELL:

2    Q    Now, I'm going to ask you to describe the blue piece of

3    paper that's in the photograph.

4    A    Okay.

5    Q    Tell us what that is.

6              THE COURT:  You didn't ask him yet.  That's why he

7    was waiting.

8              Go ahead.

9    A    The blue sticker is stuck on top of a green box, and on

10   top of the blue sticker is the word "Khan" and underneath it

11   is a dollar sign.

12   Q    I'm going to show you what's been marked as Government's

13   605 for identification.

14             (The above-referred to exhibit was published to the

15   witness.)

16   Q    I ask you if that is, in fact, the blue sticker that was

17   shown in photograph 130?

18   A    Yes, it is.

19   Q    Did you have an occasion to voucher that particular blue

20   Post-it sticker, by the way, on September 10th?

21   A    I did.

22   Q    Is this, in fact, the blue Post-it sticker that you've

23   just identified in photograph 130?

24   A    It is.

25             MR. BROWNELL:  I'm going to offer this in evidence,

E.  Maher - Direct / Brownell                785

1  your Honor, as Government's Exhibit 605.

2           MR. SHARGEL:  No objection.

3           MR. SOLANO:  No objection.

4           THE COURT:  Received.

5           (Government's Exhibit 605 was received in evidence.)

6           (The above-referred to exhibit was published to the

7  jury.)

8  BY MR. BROWNELL:

9  Q   I'm going to show you what's been marked for

10 identification as Government's Exhibit 134.

11          (The above-referred to exhibit was published to the

12 witness.)

13 Q   I'm going to ask you is that another photograph of that

14 same drawer depicting the blue Post-it note with Khan and the

15 dollar sign and the other items that were in that drawer?

16 A   Yes.

17          MR. BROWNELL:  I'm going to ask that this be

18 admitted into evidence as Government's Exhibit 134.

19          MR. SHARGEL:  No objection.

20          MR. SOLANO:  No objection.

21          THE COURT:  Received.

22          (Government's Exhibit 134 was received in evidence.)

23          (The above-referred to exhibit was published to the

24 jury.)

25

E. Maher - Direct / Brownell                    786

1   BY MR. BROWNELL:

2   Q    In this particular photograph, on the upper part of the

3   photograph, there's a white plastic bag and there's a letter

4   that shows a partially cut off letter U.

5            Did you have an occasion to open that particular

6   plastic bag?

7   A    Yes, I did.

8   Q    What, if anything, was in the plastic bag?

9   A    Money.

10  Q    Did you have an occasion to count the money after you

11  observed it in the -- did you have occasion to count the

12  money?

13  A    Yes.

14  Q    And how much was it?

15  A    Twenty-five hundred dollars.

16  Q    Did you voucher that money?

17  A    I did.

18  Q    Do you remember what number you vouchered it under?

19  A    If I could look at my notes again.

20            MR. BROWNELL:  With the Court's permission?

21            THE COURT:  Yes, you may.

22            (Pause in the proceedings.)

23  A    N-24.

24  Q    I'm going to show you an exhibit, Government Exhibit

25  Number 604 for identification.

E. Maher - Direct / Brownell                787

1            (The above-referred to exhibit was published to the
2    witness.)
3    Q    I ask if you recognize what this particular exhibit is?
4    A    Yes.
5    Q    What do you recognize this as?
6    A    That's the exhibit of N-24.
7    Q    Which is?
8    A    The money.
9    Q    How do you know that?
10   A    Because of the government sticker that's located at the
11   bottom of the photo.
12   Q    And at the top of the photograph, is that a DEA evidence
13   sticker?
14   A    Yes, it is.
15   Q    Does your name appear on that sticker?
16   A    Yes, it does.
17            MR. BROWNELL:  I'm going to ask that this be
18   admitted into evidence as Government's 604.
19            THE COURT:   Any objection?
20            MR. SHARGEL:   No objection.
21            MR. SOLANO:   No objection.
22            THE COURT:   Received.
23            (Government's Exhibit 604 was received in evidence.)
24   BY MR. BROWNELL:
25   Q    The white plastic bag that the money, the $2,500, was

E.  Maher - Direct / Brownell                788

1    found in, did you have an occasion to voucher that?

2    A    Yes, I did.

3    Q    Do you remember under what voucher number that was

4    vouchered by yourself?

5    A    If I could look at my notes again.

6            THE COURT:  Yes, you may.

7            (Pause in the proceedings.)

8    A    N-25.

9    Q    I'm going to show you what's been marked for

10   identification as Government's Exhibit 606.

11           (The above-referred to exhibit was published to the

12   witness.)

13   Q    As best you can see this, is that the white plastic bag

14   that the $2,500 was contained in on September 10th of 2008?

15   A    Yes.

16   Q    How do you know that?

17   A    From the government exhibit number and also the DEA

18   label.

19           MR. BROWNELL:  I'm going to ask that this be

20   admitted into evidence as Government's Exhibit 606.

21           MR. SHARGEL:  No objection.

22           MR. SOLANO:  No objection.

23           THE COURT:  Received.

24           (Government's Exhibit 606 was received in evidence.)

25           (The above-referred to exhibit was published to the

E. Maher - Direct / Brownell                789

1    jury.)

2    BY MR. BROWNELL:

3    Q    Now, Agent Maher, the white Post-it sticker, Government's

4    Exhibit 605.

5              THE COURT:  You mean blue?

6              MR. BROWNELL:  I'm sorry, blue.  Thank you.

7    Q    With "Khan" and the dollar sign, that was next to the

8    white plastic bag with the $2,500?

9    A    Yes.

10   Q    Now, the blue Post-it sticker with "Khan" and the dollar

11   sign, that was stuck to the green box that's shown in

12   Government's Exhibit 134?

13   A    Yes.

14   Q    Did the box itself contain any currency or cash?

15   A    No.

16   Q    In fact, what did the box contain?

17   A    It contained a Rolex watch, a gold necklace with a gold

18   chain, and appraisal.

19   Q    Other than the money, speaking about that particular

20   drawer, other than the $2,500 in the white plastic bag, was

21   there any other cash or currency in any part of that drawer?

22   A    No.

23   Q    Did you have an occasion within Simels' office itself to

24   recover any computer equipment?

25   A    Yes.

E. Maher - Direct / Brownell                    790

1   Q    I'm going to ask you if you recovered a Dell CPU desktop

2   computer that you marked with the DEA exhibit number of N-29?

3   A    Yes.

4   Q    I'm going to ask if you recovered a Dell laptop computer

5   located in a computer bag that you gave the designation of

6   N-30?

7   A    Yes.

8   Q    And did you voucher those particular items?

9   A    I did.

10           MR. BROWNELL:   Your Honor, if I could just have a

11   moment.

12           THE COURT:   About how much longer is your direct,

13   Mr. Brownell?

14           MR. BROWNELL:   Judge, it could be another half-hour,

15   20 minutes.

16           THE COURT:   All right.   Let's finish it on Monday.

17           MR. BROWNELL:   That's fine.

18           THE COURT:   I think it's a good time to break for

19   the week.   We will resume Monday at 9:30.   We're not sitting

20   tomorrow.

21           Put the case out of your minds.   Don't discuss the

22   case with anyone.   Avert your eyes if there are any newspaper

23   articles or online articles or information that come to your

24   attention.   Remember what I told you about keeping yourselves

25   quarantined.

Proceedings                                    791

1          Make sure you leave early on Monday so we can start

2   promptly at 9:30.   We're right on schedule on the schedule I

3   gave to you when you were selected as jurors.

4          Have a nice Friday and a nice weekend.   Safe home.

5   See you Monday morning.   Don't discuss the case.

6          All rise.

7          Good night.

8

9          (Jury exits the courtroom.)

10

11          (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                      792

1        THE COURT:  You can step out, sir.

2        (Witness leaves the witness stand.)

3        THE COURT:  I assume both sides, each side still

4   wants to call an expert witness on the subject of what a bona

5   fide legal representation is?

6        MR. FODEMAN:  No, your Honor.  We were just going to

7   bring that up with you.

8            Upon reflection and having considered how the case

9   has gone in and having spoken with defense counsel a little

10  bit on the issue, I don't think that we need to call Professor

11  Gillers to establish that.

12           The only area that we'd like -- the only

13  hesitance --

14       THE COURT:  Should I strike his name off my list

15  then?

16       MR. FODEMAN:  I think you can pretty much go ahead

17  and strike it off, but I would like to couch it with just this

18  caveat.

19           You may have recalled during one of the tapes Mr.

20  Simels describing the ten thousand dollar payment to Ms.

21  Camacho as a witness fee.  Our concern is, and he somehow

22  tries to justify it as being just a legitimate witness fee.

23  We just need to know, the Government's interest here is just

24  having the jury know that such witness fees are not allowed.

25  Now, whether that comes from the Court or whether we can

Proceedings                                                793

1    stipulate to that fact is fine, but that's the only thing I

2    could imagine Professor Gillers could testify about at this

3    point.

4           I don't think that that even is the defense, as it

5    turns out, because they're saying he wasn't going to pay the

6    bribe at all in the end, but I just don't want any jurors

7    thinking 'well, if that were true, that would be okay.'  So

8    that's our only issue left.

9           MR. SHARGEL:  I want something out of that also.

10   I've discussed this, I think we can craft a stipulation over

11   the weekend.

12          But I'm still interested, very interested, in

13   calling Anthony Ricco, not quite -- Rule 16 notice was not

14   parallel.  I talked about calling an ethicist if Professor

15   Gillers were to testify, but I don't see Mr. Ricco in that

16   role.

17          My object in calling, and I've of course supplied

18   Rule 16 notice, is to put before the jury evidence relating to

19   practice and practicalities of a criminal defense lawyer in

20   the detail that I spelled out.

21          THE COURT:  All right.

22          MR. SHARGEL:  I've been in touch with him.  I know

23   that you wanted to hear him, and I told him that you wanted to

24   hear him outside the presence of the jury.  I assume that's --

25          THE COURT:  Not necessarily.  I mean, your reply

Proceedings                                            794

1   papers have some more detail about what he would say.  I'm

2   still inclined to allow it, but obviously you're going to make

3   your own judgments about how to try your case.

4        I do think there are on this subject, and I'll see

5   what remains of it after the stipulation, but I think in terms

6   of the examination and I think in part based on the opening

7   statements, I think there's a possibility that the jury's

8   going to need to be apprised of a couple of things so as to

9   avoid confusion.

10       There are some asymmetries in what people are

11  allowed to do.  You're perfectly allowed, the defense lawyers

12  obviously, are allowed to impeach a witness by reference to

13  the benefits conferred, the money for example, but the

14  Government's allowed to do that.  Whereas, but for the, I

15  think it's true that but for the 40 dollar witness fee, I

16  think it's still 40 dollars, a defense lawyer is not permitted

17  to confer a benefit like that on a witness.  So I'm sharing

18  that with you.

19       MR. SHARGEL:  Well, I well understand that, but

20  again, Mr. Fodeman or Mr. D'Alessandro, I don't remember,

21  makes the point.  My defense is not that he gave her ten

22  thousand dollars or intended to make an offer of ten thousand

23  dollars, or any amount of money other than five hundred

24  dollars, to pay her expenses.  He said that on the tape.  And

25  I contend and would want as part of the stipulation that there

Proceedings                                          795

1    was nothing improper about saying 'I will give a witness five

2    hundred dollars for time and effort to come up to my office to

3    pay for her expenses.'

4              THE COURT:  What you stipulate to is your business,

5    and what you argue is obviously your business, but to the

6    extent I think there's a specter, whether you argue it or not,

7    that one of the jurors is going to think 'well, if the

8    Government can provide money to Selwyn Vaughn how can it

9    complain about the offer, assuming it was made, of ten

10   thousand dollars to Leslyn Camacho,' I intend to disabuse any

11   juror of that, of any problem with that asymmetry and the

12   abilities of each side whether or not you argue, because it

13   was implicit, whether it was intentional or not, it was

14   implicit to me sitting here as a thirteenth juror in your

15   examination of Vaughn.  But before I say anything to the jury,

16   I'll certainly let you see it and comment on it.

17             MR. SHARGEL:  Very well.

18             THE COURT:  The same, to a much lesser extent, but I

19   had the same feeling when it came to appointed counsel, 'the

20   Government paid for your lawyer.'  I had the same sense that,

21   intentionally or otherwise, what you were conveying to the

22   jury is the Government conferred a benefit on this witness,

23   and the problem there is, not the problem, but my reaction to

24   it has another dimension and that is Vaughn would have gotten

25   that appointed counsel whether he was assisting the Government

Proceedings                                              796

1    or not.  Anybody who is in his situation would have been

2    appointed a lawyer under the CJA, even if he chose to take the

3    Fifth Amendment after immunity was conferred on him.

4             Do you understand?

5             MR. SHARGEL:  No, I understand your point, but by

6    the same token, and I didn't go into it at this level, but in

7    the same token, I know that prosecutors willy-nilly support

8    the appointment of a CJA lawyer when a person is not really

9    eligible for a CJA.

10            He said that his wife was employed.

11            THE COURT:  You haven't gone there.

12            MR. SHARGEL:  No, I haven't because I know that

13   would have meant an objection about details about his life,

14   but the point is that's a benefit.  He received a benefit.  He

15   doesn't have an outstanding case, and for the life of me -- I

16   didn't want to get into lawyer/client conversations.  For the

17   life of me I don't understand, particularly why when his

18   agreement with the DEA is he's not getting any immunity for

19   what he discusses.  He was authorized to do every single thing

20   that he spoke about on the stand in terms of meeting with Mr.

21   Simels.  They can't give him immunity for any outstanding

22   interest that the government of Guyana may or may not have in

23   him.  So this was kind of like the frosting --

24            THE COURT:  It would be unusual.  I don't know.  It

25   is a benefit, and that's why it's fair ground.  Maybe this

Proceedings                                      797

1    doesn't come up as much in your practice, but people who don't

2    have a pending case who have participated in murders all the

3    time get appointed CJA counsel.  I mean, that's just routine.

4    I mean, that happens all the time.  And the notion that he

5    doesn't have some potential exposure for those murders in

6    Guyana here kind of underestimates the power of prosecutors

7    here to bring cases.  I mean, cases have been brought with

8    less direct nexus to this district than that.

9            So I don't think if someone were to challenge the

10   bona fides of his assertion of the Fifth doesn't strike me, on

11   the facts I've heard so far, that that challenge would go very

12   far.

13           I don't mean to dwell on it.  It's a much less

14   pointed manifestation than the $50,000 was of just a problem.

15   You're allowed to argue that it gives him an incentive curry

16   favor with the Government; it makes him into a liar.

17           All I want to dispel is the notion that I think was

18   in the air, and that is how can the Government properly

19   complain about Mr. Simels, assuming the jury finds that this

20   happened, how can it properly complain about Simels offering

21   money to witnesses when the Government offers money to

22   witnesses, and in that regard it's not a level playing field.

23   The Government has authority that the defense lawyer doesn't

24   have.  That's what I intend to address.

25           MR. SHARGEL:  Well, just so it's clear, if you do

Proceedings                                    798

1   address it, and there's an objection to be made I'll make it,

2   but if you do address it, it's not because a door has been

3   opened.  If there had been no cross-examination and the

4   Government brought that out on direct examination to fairly

5   put it before the jury, you would have had the same problem.

6   The fact that the jury may be wondering about that doesn't

7   necessarily mean that -- I mean, it wasn't raised in the first

8   instance by defense counsel, unless I was the first to say it

9   in opening.  I don't remember if they said anything in their

10  opening statement.

11          The bottom line is that I don't know what the *human

12  reaction is to that.  I don't think that I'm unfairly pushing

13  it.  I don't think that I opened any door to it.

14          THE COURT:  I don't think you've done anything

15  unfair.  I just want to make sure the jury understands who's

16  permitted to do what.

17          It's probably best to postpone the rest of this

18  conversation until --

19          MR. SHARGEL:  We see it.

20          THE COURT:  -- until I see your stipulation and

21  until I decide in fact I'm going to give an instruction and

22  then I'll show you precisely what it's going to be.

23          MR. SHARGEL:  Do you want to hear me, and I can be

24  brief, on the issue raised by the Government's letter last

25  evening?

Proceedings                                    799

1              THE COURT:   Yes.

2              MR. SHARGEL:   Well, first, in all events, we still

3       have an audibility hearing outstanding.

4              THE COURT:   Fair enough.

5              MR. SHARGEL:   So I put that before your Honor

6       because the weekend is approaching.

7              THE COURT:   In that vein, I anticipated this, and in

8       that vein I'm going to need a little help as to where that

9       snippet of conversation purportedly about the five hundred

10      dollars and the money to be suing Vaughn, where it is.

11             MR. FODEMAN:   We're working on that.

12             THE COURT:   If you can put it on a disk, that would

13      be great.

14             MR. SHARGEL:   But, see, I'm worried about one thing.

15      One of the issues before you is not whether you can hear a

16      snippet, but whether there's enough of a snippet to put the

17      snippet in a larger context.

18             THE COURT:   I understand.

19             MR. SHARGEL:   You understand, yes.

20             Judge, I'm well-familiar with these cases, and I was

21      well-familiar with the cases before the Government served its

22      motion last evening, and my point can be simply made.

23             The cases that say that it's the same as Harris

24      against New York and the other Supreme Court cases on Fourth

25      Amendment issues that deal with Fourth Amendment issues

Proceedings                                                800

1   essentially say this: They talk about the logic and appeal and
2   rationale and so forth of the Fourth Amendment cases and they
3   recognize, those cases recognize, the most recent one being in
4   2001 I think out of the Eighth Circuit, they recognize that
5   there are no exceptions in 2515, but they say it makes sense
6   that we do this in the same way as where the Fourth Amendment
7   is at issue.
8           I say two things.  One, Congress made its intention
9   plain.  It's not the only time that Congress made its
10  intention plain in a situation like this.  By way of analogy,
11  Rule 410 of the Federal Rules of Evidence that prohibits any
12  statement that's made during the course of plea bargaining is
13  absolute.
14          In 1982, I looked at this case this morning, the
15  United States against Lawson, 683 Fed 2d. 688 Second Circuit
16  1982, that issue was before the court, I think it was Judge
17  Winter who wrote the opinion, and he said it's absolute, there
18  are no exceptions.  The court looked at the legislative
19  history.  The Senate had suggested an exception where there's
20  impeachment that has value for impeachment material, and the
21  Court of Appeals said no, Congress didn't use that language
22  and we're not going to adopt that rule urged by the
23  Government.
24          Now, the Court does say that it has some logical
25  appeal because if you make exceptions it will discourage plea

Proceedings                                                801

1  bargaining perhaps, the very purpose behind Rule 410, but it

2  said at the end of the opinion, the bottom line was that this

3  was the congressional intent.

4           The whole idea of Title III and the wiretap law was

5  to make, it was Congress's obvious intention to make it more

6  difficult to get a wiretap in the first place.  The procedural

7  requirements are much more strict than an ordinary Fourth

8  Amendment search warrants of any kind.  Congress purposely and

9  deliberately said in 2515 that it should not be admitted in

10 any proceeding, period, without exception.  Harris against New

11 York, which I think was decided in 1969, but the cases about,

12 you know, the Fourth Amendment cases are something that

13 Congress was aware of when they drew this statute.

14          I recognize that four of five circuits have said

15 that it should be admitted for impeachment material, but your

16 Honor is maybe guided by those cases, but I don't think

17 there's all that much guidance because, with all respect, I

18 don't think they're principal decisions.

19          Courts generally don't like the idea, I mean let me

20 be as blunt as possible, where you have something out there

21 that is appropriate for impeachment but you can't use it

22 because of some proscription, but in this case, the rule in

23 2515 is so plain and so direct that I respectfully suggest

24 that you adhere to its strict meaning.

25          I have nothing more to say on it.

Proceedings                                      802

1          THE COURT:  Thank you.

2          MR. FODEMAN:  Judge, I don't think Mr. Shargel is

3    saying as bluntly as possible.

4          If you were to preclude the Government from using

5    this evidence in rebuttal, what it essentially would permit

6    Mr. Simels to do in this obstruction of justice case would

7    allow him to take the stand, say that he had never any

8    intention of paying Miss Camacho, when we all know that he

9    had, at least we will argue that on that conversation he's

10   discussing with Mr. Khan his intent to pay her, essentially

11   saying 'I need money, I need money in case this woman is for

12   real.'  It would be an order that would permit Mr. Simels a

13   shield against adequate cross-examination and would allow him

14   to perjure himself.

15         THE COURT:  I think there's no doubt about the fact

16   that that's exactly what he's saying.  He's saying that Title

17   III is written in such a way that someone who is in a

18   consensual conversation truthfully says 'I killed Jimmy Hoffa'

19   can get it suppressed on some technical ground.  The sealing

20   violation, or here the minimization violation, it has nothing

21   to do with the voluntariness or even the truthfulness of his

22   statement and then can take the stand and say 'I had nothing

23   to do with murdering Jimmy Hoffa' with the impunity that

24   attends the Government's inability to use this tape-recorded

25   conversation.

Proceedings                                803

1              That's what you're saying, right?

2              MR. SHARGEL:  Yes, I'm saying that, but I point to

3    two things in saying it.  That very thing, that Jimmy Hoffa

4    analogy, can be used in 410 in the same way that I'm asking

5    you to apply.

6              And the other thing if I may say, I don't regard

7    minimization as, and I respectfully submit, minimization is

8    not technical.

9              THE COURT:  For whatever reason, but it would apply

10   if it were technical, right?

11             MR. SHARGEL:  Yes, yes.

12             THE COURT:  Your argument would apply to the sealing

13   violation.

14             MR. SHARGEL:  And it's not something that I read in

15   a case somewhere or at a CLE program.  I look at 2515 and

16   that's what it says.

17             THE COURT:  I understand.  I just think you're both

18   in agreement.  You're saying that this result ought to flow

19   notwithstanding how unfair Mr. Fodeman thinks the outcome is.

20             MR. SHARGEL:  But I don't agree with, the only place

21   I don't agree is that Mr. Simels is being left with no

22   argument.  We have an argument that we will present on the

23   defense case.

24             THE COURT:  And if you lose this motion, we'll hear

25   that argument.

Proceedings                                    804

1          MR. SHARGEL:   Yes.

2          Have a good night, judge.

3          THE COURT:   Yes, you too.

4          MR. FODEMAN:   Thank you, judge.

5          THE COURT:   Anyone else being stricken from this

6    list?

7          MR. FODEMAN:   No, judge, but I think there's a very

8    good chance we'll rest on Monday.

9          THE COURT:   All right.

10         You'll be ready with your case.

11         MR. FODEMAN:   I think we can strike Mr. Gardener at

12   this point as likely off the list.  I shouldn't say likely.

13   He's off the list.

14         MR. SHARGEL:   Who's on for Monday, if I may ask for

15   the Court?  Who's on for Monday?  Who's in play?

16         MR. FODEMAN:   Obviously we have the witness on the

17   stand.  We have Investigator Mazzella.  We have a

18   representative from the MCC SIS office.

19         MR. D'ALESSANDRO:   Luis Rodriguez.  And a FedEx

20   representative for business records, Manny Mancuso.

21         THE COURT:   Is there additional evidence about Miss

22   Irving's participation in this?

23         MR. D'ALESSANDRO:   Yes.

24         MR. FODEMAN:   Yes, there is, and you haven't

25   obviously seen -- I guess it would come in the form of these

Proceedings                                                    805

1   computer records and documents, as well as records from the

2   MCC.

3          THE COURT:  I returned to you the copies of the

4   T-III that I suppressed.  I'll need them back.

5          MR. FODEMAN:  Right.

6          THE COURT:  And Mr. Shargel's right, context

7   matters, but if you could also specifically, if you could give

8   me a hint as to where to look.

9          MR. FODEMAN:  Absolutely.

10         MR. D'ALESSANDRO:  Could we get some guidance on

11  that, Mr. Shargel?

12         We had been operating, as you are painfully aware,

13  with walls in place.

14         Does anyone have an objection to Mr. Fodeman,

15  myself, Mr. Brownell or the investigator John Mazzella

16  accessing these CDs?  I think it's going to be the most

17  effective way for us to find it rather than to find a

18  walled-off AUSA in order to do that.

19         THE COURT:  I think given the suppression ruling,

20  efficiency matters now.

21         Don't you agree?

22         MR. SHARGEL:  I don't have any problem with that.

23         The only lingering problem I have that's never been

24  resolved, although I've tried so hard to resolve it, is that

25  the DEA still has the non-Khan-related material in its

Proceedings                                         806

1  possession, and I've asked that it be put in the courthouse.

2  Unless I don't know something, unless it happened in the dark

3  of night or under cover of night, I still believe that it's at

4  the DEA facility, and it shouldn't be there.  It just

5  shouldn't be there.  It's unseemly.  It doesn't look good.

6            THE COURT:  All right.  I'm certainly sorry I

7  brought this subject up now.

8            Where is it?

9            MR. D'ALESSANDRO:  Judge, I assume it is at the DEA.

10 It's in the vault.  Nobody, to my knowledge, has taken it or

11 opened it, and we can inspect the seals at the time we bring

12 it over.

13            What my understanding was with Mr. Shargel, and he

14 can correct me if I'm wrong, is that before we brought it to

15 the court which would be a whole sealing procedure, let the

16 trial go forward and maybe something that happens in the

17 middle of trial which would make a piece of evidence that was

18 not deemed relevant relevant, and we would have to go and get

19 it.  I just thought it was easier to leave it at the DEA.

20            THE COURT:  Why are you keeping it at all?

21            MR. D'ALESSANDRO:  For the same reasons that if this

22 case ends in a conviction and there's an appeal and the case

23 comes back and things are re-looked at, I just want to

24 maintain the integrity of the evidence.

25            Is it paper documents, is that the issue, or is it

Proceedings                                    807

1    electronic?   I mean, I just want some clarification.

2              MR. SHARGEL:   The computer server.

3              But may I ask how could a non -- you've heard the

4    evidence now.   How could a non-Khan-related document, a

5    document --

6              THE COURT:   That's why I asked why you're keeping it

7    at all.

8              What could happen?

9              MR. D'ALESSANDRO:   To be clear, I don't think we're

10   talking about paper documents.   We're talking about the

11   electronic documents, so it's the server, and that, I can't --

12   that is the evidence and it can't be pulled out.

13             THE COURT:   Is this the server from which David

14   Wikstrom culled Khan-related documents?

15             MR. D'ALESSANDRO:   Yes.

16             THE COURT:   So the server includes Khan and

17   non-Khan?

18             MR. D'ALESSANDRO:   Yes.   So they have a copy.   We

19   just have the original.

20             MR. SHARGEL:   I think David Wikstrom was using the

21   copy, a cloned copy of the server.   I don't think he had the

22   original server.

23             MR. D'ALESSANDRO:   No, I said we have the original.

24   The DEA maintained the original.

25             MR. SHARGEL:   Judge, it shouldn't be with the DEA.

Proceedings                                          808

1    That's the first step.  And what happens later --

2            THE COURT:  But what if there's a claim?  I mean

3    what difference does it make if it's in a vault at the DEA or

4    the U.S. Attorney's office?

5            MR. SHARGEL:  Because Mr. Simels has a practice and

6    the idea of having the client's file, electronic file with

7    confidential attorney/client information on it sitting in a

8    government office as opposed to the court.

9            THE COURT:  This is a government office.

10           MR. SHARGEL:  We agreed there was space in the

11   courthouse.  The last I heard was there was space for the

12   court to have it in its vault.

13           THE COURT:  The vault downstairs with the sealed

14   applications for sentencing adjournments in it?  If you could

15   look at that vault, you might want to revise this application.

16           I'm not going to decide this today.

17           MR. SHARGEL:  All right.  Fair enough.

18           THE COURT:  Thank you.

19           MR. SHARGEL:  Have a good night.

20           THE COURT:  Have a good night.

21           (Time noted:   5:30 p.m.)

22

23

24

25

809

I N D E X

| WITNESS | PAGE |
|---|---|
| S E L W Y N   V A U G H N | 505 |
| CROSS-EXAMINATION (Cont'd.) | |
| BY MR. SHARGEL: | 506 |
| CROSS EXAMINATION | |
| BY MR. SALANO: | 639 |
| REDIRECT EXAMINATION | |
| BY MR. D'ALESSANDRO | 659 |
| P E T E R   M Y E R S | 681 |
| DIRECT EXAMINATION | |
| BY MR. FODEMAN: | 681 |
| CROSS-EXAMINATION | |
| BY MR. SHARGEL: | 699 |
| CROSS-EXAMINATION | |
| BY MR. SOLANO: | 720 |
| N I C O L E   W A I T E | 725 |
| DIRECT EXAMINATION | |
| BY MR. FODEMAN: | 725 |
| CROSS-EXAMINATION | |
| BY MR. SHARGEL | 746 |
| REDIRECT EXAMINATION | |
| BY MR. FODEMAN | 758 |

810

1          RECROSS EXAMINATION

2          BY MR. SHARGEL                                761

3

4     EDWARD MAHER

5          DIRECT EXAMINATION

6          BY MR. BROWNELL                              764

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

811

1                        E X H I B I T S

2

3

4        Government's Exhibits 612, 613 and 614 were

5        received and marked into evidence                    688

6

7        Government's Exhibit 815 was received and

8        marked into evidence                                 691

9

10       Government's Exhibits 116, 117, 124 and 125

11       were received and marked into evidence               694

12

13       Defendant's Exhibit 3500-MB-1 was received

14       and marked into evidence                             713

15

16       Government's Exhibit 700                              736

17

18       Defendant's Exhibit 631                              756

19

20       Government's Exhibit 100                              768

21

22       Government's Exhibit 522                              778

23

24       Government's Exhibit 523                              779

25

812

1

2       Government's Exhibit 524                          779

3

4       Government's Exhibits 529, 531, 532, 534,

5       535, 537, 538, 540, 541, 547, 548, 553, 554

6       and 555                                           781

7

8       Government's Exhibit 514                           782

9

10      Government's Exhibit 130                           783

11

12      Government's Exhibit 605                           785

13

14      Government's Exhibit 134                           785

15

16      Government's Exhibit 604                           787

17

18      Government's Exhibit 606                           788

19

20

21

22

23

24

25

813

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1,000** [7] - 634:16, 634:18, 652:4, 652:7, 652:8, 652:9, 656:7
**$15,000** [1] - 673:12
**$2,500** [4] - 787:25, 788:14, 789:8, 789:20
**$20,000** [1] - 640:23
**$20.00** [1] - 690:8
**$50,000** [8] - 587:22, 634:25, 638:5, 672:22, 672:23, 673:1, 673:7, 797:14
**$50.00** [1] - 669:16

## '

**'06** [1] - 640:11
**'08** [8] - 642:20, 645:11, 645:12, 645:19, 646:8, 666:8, 669:22
**'09** [1] - 774:25
**'if** [2] - 732:8, 734:17
**'the** [1] - 795:19
**'well** [2] - 793:7, 795:7

## 0

**08-cr-640** [1] - 503:5

## 1

**1** [5] - 524:2, 524:3, 598:24, 625:2, 625:20
**10** [6] - 524:4, 615:23, 616:2, 616:10, 616:13, 690:8
**100** [5] - 767:13, 768:2, 768:6, 771:23, 811:20
**100,000** [1] - 517:24
**101** [1] - 766:12
**10th** [1] - 765:6, 765:16, 765:23, 766:20, 771:25, 773:16, 774:5, 778:8, 781:12, 784:20, 788:14
**11** [12] - 523:19, 524:13, 524:15, 525:1, 525:2, 525:10, 525:16, 536:10, 617:2, 632:23, 633:3
**116** [8] - 693:12, 693:22, 694:3, 694:7, 695:4, 695:11, 700:25, 811:10
**117** [7] - 693:12, 693:22, 694:3, 694:17, 695:14, 696:3, 811:10
**11:30** [1] - 591:6
**11th** [10] - 602:9, 604:9, 604:13, 604:14, 605:12, 611:9, 612:7, 614:22, 615:18, 626:18
**12** [3] - 505:21, 560:24, 727:22
**124** [5] - 693:12, 693:22, 694:3, 696:11, 811:10
**125** [5] - 693:12, 693:22, 694:4, 696:18, 811:10
**128** [2] - 772:13, 772:24
**129** [1] - 773:7
**12th** [1] - 641:3
**13** [18] - 505:21, 563:4, 563:8, 565:2,

565:8, 565:9, 575:22, 594:12, 605:16, 616:2, 648:7, 649:7, 651:5, 651:15, 652:3, 652:4, 680:4, 713:11
**130** [6] - 783:2, 783:19, 783:23, 784:17, 784:23, 812:10
**134** [5] - 785:10, 785:18, 785:22, 789:12, 812:14
**13th** [4] - 585:22, 586:11, 586:12, 649:25
**14** [1] - 588:13
**14th** [2] - 774:24, 775:7
**15** [5] - 578:15, 578:16, 579:4, 586:25, 607:17
**158th** [1] - 726:11
**16** [4] - 585:21, 633:3, 793:13, 793:18
**17** [9] - 586:7, 652:16, 652:23, 655:14, 655:25, 668:11, 680:4, 680:7, 680:9
**1700** [1] - 695:21
**1735** [1] - 766:5
**18** [6] - 561:12, 586:10, 588:13, 627:6, 666:8, 666:12
**182-22** [1] - 726:11
**18th** [1] - 628:6
**19** [6] - 579:4, 580:18, 586:25, 597:20, 603:19, 607:16
**1969** [1] - 801:11
**1982** [2] - 800:14, 800:16
**1994** [2] - 514:17, 514:20
**1st** [2] - 749:5, 749:11

## 2

**20** [13] - 522:6, 545:18, 545:19, 576:5, 587:6, 588:10, 617:3, 633:3, 653:24, 665:20, 666:2, 790:15
**2000** [1] - 638:18
**2000's** [2] - 515:11, 516:3
**2001** [1] - 800:4
**2002** [3] - 516:24, 516:25, 691:22
**2002/2003** [1] - 517:8
**2003** [4] - 516:19, 516:24, 516:25, 715:18
**2004** [1] - 516:19
**2005** [12] - 518:22, 518:25, 519:1, 519:2, 519:3, 522:1, 522:6, 542:11, 547:15, 547:16, 549:25, 639:11
**2006** [20] - 512:8, 521:9, 521:12, 521:17, 522:13, 523:11, 525:13, 544:7, 544:10, 550:1, 550:5, 637:16, 640:6, 640:18, 640:22, 642:7, 643:23, 644:1, 672:25, 776:21
**2007** [10] - 563:15, 563:16, 563:24, 564:22, 565:8, 644:16, 713:12, 756:17, 756:18
**2007/2008** [1] - 710:5
**2008** [50] - 520:4, 520:6, 523:19, 524:13, 524:15, 524:18, 524:20, 525:1, 525:2, 525:6, 525:7, 525:11, 525:16, 526:3, 528:16, 536:10, 556:8, 557:19, 562:12, 563:4, 563:8, 564:23, 565:8,

565:9, 565:12, 574:23, 575:22, 603:19, 614:8, 624:22, 633:23, 641:3, 646:24, 647:5, 648:7, 665:20, 666:2, 732:23, 735:23, 736:12, 746:8, 748:2, 749:5, 749:11, 765:7, 773:16, 774:5, 788:14
**2009** [5] - 503:10, 627:6, 638:18, 758:4, 774:24
**206** [2] - 603:3, 603:4
**20th** [2] - 652:3, 655:15
**21** [6] - 565:23, 585:23, 650:9, 650:14, 656:11, 664:4
**21st** [3] - 516:5, 559:18, 614:7
**22** [4] - 544:9, 589:2, 663:13, 663:14
**225** [1] - 503:23
**22nd** [1] - 544:10
**23** [6] - 580:25, 594:9, 600:12, 652:12, 657:2, 683:20
**230** [1] - 726:24
**24** [4] - 596:23, 600:5, 600:8, 666:23
**25** [7] - 571:20, 598:8, 605:22, 605:25, 629:24, 633:23, 668:1
**2515** [4] - 800:5, 801:9, 801:23, 803:15
**25th** [1] - 633:19
**26** [2] - 598:24, 651:5
**27** [2] - 586:10, 600:12
**27th** [10] - 732:23, 735:23, 736:12, 741:17, 742:23, 748:2, 749:6, 756:18, 760:23, 761:7
**28** [5] - 570:5, 600:21, 627:10, 627:15, 696:12
**29** [1] - 595:25
**2:00** [1] - 653:10
**2d** [1] - 800:15

## 3

**3** [8] - 522:17, 564:24, 574:23, 617:5, 627:10, 627:15, 629:2, 635:22
**3-o** [1] - 611:6
**30** [3] - 503:10, 656:17, 751:8
**301** [3] - 611:5, 611:20
**301-a** [1] - 612:25
**304** [3] - 665:8, 665:25, 666:5
**31** [1] - 656:11
**32** [1] - 616:13
**34** [5] - 631:24, 632:5, 652:16, 655:14, 655:25
**3500** [1] - 640:9
**3500-em-3** [1] - 771:18
**3500-mb-1** [8] - 707:1, 709:4, 709:9, 713:2, 713:3, 713:10, 723:9, 811:13
**3500-sb1** [1] - 617:24
**35c** [1] - 766:5
**37** [1] - 598:21
**38** [1] - 652:23
**39** [2] - 625:2, 625:20
**3:00** [1] - 654:3
**3:40** [1] - 722:17
**3:50** [1] - 723:1
**3:55** [1] - 725:4

## 4

**4** [3] - 587:6, 587:8, 635:23
**40** [8] - 656:17, 780:2, 780:8, 780:13, 780:18, 780:25, 794:15, 794:16
**400** [1] - 556:20
**400-t-3** [1] - 558:25
**400t** [1] - 559:8
**400t-4** [1] - 562:18
**401** [4] - 602:12, 663:10, 666:23, 668:1
**401t** [1] - 594:9
**401t-3** [1] - 565:13
**401t13** [1] - 615:23
**401t15** [2] - 624:24, 625:20
**401t16** [1] - 626:21
**401t18** [1] - 627:7
**41** [2] - 652:3, 652:4
**41-t-3** [1] - 650:8
**410** [3] - 800:11, 801:1, 803:4
**44** [1] - 659:9

## 5

**5** [6] - 524:1, 525:14, 536:22, 536:23, 587:8, 598:9
**50** [3] - 528:7, 528:12, 765:5
**500** [2] - 640:2, 641:16
**505** [1] - 809:4
**506** [1] - 809:6
**514** [5] - 781:15, 781:25, 782:17, 782:21, 812:8
**522** [6] - 774:2, 775:13, 776:3, 778:2, 778:3, 811:22
**523** [4] - 778:16, 778:25, 779:3, 811:24
**524** [4] - 779:6, 779:15, 779:19, 812:2
**529** [4] - 779:25, 781:2, 781:21, 812:4
**531** [3] - 781:2, 781:21, 812:4
**532** [3] - 781:2, 781:21, 812:4
**534** [3] - 781:7, 781:21, 812:4
**535** [3] - 781:7, 781:21, 812:5
**537** [3] - 781:7, 781:21, 812:5
**538** [3] - 781:7, 781:22, 812:5
**540** [3] - 781:7, 781:22, 812:5
**541** [3] - 781:7, 781:22, 812:5
**547** [3] - 781:7, 781:22, 812:5
**548** [3] - 781:8, 781:22, 812:5
**553** [3] - 781:8, 781:22, 812:5
**554** [3] - 781:8, 781:22, 812:6
**555** [3] - 781:8, 781:22, 812:6
**5:30** [1] - 808:21
**5:32** [1] - 615:7

## 6

**6** [1] - 536:21
**6/11/08** [1] - 615:5
**60** [3] - 528:12, 528:13, 611:5
**604** [4] - 786:25, 787:18, 787:23, 812:16
**605** [5] - 784:13, 785:1, 785:5, 789:4,

812:12
**606** [4] - 788:10, 788:20, 788:24, 812:18
**612** [5] - 688:8, 688:21, 688:25, 695:3, 811:4
**613** [4] - 540:1, 688:8, 688:21, 688:25, 696:17, 811:4
**614** [7] - 688:4, 688:21, 688:25, 689:19, 701:21, 701:23, 811:4
**615** [2] - 690:10, 691:3
**630** [2] - 635:17, 635:18
**631** [3] - 755:16, 755:19, 756:9, 758:23, 811:18
**639** [1] - 809:8
**659** [1] - 809:10
**681** [2] - 809:11, 809:13
**683** [1] - 800:15
**688** [2] - 800:15, 811:5
**691** [1] - 811:8
**694** [1] - 811:11
**699** [1] - 809:15

## 7

**7/1/09** [1] - 775:1
**7/14/09** [1] - 774:14
**700** [7] - 736:4, 736:20, 736:23, 737:2, 762:15, 811:16
**7001** [1] - 686:22
**713** [1] - 811:14
**718-330-7687** [1] - 503:24
**720** [1] - 809:17
**725** [2] - 809:18, 809:20
**736** [1] - 811:16
**746** [1] - 809:22
**756** [1] - 811:18
**758** [1] - 809:24
**761** [1] - 810:2
**764** [1] - 810:6
**768** [1] - 811:20
**778** [1] - 811:22
**779** [2] - 811:24, 812:2
**7800** [3] - 691:12, 691:14, 696:25
**7801** [4] - 691:14, 720:9, 721:6
**7806** [11] - 686:7, 686:23, 687:25, 689:6, 691:14, 693:17, 701:25, 720:6, 720:7, 720:13, 720:19
**781** [1] - 812:6
**782** [1] - 812:8
**783** [1] - 812:10
**785** [2] - 812:12, 812:14
**787** [1] - 812:16
**788** [1] - 812:18
**7:30** [3] - 545:5, 546:12, 546:13

## 8

**8** [2] - 631:23, 632:5
**815** [2] - 691:7, 811:7

## 9

**90th** [1] - 565:6
**9:30** [3] - 503:10, 790:19, 791:2
**9:35** [1] - 504:3
**9:42** [1] - 506:10
**9th** [1] - 624:25

## A

**abbreviation** [1] - 727:2
**abduction** [1] - 544:20
**abilities** [1] - 795:12
**ability** [1] - 512:10
**able** [21] - 516:7, 518:14, 552:11, 558:18, 563:5, 581:4, 584:12, 587:14, 587:15, 587:17, 587:21, 588:20, 625:21, 664:2, 711:24, 721:11, 743:7, 758:6, 763:6
**above-referred** [23] - 594:10, 736:5, 736:24, 755:17, 756:15, 762:16, 766:13, 767:14, 768:7, 772:14, 773:8, 774:3, 778:17, 779:7, 783:3, 783:24, 784:14, 785:6, 785:11, 785:23, 787:1, 788:11, 788:25
**absolute** [2] - 800:13, 800:17
**Absolutely** [1] - 805:9
**accent** [2] - 538:6, 539:17
**accept** [2] - 628:22, 717:6
**access** [2] - 663:25, 753:16
**accessing** [1] - 805:16
**accompanied** [1] - 709:4
**accomplish** [4] - 515:16, 711:17, 714:12, 715:23
**According** [3] - 568:13, 568:14, 656:12
**according** [3] - 569:13, 578:19, 621:7, 627:22, 714:11
**account** [2] - 586:16, 603:8
**accuracy** [1] - 539:20
**accurate** [4] - 540:7, 571:13, 633:15, 699:21
**achieve** [2] - 607:2, 609:8
**acknowledging** [1] - 713:16
**act** [1] - 586:22
**acted** [3] - 508:17, 769:18, 770:17
**acting** [4] - 510:11, 510:13, 670:20, 711:25
**activities** [2] - 521:17, 551:15
**activity** [6] - 514:18, 515:21, 515:24, 521:13, 523:15, 551:23
**acts** [1] - 507:1
**actual** [5] - 544:20, 650:18, 700:14, 721:2, 724:20
**adapted** [1] - 703:3
**add** [2] - 573:13, 598:18, 724:24
**added** [3] - 610:5, 696:9, 700:1
**addition** [1] - 638:4
**additional** [7] - 531:1, 531:5, 573:13, 624:18, 644:21, 646:16, 804:21
**additionally** [1] - 645:3

__ W. Name - Directcross / Atty. __

**additions** [1] - 728:2
**address** [7] - 614:13, 658:7, 766:6, 766:8, 797:24, 798:1, 798:2
**addressed** [1] - 508:3
**adds** [1] - 530:25
**adequate** [1] - 802:13
**adhere** [1] - 801:24
**adhered** [1] - 747:22
**adjournments** [1] - 808:14
**Administration** [1] - 764:14
**admissible** [1] - 714:18
**admissions** [1] - 553:18
**admit** [1] - 713:1
**admitted** [11] - 594:21, 717:14, 757:19, 775:13, 778:25, 782:17, 785:18, 787:18, 788:20, 801:9, 801:15
**adopt** [1] - 800:22
**adopted** [1] - 702:16
**Adopted** [1] - 703:5
**aerial** [4] - 689:17, 689:21, 690:1, 690:2
**Aerial** [1] - 689:22
**affairs** [1] - 597:23
**affidavit** [10] - 632:17, 632:20, 633:2, 634:6, 664:20, 665:19, 665:21, 665:23, 776:6, 776:13
**affixed** [1] - 775:10
**afraid** [1] - 603:24
**African** [1] - 623:3
**afternoon** [18] - 504:22, 615:7, 634:13, 634:19, 639:7, 639:8, 653:19, 659:17, 659:18, 699:10, 699:11, 720:3, 720:4, 737:6, 746:15, 746:16, 763:23, 766:22
**afterwards** [1] - 740:24
**age** [1] - 617:19
**agent** [19] - 509:3, 510:11, 526:15, 539:5, 539:9, 539:11, 540:1, 540:2, 557:2, 564:9, 569:8, 764:16, 764:17, 764:20, 764:25, 765:4, 765:8, 769:11, 770:1
**Agent** [11] - 509:17, 509:19, 557:2, 625:5, 763:18, 767:16, 768:10, 778:6, 781:10, 781:25, 789:3
**agents** [45] - 509:2, 513:18, 525:12, 525:17, 526:3, 526:6, 526:13, 527:4, 528:4, 528:11, 528:23, 528:24, 529:7, 531:20, 536:11, 536:14, 536:16, 537:6, 537:10, 537:11, 537:13, 537:14, 537:25, 538:7, 538:9, 554:20, 555:4, 555:11, 555:24, 563:19, 567:13, 567:17, 569:17, 723:16, 765:22, 765:25, 766:23, 767:7, 767:10, 769:15, 773:4, 773:20, 783:15
**ago** [16] - 514:1, 585:14, 585:17, 600:9, 678:13, 683:20, 686:5, 686:10, 745:9, 745:10, 745:19, 745:20, 746:4, 748:2
**agree** [8] - 654:5, 668:13, 676:5, 680:10, 780:9, 803:20, 803:21, 805:21
**agreed** [5] - 622:10, 637:23, 638:1,

724:25, 808:10
**agreement** [5] - 635:5, 635:9, 637:23, 796:18, 803:18
**agreements** [2] - 635:6, 635:7
**Agricole** [4] - 517:12, 621:5, 622:7, 622:21
**ahead** [4] - 531:9, 559:20, 594:5, 601:3, 609:1, 650:20, 671:11, 761:16, 778:4, 781:6, 781:20, 782:12, 784:8, 792:16
**air** [1] - 797:18
**airport** [1] - 664:11
**al** [1] - 504:2
**alcohol** [1] - 665:17
**Alica** [1] - 566:21
**aligned** [3] - 588:3, 588:4, 588:5
**alleged** [1] - 583:13
**alleging** [1] - 608:5
**Allison** [29] - 547:3, 547:6, 547:24, 548:5, 548:7, 548:13, 549:16, 550:9, 551:17, 570:14, 570:15, 579:1, 580:15, 580:16, 594:13, 595:19, 597:4, 597:8, 598:10, 598:22, 599:16, 599:19, 600:4, 600:7, 604:23, 605:17, 623:6, 623:19, 623:23
**Allison's** [4] - 550:14, 550:18, 552:18, 605:13
**allow** [8] - 683:8, 684:8, 714:18, 753:24, 777:6, 794:2, 802:7, 802:13
**allowed** [13] - 589:14, 727:14, 730:15, 730:16, 752:15, 752:21, 752:23, 792:24, 794:11, 794:12, 794:14, 797:15
**allows** [1] - 683:12
**almost** [4] - 560:25, 602:11, 673:18, 686:5
**alone** [4] - 676:18, 714:20, 733:8, 733:9
**altogether** [1] - 612:21
**Amendment** [11] - 507:6, 508:1, 508:4, 510:1, 796:3, 799:25, 800:2, 800:6, 801:8, 801:12
**America** [5] - 503:4, 504:1, 632:8, 693:9
**american** [2] - 632:2, 632:7
**American** [5] - 521:9, 521:12, 522:15, 538:7, 689:22
**amount** [3] - 638:21, 673:7, 794:23
**Amps** [1] - 685:12
**amps** [1] - 685:12
**analogy** [2] - 800:10, 803:4
**analysis** [1] - 687:12
**Andrew** [2] - 725:7, 763:24
**angle** [1] - 689:25
**announce** [2] - 627:10
**answer** [49] - 507:8, 508:2, 508:5, 530:25, 531:4, 531:13, 531:17, 531:21, 532:1, 532:20, 533:16, 573:15, 574:12, 578:13, 585:10, 587:11, 587:13, 588:25, 589:8, 589:9, 591:11, 598:12, 598:13, 598:23, 599:10, 600:19,

601:22, 607:7, 609:1, 624:19, 627:25, 660:1, 660:15, 661:14, 667:6, 672:18, 675:23, 675:24, 685:23, 704:3, 735:14, 735:15, 735:16, 742:15, 752:1, 752:6, 757:24
**answered** [3] - 588:23, 742:15, 754:10
**answers** [4] - 508:21, 530:8, 530:10, 530:12
**antenna** [2] - 689:21, 689:22
**antennas** [1] - 690:5
**Anthony** [1] - 793:13
**anti** [2] - 632:2, 632:7
**anti-american** [2] - 632:2, 632:7
**anticipate** [1] - 504:18
**anticipated** [1] - 799:7
**anticipation** [1] - 717:24
**anyway** [1] - 541:3
**apart** [3] - 701:13, 714:4, 721:6
**apartment** [1] - 558:15
**Apartment** [1] - 766:5
**apologize** [2] - 652:16, 674:1
**appeal** [3] - 800:1, 800:25, 806:22
**Appeals** [1] - 800:21
**appear** [1] - 508:13, 532:12, 532:14, 688:11, 690:16, 692:4, 695:23, 696:19, 720:21, 720:23, 787:15
**appearance** [2] - 532:14, 743:12
**Appearances** [1] - 503:14
**appeared** [5] - 556:17, 582:15, 648:25, 739:1, 783:13
**application** [6] - 512:8, 676:24, 703:23, 724:2, 725:1, 808:15
**applications** [3] - 682:5, 682:7, 808:14
**applied** [1] - 520:25
**apply** [3] - 803:5, 803:9, 803:12
**appointed** [4] - 795:19, 795:25, 796:2, 797:3
**appointment** [1] - 796:8
**appraisal** [1] - 789:18
**appreciate** [1] - 716:5
**apprised** [1] - 794:8
**approach** [7] - 538:11, 555:1, 559:18, 589:25, 687:19, 702:19, 715:25
**approaching** [2] - 667:21, 799:6
**appropriate** [4] - 515:18, 713:23, 724:24, 801:21
**appropriately** [1] - 755:4
**approval** [2] - 732:6, 762:25
**approve** [1] - 761:20
**approved** [6] - 754:14, 761:19, 762:3, 763:1, 763:2, 765:13
**approves** [1] - 761:21
**April** [8] - 556:8, 557:18, 562:12, 570:6, 637:20, 746:8, 749:5, 749:11
**area** [24] - 539:23, 613:25, 614:10, 614:11, 682:25, 698:15, 729:3, 729:4, 729:5, 729:6, 729:11, 730:21, 733:4, 733:5, 733:7, 735:4, 738:15, 740:5, 740:6, 744:22, 754:21, 768:17, 772:4, 792:12

**argue** [6] - 711:7, 795:5, 795:6, 795:12, 797:15, 802:9

**arguing** [3] - 703:21, 711:10, 712:8

**argument** [7] - 704:4, 717:25, 718:1, 803:12, 803:22, 803:25

**Arienne** [10] - 503:9, 503:21, 648:9, 651:3, 662:20, 669:7, 670:22, 671:22, 767:5, 772:3

**army** [1] - 664:10

**Army** [3] - 609:24, 610:8, 624:6

**arranging** [2] - 564:24, 626:24

**arrest** [3] - 659:23, 723:25, 767:6

**arrested** [8] - 550:1, 561:9, 561:13, 639:14, 643:25, 644:2, 644:24, 723:16

**arrived** [1] - 733:14

**arrives** [1] - 729:22

**arrow** [1] - 768:16

**articles** [1] - 549:1, 790:23

**ascertain** [1] - 755:7

**aside** [3] - 525:8, 634:18, 769:3

**aspect** [1] - 743:8

**asserted** [3] - 508:1, 510:1, 723:11

**assertion** [3] - 621:12, 717:11, 797:10

**assertions** [3] - 710:14, 714:2, 714:4

**assessment** [1] - 616:21

**assistance** [3] - 596:19, 596:22, 716:5

**Assistant** [1] - 503:17

**assistant** [3] - 559:11, 641:4, 748:6

**assisted** [1] - 594:22

**assisting** [3] - 765:22, 765:25, 795:25

**assume** [5] - 593:12, 780:7, 792:3, 793:24, 806:9

**assuming** [3] - 504:22, 795:9, 797:19

**Assuming** [1] - 730:10

**assurances** [2] - 511:22, 511:25

**assured** [1] - 504:25

**asymmetries** [1] - 794:10

**asymmetry** [1] - 795:11

**attached** [3] - 537:8, 709:8, 775:4

**attachment** [2] - 603:4, 603:11

**attack** [3] - 585:4, 609:12, 712:1

**attempt** [1] - 644:19

**attempted** [4] - 622:20, 624:9, 692:10, 693:1

**attempting** [1] - 574:19

**attends** [1] - 802:24

**attention** [6] - 525:20, 558:9, 594:8, 652:2, 765:6, 790:24

**attorney** [29] - 728:5, 728:6, 730:20, 731:1, 732:5, 732:13, 732:17, 736:10, 736:11, 736:14, 737:14, 740:20, 744:21, 744:22, 748:6, 750:16, 750:17, 753:15, 754:8, 757:7, 757:13, 757:19, 757:22, 759:14, 759:20, 762:1, 762:2

**Attorney** [1] - 503:15

**attorney's** [3] - 731:3, 738:11, 741:20, 742:20, 743:11

**Attorney's** [4] - 512:7, 638:10, 647:11, 750:11, 808:4

**attorney/client** [1] - 808:7

**Attorneys** [1] - 503:17

**attorneys** [8] - 558:19, 638:12, 641:4, 728:11, 728:13, 729:23, 730:18, 744:12

**attorneys'** [1] - 754:16

**attributable** [2] - 675:5, 677:5

**attribute** [1] - 675:7

**attributed** [1] - 676:5

**attribution** [8] - 567:9, 569:15, 570:17, 571:24, 576:4, 577:7, 577:9, 580:6, 586:11, 594:12, 595:25, 601:1, 606:8, 609:11, 610:21, 680:1

**attributions** [1] - 631:23

**au** [6] - 524:14, 524:22, 524:23, 524:25, 525:6, 525:9

**audibility** [1] - 799:3

**audio** [9] - 684:10, 687:8, 687:14, 687:15, 687:16, 697:4, 700:2, 700:12, 700:17

**August** [2] - 756:17, 756:18

**Ausa** [2] - 641:3, 805:18

**auspices** [1] - 631:14

**authorities** [11] - 507:19, 512:6, 521:9, 521:12, 522:15, 523:10, 523:14, 523:20, 524:13, 557:14, 558:18

**authority** [2] - 723:13, 797:23

**authorized** [1] - 796:19

**automatically** [2] - 632:13, 633:6

**avail** [1] - 507:5

**available** [3] - 717:23, 718:13, 721:22

**Avenue** [2] - 726:11, 766:5

**Avert** [1] - 790:22

**avoid** [1] - 794:9

**avoiding** [1] - 715:24

**aware** [10] - 511:4, 511:5, 511:8, 513:4, 513:5, 589:11, 670:12, 686:2, 801:13, 805:12

**awkward** [2] - 718:15, 718:17

---

**B**

**backup** [1] - 652:11

**backward** [1] - 723:19

**backwards** [1] - 723:20

**bad** [3] - 598:1, 598:2, 781:5

**bag** [11] - 775:3, 775:4, 786:3, 786:6, 786:8, 787:25, 788:13, 789:8, 789:20, 790:5

**Baker** [1] - 712:13

**ballbearings** [1] - 642:23

**Banks** [6] - 550:18, 550:20, 560:8, 561:8

**bar** [17] - 527:1, 527:15, 539:1, 540:9, 591:1, 620:1, 621:16, 621:22, 703:1, 704:7, 709:11, 710:1, 712:18, 713:22, 717:1, 718:19, 776:1

**Barbados** [1] - 512:9

**barely** [1] - 530:1

**bargaining** [2] - 800:12, 801:1

**Barrett** [5] - 607:17, 607:18, 607:22,

610:17, 610:21

**base** [8] - 686:18, 697:13, 699:22, 700:4, 700:8, 701:24, 705:22, 706:2

**based** [11] - 566:14, 588:10, 588:18, 606:12, 607:2, 609:15, 628:16, 630:1, 632:11, 682:4, 794:6

**Based** [3] - 513:16, 563:18, 741:4

**basing** [1] - 608:24

**basis** [3] - 510:2, 673:18, 780:19

**bear** [1] - 679:5

**beat** [1] - 552:17

**began** [2] - 628:25, 639:16

**Begging** [1] - 610:16

**beginning** [7] - 514:13, 539:6, 577:10, 629:21, 669:22, 735:7, 746:8

**Beginning** [1] - 551:1

**behalf** [5] - 507:1, 583:23, 608:3, 670:7, 715:19

**behind** [6] - 558:1, 572:7, 724:16, 729:3, 782:14, 801:1

**Belfield** [1] - 544:17

**Belfield's** [2] - 544:16, 544:18

**belief** [4] - 575:23, 575:24, 577:8, 648:6

**believability** [1] - 585:5

**Bellfield** [2] - 776:14, 776:23

**Bellfield's** [1] - 631:2

**below** [1] - 738:1

**bench** [1] - 593:7

**benefit** [6] - 700:6, 794:17, 795:22, 796:14, 796:25

**benefits** [3] - 676:21, 676:22, 794:13

**Benton** [1] - 503:15

**Berg** [1] - 503:21

**beside** [1] - 766:2

**best** [14] - 514:18, 532:21, 533:16, 589:1, 626:4, 630:15, 641:11, 653:18, 654:1, 788:13, 798:17

**better** [7] - 531:17, 531:21, 570:24, 591:19, 665:14, 697:13, 700:3

**between** [23] - 508:11, 519:1, 519:3, 528:12, 528:15, 546:12, 546:13, 564:22, 565:8, 571:1, 574:24, 583:13, 583:23, 584:13, 667:19, 669:25, 708:1, 710:8, 723:22, 747:10, 748:9, 748:12, 753:4

**Between** [1] - 600:5

**Beyond** [2] - 607:17, 702:2

**big** [2] - 676:20, 694:22

**Bill** [2] - 749:17, 749:19

**birth** [4] - 515:10, 515:12, 515:14, 515:25

**bit** [4] - 552:17, 635:25, 726:17, 792:10

**blame** [1] - 559:24

**blonde** [2] - 758:1, 760:3

**blow** [2] - 522:10, 522:23

**blowing** [1] - 535:16

**blown** [3] - 523:2, 525:22, 692:22

**blue** [10] - 784:2, 784:9, 784:10,

784:16, 784:19, 784:22, 785:14, 789:5, 789:6, 789:10

**blunt** [1] - 801:20
**bluntly** [1] - 802:3
**Bob** [3] - 515:20, 569:25, 570:1
**bomb** [34] - 521:23, 522:7, 523:20, 525:18, 526:7, 533:19, 533:21, 533:24, 534:2, 534:10, 534:16, 535:15, 535:21, 536:7, 536:11, 536:13, 537:7, 537:8, 541:8, 541:12, 541:18, 541:19, 542:8, 542:12, 542:14, 542:16, 542:18, 542:21, 542:24, 605:7, 605:10, 642:4, 642:22, 679:1
**bombs** [4] - 578:25, 641:21, 643:20, 678:14
**bona** [2] - 792:4, 797:10
**book** [1] - 559:3
**boom** [1] - 541:16
**boss** [6] - 548:20, 662:24, 663:4, 671:18, 749:22, 750:8
**bother** [1] - 759:18
**bottom** [13] - 541:2, 567:5, 567:6, 598:21, 613:7, 613:23, 615:4, 694:14, 705:21, 779:11, 787:11, 798:11, 801:2
**bought** [1] - 513:23
**box** [6] - 541:16, 700:15, 784:9, 789:11, 789:14, 789:16
**boxing** [8] - 547:9, 547:10, 547:17, 547:18, 547:21, 547:22, 548:4
**break** [11] - 529:24, 591:6, 591:18, 591:19, 592:2, 653:7, 653:9, 722:12, 727:15, 751:4, 790:18
**bribe** [1] - 793:6
**Bricks** [1] - 663:24
**Bridgetown** [1] - 512:9
**brief** [3] - 599:6, 678:10, 798:24
**briefly** [5] - 618:13, 719:23, 758:18, 765:18, 768:23
**bring** [15] - 505:13, 509:16, 531:2, 541:8, 542:25, 558:4, 569:8, 597:17, 648:7, 706:7, 728:13, 740:10, 792:7, 797:7, 806:11
**Bring** [2] - 593:13, 725:3
**bringing** [2] - 675:14, 728:18
**brings** [1] - 647:6
**Britain** [1] - 504:21
**broad** [3] - 584:10, 584:11, 584:16
**broaden** [1] - 513:9
**broke** [1] - 655:21
**broken** [1] - 692:23
**Brooklyn** [3] - 503:7, 503:24, 757:2
**brother** [4] - 586:1, 586:3, 623:19, 623:23
**brought** [15] - 544:24, 557:23, 566:12, 608:5, 647:9, 670:5, 670:14, 673:19, 676:16, 679:22, 711:14, 797:7, 798:4, 806:7, 806:14
**Brownell** [45] - 503:17, 504:9, 763:18, 764:10, 768:1, 768:9, 771:19, 772:5, 775:12, 776:4, 778:5, 778:24, 779:4,

779:14, 779:25, 780:2, 780:4, 780:11, 780:14, 781:2, 781:4, 781:7, 781:9, 781:24, 782:11, 782:16, 782:22, 783:18, 784:1, 784:25, 785:8, 785:17, 786:1, 786:20, 787:17, 787:24, 788:19, 789:2, 789:6, 790:10, 790:13, 790:14, 790:17, 805:15, 810:6
**build** [2] - 566:21, 662:17
**building** [10] - 509:1, 509:6, 509:10, 509:19, 565:5, 565:6, 565:7, 566:13, 766:15, 766:20
**built** [2] - 533:22, 534:10, 642:9
**Built** [1] - 533:24
**bunch** [1] - 616:23
**burden** [1] - 711:21
**Bureau** [1] - 747:4
**bus** [1] - 520:14
**business** [10] - 570:11, 639:21, 640:1, 662:17, 682:8, 756:1, 756:3, 795:4, 795:5, 804:20
**button** [1] - 562:24
**Buxton** [47] - 517:13, 519:5, 519:9, 519:11, 519:14, 522:9, 526:7, 527:4, 527:8, 527:9, 535:16, 541:8, 541:21, 541:23, 541:25, 542:25, 569:3, 569:4, 571:1, 575:16, 575:18, 575:25, 576:2, 578:18, 578:22, 580:24, 581:5, 581:6, 581:9, 581:11, 583:24, 586:20, 587:2, 588:12, 589:13, 589:14, 591:10, 599:21, 605:2, 618:23, 622:20, 624:5, 631:11, 641:22, 663:24, 666:17, 676:17
**buy** [4] - 684:19, 690:4, 690:5, 690:24
**buys** [1] - 682:19

**C**

**C-4** [3] - 642:22, 643:14, 643:17
**cable** [3] - 689:8, 689:13
**Cadman** [1] - 503:23
**calculus** [1] - 755:1
**Camacho** [8] - 631:20, 634:5, 634:21, 664:20, 756:21, 792:21, 795:10, 802:8
**camera** [1] - 770:1
**Campbell** [2] - 503:15
**cannot** [2] - 510:4, 699:18
**capabilities** [1] - 697:7
**capability** [2] - 536:9, 702:14
**capable** [1] - 700:23
**capacity** [2] - 761:4, 764:25, 765:3
**capital** [1] - 517:20
**captain** [1] - 750:4
**captains** [1] - 750:6
**capture** [1] - 700:10
**captures** [1] - 700:3
**car** [11] - 542:8, 542:16, 542:18, 542:25, 549:9, 638:15, 638:16, 638:20, 679:1, 690:3, 724:1
**card** [1] - 559:22
**care** [2] - 573:25, 664:8
**career** [1] - 752:20

**careful** [2] - 527:14, 756:12
**carefully** [2] - 618:15, 620:14
**Caribbean** [2] - 538:1, 560:17
**Carl** [1] - 713:11
**carried** [1] - 526:6
**Casandra** [2] - 509:4, 509:8
**Case** [1] - 504:1
**case** [60] - 508:5, 512:6, 513:18, 515:2, 528:14, 529:7, 539:24, 564:19, 566:13, 566:21, 567:7, 570:7, 571:21, 571:25, 572:17, 572:19, 577:12, 586:17, 592:3, 626:2, 641:12, 645:19, 645:22, 646:15, 647:8, 653:10, 658:23, 670:14, 670:18, 676:16, 679:9, 679:12, 703:22, 704:1, 706:7, 707:11, 719:12, 722:12, 723:13, 739:21, 755:11, 763:1, 790:21, 790:22, 791:5, 792:8, 794:3, 796:15, 797:2, 800:14, 801:22, 802:6, 802:11, 803:15, 803:23, 804:10, 806:22
**cases** [16] - 732:6, 754:18, 764:19, 764:21, 764:23, 797:7, 799:20, 799:21, 799:23, 799:24, 800:2, 800:3, 801:11, 801:12, 801:16
**cash** [2] - 789:14, 789:21
**Cat** [1] - 503:25
**catalog** [1] - 770:22
**catch** [1] - 539:14
**caveat** [1] - 792:18
**Cd** [13] - 541:12, 541:14, 541:18, 542:12, 542:21, 556:17, 605:10, 642:4, 642:22, 690:17, 691:18, 695:22
**Cdma** [1] - 685:9
**Cds** [1] - 805:16
**cell** [17] - 631:3, 682:6, 682:9, 682:12, 682:14, 682:22, 682:23, 683:9, 684:22, 685:5, 687:6, 687:10, 696:7, 696:8, 696:9
**cellular** [10] - 683:7, 683:16, 684:7, 685:6, 690:5, 693:7, 693:8, 698:12, 705:5, 705:10
**cents** [1] - 638:19
**century** [2] - 516:5, 559:18
**certain** [21] - 521:15, 581:5, 606:1, 606:4, 615:17, 620:3, 630:4, 644:13, 655:23, 668:2, 668:5, 672:1, 682:13, 692:2, 715:17, 732:5, 747:8, 747:14, 747:15, 754:18, 770:8
**certainly** [3] - 646:1, 795:16, 806:6
**certainty** [2] - 533:10, 533:12
**certificate** [4] - 515:10, 515:12, 515:14, 515:25
**cetera** [1] - 665:12
**chain** [1] - 789:18
**chaise** [2] - 686:21, 686:22
**challenge** [2] - 797:9, 797:11
**chance** [6] - 531:2, 573:16, 688:5, 689:4, 703:9, 804:8
**change** [5] - 606:16, 607:10, 628:18, 628:22, 728:1
**changed** [5] - 541:11, 683:6, 683:7,

683:16, 683:17
**channel** [2] - 687:9, 687:10
**chaos** [1] - 596:10
**Chapman** [11] - 708:8, 708:9, 708:11, 708:12, 708:16, 713:11, 715:3, 715:20, 715:22, 716:1, 716:5
**characteristics** [1] - 743:8
**characterized** [1] - 759:6
**charge** [5] - 515:8, 580:7, 580:20, 581:1
**charged** [5] - 514:20, 514:24, 515:6, 520:15, 520:25
**charitable** [1] - 662:17
**chassis** [4] - 689:10, 692:1, 692:4, 697:8
**check** [11] - 553:25, 617:17, 680:5, 732:19, 754:23, 757:17, 757:18, 757:21, 759:13, 763:1
**checked** [1] - 755:12
**checking** [8] - 615:17, 616:6, 617:4, 729:8, 757:4, 757:5
**chief** [3] - 513:8, 703:22, 704:1
**child** [1] - 544:15
**childhood** [1] - 618:22
**children** [5] - 512:17, 513:10, 535:9, 644:6, 644:8
**chose** [1] - 796:2
**cigarettes** [1] - 723:18
**Circuit** [3] - 723:13, 800:4, 800:15
**circuits** [1] - 801:14
**circumstance** [1] - 753:2
**circumstances** [2] - 567:1, 710:11
**circumstancess** [1] - 631:16
**Citibank** [1] - 516:12
**citizen** [2] - 684:19, 715:19
**citizenship** [2] - 513:2, 513:8
**city** [1] - 517:22
**civilians** [1] - 518:4
**Cja** [4] - 796:2, 796:8, 796:9, 797:3
**claim** [5] - 570:12, 570:13, 652:4, 703:15, 808:2
**claimed** [1] - 569:2
**clair** [1] - 672:11
**clarification** [1] - 807:1
**clarify** [2] - 513:17, 744:11
**Clark** [1] - 605:23
**Clark's** [6] - 575:25, 663:15, 664:11, 665:4, 666:14, 667:22
**Clarke** [77] - 570:19, 570:25, 571:21, 572:16, 572:18, 572:21, 572:25, 573:2, 573:7, 573:11, 574:24, 575:6, 575:15, 575:18, 576:1, 576:11, 576:23, 577:12, 580:11, 580:13, 580:21, 583:13, 583:23, 584:14, 584:18, 585:19, 595:3, 595:11, 595:20, 605:18, 605:20, 607:10, 608:9, 608:13, 608:17, 608:18, 608:20, 609:3, 609:13, 609:21, 610:7, 610:12, 610:24, 616:24, 617:17, 622:21, 623:2, 623:16, 623:20, 623:25, 627:18, 627:21, 628:18, 628:20, 631:6,

664:5, 664:6, 664:25, 665:6, 665:10, 668:13, 671:7, 671:12, 671:18, 680:10, 734:23, 735:1, 735:2, 738:9, 739:22, 743:23, 755:22, 758:6, 758:10, 759:2, 759:6
**clarke** [1] - 757:1
**Clarke's** [12] - 584:18, 584:20, 585:25, 586:3, 624:6, 628:7, 628:22, 632:2, 668:21, 679:17, 680:1, 680:18
**Clayton** [2] - 646:25, 647:3
**Cle** [1] - 803:15
**cleaning** [1] - 657:19
**clear** [7] - 511:20, 533:20, 693:5, 710:7, 745:23, 797:25, 807:9
**cleared** [1] - 762:9
**clearly** [3] - 510:12, 651:24, 666:25
**Clerk** [4] - 681:10, 725:11, 763:25, 764:6
**client** [15] - 564:1, 564:2, 715:21, 729:1, 730:24, 731:14, 732:8, 732:9, 734:17, 735:2, 735:6, 735:13, 739:11, 739:14, 754:3
**client's** [3] - 572:16, 572:19, 808:6
**clocks** [1] - 546:3
**cloned** [1] - 807:21
**close** [1] - 807:21
**closer** [1] - 681:21
**closest** [3] - 549:25, 550:2, 550:3
**closets** [1] - 770:13
**clothes** [2] - 548:24, 549:1
**clothing** [1] - 604:23
**club** [1] - 612:15
**co** [3] - 584:15, 681:18, 681:23
**co-conspirators** [1] - 584:15
**co-director** [2] - 681:18, 681:23
**cocaine** [15] - 521:3, 521:7, 550:13, 550:15, 550:17, 550:20, 551:9, 554:2, 555:8, 555:12, 555:25, 556:2, 640:3, 640:19, 641:17
**code** [2] - 744:18, 744:19
**coding** [1] - 687:17
**coffee** [1] - 577:19
**cofounded** [1] - 683:20
**Colen** [1] - 646:25
**collect** [1] - 639:2
**Collin** [1] - 646:22
**column** [1] - 738:10
**comfortable** [1] - 676:2
**coming** [11] - 591:11, 603:14, 633:25, 651:24, 672:17, 673:22, 675:10, 688:5, 689:3, 727:19, 728:19
**commander** [12] - 741:6, 741:9, 744:2, 750:7, 750:8, 751:18, 752:7, 752:18, 753:2, 753:3, 753:5, 753:16
**commanders** [1] - 750:2
**comment** [1] - 795:16
**commercially** [1] - 721:21
**commissioner** [1] - 582:9
**commit** [2] - 511:3, 516:13

**committed** [3] - 510:18, 510:19, 511:7
**common** [1] - 594:15
**communicate** [1] - 706:3
**communicates** [2] - 682:12, 700:7
**communicating** [2] - 537:15, 716:1
**communication** [5] - 539:19, 628:20, 706:20, 707:25, 710:8
**communications** [1] - 714:17
**Communications** [1] - 681:20
**community** [1] - 667:6
**company** [31] - 658:16, 681:18, 681:19, 682:3, 683:4, 683:19, 683:20, 684:21, 690:22, 691:10, 695:20, 697:21, 697:24, 702:7, 706:18, 707:10, 707:17, 707:23, 708:1, 710:8, 715:12, 715:13, 715:16, 716:2, 719:11, 725:20, 725:22, 726:2, 747:1, 747:11
**company's** [3] - 683:1, 694:15, 715:24
**compatible** [1] - 691:15
**competitors** [1] - 571:3
**complain** [3] - 795:9, 797:19, 797:20
**complete** [2] - 504:15, 737:11
**completely** [3] - 561:9, 676:15, 721:12
**complied** [1] - 719:16
**comply** [1] - 707:22
**component** [2] - 692:22, 720:5
**components** [5] - 537:9, 686:11, 686:12, 720:16, 720:19
**computer** [25] - 630:9, 630:11, 630:13, 630:14, 630:16, 686:14, 686:15, 686:18, 686:20, 693:18, 694:9, 694:18, 695:5, 700:19, 700:20, 721:22, 721:24, 782:14, 789:24, 790:2, 790:4, 790:5, 805:1, 807:2
**concept** [1] - 705:6
**concern** [7] - 621:18, 647:12, 647:14, 679:3, 679:4, 792:21
**concerned** [1] - 669:20
**concerning** [2] - 556:10, 710:18
**concisely** [1] - 582:23
**condition** [1] - 693:5
**conduct** [1] - 706:10
**conducted** [6] - 765:3, 769:13, 769:14, 769:16, 770:14, 770:15
**conducting** [3] - 764:24, 765:10, 771:8
**conducts** [1] - 700:16
**confer** [1] - 794:17
**conference** [4] - 591:1, 657:12, 772:2, 776:1
**conferred** [6] - 508:8, 509:22, 676:23, 794:13, 795:22, 796:3
**confess** [1] - 599:3
**confidential** [1] - 808:7
**confirm** [4] - 604:5, 664:2, 715:21, 732:19
**confront** [1] - 540:5
**confusing** [2] - 620:8, 760:20
**confusion** [2] - 777:6, 794:9
**Congress** [5] - 800:8, 800:9, 800:21,

## W. Name - Directcross / Atty.

801:8, 801:13

**Congress's** [1] - 801:5
**congressional** [1] - 801:3
**conmmit** [1] - 665:14
**connect** [1] - 689:14
**connected** [3] - 686:20, 689:12, 777:5
**connection** [23] - 505:21, 528:14, 529:7, 544:13, 551:12, 554:1, 562:11, 566:16, 581:17, 586:13, 586:16, 605:2, 609:20, 614:15, 634:21, 688:21, 691:3, 693:23, 700:23, 706:16, 715:14, 741:20, 776:17
**Connector** [1] - 689:11
**connector** [3] - 689:11, 689:17, 689:25
**connects** [1] - 689:8
**Conrad** [1] - 560:8
**consensual** [1] - 802:18
**consider** [5] - 714:2, 714:8, 714:19, 723:8, 724:12
**considered** [5] - 622:8, 711:4, 714:16, 720:9, 792:8
**console** [1] - 541:14
**conspirators** [1] - 584:15
**Constitution** [1] - 507:6
**Conf'd** [4] - 506:17, 603:1, 687:1, 809:5
**contact** [10] - 504:12, 556:10, 564:23, 565:1, 606:16, 669:6, 671:15, 671:17, 715:4, 740:8
**contacted** [3] - 669:22, 670:21, 671:1
**contacting** [1] - 670:25
**contacts** [1] - 504:13
**contain** [2] - 789:14, 789:16
**contained** [3] - 723:14, 788:14, 789:17
**contains** [1] - 686:21
**contend** [1] - 794:25
**content** [1] - 723:14
**contents** [1] - 635:9
**context** [8] - 560:4, 565:18, 566:2, 591:9, 596:20, 676:15, 799:17, 805:6
**continually** [1] - 525:12
**continue** [2] - 623:9, 683:14
**continued** [1] - 732:1
**Continued** [12] - 543:2, 590:3, 591:23, 592:8, 593:18, 602:19, 636:1, 722:19, 731:15, 775:17, 777:12, 791:11
**continues** [1] - 567:9
**Continuing** [1] - 715:16
**continuous** [1] - 614:7
**contract** [4] - 747:4, 747:10, 747:21
**contractor** [2] - 708:14, 708:16
**Control** [1] - 697:1
**control** [4] - 686:13, 690:17, 712:12, 726:19
**controlled** [1] - 562:7
**controls** [2] - 693:16, 700:9
**convenient** [2] - 562:13, 562:16
**conversation** [66] - 552:25, 556:16, 558:9, 560:7, 561:19, 561:23, 562:6,

562:7, 562:8, 562:12, 562:20, 564:16, 565:14, 572:24, 574:9, 574:22, 574:23, 575:22, 576:5, 576:6, 577:10, 577:20, 582:15, 585:21, 586:14, 588:11, 596:18, 604:17, 605:6, 605:22, 607:17, 609:16, 610:6, 610:10, 610:25, 611:2, 615:18, 626:7, 626:19, 629:21, 629:22, 633:18, 633:22, 646:24, 647:2, 658:6, 658:22, 659:11, 660:19, 663:18, 679:8, 679:21, 680:24, 683:12, 684:7, 699:16, 699:19, 735:8, 746:5, 754:6, 798:18, 799:9, 802:9, 802:18, 802:25
**conversations** [28] - 510:14, 530:1, 537:18, 556:9, 556:13, 558:21, 559:16, 581:21, 582:4, 582:24, 584:8, 585:3, 606:13, 607:2, 628:16, 630:4, 630:21, 631:5, 631:11, 632:11, 683:9, 684:9, 684:22, 697:4, 699:24, 700:3, 702:14, 796:16
**converts** [1] - 700:13
**convey** [4] - 595:10, 596:15, 626:9, 628:15
**conveying** [2] - 595:12, 795:21
**convicted** [4] - 601:21, 601:23, 601:25, 660:7
**conviction** [1] - 806:22
**cooperate** [4] - 628:11, 643:22, 644:6, 645:17
**cooperated** [1] - 640:6
**cooperates** [1] - 512:24
**cooperating** [8] - 504:11, 510:13, 644:3, 671:13, 671:18, 672:24, 776:17, 776:22
**cooperation** [3] - 645:10, 645:22, 674:2
**cooperative** [1] - 508:13
**cooperator** [2] - 670:10, 673:5
**cop** [1] - 520:13
**copied** [2] - 722:3, 738:21
**copies** [1] - 805:3
**copy** [12] - 611:20, 612:23, 707:11, 710:12, 713:18, 751:17, 751:20, 752:7, 772:4, 807:18, 807:21
**corner** [1] - 666:4
**Correct** [3] - 601:1, 683:3, 780:10
**correct** [176] - 507:19, 507:22, 510:15, 512:2, 512:4, 512:12, 516:23, 518:23, 519:12, 519:25, 520:18, 521:4, 521:10, 521:24, 522:1, 522:4, 522:11, 534:2, 547:17, 548:8, 552:19, 553:19, 558:10, 560:20, 562:20, 563:14, 563:22, 564:2, 565:16, 566:9, 566:16, 569:24, 569:25, 570:14, 572:25, 574:25, 575:7, 575:9, 575:11, 575:12, 575:14, 585:19, 600:19, 601:11, 603:20, 604:7, 604:15, 615:8, 617:22, 618:8, 620:22, 621:3, 622:2, 624:22, 626:19, 629:14, 629:25, 633:21, 634:14, 638:11, 640:12, 640:23, 641:10, 641:18, 642:5, 642:9, 644:3, 645:5, 645:12, 645:15, 645:19,

645:24, 646:6, 646:9, 646:12, 646:17, 647:15, 648:9, 648:20, 649:5, 649:9, 649:22, 651:3, 652:5, 653:1, 655:23, 656:8, 656:13, 657:17, 658:8, 660:17, 663:19, 665:6, 666:21, 669:23, 670:23, 672:2, 672:6, 673:5, 679:12, 679:15, 680:2, 680:19, 680:22, 681:24, 681:25, 683:2, 685:1, 685:2, 686:18, 689:5, 689:19, 691:19, 694:12, 694:13, 695:5, 695:6, 696:1, 697:6, 697:17, 697:21, 697:23, 697:25, 698:2, 698:7, 700:20, 702:2, 702:3, 702:4, 702:5, 705:4, 705:16, 705:25, 706:4, 706:5, 707:19, 707:20, 708:22, 709:1, 720:7, 720:8, 720:10, 721:1, 721:7, 721:8, 721:14, 721:16, 721:22, 721:23, 722:4, 746:24, 747:4, 747:8, 747:17, 747:22, 748:3, 748:10, 749:15, 749:20, 749:25, 750:2, 750:6, 751:18, 752:25, 753:17, 754:21, 755:23, 758:4, 758:15, 758:16, 760:4, 760:7, 770:2, 770:6, 778:8, 806:14
**corrected** [3] - 620:19, 620:20, 633:15
**correction** [1] - 746:21
**correctional** [1] - 730:3
**corrections** [2] - 633:13, 726:12
**Corrections** [1] - 725:17
**correctly** [1] - 648:2
**correspond** [1] - 767:23
**correspondence** [1] - 563:13
**corresponding** [2] - 651:6, 651:16
**corroborates** [2] - 776:17, 776:22
**corroborative** [1] - 776:24
**corrupt** [2] - 574:1, 647:23
**cost** [1] - 684:16
**couch** [2] - 769:9, 792:17
**counsel** [6] - 510:6, 792:9, 795:19, 795:25, 797:3, 798:8
**count** [7] - 505:25, 526:16, 528:9, 528:10, 571:12, 786:10, 786:11
**Count** [1] - 506:2
**counting** [1] - 761:14
**countries** [1] - 685:7
**country** [12] - 504:20, 510:19, 511:23, 513:8, 514:6, 514:10, 514:19, 532:13, 560:22, 596:4, 607:20, 653:22
**Counts** [1] - 505:21
**couple** [14] - 504:6, 504:22, 529:13, 529:14, 529:15, 529:18, 534:17, 607:23, 620:2, 641:21, 644:2, 646:14, 778:6, 794:8
**Couple** [1] - 697:2
**coupled** [1] - 712:9
**course** [1] - 531:16, 565:21, 698:5, 728:3, 744:3, 756:1, 756:3, 783:10, 783:12, 793:17, 800:12
**court** [18] - 592:1, 593:6, 665:2, 673:22, 678:1, 681:22, 688:6, 689:3, 712:15, 713:25, 765:13, 776:7, 778:1, 800:16, 800:18, 806:15, 808:8, 808:12
**Court** [301] - 503:2, 503:23, 504:4,

W. Name - Directcross / Atty.

504:16, 505:2, 505:6, 505:10, 505:13,
505:17, 505:22, 505:25, 506:4, 506:9,
506:11, 506:13, 521:20, 522:19,
526:18, 527:3, 527:7, 527:11, 530:24,
531:9, 538:4, 538:12, 539:3, 539:18,
540:2, 551:1, 551:3, 551:5, 551:11,
554:13, 554:24, 555:2, 555:20, 555:22,
559:6, 559:10, 559:13, 559:17, 559:23,
563:6, 570:13, 570:24, 573:13, 583:17,
583:25, 584:3, 584:6, 585:11, 585:15,
587:20, 589:24, 590:1, 591:3, 591:14,
591:21, 592:2, 593:1, 593:9, 593:11,
593:13, 594:4, 596:24, 597:2, 602:5,
605:17, 607:7, 609:1, 611:15, 611:17,
613:1, 613:5, 613:9, 615:25, 617:25,
618:2, 619:8, 620:2, 620:21, 621:11,
621:14, 621:17, 621:19, 621:21,
624:18, 627:12, 627:14, 628:3, 628:5,
631:25, 635:11, 635:25, 638:25, 639:4,
641:25, 643:1, 643:5, 643:7, 643:20,
650:10, 650:12, 650:15, 650:20, 653:7,
653:9, 653:12, 653:13, 653:16, 653:19,
653:23, 653:25, 654:3, 655:1, 655:6,
655:8, 659:13, 663:12, 665:24, 671:9,
673:24, 674:8, 675:2, 675:10, 675:14,
675:17, 676:3, 676:4, 676:15, 677:10,
678:2, 678:9, 680:8, 681:2, 681:4,
685:24, 687:21, 688:2, 688:24, 691:6,
693:24, 694:2, 694:6, 698:11, 699:4,
699:6, 702:21, 703:3, 703:5, 703:14,
703:17, 703:24, 704:4, 707:8, 708:24,
709:5, 709:7, 709:11, 710:3, 710:20,
710:25, 711:4, 711:16, 712:13, 712:17,
713:1, 713:8, 713:21, 713:25, 716:7,
717:3, 717:7, 717:19, 717:22, 718:4,
718:7, 718:14, 718:17, 719:2, 719:6,
719:24, 722:7, 722:9, 722:11, 723:4,
723:17, 724:7, 724:9, 724:13, 724:22,
725:3, 725:5, 736:22, 741:14, 742:14,
742:17, 745:3, 746:11, 756:8, 757:12,
758:15, 758:17, 758:19, 761:11,
761:14, 761:16, 761:24, 762:13,
762:18, 763:10, 763:12, 763:14,
763:17, 763:23, 768:5, 771:21, 772:7,
775:15, 776:3, 776:9, 776:19, 776:25,
777:9, 778:2, 778:4, 779:2, 779:16,
779:18, 779:23, 780:1, 780:3, 780:5,
780:13, 780:15, 780:22, 780:25, 781:3,
781:5, 781:16, 781:20, 782:12, 782:18,
782:20, 783:22, 784:6, 784:25, 785:21,
786:21, 787:19, 787:22, 788:6, 788:23,
789:5, 790:12, 790:16, 790:18, 792:1,
792:3, 792:14, 792:25, 793:21, 793:25,
795:4, 795:18, 796:11, 796:24, 798:14,
798:20, 799:1, 799:4, 799:7, 799:12,
799:18, 799:24, 800:21, 800:24, 802:1,
802:15, 803:9, 803:12, 803:17, 803:24,
804:3, 804:5, 804:9, 804:15, 804:21,
805:3, 805:6, 805:19, 806:6, 806:20,
807:6, 807:13, 807:16, 808:2, 808:9,
808:13, 808:18, 808:20

**Court's** [2] - 782:11, 786:20
**court-approved** [1] - 765:13
**courthouse** [5] - 564:14, 638:9,
707:22, 806:1, 808:11
**Courthouse**[1] - 503:6
**courtroom** [15] - 504:3, 506:10, 530:4,
532:15, 545:10, 545:11, 592:6, 594:1,
653:11, 679:15, 722:17, 723:1, 725:4,
763:21, 791:9
**Courts** [1] - 801:19
**cousin** [9] - 516:21, 517:2, 517:10,
517:15, 517:18, 639:13, 660:16,
660:21, 661:1
**cover** [2] - 673:8, 806:3
**covered** [2] - 642:1, 643:20
**covering** [1] - 751:3
**Cpu** [1] - 790:1
**craft** [1] - 793:10
**created** [3] - 664:19, 665:19, 666:1
**creation** [1] - 539:13
**credibility** [2] - 585:4, 609:13
**crime** [10] - 514:6, 514:22, 514:25,
516:13, 594:18, 601:21, 601:23,
601:25, 660:7
**crimes** [8] - 510:17, 510:18, 511:3,
511:7, 514:14, 514:17, 594:25, 665:15
**criminal** [8] - 514:18, 515:21, 515:24,
521:13, 521:17, 606:3, 668:4, 793:19
**criminals** [2] - 519:14, 581:6
**Cross** [13] - 506:17, 584:25, 603:1,
639:5, 655:11, 699:8, 720:1, 746:13,
809:5, 809:7, 809:14, 809:16, 809:21
**cross** [24] - 504:22, 531:24, 532:5,
532:9, 532:11, 532:19, 532:24, 584:23,
585:2, 585:4, 593:9, 608:20, 639:10,
641:20, 653:25, 667:20, 671:10, 676:8,
703:6, 704:5, 711:13, 798:3, 802:13
**cross-examination** [18] - 531:24,
532:5, 532:9, 532:11, 532:19, 532:24,
584:23, 585:2, 585:4, 667:20, 671:10,
676:8, 703:6, 704:5, 711:13, 798:3,
802:13
**Cross-examination** [10] - 506:17,
584:25, 603:1, 699:8, 720:1, 746:13,
809:5, 809:14, 809:16, 809:21
**cross-examine** [1] - 608:20
**crossed** [1] - 737:19
**Csm** [2] - 689:6, 691:12
**Csm-7805** [1] - 683:23
**Csm-7806** [3] - 684:4, 684:25, 685:11
**Csr** [1] - 503:23
**culled** [1] - 807:14
**cultural** [1] - 574:24
**culture** [1] - 575:7
**currency** [3] - 640:24, 789:14, 789:21
**curry** [1] - 797:15
**cursory** [2] - 705:23, 705:24
**cusp** [1] - 723:22
**Custody**[1] - 726:19
**customer** [2] - 690:24, 690:25

**customers** [1] - 682:20
**cut** [1] - 786:4

# D

**D'alessandro** [54] - 503:16, 504:8,
505:20, 506:2, 506:22, 514:2, 521:19,
538:2, 538:11, 539:4, 539:9, 539:12,
551:10, 554:22, 555:1, 583:16, 584:5,
587:19, 589:23, 589:25, 591:7, 610:9,
659:14, 659:16, 663:5, 663:10, 663:13,
665:8, 665:25, 674:1, 675:12, 675:15,
675:24, 677:7, 678:8, 678:13, 679:8,
679:18, 680:7, 711:8, 776:13, 776:20,
794:20, 804:19, 804:23, 805:10, 806:9,
806:21, 807:9, 807:15, 807:18, 807:23,
809:10
**D'alessandro's** [1] - 508:2
**daily** [1] - 673:18
**danger** [1] - 676:23
**dangerous** [6] - 519:19, 581:12, 621:5,
622:8, 622:12, 622:14
**Daniel** [2] - 503:17, 504:9
**dark** [1] - 806:2
**data** [5] - 697:19, 699:25, 700:15,
700:16
**date** [22] - 522:3, 544:8, 547:13,
554:20, 558:12, 558:21, 615:4, 615:15,
652:10, 666:4, 666:7, 666:9, 686:9,
689:1, 691:8, 691:21, 694:4, 713:4,
774:14, 774:24, 775:9, 778:11
**dated** [1] - 603:19
**dates** [3] - 558:10, 558:23, 657:12
**daughter** [3] - 544:16, 544:18, 631:2
**David** [48] - 553:1, 553:7, 566:22,
567:1, 570:12, 570:19, 570:25, 571:21,
574:24, 576:11, 576:23, 577:11,
577:12, 580:11, 580:13, 580:21,
584:14, 594:14, 595:2, 595:3, 597:4,
597:8, 605:19, 609:13, 609:21, 622:21,
624:5, 631:5, 664:5, 665:4, 665:6,
665:10, 665:15, 666:14, 667:21, 671:7,
671:12, 671:17, 680:17, 734:23, 735:1,
738:9, 739:22, 755:22, 758:6, 759:2,
807:13, 807:20
**days** [16] - 514:1, 529:13, 529:14,
529:15, 529:18, 582:24, 670:7, 741:25,
742:6, 745:24, 746:7, 748:7, 748:9,
748:12, 749:6, 778:6
**Dea** [23] - 538:9, 764:14, 764:15,
764:17, 764:20, 764:25, 765:4, 765:8,
765:22, 767:7, 775:2, 778:11, 787:12,
788:17, 790:2, 796:18, 805:25, 806:4,
806:9, 806:19, 807:24, 807:25, 808:3
**dead** [2] - 580:16, 600:8
**deal** [6] - 591:14, 668:14, 676:20,
680:11, 762:19, 799:25
**dealer** [2] - 561:21, 662:16
**dealing** [2] - 580:13, 623:20
**deals** [1] - 618:18

**W. Name - Directcross / Atty.**

**deamps** [1] - 685:12
**Dean** [1] - 544:16
**death** [8] - 550:14, 550:18, 552:18, 553:1, 567:1, 623:6, 623:19
**debriefed** [2] - 525:8, 525:10
**decade** [1] - 515:11
**decide** [6] - 732:16, 752:18, 753:8, 753:18, 798:21, 808:16
**decided** [4] - 535:8, 535:13, 562:11, 801:11
**decides** [1] - 753:19
**decision** [2] - 562:16, 679:14
**decisions** [1] - 801:18
**declaration** [1] - 676:13
**declarations** [1] - 710:15
**decode** [1] - 687:7
**deemed** [1] - 806:18
**Defendant** [1] - 503:18
**defendant** [7] - 662:5, 662:19, 666:14, 669:7, 669:22, 670:21
**Defendant's** [5] - 713:1, 713:3, 756:9, 811:13, 811:18
**defendants** [10] - 675:6, 675:7, 675:9, 675:13, 675:18, 675:21, 676:6, 676:19, 677:6, 678:4
**Defendants** [1] - 503:10
**defense** [14] - 532:23, 533:6, 653:17, 711:10, 746:17, 792:9, 793:4, 793:19, 794:11, 794:16, 794:21, 797:23, 798:8, 803:23
**Defense** [4] - 635:18, 755:16, 755:19, 758:23
**deferential** [1] - 508:20
**definitely** [1] - 760:15
**defuse** [1] - 536:13
**defused** [1] - 536:7
**deliberately** [3] - 563:1, 563:3, 801:9
**deliver** [6] - 522:9, 535:9, 541:21, 541:23, 634:6, 641:22
**Dell** [2] - 790:1, 790:4
**demeanor** [2] - 508:16, 531:23
**demonstrate** [4] - 583:12, 583:22, 584:13, 711:25
**denied** [1] - 676:24
**deny** [1] - 594:16
**denying** [2] - 525:4, 777:5
**Department** [6] - 567:12, 567:17, 569:8, 569:18, 747:6, 747:12
**department** [3] - 517:12, 518:16, 582:10
**depicted** [1] - 693:15
**depicting** [1] - 785:14
**deport** [1] - 561:7
**deported** [1] - 560:25
**describe** [8] - 549:14, 662:23, 689:24, 705:9, 721:21, 757:25, 768:23, 784:2
**described** [9] - 535:1, 546:14, 554:3, 571:2, 666:18, 715:2, 720:6, 721:17, 760:2

**describing** [7] - 571:5, 574:24, 581:14, 688:18, 701:23, 733:5, 792:20
**description** [6] - 743:1, 743:7, 745:5, 745:13, 746:6, 760:6
**design** [4] - 682:4, 698:8, 698:23, 701:16
**designation** [2] - 781:10, 790:5
**designed** [4] - 684:5, 697:21, 698:12, 698:13
**desire** [4] - 513:19, 606:15, 606:16
**desk** [10] - 733:4, 740:9, 744:4, 750:23, 769:9, 769:10, 774:23, 781:13, 782:15, 783:9
**desktop** [2] - 700:19, 790:1
**Desniak** [5] - 567:13, 568:5, 568:11, 568:18, 569:9
**Desniak's** [1] - 568:4
**destroy** [1] - 522:10
**detail** [4] - 668:15, 680:12, 793:20, 794:1
**details** [6] - 544:12, 546:11, 575:5, 598:20, 639:21, 796:13
**detainee** [6] - 727:17, 735:5, 737:13, 739:12, 739:20, 740:11
**detainees** [1] - 726:19
**detective** [2] - 518:9, 518:12
**Detention** [5] - 725:19, 726:5, 726:8, 726:14, 726:25
**determination** [4] - 562:15, 770:18, 771:3, 771:6
**determine** [1] - 721:12
**determined** [1] - 715:16
**develop** [1] - 682:16
**developed** [3] - 588:19
**development** [1] - 626:1
**device** [2] - 537:8, 698:9
**devious** [1] - 567:19
**dialed** [2] - 696:6, 696:9
**dictate** [1] - 707:5
**died** [1] - 552:10
**difference** [3] - 584:7, 711:13, 808:3
**Different** [1] - 687:15
**different** [15] - 527:11, 539:14, 542:14, 555:5, 556:6, 574:4, 575:6, 603:8, 640:7, 682:15, 687:16, 729:23, 729:24, 730:18, 779:22
**difficult** [2] - 539:23, 801:6
**diffused** [1] - 535:21
**digital** [2] - 682:14, 685:12
**diligent** [2] - 621:8, 712:7
**Dimaria** [4] - 723:13, 723:15, 723:17, 723:24
**Dimaria's** [1] - 723:21
**dimension** [1] - 795:24
**diplomat** [2] - 568:10, 568:23
**diplomate** [1] - 568:11
**Direct** [8] - 681:13, 687:1, 725:14, 732:1, 764:9, 809:12, 809:19, 810:5
**direct** [32] - 512:11, 530:4, 530:7,

531:24, 545:4, 561:22, 567:23, 569:6, 573:19, 573:20, 594:8, 608:8, 620:7, 639:9, 639:25, 641:21, 644:17, 645:21, 649:3, 649:11, 653:23, 658:12, 658:18, 720:5, 746:23, 752:19, 754:14, 765:6, 790:12, 797:8, 798:4, 801:23
**direction** [3] - 601:18, 670:20, 705:11
**directly** [2] - 604:11, 769:10
**director** [2] - 681:18, 681:23
**disable** [1] - 706:3
**disabuse** [1] - 795:10
**disagree** [1] - 676:15
**disc** [1] - 556:17
**disclosure** [1] - 527:13
**disclosures** [1] - 676:9
**discourage** [1] - 800:25
**discoverable** [3] - 703:12, 703:22, 703:23
**discredit** [1] - 585:18
**discuss** [8] - 592:2, 622:21, 625:23, 653:9, 722:12, 759:9, 790:21, 791:5
**discussed** [19] - 504:13, 509:4, 513:7, 513:11, 530:10, 530:12, 531:13, 532:5, 584:25, 605:23, 607:9, 625:5, 629:3, 631:8, 637:22, 653:14, 653:17, 778:22, 793:10
**discusses** [1] - 796:19
**discussing** [7] - 565:19, 566:2, 575:21, 600:25, 628:25, 631:20, 802:10
**discussion** [11] - 553:4, 553:6, 553:14, 612:7, 612:16, 625:8, 629:4, 632:1, 734:9, 741:5, 753:4
**discussions** [9] - 553:12, 624:9, 632:3, 740:24, 740:25, 741:1, 742:22, 742:23, 748:13
**disk** [3] - 556:20, 556:22, 799:12
**dismissed** [6] - 506:1, 515:3, 515:4, 515:8, 520:18, 520:24
**disobeying** [1] - 678:20
**dispel** [1] - 797:17
**dispense** [1] - 780:7
**dispute** [1] - 710:22
**disrespecting** [1] - 678:19
**distinguished** [1] - 762:2
**distribution** [1] - 624:1
**District** [4] - 503:2, 503:2, 503:13, 748:7
**district** [1] - 797:8
**divide** [4] - 571:1, 574:24, 583:23, 584:13
**dividends** [1] - 644:12
**document** [56] - 521:1, 523:2, 523:25, 525:21, 588:16, 601:4, 608:12, 608:13, 608:15, 609:24, 611:2, 611:23, 612:2, 613:11, 614:25, 615:2, 615:4, 618:9, 618:13, 618:18, 619:5, 620:19, 621:13, 627:1, 627:4, 627:6, 627:11, 633:9, 633:12, 635:14, 666:5, 704:2, 707:3, 709:3, 709:7, 714:11, 717:3, 723:9, 736:7, 736:9, 736:17, 755:22, 755:25,

W. Name - Directcross / Atty.

756:4, 756:14, 759:14, 774:5, 774:19, 775:1, 775:5, 776:5, 777:2, 778:19, 782:8, 807:4, 807:5

**documents** [26] - 608:8, 608:20, 609:12, 609:16, 609:20, 610:2, 610:7, 610:23, 610:24, 611:1, 611:10, 615:14, 703:12, 703:23, 712:15, 773:23, 773:25, 775:10, 778:13, 779:21, 805:1, 806:25, 807:10, 807:11, 807:14

**dollar** [6] - 784:11, 785:15, 789:7, 789:10, 792:20, 794:15

**dollars** [14] - 634:18, 638:19, 641:18, 649:14, 684:17, 684:18, 786:15, 794:16, 794:22, 794:23, 794:24, 795:2, 795:10, 799:10

**Donald** [15] - 547:3, 547:6, 548:5, 548:7, 548:12, 549:16, 550:9, 551:17, 570:14, 580:15, 580:16, 598:10, 600:7, 604:23, 605:13

**Done** [1] - 718:6

**done** [21] - 523:6, 535:15, 535:17, 540:6, 563:1, 563:3, 572:1, 572:9, 572:10, 574:7, 574:9, 574:18, 574:21, 601:13, 623:5, 659:4, 670:4, 698:23, 739:23, 744:1, 798:14

**door** [18] - 638:10, 657:12, 675:3, 675:15, 715:25, 727:10, 730:20, 733:15, 733:21, 734:1, 734:15, 735:8, 759:15, 761:7, 768:15, 798:2, 798:13

**doors** [1] - 640:2

**dorm** [2] - 740:9, 740:10

**dot** [1] - 596:25

**double** [1] - 553:25

**doubt** [3] - 760:11, 760:18, 802:15

**down** [26] - 529:24, 539:19, 560:2, 562:2, 563:19, 567:16, 571:20, 577:20, 583:5, 613:5, 614:21, 648:22, 648:25, 671:21, 696:4, 705:12, 727:15, 730:13, 738:21, 739:9, 740:11, 752:20, 758:7, 771:7, 771:8, 774:20

**Down** [2] - 560:17, 567:5

**download** [1] - 697:18

**downstairs** [1] - 808:13

**dozen** [1] - 743:21

**dozens** [1] - 573:20

**Dr** [1] - 624:4

**draft** [2] - 632:17, 632:20

**draw** [1] - 558:9

**drawer** [8] - 782:24, 783:8, 783:13, 783:14, 785:14, 785:15, 789:20, 789:21

**drawers** [1] - 770:12

**dress** [2] - 744:18, 744:19

**dressed** [2] - 744:18, 755:4

**drew** [1] - 801:13

**drive** [9] - 520:14, 547:21, 547:24, 548:14, 598:16, 661:7, 661:8, 684:10

**drive-by** [1] - 598:16

**driver's** [6] - 514:20, 515:6, 520:9, 520:10, 520:11, 731:2

**driving** [1] - 574:13

**drop** [1] - 682:18

**drove** [1] - 547:22

**drug** [13] - 522:14, 523:11, 523:15, 561:21, 570:10, 570:11, 623:20, 639:21, 645:18, 645:22, 662:16, 764:21, 775:2

**Drug** [1] - 764:14

**drugs** [7] - 523:16, 567:11, 567:19, 569:20, 586:1, 665:17

**due** [1] - 623:19

**Duly** [1] - 725:9

**duly** [4] - 505:15, 655:4, 681:8, 764:3

**During** [5] - 528:21, 529:18, 631:2, 673:5, 783:12

**during** [26] - 517:8, 526:2, 531:16, 569:7, 573:19, 573:20, 574:22, 588:6, 601:13, 606:14, 610:6, 610:25, 611:1, 615:18, 624:12, 625:10, 631:19, 656:15, 728:2, 745:13, 770:8, 770:10, 783:10, 783:15, 792:19, 800:12

**duties** [1] - 744:3

**Dvd** [1] - 556:17

**dwell** [1] - 797:13

**dying** [1] - 598:10

# E

**e-mail** [17] - 563:13, 602:15, 603:9, 603:11, 612:23, 614:7, 614:11, 614:22, 615:11, 707:12, 707:13, 707:16, 708:1, 713:10, 713:15, 713:16, 714:7

**e-mailed** [1] - 614:24

**e-mails** [12] - 603:5, 613:7, 613:19, 708:3, 709:4, 709:8, 714:3, 714:7, 723:21, 724:4, 724:15

**early** [8] - 545:5, 546:13, 565:14, 576:5, 596:18, 644:16, 646:24, 791:1

**earth** [2] - 513:7, 676:18

**ease** [1] - 682:17

**easier** [2] - 522:23, 806:19

**East** [1] - 503:23

**Eastern** [2] - 503:2, 748:7

**Edward** [5] - 763:18, 763:21, 764:2, 764:8, 810:4

**effect** [1] - 546:12

**effective** [1] - 805:17

**efficiency** [1] - 805:20

**effort** [9] - 569:8, 617:5, 621:9, 710:17, 710:23, 740:8, 752:5, 752:6, 795:2

**efforts** [3] - 516:7, 614:16, 663:6

**eficient** [1] - 621:17

**Eight** [3] - 726:13, 726:16, 746:20

**eight** [5] - 556:13, 565:11, 567:4, 567:9, 686:5

**Eighth** [1] - 800:4

**either** [11] - 528:4, 567:16, 569:16, 606:16, 641:22, 668:12, 669:6, 680:10, 689:25, 728:14, 765:3

**election** [1] - 681:18

**electronic** [5] - 505:23, 682:13, 807:1,

807:11, 808:6

**electronically** [1] - 559:5

**electronics** [1] - 681:18

**Eleven** [1] - 737:18

**eleven** [9] - 578:5, 732:25, 733:10, 733:12, 737:20, 737:21, 760:23, 764:18, 764:20

**elicit** [2] - 540:5, 675:20

**elicited** [1] - 620:12

**eligible** [2] - 513:8, 796:9

**eliminate** [1] - 624:10

**elmo** [3] - 611:14, 690:10, 695:9

**Elmo** [2] - 687:20, 693:11

**Em** [1] - 774:14

**embassy** [2] - 644:23, 645:4

**empathic** [1] - 677:2

**emphasize** [1] - 678:3

**emphatic** [2] - 677:10, 677:11

**employed** [4] - 764:11, 764:13, 776:21, 796:10

**employee** [2] - 708:13, 712:14

**employees** [1] - 658:15

**employer** [1] - 747:11

**encoding** [2] - 687:16, 687:17

**encompass** [1] - 589:22

**end** [11] - 505:1, 506:8, 536:22, 545:5, 564:7, 571:5, 591:22, 594:19, 595:6, 685:23, 690:3, 743:17, 777:11, 793:6, 801:2

**ended** [1] - 546:13

**ends** [8] - 527:15, 540:9, 621:14, 621:22, 704:7, 712:18, 718:19, 806:22

**enemies** [3] - 519:11, 519:13, 522:10

**Enemies** [1] - 519:15

**enforce** [1] - 744:19

**enforcement** [10] - 520:14, 670:21, 682:6, 683:1, 683:5, 683:9, 683:15, 684:5, 708:2, 767:7

**Enforcement** [1] - 764:14

**engaging** [2] - 514:18, 714:17

**English** [2] - 558:25, 562:23

**enhances** [2] - 717:16, 718:8

**enlarge** [1] - 635:25

**ensuing** [1] - 564:22

**entered** [7] - 651:22, 766:24, 767:1, 767:10, 768:13, 768:15, 768:25

**enters** [6] - 504:3, 506:10, 594:1, 723:1, 725:4, 763:21

**entire** [3] - 604:17, 618:13, 627:1

**entitled** [1] - 540:1

**entrance** [3] - 565:7, 728:22, 728:24

**entrepreneur** [3] - 661:17, 661:19, 662:9

**entry** [2] - 755:8, 762:10

**equipment** [54] - 505:23, 629:22, 629:25, 630:9, 630:11, 630:13, 630:14, 630:24, 631:6, 631:13, 631:17, 682:4, 682:16, 683:8, 687:7, 698:3, 698:6, 701:2, 701:4, 701:7, 701:9, 701:10,

— W. Name - Directcross / Atty.

701:11, 701:15, 701:18, 702:11, 702:13, 705:2, 705:14, 705:17, 705:19, 705:20, 706:8, 706:16, 708:5, 708:17, 708:20, 710:10, 710:18, 710:23, 711:9, 711:11, 711:12, 712:6, 712:9, 715:9, 715:10, 715:11, 715:17, 715:19, 715:21, 721:10, 724:19, 789:24

**escape** [1] - 644:19
**escaped** [2] - 581:8, 581:9
**escapees** [1] - 594:23
**escort** [3] - 740:7, 740:8, 740:10
**escorted** [1] - 509:1
**escorting** [1] - 776:16
**Esq** [9] - 503:15, 503:16, 503:16, 503:17, 503:18, 503:19, 503:20, 503:21
**essence** [1] - 527:12
**essentially** [6] - 566:12, 621:4, 721:15, 800:1, 802:5, 802:10
**establish** [3] - 620:13, 717:13, 792:11
**established** [2] - 718:5, 776:8
**estimate** [1] - 673:8
**et** [2] - 504:2, 665:12
**ethicist** [1] - 793:14
**Europe** [2] - 521:4, 521:7
**Evan** [1] - 503:19
**evening** [5] - 508:18, 509:15, 545:5, 798:25, 799:22
**event** [5] - 504:24, 623:10, 643:22, 647:5, 755:11
**events** [9] - 565:15, 565:19, 566:2, 567:15, 569:16, 603:13, 603:14, 623:18, 799:2
**eventually** [2] - 513:2, 594:17
**Eventually** [1] - 546:2
**everyday's** [1] - 677:3
**Evidence** [1] - 800:11
**evidence** [85] - 556:12, 556:16, 558:25, 566:14, 567:7, 570:8, 585:18, 603:4, 603:6, 613:1, 618:1, 663:10, 665:8, 668:1, 675:8, 675:21, 675:25, 676:16, 677:5, 688:20, 689:1, 691:3, 691:8, 693:22, 694:4, 700:24, 703:17, 703:25, 704:2, 709:3, 710:12, 713:4, 714:1, 714:19, 717:12, 717:14, 717:21, 717:22, 719:5, 721:17, 736:20, 736:23, 756:6, 756:9, 756:14, 766:11, 768:2, 768:6, 772:12, 773:6, 775:3, 775:13, 776:10, 778:3, 778:25, 779:3, 779:15, 779:19, 781:23, 782:17, 782:21, 783:18, 783:23, 784:25, 785:5, 785:18, 785:22, 787:12, 787:18, 787:23, 788:20, 788:24, 793:18, 802:5, 804:21, 806:17, 806:24, 807:4, 807:12, 811:5, 811:8, 811:11, 811:14
**evolved** [2] - 683:6, 683:7
**exacerbates** [1] - 717:13
**exact** [5] - 525:17, 545:16, 547:13, 638:21, 652:9, 701:10
**Exactly** [3] - 689:15, 715:15, 752:19
**exactly** [7] - 526:11, 620:11, 648:23,

661:8, 714:14, 781:4, 802:16
**examination** [44] - 506:17, 531:24, 532:5, 532:9, 532:11, 532:19, 532:24, 567:23, 584:23, 584:25, 585:2, 585:4, 603:1, 639:9, 640:1, 644:17, 645:21, 649:3, 649:11, 658:12, 658:18, 667:20, 671:10, 676:8, 699:8, 703:6, 704:5, 711:13, 720:1, 746:13, 746:23, 752:19, 754:14, 794:6, 795:15, 798:3, 798:4, 802:13, 809:5, 809:14, 809:16, 809:21
**Examination** [18] - 639:5, 655:11, 659:15, 678:11, 681:13, 687:1, 725:14, 732:1, 758:21, 761:17, 764:9, 809:7, 809:9, 809:12, 809:19, 809:23, 810:1, 810:5
**examine** [3] - 531:2, 573:16, 608:20
**examined** [3] - 655:5, 681:8, 764:4
**example** [6] - 631:24, 668:19, 680:16, 680:18, 714:10, 794:13
**exception** [6] - 723:10, 723:24, 724:3, 724:16, 800:19, 801:10
**exceptions** [2] - 800:5, 800:18, 800:25
**excess** [1] - 545:18
**exchange** [1] - 509:9
**exciting** [3] - 625:22, 626:11
**Excuse** [4] - 530:21, 583:25, 653:8, 749:1
**excuse** [1] - 741:12
**excused** [4] - 681:2, 722:9, 763:12, 763:16
**execute** [1] - 768:25
**executed** [7] - 766:3, 766:15, 766:17, 767:19, 767:24, 769:23, 769:24
**executing** [3] - 768:21, 768:24, 770:2
**execution** [5] - 765:15, 766:1, 768:13, 770:11, 783:15
**exempt** [1] - 510:5
**exercise** [2] - 533:1, 547:8
**exhibit** [50] - 556:19, 594:10, 603:16, 611:12, 625:20, 677:3, 695:5, 696:13, 696:16, 701:20, 709:8, 709:9, 709:12, 710:6, 736:5, 736:24, 755:17, 756:15, 762:16, 766:13, 767:14, 768:7, 771:1, 772:14, 773:8, 774:3, 774:9, 774:11, 775:2, 775:5, 775:9, 778:17, 779:7, 780:5, 780:15, 782:3, 783:3, 783:24, 784:14, 785:6, 785:11, 785:23, 786:24, 787:1, 787:3, 787:6, 788:11, 788:17, 788:25, 790:2
**Exhibit** [69] - 556:20, 603:3, 611:6, 635:18, 665:25, 666:23, 688:3, 688:8, 690:9, 691:3, 691:7, 695:3, 700:25, 701:23, 706:25, 713:1, 713:3, 736:4, 736:20, 736:23, 737:2, 755:16, 755:19, 756:9, 758:23, 762:15, 766:12, 767:13, 768:6, 771:18, 771:23, 772:24, 774:1, 774:15, 775:13, 778:3, 779:3, 779:19, 781:25, 782:17, 782:21, 783:23, 785:1, 785:5, 785:10, 785:18, 785:22, 786:24, 787:23, 788:10, 788:20, 788:24, 789:4,

789:12, 811:7, 811:13, 811:16, 811:18, 811:20, 811:22, 811:24, 812:2, 812:8, 812:10, 812:12, 812:14, 812:16, 812:18
**exhibits** [2] - 693:22, 778:7
**Exhibits** [7] - 688:25, 693:11, 694:3, 781:21, 811:4, 811:10, 812:4
**exist** [1] - 608:13
**existence** [1] - 686:4
**existing** [1] - 723:12
**exits** [2] - 592:6, 791:9
**expect** [2] - 593:9, 748:21
**expecting** [2] - 511:15, 511:17
**expedite** [1] - 779:23
**expeditious** [1] - 780:21
**expended** [2] - 676:10
**expenses** [4] - 634:16, 638:11, 794:24, 795:3
**expert** [1] - 792:4
**explain** [6] - 529:23, 568:2, 624:4, 624:13, 628:4, 662:19
**explained** [6] - 510:6, 585:7, 624:14, 642:21, 661:10, 720:5
**explaining** [3] - 585:25, 628:19, 660:15
**explains** [1] - 609:24
**explosive** [3] - 642:22, 643:14, 643:17
**exposure** [1] - 797:5
**expressed** [2] - 647:12, 679:3
**expressing** [1] - 679:4
**extend** [2] - 510:22, 723:20
**extension** [2] - 637:19, 750:10
**extent** [5] - 566:10, 667:3, 667:4, 795:6, 795:18
**extract** [1] - 700:1
**extracts** [2] - 700:12, 700:17
**extradited** [1] - 511:23
**extreme** [1] - 680:18
**eyes** [2] - 648:14, 790:22

**F**

**facilities** [2] - 726:2, 726:5
**facility** [30] - 547:8, 725:23, 726:22, 727:4, 727:7, 727:11, 728:11, 728:20, 729:9, 729:22, 732:3, 732:22, 735:18, 743:21, 743:24, 744:7, 744:22, 746:19, 746:23, 747:14, 749:14, 749:20, 752:16, 753:10, 755:25, 757:20, 758:9, 762:3, 762:4, 806:4
**Facility** [5] - 725:19, 726:8, 726:15, 727:1
**facing** [2] - 733:15
**fact** [41] - 510:25, 522:3, 524:17, 535:11, 535:12, 539:6, 541:18, 560:24, 574:19, 583:5, 600:18, 640:18, 641:15, 642:7, 645:17, 648:6, 674:5, 694:17, 710:13, 710:22, 712:6, 714:3, 714:5, 714:6, 714:8, 714:16, 719:15, 734:5, 736:17, 749:14, 751:3, 767:6, 776:8, 784:16, 784:22, 789:16, 793:1, 798:6,

**— W. Name - Directcross / Atty. —**

798:21, 802:15
**factory** [1] - 721:15
**facts** [5] - 576:21, 615:17, 616:23, 621:9, 797:11
**factual** [1] - 621:12
**failure** [1] - 554:24
**Fair** [2] - 799:4, 808:17
**fair** [7] - 512:23, 517:22, 565:16, 591:20, 671:9, 747:24, 796:25
**fairly** [1] - 798:4
**false** [14] - 516:2, 516:5, 516:8, 516:16, 536:16, 561:9, 577:22, 591:8, 619:4, 620:22, 621:4, 621:6, 622:9
**familiar** [7] - 611:24, 637:18, 683:18, 683:23, 705:6, 799:20, 799:21
**family** [14] - 504:12, 504:14, 530:21, 645:24, 647:6, 647:9, 670:3, 670:4, 670:14, 670:17, 673:19, 673:20, 678:6, 727:22
**far** [12] - 533:3, 533:4, 553:18, 564:4, 593:10, 593:11, 638:14, 639:20, 752:9, 761:4, 797:11, 797:12
**Fara** [2] - 658:1, 658:4
**Farah** [1] - 612:15
**fashion** [6] - 574:1, 635:15, 771:14, 778:10, 778:21, 779:9
**fast** [1] - 780:4
**fault** [3] - 706:1, 706:2, 744:11
**favor** [1] - 797:16
**favorable** [1] - 580:24
**Fbi** [6] - 567:12, 567:17, 569:7, 569:17, 723:15, 724:1
**fearsome** [1] - 534:23
**February** [16] - 523:19, 524:13, 524:15, 525:1, 525:2, 525:10, 525:16, 526:2, 536:10, 544:7, 544:10, 642:20, 645:12, 646:8
**Fed** [1] - 800:15
**federal** [9] - 525:17, 537:13, 554:20, 555:4, 555:11, 555:24, 643:22, 644:17, 727:5
**Federal** [2] - 727:6, 800:11
**Fedex** [1] - 804:19
**fee** [3] - 792:21, 792:22, 794:15
**feelings** [1] - 632:2
**fees** [2] - 507:22, 792:24
**fellow** [1] - 566:22
**felony** [1] - 514:24
**female** [3] - 664:11, 665:18, 674:5
**few** [18] - 532:20, 542:1, 559:15, 566:14, 601:18, 605:22, 614:17, 632:24, 633:14, 643:13, 653:15, 672:11, 685:6, 703:10, 746:18, 748:7, 749:6, 751:1
**fide** [1] - 792:5
**fides** [1] - 797:10
**field** [1] - 797:22
**fifteen** [4] - 637:20, 640:19, 651:15, 656:20
**Fifth** [6] - 507:5, 508:1, 508:4, 510:1,

796:3, 797:10
**Fifty** [1] - 528:13
**fifty** [1] - 638:19
**fight** [3] - 594:18, 594:24, 597:21
**fighting** [2] - 559:17, 559:18
**figured** [2] - 536:12, 536:13
**file** [4] - 637:7, 637:18, 808:6
**filed** [3] - 505:5, 637:8, 751:13
**files** [6] - 687:14, 687:15, 697:4, 697:19, 700:20
**fill** [4] - 601:16, 729:19, 737:11, 759:4
**fill-in** [1] - 729:19
**filled** [4] - 512:8, 756:17, 759:4, 759:5
**filling** [2] - 601:10, 601:18
**fills** [1] - 759:3
**Finally** [2] - 614:8, 679:17
**finally** [1] - 603:9
**financial** [1] - 516:13
**Fine** [7] - 618:3, 618:18, 618:21, 622:7, 622:15, 624:3, 624:8
**fine** [8] - 620:4, 669:16, 677:7, 713:24, 718:10, 718:11, 790:17, 793:1
**Fineman** [4] - 594:13, 595:19, 597:8, 599:21
**finger** [3] - 694:8, 695:18, 768:11
**fingers** [1] - 675:12
**finish** [5] - 511:15, 550:16, 700:4, 757:18, 790:16
**finished** [12] - 506:7, 528:19, 537:3, 537:4, 551:6, 588:17, 617:13, 617:14, 621:20, 642:18, 659:5, 769:16
**fire** [2] - 549:16, 552:8
**fireable** [1] - 519:25
**fired** [2] - 609:24, 610:7
**firm** [3] - 702:4, 702:6, 713:16
**first** [66] - 505:15, 522:22, 523:20, 525:17, 526:3, 526:5, 536:1, 548:17, 563:4, 563:8, 565:18, 567:6, 570:20, 574:23, 575:1, 577:16, 577:18, 580:10, 595:21, 614:6, 618:21, 620:16, 621:2, 621:3, 640:6, 640:16, 642:13, 648:8, 648:14, 660:9, 672:1, 672:23, 681:8, 682:22, 707:2, 707:3, 713:10, 725:9, 730:1, 730:25, 731:13, 732:3, 732:6, 733:14, 733:18, 734:1, 737:7, 739:5, 741:23, 746:21, 748:5, 756:21, 764:3, 769:1, 772:1, 772:10, 773:20, 774:16, 783:11, 798:7, 798:8, 799:2, 801:6, 808:1
**First** [3] - 504:8, 694:7, 712:3
**first-hand** [1] - 595:21
**fit** [2] - 519:22, 687:20
**fitted** [1] - 630:16
**five** [18] - 508:17, 529:20, 546:3, 581:8, 594:23, 640:15, 642:23, 652:3, 656:13, 656:20, 657:4, 684:18, 686:10, 786:15, 794:23, 795:1, 799:9, 801:14
**floor** [4] - 721:15, 767:16, 767:22, 768:18
**Florida** [4] - 707:19, 715:6, 715:7,

797:18
**Flow** [1] - 542:17
**flow** [1] - 803:18
**Fodeman** [77] - 503:16, 504:6, 504:9, 504:17, 505:4, 505:24, 653:17, 653:21, 653:24, 654:5, 655:2, 675:23, 681:5, 681:14, 687:2, 687:19, 688:20, 689:2, 691:2, 691:9, 693:21, 694:5, 694:7, 695:11, 695:13, 699:3, 699:4, 699:5, 702:18, 703:6, 703:19, 708:23, 709:6, 709:10, 710:24, 711:3, 712:14, 718:9, 718:10, 722:8, 723:5, 724:14, 725:15, 732:2, 736:3, 736:19, 737:1, 741:8, 742:18, 744:11, 745:2, 746:10, 746:11, 756:7, 757:10, 758:18, 758:22, 761:10, 763:11, 776:11, 792:6, 792:16, 794:20, 799:11, 802:2, 803:19, 804:4, 804:7, 804:11, 804:16, 804:24, 805:5, 805:9, 805:14, 809:13, 809:20, 809:24
**follow** [3] - 637:20, 661:20, 763:6
**followed** [2] - 548:19, 552:18
**Followed** [4] - 579:12, 674:9, 677:12, 686:24
**following** [8] - 523:24, 591:23, 592:8, 593:18, 594:2, 602:19, 777:12, 791:11
**follows** [5] - 505:16, 655:5, 681:9, 725:10, 764:4
**footsteps** [9] - 651:2, 651:10, 651:11, 651:18, 651:19, 651:24, 652:1, 652:19, 653:1
**Force** [3] - 517:3, 517:7, 518:6
**force** [5] - 518:1, 518:2, 518:3, 570:10, 594:23
**forces** [1] - 597:22
**foreign** [1] - 597:22
**forge** [2] - 515:6, 515:12
**forged** [4] - 515:14, 520:8, 520:10, 521:1
**forgery** [2] - 515:7, 521:1
**Forget** [1] - 762:19
**forging** [1] - 514:20
**forgive** [4] - 532:22, 585:14, 707:15, 751:9
**form** [15] - 601:10, 601:16, 601:17, 601:20, 614:5, 665:24, 673:14, 673:23, 673:24, 700:19, 737:12, 758:24, 771:14, 804:25
**forming** [2] - 562:6, 562:7
**forth** [6] - 657:16, 657:19, 657:20, 707:25, 714:5, 800:2
**Fortunately** [1] - 630:6
**forward** [4] - 545:19, 753:25, 755:9, 806:16
**founding** [1] - 660:23
**four** [10] - 525:21, 554:9, 597:6, 638:18, 642:13, 650:9, 650:14, 729:12, 729:13, 801:14
**fourth** [2] - 635:18, 657:14
**Fourth** [7] - 635:21, 799:24, 799:25, 800:2, 800:6, 801:7, 801:12

W. Name - Directcross / Atty.

frankly [1] - 664:8
Fraser [1] - 757:1
Fraser-clarke [1] - 757:1
Frederick [1] - 503:23
freelancer [1] - 708:13
freely [1] - 602:15
Friday [1] - 791:4
friend [7] - 520:13, 535:22, 535:23, 536:7, 537:22, 541:19, 618:22
friend's [1] - 535:24
friends [2] - 727:22, 730:2
Front [1] - 739:8
front [23] - 506:21, 546:6, 618:17, 637:23, 689:11, 689:17, 691:16, 694:21, 699:14, 701:25, 702:13, 728:22, 728:23, 733:4, 740:4, 740:9, 740:13, 740:14, 744:4, 750:23, 758:8, 768:15
Frost [15] - 612:18, 613:24, 614:6, 614:7, 614:14, 614:18, 614:19, 615:15, 762:10, 762:11, 762:12, 762:19, 762:22, 763:2
Frosts [1] - 615:15
frosting [1] - 796:23
full [4] - 504:19, 554:10, 554:11, 681:10
fully [1] - 684:8
function [1] - 628:17
fundamental [1] - 724:16
fuse [1] - 692:22
future [1] - 703:10

## G

Gadraj [1] - 597:23
gain [2] - 699:1, 753:16
gained [1] - 639:18
game [1] - 535:15
gang [18] - 541:25, 546:17, 549:13, 569:3, 569:4, 570:8, 575:16, 575:18, 575:25, 576:2, 578:18, 581:8, 605:2, 618:23, 624:5, 669:1, 669:14, 669:21
gaps [1] - 620:25
Gardener [1] - 804:11
gates [1] - 596:11
gather [6] - 519:8, 583:9, 585:18, 597:17, 600:1, 656:8
gathered [1] - 584:12
gathering [1] - 583:8
gay [2] - 558:19, 572:1
general [5] - 591:12, 612:10, 686:11, 720:19, 764:19
Generally [1] - 764:21
generally [5] - 684:17, 705:11, 726:10, 727:5, 801:19
gentleman [1] - 658:13
genuine [1] - 520:11
Geo [6] - 725:24, 726:2, 726:15, 732:22, 747:11, 759:3
George [4] - 570:14, 623:6, 623:19,

623:23
Georgetown [5] - 517:19, 517:20, 517:22, 547:20, 667:7
Gerald [3] - 503:18, 776:14, 776:23
Gillers [3] - 792:11, 793:2, 793:15
girl [1] - 544:13
girlfriend [2] - 566:22, 628:20
girlfriend's [1] - 684:22
girlfriends [2] - 665:10, 730:2
given [19] - 512:24, 519:21, 520:6, 527:8, 559:4, 595:21, 614:22, 614:23, 614:24, 616:23, 645:8, 652:5, 656:7, 658:19, 659:9, 677:2, 719:16, 745:7, 805:19
Gleeson [4] - 503:12, 504:3, 593:7, 723:1
Glock [3] - 519:18, 520:6, 659:9
gold [2] - 789:17
Goose [1] - 688:12
govern [1] - 704:5
Government [34] - 556:20, 587:18, 587:23, 588:4, 665:25, 666:23, 688:3, 690:9, 701:23, 706:25, 736:4, 736:20, 737:2, 762:15, 764:3, 768:2, 771:18, 771:23, 781:25, 782:17, 786:24, 795:8, 795:20, 795:22, 795:25, 797:16, 797:18, 797:21, 797:23, 798:4, 799:21, 800:23, 802:4
government [89] - 505:5, 507:16, 507:21, 510:11, 510:14, 511:17, 512:12, 512:25, 515:17, 526:3, 526:4, 526:5, 526:6, 528:11, 568:17, 572:22, 575:17, 582:5, 582:12, 582:19, 583:3, 583:24, 594:22, 596:20, 596:22, 608:8, 608:16, 609:4, 610:15, 610:23, 611:5, 611:6, 611:12, 613:18, 618:4, 620:12, 623:1, 623:3, 623:17, 631:14, 634:25, 635:5, 635:6, 637:6, 637:9, 637:15, 637:22, 638:18, 640:5, 640:10, 640:18, 642:7, 642:20, 643:23, 644:3, 644:12, 644:18, 645:1, 645:3, 646:5, 647:6, 670:8, 672:22, 672:24, 673:14, 675:10, 676:9, 676:21, 677:5, 681:5, 691:2, 701:6, 701:8, 706:6, 708:20, 708:25, 710:18, 712:8, 715:17, 715:20, 717:25, 774:9, 775:4, 787:10, 788:17, 796:22, 808:8, 808:9
Government's [63] - 603:3, 688:8, 688:25, 691:3, 691:7, 693:11, 694:3, 700:25, 736:23, 766:12, 767:12, 768:6, 772:13, 772:24, 773:7, 774:1, 775:13, 778:3, 778:16, 778:25, 779:3, 779:5, 779:15, 779:19, 779:25, 781:15, 781:21, 782:21, 783:2, 783:19, 783:23, 784:12, 785:1, 785:5, 785:10, 785:18, 785:22, 787:18, 787:23, 788:10, 788:20, 788:24, 789:3, 789:12, 792:23, 794:14, 798:24, 802:24, 811:4, 811:7, 811:10, 811:16, 811:20, 811:22, 811:24, 812:2, 812:4, 812:8, 812:10,

812:12, 812:14, 812:16, 812:18
government's [2] - 717:11, 724:13
gracefully [1] - 718:16
graciously [1] - 714:21
grandmother [1] - 674:4
Great [1] - 504:21
great [1] - 799:13
green [10] - 550:24, 554:13, 596:25, 611:8, 612:4, 771:11, 771:12, 784:9, 789:11
grew [1] - 622:7
ground [3] - 641:25, 796:25, 802:19
group [26] - 586:20, 588:12, 594:15, 594:16, 594:19, 595:20, 597:9, 597:21, 599:21, 631:11, 641:23, 644:22, 645:4, 647:17, 647:21, 660:23, 660:24, 663:25, 666:16, 666:17, 671:16, 686:12, 769:18, 770:16, 772:22, 773:4
Group [1] - 732:22
groups [3] - 594:19, 595:7, 595:11
Gsm [1] - 685:9
Guayana [30] - 553:6, 556:9, 557:7, 557:10, 557:11, 558:7, 560:17, 561:7, 561:20, 564:8, 565:16, 565:19, 566:3, 568:12, 568:21, 571:3, 575:7, 644:25, 647:7, 647:13, 665:13, 666:25, 667:9, 669:2, 670:17, 671:2, 673:18, 685:16, 685:22
Guayana's [1] - 560:25
Guayanba [1] - 667:6
Guerino [1] - 503:23
guess [6] - 518:21, 670:6, 703:7, 752:8, 762:7, 804:25
guidance [2] - 801:17, 805:10
guided [1] - 801:16
gun [3] - 519:22, 519:25, 658:19
guns [4] - 588:11, 588:12, 623:24, 624:1
guy [18] - 534:13, 553:10, 567:20, 574:8, 574:18, 585:23, 594:14, 595:20, 616:19, 625:1, 625:21, 626:9, 632:7, 650:2, 653:21, 664:9, 743:15, 743:16
Guyana [41] - 510:19, 510:23, 511:1, 511:23, 513:20, 514:2, 514:6, 514:10, 514:12, 514:15, 514:19, 514:25, 517:2, 517:7, 517:20, 520:9, 521:3, 530:2, 532:13, 536:13, 581:17, 582:2, 582:10, 582:17, 583:6, 588:1, 594:22, 596:8, 596:19, 607:19, 621:6, 622:9, 622:14, 630:4, 708:17, 715:5, 715:18, 715:19, 796:22, 797:6
Guyanese [9] - 518:6, 536:9, 623:3, 631:14, 657:23, 708:20, 708:25, 715:20, 776:7
guys [10] - 516:11, 516:13, 545:14, 546:21, 551:25, 561:4, 561:20, 581:4, 671:1, 671:21
gym [11] - 547:6, 547:9, 547:10, 547:11, 547:17, 547:18, 547:21, 547:22, 548:4, 548:13, 548:17

## H

**H-10** [1] - 666:23
**habit** [3] - 597:25, 598:1, 598:2
**hair** [2] - 758:1, 760:3
**half** [3] - 550:18, 550:21, 790:14
**half-hour** [1] - 790:14
**halfway** [1] - 650:2
**Halfway** [1] - 650:4
**hand** [6] - 595:21, 598:5, 598:6, 666:4, 696:4, 763:25
**handed** [5] - 551:8, 615:11, 615:14, 702:19, 703:7
**handling** [1] - 641:4
**hands** [2] - 712:12, 714:23
**handwriting** [9] - 603:16, 603:17, 611:24, 612:5, 736:17, 738:15, 738:16, 738:17, 762:21
**handyman** [1] - 650:3
**happy** [1] - 611:23
**hard** [2] - 684:10, 805:24
**hardly** [1] - 676:18
**harm** [9] - 535:9, 541:24, 605:14, 606:21, 606:23, 606:24, 610:8, 646:19, 647:21
**Harris** [2] - 799:23, 801:10
**hates** [3] - 632:7, 668:17, 680:14
**havoc** [1] - 581:11
**head** [1] - 582:9
**heals** [1] - 650:6
**Health** [2] - 624:4, 715:5
**health** [1] - 582:9
**hear** [24] - 510:12, 579:5, 596:13, 597:9, 599:7, 649:21, 650:21, 650:23, 651:1, 651:10, 651:18, 651:24, 652:19, 652:21, 661:18, 681:22, 685:23, 712:7, 776:9, 793:23, 793:24, 798:23, 799:15, 803:24
**heard** [30] - 513:12, 557:15, 577:4, 581:14, 594:13, 612:15, 612:16, 614:17, 616:6, 616:23, 617:17, 648:12, 649:23, 651:2, 651:11, 651:19, 652:1, 653:1, 658:6, 664:5, 664:6, 664:14, 664:15, 665:5, 678:6, 699:2, 710:25, 797:11, 807:3, 808:11
**hearing** [4] - 591:2, 615:20, 776:2, 799:3
**hearsay** [6] - 709:10, 711:22, 711:23, 714:1, 723:10, 724:9
**heart** [3] - 625:1, 625:21, 626:8
**heels** [1] - 650:21
**held** [3] - 591:1, 604:13, 776:1
**hello** [1] - 651:3
**help** [18] - 512:12, 515:16, 520:13, 520:20, 555:7, 559:23, 570:10, 594:18, 594:24, 603:22, 615:3, 647:22, 651:12, 664:7, 665:4, 671:14, 733:21, 799:8
**helped** [5] - 520:23, 641:22, 641:24, 665:15
**helpful** [2] - 576:7, 650:13

**helping** [3] - 567:12, 568:17, 601:16
**herself** [1] - 650:22
**hesitance** [1] - 792:13
**hidden** [2] - 577:8, 579:9
**hiding** [2] - 517:5, 519:14
**High** [1] - 563:5
**high** [2] - 563:6, 624:8
**high-ranking** [1] - 624:8
**higher** [1] - 750:4
**highlight** [1] - 659:2
**highlighted** [4] - 524:5, 525:22, 527:3, 566:11
**highlighting** [2] - 611:13, 611:20
**himself** [2] - 664:2, 802:14
**hint** [1] - 805:8
**history** [2] - 514:2, 800:19
**hm** [1] - 756:23
**Hoffa** [1] - 803:3
**Hoffa'** [2] - 802:18, 802:23
**hold** [1] - 726:23
**holds** [1] - 690:17
**home** [6] - 504:20, 509:10, 527:5, 545:25, 722:11, 791:4
**honest** [2] - 640:11, 641:10
**honestly** [1] - 664:15
**Honor** [51] - 504:9, 505:4, 530:22, 538:2, 554:23, 559:4, 563:5, 589:23, 603:4, 611:16, 635:10, 635:14, 642:2, 642:11, 647:4, 652:11, 655:10, 663:5, 663:11, 678:8, 681:3, 687:19, 688:20, 688:23, 690:10, 693:12, 693:21, 693:25, 694:1, 702:18, 709:10, 713:5, 719:22, 722:8, 723:8, 724:12, 736:19, 761:10, 763:11, 768:1, 768:4, 771:19, 772:5, 776:4, 776:14, 780:20, 785:1, 790:10, 792:6, 799:5, 801:16
**Honor's** [1] - 780:12
**Honorable** [1] - 503:12
**hotel** [1] - 673:9
**hour** [3] - 576:6, 751:6, 790:14
**hours** [5] - 504:23, 529:18, 545:6, 546:12, 552:2
**house** [3] - 541:15, 663:23, 664:1
**houses** [1] - 662:17
**Hudson** [2] - 646:25, 647:3
**human** [1] - 798:11
**hundred** [6] - 638:19, 640:19, 641:17, 641:18, 786:15, 794:23, 795:2, 799:9

## I

**Id** [16] - 730:5, 730:22, 730:25, 731:1, 731:3, 731:6, 732:5, 732:20, 737:13, 737:14, 738:11, 738:20, 738:21, 738:23, 744:17
**idea** [23] - 512:23, 528:5, 545:17, 548:22, 549:4, 574:19, 580:10, 591:19, 607:3, 607:4, 607:5, 607:12, 607:13, 607:15, 643:19, 664:13, 667:21, 757:11, 759:6, 759:8, 801:4, 801:19,

808:6
**identification** [21] - 516:3, 522:18, 524:1, 635:17, 635:19, 688:4, 690:10, 707:1, 736:4, 739:10, 755:16, 767:13, 774:1, 778:16, 779:5, 781:15, 783:2, 784:13, 785:10, 786:25, 788:10
**identified** [6] - 549:1, 556:21, 560:4, 603:16, 604:19, 784:23
**identifier** [1] - 701:24
**identifies** [1] - 702:6
**identify** [1] - 771:1
**identifying** [2] - 550:8, 604:22
**identity** [1] - 670:10
**iii** [1] - 805:4
**Iii** [2] - 801:4, 802:17
**imagine** [3] - 715:25, 719:15, 793:2
**immediately** [2] - 644:12, 735:9
**Immunity** [1] - 510:9
**immunity** [10] - 508:8, 509:22, 509:23, 510:8, 510:22, 511:11, 796:3, 796:18, 796:21
**impeach** [2] - 609:12, 794:12
**impeachment** [6] - 703:15, 703:23, 800:20, 801:15, 801:21
**implicit** [2] - 795:13, 795:14
**implies** [1] - 683:11
**imply** [1] - 606:10
**import/distribute** [1] - 764:22
**important** [5] - 571:21, 577:12, 676:19, 747:17, 747:19
**impression** [5] - 527:11, 561:20, 591:8, 591:12, 633:8
**improper** [3] - 717:8, 718:8, 795:1
**impunity** [1] - 802:23
**inability** [1] - 802:24
**incarceration** [1] - 728:3
**incentive** [2] - 724:15, 797:15
**inception** [2] - 510:17, 609:2
**inches** [1] - 690:1
**incidence** [1] - 752:22
**incident** [13] - 502:8, 741:15, 741:21, 741:25, 742:9, 745:25, 746:7, 748:1, 748:9, 748:12, 748:13, 751:10, 760:9
**inclined** [1] - 794:2
**include** [2] - 642:22, 727:21
**includes** [1] - 807:16
**including** [2] - 532:13, 578:25
**income** [1] - 637:8
**inconsistent** [1] - 540:4
**increments** [1] - 673:3
**incur** [1] - 638:11
**Independent** [1] - 708:14
**independent** [1] - 708:16
**Indian** [1] - 539:17
**indicate** [5] - 692:19, 737:17, 738:5, 768:12, 782:7
**indicated** [8] - 548:15, 692:13, 766:24, 769:25, 770:4, 770:16, 772:9, 772:20
**indicates** [2] - 701:15, 782:8

**Indicating** [1] - 689:19

**indicating** [12] - 606:12, 606:17, 606:19, 614:1, 614:11, 737:8, 737:24, 738:5, 738:16, 760:13, 768:16, 781:11

**indication** [1] - 720:25

**Indies** [1] - 538:1

**indirectly** [1] - 516:20

**individual** [7] - 534:2, 534:24, 535:1, 560:19, 714:9, 715:18, 769:5

**individuals** [6] - 517:4, 747:1, 749:11, 767:2, 769:2, 776:23

**inferring** [1] - 569:3

**infiltrating** [1] - 587:2

**influenced** [1] - 587:22

**information** [58] - 513:16, 519:8, 522:14, 523:12, 531:1, 531:6, 532:18, 552:22, 553:19, 563:18, 573:14, 578:22, 579:5, 579:10, 579:11, 580:2, 580:5, 580:19, 581:20, 581:23, 583:9, 584:12, 584:17, 587:7, 588:18, 588:22, 595:13, 595:20, 597:13, 597:17, 600:2, 600:6, 602:5, 608:16, 608:18, 617:4, 624:19, 644:18, 644:21, 644:25, 645:3, 645:7, 646:5, 646:9, 646:16, 647:19, 658:1, 698:22, 700:8, 708:5, 708:7, 710:10, 710:17, 710:18, 715:4, 790:23, 808:7

**informed** [3] - 641:16, 642:8, 644:17

**initial** [1] - 735:8

**initials** [2] - 556:21, 774:14

**injured** [3] - 663:15, 663:16, 663:23

**inmate** [25] - 727:11, 727:24, 728:5, 730:7, 730:16, 731:10, 732:9, 733:22, 734:21, 734:24, 738:6, 738:8, 740:1, 740:5, 741:11, 750:16, 750:18, 752:15, 753:7, 753:21, 754:8, 759:1, 759:4, 759:5

**inmates** [5] - 726:22, 727:5, 727:7, 727:18, 730:13

**inner** [1] - 624:5

**innocence** [1] - 710:15

**innocent** [2] - 644:6, 644:9

**inquiry** [1] - 748:16

**inserted** [1] - 720:7

**inside** [8] - 541:20, 548:17, 566:4, 690:11, 739:24, 741:2, 769:2, 769:5

**insinuate** [3] - 572:4, 574:8, 574:19

**insinuated** [1] - 605:14

**insinuating** [1] - 572:5

**insinuation** [1] - 606:24

**insist** [1] - 531:4

**inspect** [4] - 720:15, 720:18, 721:18, 806:11

**inspected** [2] - 720:12, 721:10

**inspection** [1] - 692:2

**install** [1] - 643:9

**installation** [1] - 691:12

**instance** [3] - 551:20, 557:7, 798:8

**instances** [3] - 531:12, 665:3, 753:15

**Instead** [1] - 571:15

**institution** [3] - 753:16, 754:20, 756:11

**instructed** [1] - 531:23

**instruction** [15] - 530:22, 530:23, 671:20, 675:6, 676:12, 676:25, 677:2, 677:4, 677:8, 713:22, 714:22, 717:6, 724:24, 724:25, 798:21

**Instructions** [1] - 629:6

**instructions** [7] - 531:25, 548:19, 625:11, 661:24, 662:5, 662:25, 671:23

**intact** [6] - 720:23, 721:4, 721:5, 721:13, 722:15, 722:16

**integrity** [1] - 806:24

**intelligence** [3] - 519:5, 682:6, 699:1

**intelligent** [1] - 711:25

**intend** [11] - 514:9, 585:24, 595:10, 596:15, 606:10, 623:12, 628:15, 704:2, 718:2, 795:10, 797:24

**intended** [1] - 794:22

**intending** [2] - 572:4, 703:24

**intent** [2] - 801:3, 802:10

**intention** [5] - 574:4, 800:8, 800:10, 801:5, 802:8

**intentional** [1] - 795:13

**intentionally** [3] - 563:2, 698:23, 795:21

**interaction** [2] - 509:17, 734:7

**intercept** [6] - 683:8, 688:17, 696:6, 698:12, 698:13, 699:18

**intercepted** [2] - 698:17, 711:11

**intercepting** [1] - 702:17

**interception** [1] - 792:10

**interest** [3] - 612:13, 792:23, 796:22

**interested** [3] - 612:11, 793:12

**interfere** [2] - 573:11, 769:3

**interjecting** [1] - 621:1

**internal** [2] - 720:15, 720:18

**internally** [1] - 721:19

**interrogated** [1] - 545:1

**Interrogated** [1] - 545:2

**interrupt** [1] - 710:20

**interrupted** [1] - 599:6

**interruption** [2] - 714:24, 719:2

**interview** [12] - 526:2, 614:16, 641:5, 745:14, 745:17, 748:9, 748:10, 748:12, 749:3, 749:8, 753:8, 753:21

**interviewed** [2] - 524:13, 524:22, 524:25, 525:4, 525:5, 526:12, 526:14, 528:4, 539:5, 539:7, 641:3, 741:19, 741:24, 742:3, 745:24, 746:3, 748:5, 748:19, 750:14, 754:2, 758:3, 758:4

**intimate** [1] - 639:21

**introduce** [4] - 607:13, 626:1, 693:21, 709:2

**introduced** [3] - 627:18, 650:22, 703:22

**introductory** [1] - 577:20

**inures** [1] - 717:14

**invest** [1] - 558:19

**investigation** [3] - 625:11, 656:7,

706:11

**investigations** [1] - 764:23

**investigator** [27] - 557:24, 614:15, 733:13, 733:16, 733:20, 733:23, 734:11, 736:1, 736:15, 737:5, 737:14, 740:21, 741:10, 743:2, 743:15, 744:22, 745:6, 759:14, 759:24, 760:21, 762:2, 762:6, 762:8, 762:24, 762:25, 763:2, 805:15

**Investigator** [5] - 625:8, 629:7, 633:18, 634:3, 804:17

**investigators** [6] - 557:25, 728:14, 734:5, 750:11, 761:19, 762:1

**invoke** [1] - 508:4

**involve** [1] - 735:11

**involved** [17] - 514:14, 515:20, 517:2, 521:13, 528:15, 586:12, 587:1, 587:4, 604:15, 634:5, 660:5, 660:13, 660:16, 675:25, 729:8, 764:24, 765:10

**involvement** [2] - 575:25, 715:24

**involving** [3] - 535:15, 623:20, 764:23

**Irizarry** [3] - 710:7, 710:9

**Irving** [20] - 503:9, 503:21, 506:1, 588:7, 595:2, 601:15, 648:9, 650:1, 652:21, 655:15, 655:17, 655:22, 656:16, 656:24, 662:20, 669:8, 670:22, 671:22, 767:5

**Irving's** [2] - 772:3, 804:22

**isolation** [1] - 564:6

**issue** [12] - 504:18, 541:6, 566:16, 600:9, 609:4, 723:14, 792:10, 793:8, 798:24, 800:7, 800:16, 806:25

**issued** [1] - 706:22

**issues** [4] - 504:6, 799:15, 799:25

**item** [10] - 635:23, 689:24, 690:14, 692:10, 694:11, 697:8, 699:22, 699:23, 770:21, 770:22

**items** [16] - 687:20, 687:22, 687:23, 688:9, 689:4, 691:23, 705:17, 765:20, 765:21, 770:4, 770:8, 770:12, 770:19, 771:1, 785:15, 790:8

**itself** [7] - 556:16, 685:18, 692:4, 710:12, 721:12, 789:14, 789:23

## J

**Jackson** [5] - 509:4, 509:8, 564:10, 625:12, 629:7

**Jagnarian** [1] - 566:21

**jail** [3] - 581:9, 747:2, 748:14

**jails** [1] - 726:5

**Jamaica** [1] - 726:11

**January** [2] - 645:11, 646:8

**Javier** [1] - 503:20

**jerk** [1] - 633:7

**Jerry** [1] - 746:17

**Jersey** [1] - 757:15

**Jimmy** [3] - 802:18, 802:23, 803:3

**job** [7] - 553:15, 553:16, 596:14, 661:11, 662:6, 726:17, 746:21

W. Name - Directcross / Atty.

**jobs** [1] - 734:4
**John**[4] - 503:12, 509:6, 509:9, 805:15
**join** [1] - 676:14
**Jones**[2] - 641:7, 658:23
**Judge**[38] - 503:13, 504:3, 504:6, 504:17, 506:2, 508:2, 508:8, 538:11, 558:25, 559:7, 593:7, 613:2, 615:24, 628:1, 677:1, 688:1, 699:3, 699:5, 699:7, 708:23, 710:7, 710:9, 711:15, 718:10, 719:12, 723:1, 723:6, 742:13, 779:20, 780:17, 782:16, 790:14, 799:20, 800:16, 802:2, 806:9, 807:25
**judge** [8] - 584:5, 594:6, 707:21, 758:18, 776:11, 804:2, 804:4, 804:7
**judgments** [1] - 794:3
**July**[19] - 503:10, 519:1, 519:3, 534:20, 624:22, 624:25, 626:18, 627:6, 628:6, 633:19, 633:20, 633:23, 639:11, 666:8, 666:12, 743:17, 774:24, 775:6
**June**[18] - 519:1, 519:3, 534:20, 602:9, 604:9, 604:13, 604:14, 605:12, 611:9, 612:7, 614:22, 615:18, 624:21, 652:3, 655:15, 665:20, 666:2, 758:4
**juror** [2] - 795:11, 795:14
**jurors** [5] - 559:13, 733:5, 791:3, 793:6, 795:7
**jury** [66] - 503:13, 506:10, 506:22, 506:23, 527:9, 528:10, 545:17, 546:6, 556:13, 559:3, 567:5, 583:12, 583:22, 584:13, 591:2, 591:8, 593:13, 594:3, 594:11, 603:13, 618:17, 620:18, 624:14, 647:22, 675:6, 675:21, 676:4, 676:6, 676:12, 676:22, 694:5, 705:9, 708:11, 713:7, 717:7, 717:24, 718:13, 722:17, 725:3, 725:4, 726:17, 736:25, 756:16, 762:17, 765:18, 766:14, 768:8, 768:23, 772:15, 773:9, 776:2, 777:6, 783:25, 785:7, 785:24, 789:1, 792:24, 793:18, 793:24, 795:15, 795:22, 797:19, 798:5, 798:6, 798:15
**Jury**[6] - 506:12, 592:6, 594:1, 653:11, 655:7, 791:9
**jury's** [1] - 794:7
**Justice**[2] - 747:6, 747:11
**justice** [1] - 802:6
**justify** [1] - 792:22

**K**

**keep** [10] - 531:23, 561:19, 561:23, 562:1, 578:8, 591:16, 640:1, 667:17, 751:20, 756:3
**keeping** [6] - 526:16, 528:9, 528:10, 790:24, 806:20, 807:6
**keeps** [2] - 621:1, 755:25
**kept** [1] - 537:9
**key** [4] - 605:25, 606:1, 668:2
**Khan**[120] - 507:1, 515:11, 516:20, 518:22, 519:12, 519:15, 520:6, 520:20, 520:21, 521:2, 521:6, 534:16, 534:23,

535:14, 541:7, 541:10, 548:20, 549:2, 549:24, 549:25, 551:20, 553:1, 553:4, 553:17, 564:2, 565:15, 566:3, 566:8, 568:16, 569:7, 573:7, 574:25, 575:6, 575:16, 576:23, 577:14, 578:18, 581:23, 583:14, 583:24, 584:14, 586:5, 595:11, 595:21, 595:23, 598:19, 601:11, 603:14, 605:2, 609:4, 618:7, 618:10, 618:22, 622:15, 622:22, 622:25, 623:1, 623:2, 623:3, 623:16, 624:3, 624:10, 630:3, 630:12, 631:8, 639:10, 639:16, 640:18, 641:4, 641:12, 641:16, 642:3, 642:4, 643:15, 643:16, 643:25, 644:13, 644:18, 645:15, 646:6, 646:15, 646:16, 647:14, 647:17, 647:22, 647:23, 648:3, 658:19, 658:23, 659:9, 660:13, 660:21, 667:13, 668:17, 668:18, 668:24, 670:1, 670:14, 670:18, 672:9, 675:11, 676:18, 678:15, 678:20, 678:25, 679:11, 680:15, 715:18, 719:12, 776:20, 776:22, 776:24, 784:10, 785:14, 789:7, 789:10, 802:10, 807:14, 807:16
**khan** [3] - 805:25, 807:4, 807:17
**Khan's** [15] - 522:10, 546:17, 566:8, 583:22, 603:17, 604:5, 644:22, 645:4, 645:18, 645:22, 646:3, 646:9, 647:21, 658:15
**Khan-related** [1] - 807:14
**kidnap** [2] - 644:22, 645:4
**kidnaped** [4] - 544:13, 544:15, 568:11, 568:22
**kidnapped** [5] - 569:2, 607:25, 608:4, 608:5, 631:3
**kidnappers** [2] - 568:18, 631:4
**kidnapping** [9] - 544:3, 545:24, 567:14, 568:1, 568:2, 568:4, 568:10, 659:22, 660:5
**kidnappings** [1] - 645:7
**kids** [2] - 535:13, 647:13
**kill** [5] - 522:10, 535:4, 535:13, 600:13, 622:22
**killed** [18] - 535:18, 549:16, 550:5, 596:9, 598:14, 598:22, 598:23, 599:17, 599:19, 600:4, 600:6, 601:1, 601:8, 644:7, 644:9, 669:18, 670:19, 802:18
**Killed**[1] - 644:10
**killing** [5] - 526:7, 559:21, 600:14, 623:1, 623:3
**kilo** [2] - 640:23, 641:18
**kilogram** [11] - 550:13, 550:15, 550:17, 550:19, 550:20, 551:9, 554:2, 555:8, 555:12, 555:24, 640:2
**kilos** [2] - 640:19, 641:17
**kind** [16] - 548:24, 550:8, 572:10, 630:14, 682:19, 686:14, 688:18, 689:13, 694:18, 695:5, 723:21, 724:9, 737:13, 796:23, 797:6, 801:8
**kinds** [2] - 712:15, 764:19
**Kingdom**[2] - 681:16, 684:15

**knee** [1] - 633:6
**knowing** [3] - 516:7, 601:8, 671:17
**knowledge** [16] - 518:19, 518:20, 545:24, 568:8, 569:6, 569:10, 575:24, 589:1, 589:18, 594:15, 595:21, 641:11, 666:20, 670:10, 712:4, 806:10
**known** [2] - 577:13, 670:11

**L**

**label** [2] - 774:18, 788:18
**labeled** [1] - 771:14
**laboratory** [3] - 706:8, 721:11
**laborer** [1] - 662:9
**lack** [1] - 697:13
**lady** [2] - 633:10, 657:19
**language** [2] - 561:3, 800:21
**lap** [5] - 686:13, 686:14, 686:16, 686:17
**laptop** [34] - 615:24, 630:16, 630:24, 687:13, 688:13, 690:18, 690:24, 693:1, 693:2, 693:3, 693:18, 694:9, 696:13, 697:4, 697:15, 700:1, 700:7, 700:8, 700:9, 700:11, 700:13, 700:15, 700:17, 700:19, 700:21, 706:4, 721:22, 721:25, 722:3, 790:4
**laptops** [6] - 689:9, 689:12, 693:17, 699:14, 721:17, 721:18
**large** [3] - 545:8, 583:12, 586:2
**larger** [4] - 522:21, 696:15, 699:23, 799:17
**Larry**[7] - 613:24, 614:6, 614:7, 614:14, 614:17, 615:15
**last** [34] - 505:5, 508:12, 508:17, 509:15, 529:16, 530:14, 530:18, 533:7, 533:11, 533:13, 533:14, 536:3, 536:5, 536:22, 536:23, 546:10, 567:10, 582:24, 655:25, 673:13, 674:3, 674:4, 674:5, 675:19, 680:6, 685:24, 686:9, 739:7, 760:6, 778:6, 798:24, 799:22, 808:11
**lasted** [1] - 751:6
**late** [3] - 505:5, 505:11, 549:25
**latter** [1] - 716:4
**laundering** [1] - 764:23
**law** [14] - 670:20, 682:6, 683:1, 683:5, 683:14, 684:5, 706:22, 710:19, 766:10, 766:16, 767:7, 767:20, 778:13, 801:4
**Law**[1] - 725:11
**Lawrence**[5] - 503:21, 739:6, 759:24, 762:12, 762:22
**Lawson**[1] - 800:15
**lawyer** [58] - 507:10, 507:13, 507:15, 508:3, 532:7, 532:23, 533:6, 563:18, 585:2, 585:4, 618:4, 618:7, 733:13, 733:16, 733:19, 733:23, 734:10, 734:14, 734:20, 734:21, 735:2, 735:22, 735:25, 737:5, 739:16, 741:10, 743:1, 743:15, 743:22, 745:6, 746:17, 750:15, 752:14, 752:15, 752:17, 752:22, 753:4,

753:8, 753:20, 754:2, 754:7, 757:6, 757:23, 757:24, 757:25, 760:3, 760:20, 762:5, 762:6, 762:24, 793:19, 794:16, 795:20, 796:2, 796:8, 797:23
**lawyer's** [1] - 735:16
**lawyer/client** [1] - 796:16
**lawyers** [14] - 531:14, 531:17, 532:8, 604:2, 672:14, 706:6, 706:7, 734:5, 735:21, 740:1, 743:21, 753:8, 755:13, 794:11
**lay** [1] - 700:6
**layman's** [1] - 687:3
**lead** [1] - 513:2
**leader** [4] - 541:25, 765:17, 765:19, 765:20
**leaders** [1] - 618:23
**leads** [1] - 686:20
**learn** [4] - 734:10, 748:16, 748:18, 758:10
**learned** [5] - 565:15, 583:21, 606:2, 668:4, 734:7
**learning** [1] - 581:20
**least** [13] - 553:18, 556:15, 582:10, 593:8, 640:19, 655:13, 711:18, 714:13, 715:23, 717:10, 739:5, 773:3, 802:9
**leave** [5] - 509:6, 558:1, 586:22, 791:1, 806:19
**leaves** [10] - 593:2, 653:11, 656:16, 657:4, 657:8, 658:8, 722:17, 763:16, 792:2
**leaving** [5] - 504:20, 591:8, 656:2, 767:2, 767:4
**Led** [3] - 692:13, 692:15, 705:25
**led** [4] - 577:7, 603:13, 603:14
**left** [22] - 508:11, 508:22, 509:8, 509:10, 509:19, 524:19, 578:24, 609:7, 653:3, 655:17, 655:25, 692:1, 694:11, 696:4, 699:23, 701:19, 767:9, 769:16, 769:22, 793:8, 803:21
**left-hand** [1] - 696:4
**legal** [5] - 507:22, 740:1, 744:10, 744:12, 792:5
**legislative** [1] - 800:18
**legitimate** [1] - 792:22
**lengthy** [2] - 559:10, 654:4
**Leslie** [2] - 624:4, 715:5
**Leslyn** [7] - 631:20, 632:7, 634:5, 634:21, 664:20, 756:21, 795:10
**Less** [1] - 504:17
**less** [2] - 797:8, 797:13
**lesser** [2] - 514:25, 795:18
**letter** [8] - 610:12, 618:7, 618:10, 719:11, 719:16, 786:3, 786:4, 798:24
**level** [2] - 796:6, 797:22
**liable** [1] - 637:4
**liar** [4] - 572:25, 573:3, 573:8, 797:16
**license** [6] - 514:21, 515:6, 520:9, 520:10, 520:11, 731:2
**lie** [8] - 511:21, 633:10, 633:11, 668:18, 680:15, 680:20, 680:22, 680:23

**lieutenants** [1] - 749:25
**life** [13] - 546:16, 546:22, 556:2, 563:11, 586:2, 645:11, 645:23, 646:11, 668:15, 680:12, 796:13, 796:15, 796:17
**lifestyle** [2] - 586:3
**light** [1] - 713:21
**lights** [1] - 692:17
**likely** [5] - 606:5, 668:6, 780:22, 804:12
**limitation** [1] - 677:3
**limitations** [1] - 514:6
**limited** [4] - 513:14, 513:15, 513:16, 717:4
**limiting** [5] - 713:22, 714:22, 717:15, 724:24, 724:25
**Line** [4] - 597:20, 600:23, 605:22, 680:9
**line** [89] - 513:12, 513:13, 524:4, 524:7, 541:2, 559:8, 560:1, 560:14, 560:24, 561:11, 561:12, 565:17, 565:23, 570:5, 571:20, 574:17, 576:4, 579:4, 580:10, 580:18, 580:20, 580:25, 585:23, 586:10, 586:25, 587:6, 588:10, 589:2, 594:12, 595:25, 597:5, 597:6, 598:9, 598:21, 598:24, 600:5, 600:8, 600:12, 605:25, 607:17, 616:12, 616:13, 617:3, 617:5, 618:17, 618:21, 620:14, 625:2, 625:20, 627:10, 627:15, 629:24, 631:24, 632:5, 633:3, 650:9, 650:14, 651:5, 651:15, 652:3, 652:12, 652:16, 652:23, 655:14, 655:25, 656:11, 656:20, 663:8, 663:13, 663:14, 666:23, 667:23, 668:1, 668:11, 669:3, 680:4, 680:7, 705:21, 737:4, 738:5, 738:15, 756:21, 762:20, 798:11, 801:2
**lines** [10] - 551:3, 567:10, 587:8, 588:13, 605:22, 640:16, 642:13, 657:4, 737:3, 737:7
**lingering** [1] - 805:23
**Lipton** [6] - 503:19, 615:24, 616:1, 621:13, 677:4, 703:7
**list** [48] - 612:10, 612:13, 696:4, 696:20, 727:12, 727:13, 727:16, 727:18, 727:21, 727:23, 728:1, 728:5, 728:9, 730:5, 730:6, 730:7, 744:18, 754:13, 754:16, 754:24, 755:7, 755:12, 755:13, 755:21, 756:17, 757:4, 757:5, 757:6, 757:7, 757:13, 757:17, 757:19, 757:21, 757:22, 758:25, 759:19, 759:20, 761:19, 761:20, 761:21, 763:1, 763:3, 763:4, 792:14, 804:6, 804:12, 804:13
**listen** [6] - 530:24, 573:15, 683:9, 683:12, 684:7, 684:22
**listening** [2] - 571:10, 585:3
**lists** [1] - 754:20
**lit** [1] - 705:25
**literally** [3] - 623:10, 686:16, 738:21
**litigate** [1] - 539:20
**live** [1] - 611:13
**lived** [1] - 622:7

**lives** [1] - 645:24
**living** [7] - 512:2, 551:14, 551:21, 586:2, 681:17, 725:16
**load** [1] - 690:25
**loaded** [1] - 695:21
**locate** [1] - 518:14
**located** [12] - 682:1, 682:2, 726:10, 766:8, 766:16, 769:9, 771:2, 775:2, 781:11, 783:8, 787:10, 790:5
**locating** [3] - 555:7, 705:12, 716:5
**location** [12] - 519:11, 542:1, 658:7, 766:4, 767:19, 768:25, 769:2, 769:5, 769:13, 769:21, 774:19, 778:12
**locations** [1] - 769:12
**lock** [1] - 596:11
**locked** [2] - 657:13, 782:24
**logbook** [4] - 735:18, 735:20, 735:23, 735:25
**logic** [1] - 800:1
**logical** [2] - 698:24, 800:24
**logo** [2] - 695:20, 696:25
**London** [1] - 682:2
**look** [52] - 523:24, 524:2, 524:4, 554:9, 555:3, 562:19, 565:13, 578:5, 580:10, 596:1, 596:2, 597:16, 597:17, 602:12, 616:10, 624:24, 626:4, 627:6, 631:23, 632:23, 640:15, 642:15, 647:23, 650:8, 682:16, 688:5, 689:4, 689:24, 695:15, 696:11, 701:6, 703:9, 703:11, 705:23, 705:24, 707:2, 707:3, 712:2, 715:3, 718:15, 718:17, 721:2, 730:5, 756:14, 759:18, 782:9, 786:19, 788:5, 803:15, 805:8, 806:5, 808:15
**Look** [3] - 570:17, 615:23, 631:23
**looked** [17] - 555:17, 555:21, 555:23, 633:12, 691:23, 695:25, 706:1, 738:21, 743:2, 743:5, 746:6, 773:2, 773:3, 773:19, 800:14, 800:18, 806:23
**looking** [37] - 517:4, 544:25, 545:10, 546:9, 556:21, 559:14, 579:5, 579:10, 579:11, 580:2, 580:4, 580:5, 580:19, 595:17, 613:25, 614:1, 614:10, 614:11, 626:6, 627:11, 646:9, 646:17, 646:25, 647:18, 647:21, 658:3, 682:5, 691:18, 695:4, 696:3, 715:2, 721:24, 723:19, 737:2, 755:19, 762:20, 771:23
**Looking** [1] - 758:23
**looks** [4] - 506:6, 630:15, 693:16, 737:19
**lose** [1] - 803:24
**lost** [1] - 747:22
**loved** [1] - 665:11
**loves** [1] - 679:22
**lower** [1] - 554:14
**Lucky** [4] - 536:4, 536:5, 536:7, 537:22
**Luis** [1] - 804:19
**lump** [1] - 673:1
**lunch** [3] - 653:7, 653:9, 655:21
**Luncheon** [3] - 610:13, 610:14, 654:6
**lying** [1] - 675:16

W. Name - Directcross / Atty.

# M

**ma'am** [1] - 763:9
**machine** [1] - 735:12
**magistrate** [2] - 520:24, 520:25
**magnetic** [1] - 690:3
**Maher** [13] - 763:18, 763:21, 764:2, 764:8, 764:11, 767:16, 768:10, 778:6, 781:10, 781:25, 789:3, 810:4
**mail** [18] - 563:13, 602:15, 603:9, 603:11, 612:23, 614:7, 614:11, 614:20, 614:22, 615:11, 707:12, 707:13, 707:16, 708:1, 713:10, 713:15, 713:16, 714:7
**mailed** [1] - 614:24
**mails** [12] - 603:5, 613:7, 613:19, 708:3, 709:4, 709:8, 714:3, 714:7, 723:21, 724:4, 724:15
**main** [1] - 609:3
**maintain** [2] - 754:19, 806:24
**maintained** [2] - 754:13, 807:24
**maintains** [2] - 702:4, 754:20
**man** [9] - 534:8, 534:9, 534:10, 560:2, 560:4, 561:6, 606:2, 668:4, 750:4
**Man** [7] - 618:3, 618:18, 618:22, 622:7, 622:15, 624:3, 624:8
**man's** [1] - 534:12
**manages** [1] - 765:20
**Mancuso** [1] - 804:20
**Manhattan** [3] - 565:6, 766:7, 775:3
**manifestation** [1] - 797:14
**Manny** [1] - 804:20
**manual** [3] - 696:5, 705:2, 705:5
**manufacture** [1] - 682:4
**manufactured** [3] - 684:13, 684:14, 697:24
**manufacturers** [1] - 682:23
**March** [20] - 563:24, 564:22, 564:24, 565:8, 641:3, 645:19, 646:14, 647:5, 659:7, 732:23, 735:23, 736:11, 741:17, 742:23, 748:2, 749:6, 761:7, 776:21
**Mark** [1] - 712:13
**mark** [5] - 550:25, 611:11, 768:11, 770:22, 778:10
**marked** [30] - 523:25, 611:8, 611:10, 612:25, 635:22, 689:1, 691:8, 694:4, 700:24, 709:3, 713:4, 755:15, 767:12, 768:17, 773:25, 778:15, 778:21, 779:9, 781:10, 781:14, 783:1, 784:12, 785:9, 788:9, 790:2, 811:5, 811:8, 811:11, 811:14
**marketed** [1] - 698:1
**marking** [1] - 778:22
**marks** [1] - 559:12
**Martin** [5] - 560:15, 560:17, 560:20
**Marvin** [2] - 517:15, 639:13
**match** [1] - 559:5
**matching** [3] - 519:18, 519:20, 519:21
**Matching** [1] - 519:22
**material** [4] - 553:25, 800:20, 801:15,

805:25
**materials** [1] - 656:8
**Matter** [1] - 560:24
**matter** [8] - 522:3, 549:6, 641:5, 645:18, 674:5, 678:22, 715:14, 723:11
**matters** [2] - 805:7, 805:20
**Matteson** [1] - 737:25
**Mazzella** [16] - 509:6, 509:10, 509:18, 509:19, 557:2, 625:6, 625:9, 625:12, 629:7, 633:19, 633:22, 633:25, 634:3, 634:4, 804:17, 805:15
**Mb-1** [3] - 707:2, 707:4
**Mcc** [2] - 804:18, 805:2
**meal** [1] - 751:4
**mean** [68] - 529:24, 530:12, 533:24, 539:21, 566:6, 568:15, 568:16, 571:12, 572:12, 576:20, 579:4, 579:8, 580:7, 583:8, 583:25, 585:21, 585:24, 591:12, 594:15, 597:9, 597:12, 597:25, 598:11, 599:8, 599:20, 600:9, 605:17, 606:10, 608:1, 608:12, 617:25, 620:10, 620:11, 626:8, 626:9, 627:5, 628:11, 652:7, 661:21, 664:5, 664:8, 667:17, 668:18, 669:16, 682:11, 689:13, 692:21, 698:25, 703:3, 707:10, 707:23, 726:20, 748:21, 754:19, 762:1, 774:17, 777:4, 789:5, 793:25, 797:3, 797:4, 797:7, 797:13, 798:7, 801:19, 807:1, 808:2
**meaning** [7] - 519:22, 572:7, 577:8, 608:14, 732:9, 774:24, 801:24
**Meaning** [5] - 519:25, 520:2, 599:3, 689:10, 752:25
**means** [5] - 609:8, 609:11, 628:18, 705:11, 765:19
**meant** [4] - 509:23, 573:22, 573:25, 796:13
**meantime** [1] - 611:19
**Meanwhile** [1] - 740:12
**measure** [1] - 702:11
**mechanical** [1] - 503:25
**medical** [1] - 624:6
**Medicare** [1] - 559:22
**Meet** [1] - 671:4
**meet** [19] - 563:8, 564:25, 576:11, 576:12, 576:23, 577:18, 626:15, 627:8, 634:11, 639:10, 664:9, 667:18, 730:15, 730:16, 735:5, 739:13, 740:1, 742:19, 761:4
**meeting** [45] - 565:10, 565:19, 567:17, 569:17, 575:2, 577:11, 577:18, 588:6, 601:13, 602:14, 604:9, 604:13, 624:3, 624:21, 626:13, 626:24, 628:6, 629:12, 631:19, 648:8, 648:15, 648:20, 649:7, 649:9, 649:19, 649:25, 651:13, 651:22, 651:25, 652:3, 652:4, 655:15, 655:22, 655:23, 656:7, 656:15, 656:17, 656:25, 657:9, 659:7, 660:10, 661:25, 666:1, 672:1, 796:20
**meetings** [12] - 575:3, 582:25, 622:20, 623:15, 624:9, 624:13, 649:4, 651:14,

657:11, 657:25, 659:20
**meets** [1] - 755:8
**member** [7] - 517:6, 518:6, 546:17, 624:8, 644:23, 713:16, 759:3
**members** [19] - 631:11, 644:22, 645:5, 645:15, 647:15, 647:17, 647:22, 660:23, 665:13, 669:1, 669:21, 728:13, 741:1, 742:19, 765:18, 768:12, 768:23, 772:22, 776:15
**memo** [4] - 563:13, 710:3, 728:17, 761:21
**men** [3] - 545:13, 545:17, 545:19
**mention** [7] - 508:11, 508:12, 614:17, 646:23, 694:14, 780:5, 780:15
**mentioned** [12] - 568:4, 594:16, 594:17, 596:19, 638:1, 646:21, 671:7, 671:12, 684:25, 697:3, 726:7, 781:16
**mentions** [1] - 618:3
**merely** [12] - 546:22, 571:9, 572:8, 574:2, 574:13, 588:5, 595:12, 595:20, 600:3, 606:12, 606:17, 626:10
**message** [2] - 579:9, 614:5
**messages** [1] - 714:8
**messed** [1] - 562:24
**met** [19] - 518:22, 520:4, 528:11, 529:6, 529:11, 541:6, 556:8, 563:11, 565:2, 565:12, 578:3, 582:12, 582:19, 602:8, 609:2, 615:6, 627:2, 648:9, 671:22
**Miami** [2] - 715:6, 715:7
**middle** [3] - 562:19, 568:1, 806:17
**midst** [1] - 567:12
**might** [42] - 514:11, 517:5, 522:8, 522:23, 523:13, 531:21, 533:2, 533:8, 535:8, 537:11, 537:19, 548:22, 561:25, 586:17, 600:8, 602:11, 604:24, 605:14, 608:13, 608:16, 612:24, 615:3, 616:19, 625:7, 626:5, 626:20, 632:22, 635:1, 640:20, 641:1, 646:19, 650:3, 652:7, 662:4, 667:18, 671:13, 672:20, 689:24, 692:19, 753:15, 780:20, 808:15
**Might** [12] - 595:16, 611:4, 624:23, 626:3, 629:2, 631:22, 646:18, 646:23, 648:23, 650:5, 652:6, 711:4
**mike** [1] - 681:21
**military** [6] - 580:8, 580:20, 609:20, 616:24, 665:13, 665:18
**Millard** [2] - 534:13, 534:14
**mind** [12] - 509:17, 530:18, 572:10, 574:6, 588:3, 718:12, 723:10, 723:12, 723:24, 724:2, 724:4, 724:20, 760:11
**minds** [1] - 790:21
**mine** [2] - 520:13, 535:22
**mini** [1] - 520:14
**minimization** [3] - 802:20, 803:7
**minimum** [1] - 723:25
**Minister** [2] - 624:4, 715:4
**minister** [1] - 597:22
**minutes** [15] - 508:17, 549:7, 577:21, 592:3, 653:15, 653:24, 656:17, 703:11,

723:17, 740:17, 740:18, 751:7, 751:8, 790:15

**misdemeanor** [1] - 514:24
**mislead** [1] - 527:9
**misplaced** [1] - 558:14
**Miss** [5] - 588:7, 595:2, 601:15, 802:8, 804:21
**missing** [2] - 689:6, 689:16
**misspoke** [1] - 605:19
**mistake** [3] - 537:12, 537:13, 640:21
**mistrial** [2] - 676:13, 676:24
**Mm-hm** [1] - 756:23
**mobile** [3] - 696:5, 705:5, 705:10
**model** [1] - 698:13
**module** [5] - 686:22, 692:8, 721:3, 721:12, 722:15
**modules** [9] - 686:21, 686:23, 692:7, 692:9, 720:6, 720:13, 720:16, 721:6, 721:8
**moment** [17] - 509:16, 553:25, 565:20, 585:14, 585:17, 611:16, 619:5, 635:10, 638:22, 663:5, 709:6, 745:2, 757:18, 770:5, 772:6, 776:11, 790:11
**Monday** [10] - 506:6, 506:7, 670:22, 790:16, 790:19, 791:1, 791:5, 804:8, 804:14, 804:15
**money** [35] - 516:11, 561:6, 628:22, 629:4, 629:14, 634:1, 634:6, 634:14, 634:19, 634:20, 634:24, 635:2, 635:8, 637:5, 637:15, 638:4, 673:14, 673:16, 673:19, 673:20, 764:23, 786:10, 786:12, 786:16, 787:8, 787:25, 789:19, 794:13, 794:23, 795:8, 797:21, 799:10, 802:11
**Money** [1] - 786:9
**monies** [1] - 676:10
**month** [17] - 518:25, 529:5, 529:6, 529:11, 530:14, 530:18, 547:14, 602:11, 644:2, 646:14, 647:20, 729:12, 729:13, 745:9, 751:1, 760:6
**months** [2] - 534:17, 564:22
**Moore** [2] - 646:22, 646:25
**morning** [14] - 504:9, 506:7, 506:11, 506:12, 506:19, 506:20, 508:12, 545:5, 546:4, 546:13, 591:17, 653:14, 791:5, 800:14
**Morris** [2] - 503:16, 504:8
**Most** [1] - 698:24
**most** [6] - 572:16, 622:8, 622:14, 780:20, 800:3, 805:16
**mother** [23] - 512:15, 512:17, 513:10, 605:13, 606:4, 606:5, 606:16, 606:21, 606:23, 606:25, 607:14, 608:19, 667:22, 668:5, 668:6, 668:16, 668:21, 673:17, 679:17, 679:22, 680:1, 680:13, 680:18
**motion** [5] - 505:4, 780:18, 780:22, 799:22, 803:24
**motive** [1] - 724:15
**mouth** [1] - 681:21

**Move** [2] - 643:20, 719:3
**move** [9] - 586:10, 596:2, 676:12, 678:2, 688:20, 697:3, 718:14, 769:9, 772:22
**moved** [2] - 770:1, 783:14
**movement** [2] - 551:23, 552:16
**movements** [1] - 552:12
**moves** [2] - 691:2, 736:20
**moving** [1] - 558:15
**murder** [19] - 514:6, 514:7, 547:2, 549:7, 550:4, 551:12, 552:14, 552:22, 553:7, 553:12, 553:19, 553:22, 554:1, 554:3, 554:4, 570:11, 600:21, 601:7, 604:15
**murdered** [4] - 555:8, 570:12, 570:13, 570:15
**murdering** [1] - 802:23
**murders** [2] - 797:2, 797:5
**Myers** [18] - 505:20, 681:5, 681:12, 681:15, 681:20, 689:3, 691:10, 693:16, 693:19, 696:21, 699:10, 707:4, 711:19, 714:5, 714:17, 717:10, 720:3, 720:5
**Myrven** [6] - 516:21, 517:1, 517:2, 517:16, 517:17, 518:5

## N

**N-24** [2] - 786:23, 787:6
**N-25** [1] - 788:8
**N-29** [1] - 790:2
**N-30** [1] - 790:6
**N-40** [9] - 774:15, 774:16, 774:19, 774:20, 774:22, 774:23, 778:22, 779:10, 781:11
**N-42** [1] - 782:6
**naked** [1] - 664:12
**name** [50] - 534:8, 534:12, 534:13, 535:24, 536:1, 536:3, 536:5, 568:4, 611:21, 611:22, 611:25, 612:18, 612:20, 614:17, 615:15, 641:7, 648:12, 657:21, 658:13, 681:10, 681:19, 688:12, 691:10, 725:12, 725:22, 729:1, 731:9, 731:10, 734:21, 735:1, 737:13, 737:22, 737:23, 739:5, 739:7, 742:3, 742:4, 746:17, 749:13, 756:21, 757:1, 759:22, 760:12, 760:19, 761:1, 761:2, 764:6, 764:8, 787:15, 792:14
**named** [4] - 566:21, 566:22, 759:24
**names** [7] - 612:13, 665:11, 738:18, 738:19, 754:16, 767:21, 767:23
**Nancy** [1] - 715:5
**narcotics** [1] - 764:22
**nasty** [1] - 574:1
**nature** [1] - 682:19
**near** [1] - 545:11
**neat** [1] - 550:24
**necessarily** [3] - 724:20, 793:25, 798:7
**necklace** [1] - 789:17
**need** [30] - 513:19, 515:22, 562:18, 574:21, 603:22, 607:1, 608:7, 608:9,

610:12, 611:17, 628:4, 637:7, 639:2, 668:14, 668:15, 680:12, 693:7, 705:14, 710:25, 715:21, 737:11, 780:7, 792:10, 792:23, 794:8, 799:8, 802:11, 805:4
**needed** [6] - 577:25, 609:5, 637:5, 641:16, 648:1, 648:2
**needn't** [1] - 567:5
**needs** [6] - 668:12, 680:9, 680:10
**network** [1] - 682:24
**networks** [1] - 683:7
**neutralize** [1] - 609:6
**neutralized** [1] - 609:5
**never** [57] - 509:4, 513:7, 513:11, 519:20, 520:10, 529:6, 532:16, 539:5, 539:11, 545:22, 546:7, 546:8, 550:15, 550:21, 553:3, 553:4, 553:5, 563:11, 563:12, 563:13, 565:9, 570:4, 575:13, 576:1, 589:20, 619:2, 620:18, 620:19, 622:13, 630:6, 630:8, 631:12, 631:15, 634:13, 642:5, 643:9, 644:8, 648:9, 648:12, 648:13, 660:6, 663:4, 664:14, 664:15, 665:5, 665:11, 679:3, 718:17, 732:4, 758:10, 802:7, 805:23
**Never** [5] - 536:8, 556:4, 614:18, 614:19, 631:8, 641:24
**New** [13] - 503:2, 503:7, 503:24, 561:21, 567:19, 569:20, 748:7, 756:22, 757:2, 757:15, 766:7, 799:24, 801:10
**new** [4] - 570:6, 570:7, 626:1, 633:25
**news** [3] - 625:22, 626:11
**newspaper** [2] - 568:14, 790:22
**newspapers** [1] - 568:13
**Next** [1] - 621:5
**next** [51] - 507:13, 515:11, 536:24, 541:6, 543:2, 548:22, 549:4, 550:6, 559:11, 561:7, 567:8, 569:15, 570:17, 571:24, 576:4, 579:12, 580:20, 586:25, 587:6, 590:3, 596:23, 597:3, 598:8, 598:23, 601:1, 602:8, 617:2, 626:15, 627:2, 627:7, 635:23, 636:1, 638:10, 653:5, 655:18, 674:9, 677:12, 681:4, 686:24, 722:19, 723:4, 731:15, 735:3, 735:9, 738:10, 739:10, 739:23, 746:2, 763:17, 775:17, 789:7
**next-door** [1] - 638:10
**nexus** [1] - 797:8
**nice** [5] - 565:6, 722:11, 763:14, 791:4
**nickname** [1] - 560:8
**Nicole** [3] - 723:5, 725:13
**Nigel** [3] - 535:25, 536:1, 536:7
**night** [14] - 505:5, 508:12, 663:17, 667:9, 674:4, 674:5, 675:19, 711:5, 791:7, 804:2, 806:3, 808:19, 808:20
**nilly** [1] - 796:7
**nine** [5] - 574:17, 577:17, 577:18, 668:11, 680:4
**Ninety** [1] - 553:10
**nobody** [1] - 560:1
**Nobody** [1] - 806:10
**non** [8] - 522:14, 523:11, 523:15,

775:2, 805:25, 807:3, 807:4, 807:17

**non-drug** [4] - 522:14, 523:11, 523:15, 775:2

**non-khan** [1] - 807:17

**non-khan-related** [2] - 805:25, 807:4

**None** [1] - 710:24

**normal** [1] - 630:15

**north** [1] - 682:2

**note** [8] - 603:14, 604:10, 672:9, 672:12, 672:14, 672:17, 785:14

**notebook** [3] - 771:11, 771:12, 774:20

**noted** [1] - 808:21

**notes** [9] - 558:12, 558:14, 558:16, 612:7, 648:19, 749:12, 782:9, 786:19, 788:5

**nothing** [25] - 523:15, 554:6, 560:2, 563:13, 572:1, 572:5, 574:7, 574:17, 586:4, 601:7, 621:9, 659:12, 676:8, 701:18, 702:2, 722:6, 746:10, 758:15, 761:10, 763:10, 777:3, 795:1, 801:25, 802:20, 802:22

**Nothing** [4] - 554:7, 678:8, 681:1, 699:3

**notice** [4] - 559:21, 733:14, 793:13, 793:18

**notion** [2] - 797:4, 797:17

**notwithstanding** [1] - 803:19

**November** [3] - 522:6, 534:21, 713:11

**number** [37] - 505:25, 528:3, 545:16, 556:19, 562:21, 573:24, 596:14, 675:4, 686:21, 695:2, 695:8, 695:10, 696:9, 696:16, 701:20, 701:25, 708:3, 731:6, 737:2, 737:15, 738:11, 738:23, 771:1, 771:3, 771:15, 774:9, 774:11, 774:13, 778:7, 778:12, 778:22, 782:2, 786:18, 788:3, 788:17, 790:2

**Number** [5] - 522:20, 675:5, 771:18, 774:15, 786:25

**numbers** [9] - 631:3, 696:6, 696:7, 696:8, 696:9, 780:6, 780:16, 780:25

**nurses** [1] - 663:17

**O**

**o'clock** [7] - 596:11, 653:10, 654:3, 737:18, 737:20, 766:21

**oath** [1] - 546:6

**obeyed** [1] - 756:11

**object** [13] - 629:13, 665:22, 671:8, 673:23, 674:7, 675:3, 741:12, 741:13, 742:13, 744:9, 775:14, 781:17, 793:17

**objected** [3] - 607:1, 678:25, 679:3

**objecting** [1] - 779:20

**objection** [36] - 584:4, 585:10, 688:22, 688:23, 691:4, 691:5, 693:24, 703:6, 709:5, 711:1, 712:17, 736:21, 756:7, 768:3, 768:4, 777:9, 779:1, 779:16, 779:17, 780:19, 782:18, 782:19, 783:20, 783:21, 785:2, 785:3, 785:19, 785:20, 787:19, 787:20, 787:21,

788:21, 788:22, 796:13, 798:1, 805:14

**Objection** [12] - 521:19, 538:2, 551:10, 554:22, 583:16, 587:19, 589:23, 610:9, 698:10, 708:23, 709:10, 757:10

**objective** [1] - 609:9

**obligation** [2] - 634:24, 637:18

**observe** [5] - 559:14, 643:11, 758:6, 767:1, 767:4

**observed** [5] - 642:5, 642:8, 642:21, 767:23, 786:11

**obstruction** [1] - 802:6

**obtain** [2] - 515:14, 516:8

**obtained** [3] - 520:9, 520:10, 700:8

**obtaining** [1] - 629:4

**obvious** [1] - 801:5

**Obviously** [1] - 804:16

**obviously** [6] - 528:14, 705:6, 794:2, 794:12, 795:5, 804:25

**occasion** [13] - 533:2, 533:20, 607:12, 742:19, 744:4, 773:22, 782:23, 784:19, 786:5, 786:10, 786:11, 788:1, 789:23

**occasionally** [1] - 708:12

**occurred** [9] - 576:18, 577:16, 594:2, 602:14, 741:24, 742:5, 748:1, 748:2, 758:6

**October** [5] - 524:18, 524:20, 547:15, 547:16

**offense** [2] - 520:15, 520:18

**offer** [14] - 628:24, 703:17, 703:24, 704:2, 706:6, 709:3, 717:21, 723:9, 723:12, 756:6, 783:18, 784:25, 794:22, 795:9

**offered** [5] - 712:2, 714:14, 717:23, 721:10, 723:11

**offering** [9] - 709:7, 710:4, 710:16, 711:5, 711:18, 711:20, 711:23, 717:4, 797:20

**offers** [1] - 797:21

**office** [54] - 512:7, 515:18, 565:5, 565:6, 565:7, 565:11, 570:1, 615:8, 628:6, 632:18, 638:10, 638:12, 643:12, 657:13, 664:11, 701:6, 701:8, 707:18, 707:19, 710:19, 712:9, 713:18, 719:18, 719:20, 741:20, 742:20, 743:11, 750:11, 767:20, 770:2, 772:2, 772:3, 772:9, 772:19, 773:2, 773:13, 773:14, 773:19, 773:22, 774:6, 775:2, 776:8, 778:13, 781:13, 782:9, 782:15, 782:24, 789:23, 795:2, 804:18, 808:4, 808:8, 808:9

**officer** [16] - 517:10, 517:18, 518:10, 518:11, 518:12, 664:10, 664:11, 725:17, 726:12, 730:3, 740:8, 740:10, 741:10, 741:12, 746:21

**officers** [4] - 665:18, 666:21, 683:9, 740:7

**offices** [4] - 706:23, 766:10, 766:16, 768:13

**official** [5] - 515:17, 582:20, 610:2, 610:7, 610:15

**officials** [4] - 582:5, 582:13, 583:3, 608:8

**often** [2] - 604:4, 729:11

**old** [1] - 635:15

**once** [12] - 540:4, 573:10, 634:20, 659:3, 701:1, 727:23, 728:23, 735:13, 739:9, 739:23, 755:7, 757:4

**Once** [4] - 541:23, 730:4, 730:23, 731:14

**one** [96] - 508:24, 509:2, 518:3, 524:3, 524:7, 532:13, 533:2, 540:5, 547:3, 549:24, 550:20, 551:3, 555:8, 555:12, 557:10, 558:15, 558:25, 562:20, 563:19, 566:20, 570:13, 583:12, 587:25, 589:2, 593:8, 600:15, 601:2, 603:8, 606:17, 606:19, 606:21, 606:22, 609:11, 611:6, 611:11, 613:19, 618:23, 621:1, 621:5, 622:8, 623:25, 633:20, 635:10, 637:2, 638:1, 641:7, 650:24, 657:25, 658:15, 660:22, 667:21, 672:4, 675:4, 686:9, 686:22, 687:9, 689:11, 690:2, 692:17, 694:22, 694:23, 694:25, 695:1, 695:2, 696:15, 697:12, 698:15, 706:14, 709:8, 709:9, 714:10, 715:13, 719:9, 723:6, 734:10, 734:11, 735:15, 736:14, 751:17, 751:20, 757:18, 761:12, 761:14, 769:5, 769:15, 769:16, 780:14, 780:18, 792:19, 795:7, 799:14, 800:3

**One** [13] - 539:4, 541:15, 570:11, 581:23, 606:2, 620:2, 642:11, 647:4, 657:16, 663:5, 668:3, 799:15, 800:8

**one's** [1] - 777:5

**onerous** [2] - 714:13, 715:23

**ones** [2] - 638:5, 781:16

**online** [1] - 790:23

**onlooker** [1] - 546:10

**open** [11] - 592:1, 593:6, 672:8, 690:25, 710:9, 712:11, 717:10, 718:2, 778:1, 783:11, 786:5

**Open** [1] - 678:1

**opened** [12] - 536:8, 537:6, 549:16, 552:8, 675:3, 675:15, 694:25, 783:9, 783:10, 798:3, 798:13, 806:11

**opening** [3] - 794:6, 798:9, 798:10

**openly** [1] - 724:18

**operate** [3] - 630:24, 647:24, 726:2

**operated** [1] - 715:19

**operates** [2] - 690:20, 690:21

**operating** [2] - 695:24, 805:12

**operational** [1] - 693:5

**operator** [2] - 684:6, 684:8

**opinion** [3] - 616:15, 800:17, 801:2

**opportunity** [9] - 617:8, 627:3, 627:5, 649:20, 720:12, 720:15, 720:18, 721:18, 781:17

**opposed** [1] - 808:8

**opposing** [2] - 594:19, 595:6

**opposite** [1] - 595:11

**option** [1] - 716:1

**options** [3] - 606:18, 606:19, 606:21
**orally** [2] - 505:8, 505:11
**order** [12] - 504:25, 613:7, 640:1, 672:8, 693:12, 705:14, 707:21, 771:23, 771:24, 772:1, 802:12, 805:18
**ordered** [1] - 710:7
**ordinary** [1] - 801:7
**organization** [5] - 645:15, 646:6, 646:16, 662:21, 768:20
**organizations** [1] - 764:21
**orient** [1] - 694:8
**original** [7] - 558:25, 692:9, 721:25, 807:19, 807:22, 807:23, 807:24
**otherwise** [2] - 510:5, 795:21
**ought** [2] - 676:22, 803:18
**ourselves** [1] - 521:21
**outcome** [1] - 803:19
**outside** [6] - 506:23, 547:16, 547:18, 548:17, 548:18, 793:24
**outstanding** [3] - 796:15, 796:21, 799:3
**overruled** [4] - 712:17, 725:1, 742:14, 777:9
**Overruled** [8] - 521:20, 538:4, 583:17, 589:24, 671:9, 698:11, 708:24, 757:12
**owe** [1] - 655:24
**own** [12] - 513:11, 513:13, 516:7, 518:19, 518:20, 588:3, 594:14, 597:21, 662:16, 700:6, 762:21, 794:3
**owned** [3] - 547:6, 746:24, 747:1
**owns** [1] - 725:22

# P

**pace** [1] - 591:17
**package** [1] - 713:19
**pad** [1] - 648:17
**Page** [8] - 616:2, 616:13, 617:2, 650:14, 652:3, 656:20, 663:13, 809:2
**page** [117] - 522:17, 524:1, 524:2, 524:3, 525:14, 536:21, 536:22, 536:24, 543:2, 550:23, 554:9, 554:11, 559:2, 559:8, 560:1, 561:7, 561:8, 562:20, 565:13, 565:18, 567:4, 567:6, 567:8, 567:9, 570:17, 570:18, 571:20, 576:4, 576:5, 578:5, 578:15, 579:4, 579:12, 585:21, 586:7, 586:10, 586:25, 587:6, 588:10, 589:2, 590:3, 591:23, 592:8, 593:18, 594:9, 596:23, 597:3, 598:8, 598:24, 600:12, 600:21, 602:19, 605:16, 607:16, 615:23, 616:2, 616:4, 616:5, 616:10, 617:2, 618:3, 621:15, 625:2, 625:20, 627:10, 627:15, 629:2, 631:23, 632:5, 632:23, 633:3, 635:18, 635:20, 635:21, 635:22, 635:23, 636:1, 640:14, 640:15, 642:12, 650:8, 650:11, 651:5, 651:15, 652:12, 652:15, 652:23, 655:14, 655:25, 656:11, 657:2, 659:1, 664:4, 668:11, 674:9, 677:12, 680:4, 680:7, 686:24, 707:2, 707:3, 713:10,
716:6, 722:19, 731:15, 775:17, 777:12, 791:11
**pages** [4] - 559:5, 577:18, 656:13, 707:3
**pagination** [1] - 559:2
**paid** [5] - 507:24, 512:8, 673:3, 679:2, 795:20
**painfully** [1] - 805:12
**Palm** [1] - 570:12
**Panasonic** [4] - 688:12, 694:19, 696:12, 699:14
**panel** [2] - 689:11, 702:1
**paper** [3] - 784:3, 806:25, 807:10
**papers** [1] - 794:1
**paperwork** [1] - 719:17
**Paragraph** [1] - 627:16
**paragraph** [17] - 525:21, 536:24, 550:23, 550:24, 554:10, 554:11, 555:17, 565:22, 566:11, 570:23, 621:13, 640:15, 642:12, 642:14, 642:15
**paragraphs** [1] - 537:20
**paralegals** [1] - 728:14
**parallel** [1] - 793:14
**paraphrase** [1] - 596:1
**paraphrasing** [1] - 569:20
**Pardon** [5] - 575:10, 596:6, 625:16
**park** [2] - 638:15, 638:16
**parking** [1] - 638:19
**part** [43] - 506:25, 538:6, 544:20, 549:13, 575:15, 575:18, 576:1, 578:24, 583:12, 589:6, 589:10, 589:19, 590:10, 613:4, 614:1, 618:11, 618:15, 619:2, 619:3, 623:11, 624:2, 624:7, 626:6, 643:10, 658:6, 659:10, 660:12, 667:18, 671:16, 673:17, 677:10, 677:11, 689:6, 689:17, 692:5, 694:14, 697:8, 755:1, 786:2, 789:21, 794:6, 794:25
**Part** [4] - 624:2, 624:7, 682:8, 711:9
**partially** [1] - 786:4
**participate** [1] - 546:14
**participated** [7] - 514:14, 546:7, 546:8, 547:2, 569:14, 765:3, 797:2
**participation** [6] - 514:7, 544:2, 554:2, 586:22, 589:17, 804:22
**particular** [30] - 547:11, 649:19, 658:4, 684:2, 685:4, 685:5, 693:12, 698:13, 730:7, 759:13, 765:15, 766:6, 766:8, 766:20, 767:22, 768:20, 770:22, 772:16, 773:10, 774:10, 778:19, 782:2, 783:5, 783:14, 784:19, 786:2, 786:5, 787:3, 789:19, 790:8
**particularly** [4] - 667:6, 674:3, 705:22, 796:17
**parties** [3] - 571:2, 571:3, 676:4
**parts** [9] - 595:18, 605:4, 619:4, 624:15, 649:12, 686:1, 761:15
**pass** [2] - 597:18, 711:5
**passive** [1] - 698:21
**passports** [3] - 516:5, 516:8, 516:16
**password** [2] - 693:3, 697:16
**past** [6] - 514:2, 529:11, 547:21, 606:13, 643:12, 659:23
**patriot** [1] - 570:9
**Paul** [2] - 604:4, 645:8
**pause** [1] - 562:24
**Pause** [23] - 523:4, 524:8, 525:24, 537:1, 565:24, 578:9, 593:14, 617:11, 619:7, 635:12, 638:23, 707:6, 738:3, 745:4, 761:25, 763:19, 771:22, 772:8, 776:12, 779:12, 782:13, 786:22, 788:7
**pavement** [1] - 673:13
**pay** [14] - 561:6, 597:16, 629:13, 634:1, 634:24, 635:2, 635:7, 637:5, 638:2, 638:14, 793:5, 794:24, 795:3, 802:10
**paying** [5] - 507:17, 507:21, 507:23, 644:12, 802:8
**payment** [2] - 672:23, 792:20
**payments** [1] - 676:20
**Pegasus** [2] - 567:17, 569:17
**penalized** [4] - 669:15, 669:17, 678:15, 678:16
**penalty** [3] - 678:19, 679:2, 679:4
**pending** [1] - 797:2
**penetrate** [3] - 519:5, 625:21, 626:8
**penetrated** [1] - 625:1
**penetration** [1] - 586:19
**people** [70] - 516:8, 517:9, 518:15, 518:18, 526:7, 535:16, 546:20, 546:21, 549:11, 549:25, 556:9, 559:14, 559:23, 566:14, 566:20, 567:18, 570:12, 570:13, 571:1, 571:10, 580:24, 581:8, 581:15, 581:21, 583:24, 597:16, 605:25, 606:1, 612:10, 614:16, 625:19, 644:14, 646:3, 646:9, 646:16, 646:21, 649:23, 649:25, 657:13, 657:16, 664:7, 664:9, 667:2, 667:3, 667:7, 668:2, 668:15, 669:14, 674:4, 676:17, 680:13, 698:16, 708:17, 727:22, 728:18, 729:19, 738:25, 743:4, 743:18, 745:13, 746:6, 760:13, 760:15, 760:23, 761:7, 794:10, 797:1
**per** [2] - 640:23, 641:18
**Perera** [2] - 776:14, 776:23
**perfectly** [1] - 794:11
**performed** [2] - 507:1, 747:24
**Perhaps** [1] - 653:18
**perhaps** [5] - 508:3, 516:8, 573:20, 677:1, 801:1
**period** [5] - 517:8, 569:7, 588:6, 631:2, 801:10
**perjure** [1] - 802:14
**Permission** [1] - 753:14
**permission** [5] - 602:15, 753:12, 780:12, 782:11, 786:20
**permit** [2] - 802:5, 802:12
**permits** [1] - 684:6
**permitted** [4] - 727:8, 728:13, 794:16, 798:16
**Persaud** [4] - 553:1, 553:7, 553:22,

566:22
**Persaud's** [1] - 567:1
**person** [22] - 517:5, 518:14, 528:5, 533:5, 537:6, 539:5, 562:5, 652:24, 658:1, 663:19, 663:25, 669:7, 727:23, 728:1, 732:14, 732:18, 742:1, 742:3, 755:7, 760:3, 760:11, 796:8
**personal** [7] - 518:19, 518:20, 569:6, 569:10, 575:24, 606:13, 706:10
**personally** [7] - 568:6, 568:7, 623:18, 662:1, 706:17, 706:18, 707:11
**persons** [1] - 530:2
**perspective** [1] - 646:2
**Persuad** [1] - 570:12
**persuading** [1] - 607:10
**pertains** [2] - 618:12, 755:22
**Perusing** [2] - 588:16, 601:4
**Peter** [3] - 505:20, 681:5, 681:12
**Petersen** [2] - 641:8, 658:23
**petty** [1] - 514:22
**ph** [2] - 688:12, 727:3
**phantom** [4] - 570:8, 570:10, 660:25, 669:1
**Phantom** [1] - 776:16
**phased** [1] - 686:3
**phone** [28] - 548:19, 624:21, 631:3, 682:6, 682:12, 682:15, 682:22, 682:23, 683:9, 684:22, 687:6, 687:9, 687:10, 696:7, 696:8, 696:9, 697:7, 697:12, 705:5, 705:10, 705:13, 742:1, 742:2, 749:12, 749:15, 750:10
**phones** [3] - 673:10, 682:9, 696:6
**phony** [2] - 515:10, 515:25
**photo** [2] - 772:16, 787:11
**photograph** [15] - 695:9, 731:4, 772:25, 773:3, 773:10, 773:18, 783:5, 783:13, 784:3, 784:17, 784:23, 785:13, 786:2, 786:3, 787:12
**photographs** [11] - 693:13, 693:15, 769:22, 769:25, 770:5, 770:6, 770:7, 770:11, 772:20, 772:21
**photos** [3] - 769:12, 770:13, 770:14
**Phrase** [2] - 584:3, 584:6
**physical** [2] - 610:8, 743:8
**physically** [1] - 689:8
**pick** [1] - 689:13
**picked** [2] - 623:24, 723:18
**picking** [2] - 621:11, 689:17
**picture** [1] - 565:5
**piece** [4] - 650:18, 651:16, 784:2, 806:17
**pieces** [1] - 701:16
**pistol** [2] - 519:21, 659:9
**pistols** [2] - 519:18, 519:20
**pitting** [1] - 723:23
**place** [19] - 509:25, 542:7, 544:23, 545:8, 546:3, 563:24, 581:12, 596:10, 622:12, 622:13, 685:20, 723:18, 745:17, 747:14, 749:5, 753:4, 801:6, 803:20, 805:13

**placed** [10] - 521:24, 522:7, 534:4, 541:18, 542:16, 542:18, 723:25, 739:12, 739:24, 767:6
**places** [3] - 621:6, 667:8, 667:18
**plain** [3] - 800:9, 800:10, 801:23
**Plaintiff** [2] - 503:5, 503:15
**plan** [12] - 541:11, 542:24, 622:21, 625:14, 625:17, 634:1, 664:23, 767:16, 767:22, 768:18, 768:20, 768:24
**planned** [1] - 504:22
**plastic** [7] - 786:3, 786:6, 786:8, 787:25, 788:13, 789:8, 789:20
**play** [16] - 544:20, 564:19, 627:19, 627:22, 628:7, 628:14, 628:15, 650:18, 650:24, 651:6, 651:16, 652:12, 652:16, 656:21, 662:1, 804:15
**played** [13] - 556:13, 564:16, 567:4, 582:24, 650:25, 651:8, 651:17, 652:14, 652:17, 655:14, 656:1, 656:22, 657:6
**player** [7] - 541:12, 541:14, 542:12, 542:22, 605:10, 642:22
**playing** [5] - 559:9, 649:20, 664:12, 797:22
**Plaza** [1] - 503:23
**plea** [3] - 628:10, 800:12, 800:25
**pleasant** [2] - 622:12, 622:13
**plot** [1] - 712:9
**Pm** [7] - 546:12, 546:13, 615:7, 722:18, 723:2, 725:4, 808:21
**Pnc** [1] - 624:8
**pocket** [2] - 673:8, 673:11
**point** [46] - 513:24, 514:11, 517:3, 546:18, 569:12, 578:17, 582:18, 582:21, 585:22, 608:22, 620:23, 620:24, 621:8, 633:24, 637:10, 637:12, 637:13, 650:18, 651:1, 651:13, 651:18, 651:22, 652:19, 653:1, 653:3, 655:25, 656:3, 656:24, 657:4, 658:3, 659:6, 664:19, 672:4, 675:12, 679:2, 703:18, 717:9, 717:13, 734:13, 793:3, 794:21, 796:5, 796:14, 799:22, 803:2, 804:12
**pointed** [2] - 598:18, 797:14
**Police** [4] - 517:2, 517:7, 517:19, 518:6
**police** [17] - 517:9, 517:10, 517:12, 517:18, 518:1, 518:2, 518:3, 518:10, 518:11, 518:12, 518:15, 594:23, 596:10, 596:12, 596:20, 596:22, 600:14
**policeman** [1] - 518:7
**policemen** [2] - 596:4, 596:9
**political** [6] - 519:11, 519:13, 571:1, 571:2, 571:3, 574:24
**politics** [1] - 575:6
**Population** [1] - 517:24
**pornographic** [2] - 665:17, 666:20
**pornography** [2] - 664:12, 665:6
**Port** [6] - 524:14, 524:22, 524:23, 524:25, 525:6, 525:9
**Port-au-spain** [5] - 524:14, 524:22, 524:23, 524:25, 525:6, 525:9
**portable** [1] - 541:14

**portion** [12] - 554:15, 618:11, 655:13, 656:1, 659:2, 663:14, 665:9, 665:16, 667:12, 668:9, 773:3
**portions** [1] - 664:16
**portrayed** [1] - 537:6
**pose** [1] - 703:9
**Pose** [2] - 555:22, 628:5
**posed** [1] - 530:25
**poses** [1] - 531:5
**position** [7] - 522:19, 606:2, 615:25, 616:18, 668:3, 724:13, 764:15
**possess** [1] - 572:16
**possession** [3] - 521:1, 614:20, 806:1
**possibility** [1] - 794:7
**possible** [18] - 522:8, 564:5, 577:23, 577:24, 582:23, 611:14, 626:14, 640:11, 640:13, 662:4, 670:2, 685:20, 708:6, 713:6, 721:1, 722:5, 801:20, 802:3
**possibly** [3] - 506:7, 686:6, 758:1
**Post** [5] - 784:20, 784:22, 785:14, 789:3, 789:10
**Post-it** [5] - 784:20, 784:22, 785:14, 789:3, 789:10
**postpone** [2] - 704:4, 798:17
**potential** [2] - 673:21, 754:3, 797:5
**pounds** [2] - 642:22, 642:23
**power** [8] - 643:19, 692:10, 692:11, 692:14, 692:20, 693:1, 705:24, 797:6
**powered** [1] - 693:3
**practicalities** [1] - 793:19
**practice** [3] - 793:19, 797:1, 808:5
**preacher** [2] - 606:3, 668:4
**precisely** [2] - 717:8, 798:22
**preclude** [1] - 802:4
**premises** [7] - 766:4, 766:9, 766:24, 767:1, 767:2, 767:4, 767:9
**preparation** [5] - 530:3, 531:16, 532:17, 564:19, 670:13
**prepare** [1] - 529:9
**prepared** [4] - 505:9, 628:21, 641:12, 777:2
**preparing** [7] - 529:1, 537:12, 564:8, 632:17, 632:20, 633:9, 646:15
**presence** [5] - 506:23, 544:3, 552:10, 594:2, 793:24
**present** [6] - 544:23, 544:25, 545:13, 546:9, 655:7, 803:22
**presented** [1] - 572:18
**presently** [1] - 572:21
**presents** [1] - 699:25
**preserved** [1] - 687:17
**president** [4] - 583:6, 607:19, 607:20, 608:2
**press** [1] - 596:24
**pressing** [1] - 710:17
**presume** [4] - 514:23, 519:16, 520:1, 576:10
**pretend** [1] - 532:22

**pretending** [1] - 533:5
**pretty** [2] - 589:13, 792:16
**previous** [2] - 680:24, 692:2
**previously** [4] - 607:6, 607:9, 629:3, 655:4
**primarily** [2] - 698:9, 712:4
**principal** [1] - 801:18
**principles** [1] - 724:16
**printed** [1] - 615:5
**printer** [1] - 689:14
**printout** [1] - 703:7
**prison** [2] - 644:19, 661:5
**prisoners** [1] - 726:20
**Prisons** [1] - 747:4
**private** [5] - 684:19, 725:20, 725:22, 744:23, 747:1
**Private** [6] - 725:19, 726:8, 726:14, 726:25, 744:24, 744:25
**privately** [1] - 746:24
**privilege** [3] - 508:1, 508:4, 510:1
**problem** [24] - 504:19, 505:3, 539:19, 559:12, 591:7, 620:6, 682:17, 692:20, 703:10, 711:3, 711:9, 714:25, 717:17, 717:18, 719:4, 777:4, 795:11, 795:23, 797:14, 798:5, 805:22, 805:23
**problems** [2] - 537:15, 539:4
**procedural** [1] - 801:6
**procedure** [3] - 752:14, 763:6, 806:15
**Proceed** [1] - 777:10
**proceeding** [1] - 801:10
**Proceedings** [1] - 503:25
**proceedings** [12] - 593:14, 738:3, 745:4, 761:25, 763:19, 771:22, 772:8, 776:12, 779:12, 782:13, 786:22, 788:7
**proceeds** [1] - 550:21
**process** [6] - 620:4, 730:10, 730:11, 730:23, 735:4, 735:10
**processes** [3] - 699:23, 699:25, 700:11
**produce** [2] - 685:3, 716:2
**produced** [2] - 503:25, 690:23
**product** [6] - 683:4, 684:1, 684:2, 684:4, 684:5, 701:25
**production** [3] - 684:2, 684:3, 684:25
**products** [10] - 682:3, 682:19, 683:6, 683:14, 683:16, 702:6, 702:8, 702:9, 702:10, 702:11
**Professor** [3] - 792:10, 793:2, 793:14
**proffer** [3] - 620:13, 620:18
**proffering** [1] - 676:2
**profit** [3] - 550:18, 555:6, 586:2
**Program** [2] - 695:21, 697:1
**program** [4] - 676:11, 690:17, 695:21, 803:15
**prohibits** [1] - 800:11
**prompt** [1] - 513:17
**prompted** [1] - 670:25
**promptly** [1] - 791:2
**proof** [11] - 711:22, 714:2, 714:9,

714:15, 714:16, 721:3, 722:14, 722:15
**proper** [2] - 744:17, 744:18
**properly** [4] - 539:24, 676:22, 797:18, 797:20
**proponent** [1] - 776:9
**proposal** [1] - 718:11
**propose** [1] - 675:17
**proscription** [1] - 801:22
**prosecute** [1] - 511:18
**prosecuted** [4] - 510:2, 510:5, 511:1, 511:21
**prosecutor** [3] - 667:1, 748:6, 748:23
**prosecutors** [17] - 513:18, 529:7, 529:12, 531:1, 557:23, 558:4, 566:13, 573:16, 641:2, 645:18, 658:22, 659:7, 670:1, 751:22, 752:10, 796:7, 797:6
**protection** [2] - 676:10, 676:11
**protest** [1] - 607:24
**protocol** [5] - 682:5, 682:13, 683:17, 700:11, 700:12
**protocols** [6] - 682:6, 682:8, 682:16, 682:17, 682:18, 687:15
**prove** [2] - 570:9, 714:14
**proverbial** [1] - 705:21
**provide** [4] - 715:3, 743:1, 746:6, 795:8
**provided** [7] - 507:16, 507:17, 596:19, 663:23, 683:8, 703:8, 715:17
**providing** [1] - 596:22
**provision** [1] - 637:22
**proximity** [1] - 723:22
**public** [2] - 710:6, 744:23
**publicly** [1] - 670:11
**publish** [1] - 663:11, 694:5, 713:7
**published** [23] - 594:10, 736:5, 736:24, 755:17, 756:15, 762:16, 766:13, 767:14, 768:7, 772:14, 773:8, 774:3, 778:17, 779:7, 783:3, 783:24, 784:14, 785:6, 785:11, 785:23, 787:1, 788:11, 788:25
**pulled** [1] - 807:12
**purchase** [1] - 631:17
**purchased** [1] - 631:13
**purportedly** [2] - 711:19, 799:9
**purpose** [15] - 511:10, 526:7, 547:23, 671:5, 672:10, 701:16, 702:16, 711:5, 711:20, 714:19, 717:4, 717:8, 717:15, 801:1
**purposely** [1] - 801:8
**pushing** [1] - 798:12
**put** [53] - 504:10, 504:14, 523:3, 525:15, 531:11, 534:16, 541:8, 541:12, 542:24, 550:24, 554:20, 553:5, 555:4, 555:17, 556:12, 558:24, 559:11, 570:8, 594:9, 601:23, 607:12, 620:18, 634:20, 668:16, 676:11, 679:21, 680:13, 681:21, 692:11, 700:6, 706:25, 707:5, 710:12, 712:6, 713:19, 723:6, 735:4, 740:3, 740:21, 744:21, 753:11, 753:12, 774:10, 774:13, 774:17, 780:11,

780:16, 793:18, 798:5, 799:5, 799:12, 799:16, 806:1
**Put** [2] - 665:10, 790:21
**puts** [5] - 509:25, 580:6, 598:8, 598:10, 599:8
**Putting** [1] - 634:18
**putting** [6] - 525:8, 643:12, 643:16, 679:1, 679:15, 777:2

### Q

**quarantined** [1] - 790:25
**Queens** [11] - 725:19, 726:7, 726:10, 726:14, 726:25, 727:4, 727:7, 727:10, 732:22, 735:18, 756:22
**questioning** [1] - 591:7
**questions** [56] - 508:5, 508:13, 512:20, 514:1, 527:12, 529:25, 530:3, 530:8, 531:5, 531:21, 532:8, 532:20, 532:23, 533:4, 556:7, 567:23, 573:21, 601:6, 601:15, 601:18, 629:25, 630:1, 632:21, 638:24, 655:21, 659:19, 659:24, 660:9, 660:11, 660:12, 661:10, 661:22, 663:6, 663:8, 667:23, 668:8, 668:25, 669:3, 669:5, 672:1, 672:18, 673:25, 679:7, 679:18, 680:6, 680:25, 697:2, 719:22, 729:24, 734:15, 737:11, 745:18, 746:18, 758:14, 763:8
**quickly** [4] - 622:4, 639:16, 639:18, 713:6
**quit** [1] - 664:15
**Quite** [1] - 545:16
**quite** [4] - 530:13, 577:23, 577:24, 793:13

### R

**R10** [1] - 668:1
**Radio** [2] - 689:14, 690:6
**radio** [11] - 682:4, 682:13, 687:5, 689:18, 699:25, 700:9, 700:10, 700:13, 700:16
**raise** [2] - 714:23, 763:25
**raised** [3] - 605:13, 798:7, 798:24
**raises** [2] - 570:18, 598:21
**raising** [1] - 613:10
**Ramsammy** [4] - 582:7, 582:25, 624:4, 715:5
**rank** [1] - 750:4
**ranking** [1] - 624:8
**rather** [2] - 570:22, 805:17
**rationale** [1] - 800:2
**raw** [1] - 700:10
**Rawlins** [6] - 599:20, 599:23, 600:3, 618:23, 622:21, 666:15
**ray** [1] - 730:12
**rays** [1] - 735:12
**re** [1] - 806:23
**re-looked** [1] - 806:23
**reaction** [4] - 597:24, 633:7, 795:23,

798:12

**read** [45] - 523:2, 523:9, 524:10, 525:23, 526:1, 536:25, 537:20, 554:16, 554:17, 554:19, 565:20, 565:22, 568:13, 569:18, 570:20, 578:12, 601:2, 616:4, 616:5, 617:8, 618:11, 618:13, 618:15, 619:5, 620:25, 621:1, 621:12, 621:16, 622:2, 635:24, 637:2, 637:3, 640:15, 642:13, 643:1, 656:12, 659:3, 665:8, 665:19, 666:7, 707:4, 707:9, 717:18, 739:5, 803:14

**Read** [2] - 524:7, 551:5

**Reading** [1] - 711:25

**reading** [20] - 523:1, 523:7, 537:3, 541:2, 551:7, 568:24, 570:23, 578:7, 578:8, 588:14, 588:17, 589:6, 601:17, 617:14, 642:16, 686:13, 717:7, 717:16, 718:7, 780:25

**Ready** [1] - 655:1

**ready** [6] - 504:5, 506:14, 562:21, 655:2, 758:8, 804:10

**real** [2] - 572:5, 802:12

**realize** [1] - 527:12

**really** [11] - 571:21, 582:18, 589:8, 591:18, 603:22, 625:10, 672:8, 690:5, 691:14, 721:2, 796:8

**reason** [10] - 561:17, 613:6, 622:16, 644:5, 685:3, 717:20, 724:17, 757:23, 770:10, 803:9

**reasons** [4] - 566:13, 566:17, 647:9, 806:21

**rebuttal** [1] - 802:5

**recalled** [2] - 745:6, 792:19

**receive** [15] - 511:22, 531:24, 548:10, 554:1, 555:6, 555:8, 612:23, 615:11, 629:4, 638:5, 638:18, 662:5, 662:25, 687:7, 707:18

**Received** [14] - 688:24, 691:6, 694:2, 736:22, 756:8, 768:5, 779:2, 779:18, 782:20, 783:22, 785:4, 785:21, 787:22, 788:23

**received** [65] - 505:4, 510:22, 513:16, 547:20, 554:6, 555:11, 555:24, 563:18, 602:14, 603:9, 604:10, 610:25, 611:8, 611:10, 613:8, 634:25, 635:8, 635:15, 637:5, 637:9, 638:4, 638:7, 649:14, 666:10, 669:1, 669:21, 673:13, 676:5, 676:21, 689:1, 691:7, 694:4, 706:15, 707:11, 707:13, 707:17, 708:3, 713:4, 713:17, 714:1, 736:23, 756:9, 766:11, 768:2, 768:6, 772:12, 773:6, 778:2, 778:3, 779:3, 779:15, 779:19, 781:16, 781:22, 782:21, 783:23, 785:5, 785:22, 787:23, 788:24, 796:14, 811:5, 811:7, 811:11, 811:13

**receiver** [1] - 686:12

**receivers** [2] - 700:9, 700:10

**receives** [3] - 698:22, 700:15

**receiving** [4] - 625:11, 637:15, 669:6, 675:4

**recent** [1] - 800:3

**Recently** [1] - 746:9

**recently** [2] - 742:19, 746:8

**reception** [6] - 754:20, 768:17, 769:6, 769:8, 769:10, 772:4

**receptionist** [1] - 769:7

**Receptionist** [1] - 769:8

**recess** [2] - 654:6, 722:17

**Recess** [1] - 593:4

**reciprocal** [1] - 703:14

**recognize** [29] - 520:5, 538:6, 539:17, 604:7, 612:2, 687:23, 690:12, 733:17, 743:18, 755:19, 762:21, 767:16, 767:18, 772:16, 772:18, 773:10, 773:12, 778:19, 781:19, 783:5, 783:7, 783:8, 787:3, 787:5, 800:3, 800:4, 801:14

**recognized** [2] - 537:7, 549:11, 549:13

**recollect** [18] - 509:12, 509:13, 509:16, 525:19, 533:3, 533:4, 571:19, 629:9, 629:10, 629:15, 629:16, 635:9, 637:25, 640:8, 641:19, 647:2, 649:18, 652:9

**recollection** [39] - 523:9, 524:12, 524:22, 526:2, 537:5, 537:21, 539:22, 541:3, 551:8, 554:19, 554:25, 555:18, 555:23, 565:10, 602:12, 615:10, 620:15, 620:16, 621:2, 627:7, 629:19, 630:15, 634:9, 637:4, 640:17, 642:19, 643:2, 643:7, 651:12, 651:21, 657:3, 657:8, 659:6, 666:9, 707:9, 707:16, 754:5, 754:10, 782:10

**record** [20] - 504:10, 504:14, 504:15, 554:21, 562:8, 576:16, 591:1, 625:21, 681:11, 684:9, 687:8, 688:3, 699:16, 717:21, 723:7, 739:4, 750:17, 764:7, 776:1

**recorded** [11] - 503:25, 558:5, 558:6, 558:13, 563:22, 630:4, 631:6, 684:10, 687:11, 698:18, 802:24

**recorder** [1] - 562:11

**recording** [7] - 510:14, 557:3, 557:10, 650:18, 651:7, 664:17, 665:19

**recordings** [9] - 556:25, 557:13, 557:21, 557:23, 558:3, 631:10, 687:11, 722:1, 722:5

**records** [4] - 716:3, 804:20, 805:1

**recourse** [1] - 540:4

**recover** [2] - 782:23, 789:24

**recovered** [5] - 777:7, 778:8, 778:13, 790:1, 790:4

**recross** [4] - 653:20, 654:2, 678:9, 678:10

**Recross** [3] - 678:11, 761:17, 810:1

**recruited** [2] - 618:22, 622:16

**recruiting** [1] - 647:22

**redirect** [10] - 531:2, 573:17, 591:14, 653:16, 653:20, 654:2, 654:4, 659:13, 722:7, 758:17

**Redirect** [4] - 659:15, 758:21, 809:9, 809:23

**reeked** [1] - 581:11

**refer** [1] - 660:19

**reference** [7] - 524:3, 600:7, 608:4, 629:22, 680:5, 711:8, 794:12

**referenced** [1] - 679:21

**references** [1] - 776:16

**referred** [27] - 568:2, 594:10, 609:16, 611:2, 611:7, 736:5, 736:24, 755:17, 756:15, 762:16, 766:13, 767:14, 768:7, 772:14, 773:8, 774:3, 778:17, 779:7, 783:3, 783:24, 784:14, 785:6, 785:11, 785:23, 787:1, 788:11, 788:25

**referring** [9] - 505:18, 594:21, 595:1, 667:25, 685:5, 688:3, 689:10, 739:14

**refers** [1] - 705:5

**reflect** [2] - 723:12, 724:6

**reflected** [1] - 736:17

**reflection** [1] - 792:8

**reflects** [2] - 724:4, 724:20

**refresh** [23] - 523:9, 524:12, 526:1, 537:5, 537:21, 551:7, 554:19, 555:18, 555:23, 602:11, 615:10, 627:7, 637:4, 642:19, 643:2, 651:12, 651:21, 657:8, 659:6, 666:9, 707:9, 707:16, 782:9

**refreshed** [2] - 539:22, 541:3

**refreshes** [3] - 524:21, 640:17, 657:3

**refuse** [1] - 508:5

**refused** [3] - 507:8, 508:2, 542:18

**Regan** [8] - 652:24, 658:13, 658:15, 658:19, 658:24, 659:2, 659:8, 659:9

**regard** [5] - 668:9, 708:7, 716:3, 797:22, 803:6

**regarding** [1] - 514:2

**Regarding** [1] - 728:18

**regards** [2] - 591:10, 648:19

**regular** [14] - 518:1, 518:2, 518:3, 518:10, 686:14, 727:12, 750:23, 755:21, 755:25, 756:3, 757:21, 758:25, 759:19, 759:20

**regularly** [1] - 571:10

**regulation** [1] - 752:13

**regulations** [2] - 747:8, 753:3

**rehearsed** [1] - 529:23

**reimbursed** [2] - 638:10, 638:14

**reimbursements** [1] - 673:10

**related** [5] - 523:15, 682:8, 805:25, 807:4, 807:14

**relating** [4] - 610:7, 663:18, 664:4, 793:18

**relation** [5] - 586:4, 647:11, 649:13, 660:21, 662:21

**relationship** [6] - 583:13, 622:15, 667:11, 667:13, 667:19, 756:24

**relatively** [1] - 514:22

**relevance** [5] - 776:7, 776:10, 776:25, 777:5, 777:9

**relevant** [6] - 508:5, 531:3, 714:7, 714:18, 806:18

**relief** [3] - 729:16, 729:18, 740:18

**remain** [1] - 649:18

**remained** [1] - 670:17
**remains** [1] - 794:5
**remember** [112] - 506:22, 506:25, 507:2, 507:4, 507:10, 508:6, 514:3, 522:5, 522:6, 522:13, 522:16, 523:12, 523:13, 523:14, 523:16, 523:17, 523:18, 525:8, 525:10, 525:15, 526:8, 526:9, 526:10, 529:10, 530:13, 531:15, 531:16, 531:18, 531:20, 533:9, 536:15, 536:18, 536:20, 537:10, 537:23, 544:3, 547:11, 547:13, 547:14, 550:10, 550:11, 550:13, 550:17, 550:19, 550:20, 555:11, 555:13, 555:14, 555:15, 556:20, 556:23, 557:12, 561:24, 564:18, 564:21, 565:1, 565:3, 565:5, 565:7, 567:25, 571:17, 582:23, 605:9, 605:11, 611:22, 611:25, 615:21, 625:8, 630:14, 632:1, 632:2, 632:5, 633:18, 633:22, 633:25, 634:2, 634:3, 634:7, 634:8, 634:10, 640:5, 640:20, 642:10, 645:6, 645:25, 646:23, 646:24, 649:6, 653:5, 657:18, 659:10, 659:23, 661:22, 666:3, 678:16, 678:18, 679:1, 679:16, 679:18, 680:3, 686:9, 719:15, 743:4, 743:8, 746:2, 749:5, 749:11, 749:13, 786:18, 788:3, 794:20, 798:9
**Remember** [2] - 544:8, 790:24
**remind** [3] - 521:21, 553:14, 603:19
**remote** [1] - 685:20
**remove** [1] - 516:11
**removed** [7] - 536:8, 537:8, 691:25, 692:4, 720:25, 724:14, 778:11
**repair** [2] - 717:17, 717:18
**repeat** [4] - 567:5, 583:19, 588:6, 745:11
**Repeat** [2] - 733:11, 745:8
**repeatedly** [1] - 573:2
**Rephrase** [1] - 555:2
**replaced** [1] - 685:9
**replay** [1] - 650:23
**reply** [2] - 664:14, 793:25
**report** [21] - 522:14, 523:12, 523:15, 523:16, 537:12, 537:21, 539:13, 539:22, 541:2, 551:15, 551:23, 568:14, 628:7, 741:7, 741:15, 751:13, 751:17, 751:22, 751:24, 752:9
**reported** [4] - 557:15, 632:2, 678:25, 754:5
**Reporter** [1] - 503:23
**reporting** [3] - 528:22, 528:24, 637:8
**reports** [4] - 539:21, 539:23, 540:6, 568:13
**represent** [5] - 732:10, 732:13, 732:17, 743:23, 753:9
**representation** [1] - 792:5
**representative** [2] - 804:18, 804:20
**represented** [1] - 715:18
**reputation** [1] - 566:3
**requesting** [1] - 708:5
**require** [2] - 635:7, 716:2

**required** [3] - 688:13, 693:3, 750:20
**requirement** [1] - 750:15
**requirements** [3] - 747:14, 755:8, 801:7
**requires** [2] - 693:8, 762:25
**research** [4] - 513:12, 513:13, 514:9
**reserves** [2] - 686:12, 686:13
**resolve** [1] - 805:24
**resolved** [1] - 805:24
**respect** [4] - 567:13, 730:25, 801:17
**respectfully** [4] - 536:25, 559:3, 801:23, 803:7
**respond** [4] - 505:7, 505:8, 505:10, 663:21
**responded** [1] - 652:23
**response** [3] - 507:4, 531:12, 671:9
**responsibilities** [1] - 726:18
**responsible** [4] - 545:25, 567:1, 623:25, 740:5
**responsive** [1] - 628:1
**rest** [7] - 506:5, 591:17, 619:1, 619:2, 621:8, 798:17, 804:8
**restaurants** [1] - 667:8
**result** [8] - 512:11, 520:15, 610:21, 645:10, 645:22, 692:12, 803:18
**resume** [4] - 506:14, 592:3, 653:10, 790:19
**resumes** [1] - 593:16
**retained** [1] - 507:15
**retaliation** [2] - 644:23, 647:14
**rethink** [1] - 606:1, 668:3
**retrieve** [3] - 568:17, 697:12, 697:16
**return** [2] - 513:20, 637:19
**returned** [2] - 656:24, 805:3
**returns** [1] - 637:8
**review** [1] - 749:8
**revise** [1] - 808:15
**revisiting** [1] - 678:14
**reward** [7] - 550:8, 550:22, 554:2, 555:6, 555:9, 555:12, 555:25
**Ricardo** [6] - 667:1, 667:3, 667:5, 667:13
**Ricco** [2] - 793:13, 793:15
**rid** [2] - 594:23, 596:24
**ride** [1] - 665:16
**right-hand** [1] - 666:4
**rights** [1] - 507:5
**rise** [5] - 592:4, 653:10, 655:6, 722:13, 791:6
**risk** [3] - 717:14, 717:16, 718:8
**rivals** [1] - 570:11
**road** [1] - 539:19
**robbed** [1] - 596:12
**Robert** [40] - 503:8, 503:19, 515:24, 516:16, 520:4, 520:5, 521:6, 613:24, 624:13, 662:6, 662:20, 668:19, 668:22, 669:7, 670:21, 671:19, 671:22, 671:24, 706:23, 707:12, 738:4, 761:1, 761:2, 762:10, 762:11, 762:19, 766:10,

766:16, 767:5, 767:20, 772:1, 772:9, 772:19, 773:13, 774:6, 774:23, 781:13, 782:8, 782:15, 783:9
**Rockaway** [1] - 612:16
**Rodriguez** [2] - 645:8, 804:19
**Roger** [123] - 507:1, 515:11, 516:20, 518:22, 519:12, 519:15, 520:6, 520:20, 520:21, 521:2, 521:6, 534:5, 534:6, 534:16, 534:23, 535:14, 546:17, 546:25, 547:21, 548:15, 548:20, 549:2, 549:21, 549:23, 549:24, 549:25, 550:20, 552:22, 553:1, 553:4, 553:17, 553:22, 564:2, 565:15, 566:8, 566:12, 567:11, 569:6, 569:13, 573:7, 574:25, 575:16, 576:10, 576:12, 576:23, 577:14, 578:3, 578:18, 578:19, 578:20, 578:21, 581:23, 583:22, 584:14, 586:4, 586:13, 586:16, 588:19, 589:3, 589:7, 589:9, 589:22, 594:15, 594:21, 595:1, 595:21, 595:23, 596:3, 596:19, 597:18, 597:22, 598:18, 598:23, 599:2, 601:11, 603:14, 603:17, 605:2, 607:24, 608:5, 609:4, 610:13, 610:14, 630:12, 631:8, 639:10, 639:16, 641:22, 644:13, 658:15, 660:13, 660:21, 660:22, 662:11, 662:12, 662:15, 662:20, 664:2, 664:7, 667:5, 667:13, 668:12, 668:17, 668:18, 668:24, 670:18, 671:21, 672:9, 676:17, 678:15, 678:20, 678:25, 679:11, 680:9, 680:10, 680:15
**Rogers** [7] - 566:7, 570:7, 576:13, 589:19, 662:1, 663:25, 669:14
**Rogers** [1] - 608:2
**Roi** [1] - 539:6
**role** [6] - 587:10, 624:5, 661:25, 678:5, 765:15, 793:16
**Rolex** [1] - 789:17
**Ronald** [9] - 550:4, 552:12, 554:1, 554:5, 555:7, 600:22, 600:25, 601:6, 666:15
**Rondell** [10] - 615:21, 618:23, 622:21, 663:15, 663:16, 663:22, 663:23, 664:1, 665:4, 666:15
**room** [35] - 509:20, 545:8, 545:9, 649:15, 649:17, 649:22, 649:24, 650:1, 650:2, 650:4, 653:4, 655:17, 657:12, 723:1, 739:12, 739:24, 739:25, 740:1, 740:22, 741:2, 744:21, 758:11, 769:11, 769:12, 769:15, 769:16, 769:17, 772:1, 772:2, 772:4, 777:7, 783:11
**rooms** [4] - 767:21, 769:1, 769:12, 771:24
**Roughly** [1] - 591:15
**rounds** [3] - 519:21, 519:22
**routine** [1] - 797:3
**rubber** [1] - 690:1
**rugged** [1] - 686:16
**Rule** [4] - 793:13, 793:18, 800:11, 801:1
**rule** [5] - 703:21, 723:10, 724:9,

W. Name - Directcross / Atty.

800:22, 801:22
**Rules**[1] - 800:11
**rules** [5] - 704:5, 707:5, 747:8, 747:17, 756:11
**ruling** [3] - 585:11, 585:12, 805:19
**run** [4] - 667:7, 667:10, 747:2, 747:14
**running** [4] - 693:17, 693:19, 694:15, 700:21
**runs** [1] - 690:17

# S

**safe** [1] - 504:14
**Safe** [1] - 791:4
**safety** [1] - 647:12
**said'** [1] - 591:13
**Salano** [21] - 639:2, 639:6, 640:9, 640:14, 642:11, 647:4, 650:8, 650:14, 650:24, 651:5, 651:9, 651:15, 652:2, 652:11, 652:15, 652:18, 653:8, 653:15, 655:10, 656:11, 809:8
**sale** [1] - 550:19
**sales** [1] - 719:20
**Salvador** [1] - 715:5
**Sandra** [1] - 564:10
**Sanmougan** [1] - 553:11
**Sanmougan** [1] - 560:8
**satisfactorily** [1] - 747:24
**Saturday** [1] - 674:3
**save** [3] - 546:16, 546:22, 700:2
**saves** [1] - 700:18
**saw** [20] - 539:11, 548:20, 552:6, 552:8, 565:5, 569:23, 603:5, 630:10, 630:11, 630:13, 643:8, 643:9, 643:10, 643:16, 650:19, 733:16, 733:19, 734:1, 740:20, 743:18
**scan** [2] - 730:12, 735:12
**schedule** [2] - 791:2
**scheduling** [1] - 504:18
**Schoner** [1] - 757:15
**school** [1] - 544:14
**scintilla** [1] - 675:8
**screen** [26] - 522:22, 554:14, 556:21, 558:24, 559:11, 562:18, 563:5, 594:8, 594:9, 596:24, 603:3, 611:5, 617:25, 618:1, 618:2, 635:21, 650:10, 650:12, 694:14, 695:23, 706:25, 714:10, 762:13, 768:11, 780:11, 780:16
**screens** [1] - 693:18
**screws** [3] - 690:1, 692:3, 720:25
**sealed** [1] - 808:13
**sealing** [3] - 802:19, 803:12, 806:15
**seals** [10] - 692:2, 692:8, 720:21, 720:23, 721:2, 721:3, 721:4, 722:14, 722:15, 806:11
**Sean** [3] - 544:17, 544:18, 631:2, 776:14, 776:23
**search** [26] - 764:24, 765:2, 765:10, 765:13, 765:16, 765:20, 766:15, 767:19, 768:13, 768:21, 768:25, 769:4,

769:13, 769:14, 769:16, 769:23, 769:24, 770:8, 770:14, 770:15, 771:8, 783:10, 783:12, 783:16, 801:8
**searched** [2] - 769:21, 771:24
**seat** [5] - 506:13, 723:25, 725:11, 740:3, 764:6
**seated** [5] - 504:4, 594:4, 655:8, 725:6, 730:12
**second** [13] - 526:18, 554:10, 554:11, 633:20, 639:2, 642:11, 647:4, 652:11, 669:12, 671:25, 716:6, 762:20, 771:20
**Second** [2] - 723:13, 800:15
**seconds** [1] - 549:6
**secretary** [2] - 657:17, 657:20
**secretive** [1] - 717:12
**section** [1] - 618:18
**secure** [1] - 718:3
**secured** [1] - 512:6
**seduce** [2] - 665:18, 666:21
**see** [109] - 505:3, 509:9, 509:16, 520:15, 520:22, 522:24, 523:6, 524:4, 537:25, 538:7, 547:24, 548:5, 548:7, 548:14, 548:17, 550:24, 552:5, 554:13, 557:16, 562:20, 564:1, 566:15, 566:23, 567:21, 569:22, 570:19, 571:9, 571:21, 572:2, 577:25, 587:8, 588:13, 589:2, 589:4, 591:6, 595:4, 597:10, 599:12, 599:24, 600:10, 600:13, 600:23, 605:22, 606:8, 610:3, 610:18, 611:11, 611:23, 612:18, 612:19, 613:11, 613:24, 614:9, 614:25, 615:4, 616:4, 616:5, 622:4, 625:3, 626:22, 627:16, 627:18, 628:11, 629:23, 630:24, 631:1, 632:8, 632:9, 644:6, 650:15, 654:3, 666:4, 666:24, 667:5, 682:17, 692:17, 695:9, 701:9, 705:21, 706:8, 722:5, 727:11, 730:5, 730:8, 732:9, 733:22, 734:22, 737:2, 737:16, 738:2, 738:12, 754:23, 756:19, 757:25, 759:21, 759:24, 763:1, 769:1, 779:11, 781:25, 782:2, 788:13, 793:15, 794:4, 795:16, 798:19, 798:20, 799:14
**See**[6] - 586:10, 607:23, 608:10, 614:3, 743:21, 791:5
**seeing** [5] - 574:15, 613:4, 643:12, 659:11, 733:18
**seeking** [6] - 566:21, 585:18, 588:21, 609:20, 610:21
**seeks** [1] - 585:4
**seem** [4] - 720:24, 721:4, 722:15, 751:10
**seize** [2] - 772:22, 773:22
**seized** [18] - 765:21, 770:4, 770:9, 770:12, 770:19, 770:21, 771:2, 774:5, 774:19, 774:21, 774:22, 774:23, 776:8, 780:8, 781:11, 782:8, 782:10, 782:14
**seizes** [1] - 765:21
**selected** [1] - 791:3
**self** [1] - 710:15
**self-serving** [1] - 710:15

**sell** [10] - 550:21, 569:20, 640:2, 640:18, 640:22, 682:3, 684:23, 688:13, 715:9, 715:10
**selling** [1] - 686:7
**Selwyn** [3] - 712:10, 776:15, 795:8
**Senate**[1] - 800:19
**send** [5] - 567:19, 698:22, 713:15, 728:17, 761:21
**sending** [1] - 567:11
**sense** [8] - 528:11, 583:14, 633:4, 633:7, 795:20, 800:5
**sent** [15] - 603:8, 613:8, 613:20, 613:21, 698:14, 700:11, 700:17, 713:11, 713:18, 714:3, 714:5, 714:7, 714:8, 719:11, 719:16
**sentence** [7] - 536:23, 620:17, 621:2, 621:3, 621:5, 623:13, 637:2
**sentences** [3] - 523:1, 523:6, 536:23
**sentencing** [1] - 808:14
**separate** [9] - 594:15, 597:21, 675:17, 676:19, 714:3, 721:6, 728:8, 735:20, 735:22
**Separate**[1] - 701:13
**separately** [2] - 700:18, 780:8
**September** [18] - 522:13, 523:11, 528:15, 623:24, 640:10, 643:23, 672:25, 765:6, 765:16, 765:23, 766:20, 771:25, 773:16, 774:5, 778:8, 781:12, 784:20, 788:14
**sequential** [1] - 781:3
**Series**[4] - 695:20, 696:12, 696:25, 701:25
**series** [5] - 691:14, 720:6, 769:25, 773:25, 779:21
**serious** [6] - 514:24, 572:16, 572:18, 594:24, 647:6, 678:22
**served** [1] - 799:21
**server** [6] - 807:2, 807:11, 807:13, 807:16, 807:21, 807:22
**service** [4] - 609:20, 698:3, 698:4, 715:11
**serving** [1] - 710:15
**set** [10] - 521:24, 522:7, 522:9, 523:21, 525:18, 526:7, 527:4, 534:4, 534:16, 541:8, 565:18, 605:7, 648:14
**setup** [2] - 684:8, 689:7
**seven** [4] - 567:6, 659:1, 769:18, 770:16
**seventeen** [1] - 638:19
**seventy** [1] - 684:18
**seventy-five** [1] - 684:18
**several** [4] - 573:19, 635:6, 679:7, 707:3, 713:6, 761:15
**Shack** [2] - 689:14, 690:6
**shade** [1] - 724:15
**Shaheed** [4] - 715:18, 776:20, 776:21, 776:24
**shaking** [1] - 676:18
**shall** [1] - 625:18
**shareholders** [1] - 747:2

**Shargel** [220] - 503:18, 505:3, 505:8, 505:12, 505:21, 505:23, 506:15, 506:16, 506:18, 522:21, 522:25, 527:6, 527:8, 527:14, 530:22, 531:4, 531:10, 538:5, 539:8, 539:11, 539:16, 539:25, 540:8, 541:1, 544:1, 551:2, 551:4, 554:15, 555:21, 556:19, 559:7, 559:12, 559:15, 559:21, 559:25, 563:7, 570:22, 580:1, 584:2, 585:12, 585:16, 586:8, 588:9, 591:5, 591:16, 593:8, 593:10, 594:5, 594:6, 594:7, 597:1, 603:2, 605:19, 605:21, 607:8, 611:12, 611:16, 611:18, 613:2, 613:6, 613:10, 616:2, 616:3, 617:24, 618:1, 619:6, 620:11, 620:24, 621:15, 621:18, 621:20, 622:1, 624:20, 627:13, 635:10, 635:14, 637:1, 638:22, 638:25, 639:10, 642:1, 654:1, 659:19, 661:18, 665:22, 667:20, 671:8, 673:23, 674:7, 675:3, 676:7, 677:1, 677:9, 677:11, 678:10, 678:12, 680:4, 680:9, 680:25, 685:23, 688:1, 688:22, 691:4, 693:25, 695:8, 695:12, 699:6, 699:7, 699:9, 703:4, 703:12, 703:16, 703:20, 704:1, 704:6, 705:1, 709:9, 710:5, 711:7, 711:13, 711:15, 711:23, 712:15, 713:5, 713:9, 713:21, 713:24, 714:25, 715:1, 717:5, 717:17, 717:20, 717:23, 718:6, 718:12, 718:15, 719:3, 719:4, 719:8, 719:10, 719:22, 719:24, 723:6, 723:24, 724:8, 724:11, 724:23, 725:2, 736:21, 741:12, 742:13, 744:9, 746:12, 746:14, 746:17, 756:6, 756:10, 758:13, 758:19, 758:20, 759:16, 761:12, 761:15, 761:18, 761:23, 762:14, 762:19, 763:8, 768:3, 775:14, 776:5, 777:1, 779:1, 779:17, 779:20, 780:10, 780:17, 780:24, 781:18, 781:19, 782:19, 783:20, 785:2, 785:19, 787:20, 788:21, 793:9, 793:22, 794:19, 795:17, 796:5, 796:12, 797:25, 798:19, 798:23, 799:2, 799:5, 799:14, 799:19, 802:2, 803:2, 803:11, 803:14, 803:20, 804:1, 804:14, 805:11, 805:22, 806:13, 807:2, 807:20, 807:25, 808:5, 808:10, 808:17, 808:19, 809:6, 809:15, 809:22, 810:2

**Shargel's** [1] - 805:6
**sharing** [1] - 794:17
**Sharing** [1] - 668:8
**sheet** [2] - 736:10, 736:11
**shield** [1] - 802:13
**ship** [1] - 569:20
**shipment** [2] - 567:19, 623:24
**shipping** [2] - 521:2, 521:7
**shoot** [1] - 520:2
**shooting** [2] - 661:7, 661:8
**Shop** [2] - 715:6, 715:7
**short** [7] - 504:21, 549:6, 678:13, 690:1, 745:21, 758:1, 760:3
**shorter** [2] - 576:7, 743:16

**shortly** [1] - 656:6
**Shortman** [1] - 622:22
**shot** [3] - 551:25, 552:19, 599:9
**show** [43] - 522:17, 523:25, 524:3, 525:20, 605:15, 611:13, 611:20, 612:25, 615:3, 635:18, 687:22, 690:9, 690:11, 693:11, 694:17, 695:14, 700:24, 701:11, 709:2, 709:11, 710:16, 711:24, 727:10, 730:3, 731:1, 736:3, 755:15, 766:11, 767:12, 772:12, 773:6, 773:25, 774:1, 778:15, 779:5, 781:14, 783:1, 783:13, 784:12, 785:9, 786:24, 788:9, 798:22
**showed** [1] - 618:9
**Showing** [1] - 696:18
**shown** [10] - 620:19, 656:1, 659:1, 687:23, 701:11, 705:18, 772:16, 773:3, 784:17, 789:11
**shows** [7] - 702:8, 710:5, 730:20, 762:24, 776:13, 776:17, 786:4
**Side** [14] - 527:1, 527:15, 539:1, 540:9, 591:1, 620:1, 621:22, 703:1, 704:7, 710:1, 712:18, 717:1, 718:19, 776:1
**side** [11] - 574:5, 587:25, 606:5, 613:14, 621:16, 668:6, 696:4, 709:11, 713:22, 792:3, 795:12
**Side-bar** [2] - 591:1, 776:1
**sidebar** [2] - 674:8, 675:1
**Sidebar** [4] - 590:2, 591:22, 775:16, 777:11
**sides** [4] - 575:6, 595:11, 676:16, 792:3
**sign** [13] - 635:5, 735:25, 736:10, 736:11, 736:14, 737:4, 737:15, 739:10, 755:9, 784:11, 785:15, 789:7, 789:11
**sign-in** [2] - 736:10, 736:11
**signals** [4] - 682:14, 687:5, 687:7, 687:8
**signature** [3] - 604:5, 738:12, 738:15
**signed** [3] - 635:6, 740:21, 760:12
**significance** [2] - 691:13, 695:19
**significant** [2] - 522:14, 523:11
**significantly** [1] - 504:17
**signing** [2] - 735:13, 735:17
**signs** [1] - 738:13
**Simels** [208] - 503:8, 503:19, 504:1, 515:20, 515:24, 516:16, 520:4, 520:5, 521:6, 528:15, 530:2, 541:7, 542:20, 542:21, 542:24, 546:25, 552:22, 553:22, 556:8, 556:10, 557:15, 560:5, 560:11, 563:8, 564:24, 565:10, 565:14, 566:25, 567:7, 567:9, 567:14, 568:15, 568:22, 569:11, 569:15, 570:18, 571:8, 571:25, 572:15, 573:24, 574:21, 574:23, 575:8, 575:21, 575:23, 576:7, 579:5, 580:11, 580:18, 581:14, 581:17, 582:12, 582:16, 582:19, 583:5, 584:1, 584:9, 584:11, 584:16, 585:6, 585:18, 585:22, 586:11, 586:15, 586:25, 588:7, 588:10, 588:18, 589:2, 594:17, 595:10,

595:12, 595:14, 596:15, 596:18, 597:7, 597:20, 598:8, 598:21, 599:2, 599:8, 599:19, 600:1, 600:12, 600:21, 602:8, 602:16, 604:11, 604:14, 604:20, 606:12, 607:1, 607:9, 607:16, 609:2, 609:10, 609:19, 609:23, 610:11, 610:20, 611:2, 611:11, 612:11, 613:24, 614:5, 614:15, 615:6, 615:17, 616:6, 616:11, 617:16, 618:9, 620:19, 621:8, 624:13, 624:22, 624:25, 625:25, 626:10, 626:13, 626:19, 626:25, 627:2, 627:8, 627:21, 628:10, 628:17, 628:19, 629:5, 629:13, 630:11, 632:5, 632:12, 632:17, 633:9, 633:19, 634:1, 634:4, 634:10, 634:13, 648:8, 648:11, 649:1, 649:14, 650:1, 657:17, 659:20, 660:4, 660:16, 660:20, 661:1, 661:20, 661:23, 662:6, 662:20, 663:3, 663:6, 663:18, 664:3, 664:4, 664:19, 666:14, 666:24, 667:11, 668:12, 668:19, 668:22, 669:7, 670:21, 671:4, 671:19, 671:22, 671:24, 672:2, 672:17, 679:8, 679:11, 680:17, 680:23, 706:23, 707:12, 708:1, 708:4, 710:5, 711:19, 714:11, 723:12, 723:21, 724:3, 738:4, 755:16, 761:1, 761:2, 766:10, 766:16, 767:5, 777:3, 777:7, 792:20, 796:21, 797:19, 797:20, 802:6, 802:12, 803:21, 808:5
**Simels'** [19] - 615:7, 628:6, 657:13, 759:21, 767:20, 772:2, 772:9, 772:19, 773:13, 773:22, 774:6, 774:23, 778:12, 781:13, 782:9, 782:15, 782:24, 783:9, 789:23
**similar** [2] - 778:10, 779:9
**Similar** [1] - 551:17
**simple** [1] - 607:23
**simpler** [1] - 586:3
**Simplest** [1] - 686:21
**simplistic** [1] - 607:23
**simply** [4] - 614:14, 716:1, 718:12, 799:22
**single** [2] - 712:7, 796:19
**Sis** [1] - 804:18
**sister** [1] - 673:17
**sit** [9] - 510:21, 533:9, 577:20, 583:5, 621:12, 625:23, 649:16, 743:9, 769:9
**sit-down** [1] - 577:20
**sits** [1] - 692:24
**sitting** [9] - 567:16, 569:16, 653:5, 655:17, 733:15, 769:8, 790:19, 795:14, 808:7
**situation** [12] - 551:19, 553:24, 569:1, 582:17, 583:9, 710:16, 753:7, 753:20, 753:22, 754:2, 796:1, 800:10
**Six** [2] - 506:3, 766:2
**six** [15] - 529:20, 559:8, 560:1, 565:13, 565:18, 596:11, 600:23, 642:12, 642:23, 686:10, 686:23, 690:1, 766:23, 767:9
**size** [2] - 517:22, 545:11

**W. Name - Directcross / Atty.**

**skimmed** [1] - 618:14
**skunkt** [1] - 560:25
**slash** [1] - 665:17
**slid** [1] - 613:6
**Slide** [1] - 613:5
**slide** [2] - 613:7, 614:21
**slow** [1] - 717:20
**Sm** [4] - 695:21, 696:25, 701:25, 720:6
**small** [7] - 545:8, 545:9, 667:6, 689:25, 694:22, 694:23, 781:17
**smallness** [1] - 781:19
**Smith** [5] - 691:10, 693:16, 693:19, 696:21, 717:10
**Smith/myers** [5] - 681:20, 681:24, 682:1, 683:25, 684:1
**sneaky** [1] - 712:9
**snippet** [4] - 799:9, 799:16, 799:17
**social** [9] - 727:12, 729:23, 730:1, 735:21, 735:22, 744:14, 752:20, 752:21, 758:25
**software** [8] - 630:17, 630:20, 690:25, 693:16, 693:19, 694:15, 695:24, 696:21
**Solano** [34] - 503:20, 593:9, 593:10, 593:12, 639:1, 642:2, 643:2, 655:9, 655:12, 656:23, 657:2, 657:7, 659:1, 659:12, 668:25, 676:14, 681:1, 688:23, 691:5, 694:1, 698:10, 719:23, 719:25, 720:2, 722:6, 758:15, 758:16, 768:4, 783:21, 785:3, 785:20, 787:21, 788:22, 809:17
**Solano's** [2] - 671:10, 676:7
**Sold** [1] - 708:25
**sold** [7] - 684:11, 698:5, 702:7, 702:10, 708:18, 708:20, 710:11
**someone** [23] - 507:24, 512:24, 515:4, 515:16, 515:17, 518:9, 520:2, 532:18, 532:22, 533:21, 568:20, 577:25, 588:4, 600:14, 610:8, 684:21, 699:2, 741:20, 749:14, 751:3, 797:9, 802:17
**Someone** [1] - 505:13
**Sometime** [6] - 529:5, 542:11, 551:25, 557:18, 644:1, 656:10
**sometime** [3] - 519:1, 519:3, 639:10
**Sometimes** [1] - 529:20
**sometimes** [5] - 530:10, 576:13, 596:13, 686:16, 754:16
**somewhat** [1] - 504:18
**somewhere** [1] - 803:15
**son** [3] - 668:17, 680:14, 680:20
**soon** [1] - 656:6
**sorry** [15] - 581:25, 583:25, 623:1, 623:8, 623:16, 629:9, 633:20, 702:18, 707:15, 713:21, 719:9, 720:22, 789:6, 806:6
**Sorry** [12] - 508:22, 571:18, 576:22, 623:13, 627:1, 637:11, 642:17, 689:23, 700:5, 710:20, 714:24, 719:2
**sort** [5] - 576:8, 584:17, 632:12, 683:4, 744:19
**sorts** [2] - 683:14, 744:16

**sounds** [1] - 711:20
**source** [2] - 597:13, 705:12
**sources** [3] - 581:23, 597:15, 597:20
**space** [2] - 808:10, 808:11
**spain** [6] - 524:14, 524:22, 524:23, 524:25, 525:6, 525:9
**span** [1] - 673:5
**Spaniard** [1] - 642:21
**Spanish** [1] - 534:1
**Spanish-speaking** [1] - 534:1
**speaking** [13] - 528:15, 534:1, 569:7, 611:1, 640:10, 641:2, 645:17, 684:17, 737:5, 739:17, 748:22, 750:11, 789:19
**speaks** [1] - 632:8
**special** [3] - 630:17, 630:20, 764:16, 764:17, 764:25
**specific** [7] - 522:3, 528:5, 575:15, 659:21, 660:9, 696:5, 731:6
**Specifically** [3] - 589:3, 589:6, 661:1
**specifically** [13] - 515:25, 523:10, 539:6, 584:25, 591:9, 604:10, 645:14, 658:24, 659:8, 667:25, 672:19, 726:7, 805:7
**specifics** [1] - 584:10
**specter** [1] - 795:6
**spectre** [1] - 675:18
**spell** [3] - 681:10, 725:12, 764:7
**spelled** [1] - 793:20
**spend** [2] - 529:19, 703:20
**spoken** [2] - 582:5, 792:9
**spot** [1] - 554:13
**spouse** [2] - 756:24, 757:2
**spouses** [2] - 757:8, 759:7
**spread** [1] - 638:7
**Spy** [2] - 715:6, 715:7
**Squad** [1] - 776:16
**squad** [2] - 660:25, 669:1
**St** [3] - 560:15, 560:17, 560:20
**staff** [3] - 728:14, 741:1, 759:3
**stand** [18] - 505:18, 508:11, 509:18, 593:2, 593:16, 668:16, 670:6, 679:15, 680:14, 688:1, 763:16, 763:22, 782:14, 792:2, 796:20, 802:7, 802:22, 804:17
**standard** [4] - 686:17, 687:8, 690:5, 700:22
**standing** [2] - 507:13, 548:18
**start** [12] - 514:17, 529:4, 536:22, 548:22, 559:8, 600:25, 621:11, 656:7, 672:23, 672:24, 745:23, 791:1
**Start** [1] - 780:25
**started** [24] - 506:21, 521:9, 534:20, 545:4, 570:9, 570:18, 575:1, 577:11, 578:20, 578:21, 591:10, 639:20, 640:10, 643:22, 644:2, 644:5, 645:11, 645:17, 648:19, 660:15, 670:1, 686:3, 729:21, 772:22
**starting** [4] - 617:5, 631:23, 686:5, 769:15
**starts** [6] - 562:19, 565:23, 595:25, 613:6, 613:23, 659:2

**State** [6] - 567:12, 567:17, 569:8, 569:18, 681:10, 764:6
**state** [9] - 507:18, 507:19, 723:10, 723:12, 723:24, 724:2, 724:4, 724:20, 727:5
**statement** [14] - 540:4, 540:5, 565:16, 571:13, 664:20, 666:10, 714:11, 714:15, 723:21, 723:22, 747:24, 798:10, 800:12, 802:22
**statements** [11] - 510:2, 711:16, 711:19, 711:22, 712:10, 713:25, 723:15, 723:20, 724:1, 749:8, 794:7
**States** [47] - 503:2, 503:4, 503:6, 503:13, 503:15, 503:17, 504:1, 507:6, 510:22, 511:3, 511:17, 512:2, 512:11, 512:12, 521:3, 521:4, 521:7, 524:16, 524:17, 524:20, 525:17, 526:5, 526:6, 526:12, 526:15, 536:10, 536:14, 557:5, 568:17, 607:24, 608:6, 623:25, 638:10, 638:12, 641:4, 644:23, 661:11, 685:14, 685:19, 693:6, 701:1, 741:20, 742:20, 743:11, 748:6, 764:22, 800:15
**states** [1] - 701:3
**station** [2] - 517:19, 596:10
**stationed** [2] - 519:12, 733:3
**statute** [2] - 514:5, 801:13
**stay** [2] - 512:10, 740:16
**stenography** [1] - 503:25
**step** [6] - 593:1, 653:12, 761:23, 769:3, 792:1, 808:1
**steps** [5] - 504:13, 649:23, 716:2, 716:4, 718:1
**Steve** [1] - 504:8
**Steven** [1] - 503:16
**stick** [1] - 724:23
**sticker** [12] - 775:5, 779:11, 784:9, 784:10, 784:16, 784:20, 784:22, 787:10, 787:13, 787:15, 789:3, 789:10
**stickers** [2] - 775:9, 775:11
**still** [19] - 509:20, 510:25, 578:7, 586:12, 604:14, 626:24, 633:2, 642:16, 684:2, 684:25, 685:7, 685:18, 792:3, 793:12, 794:2, 794:16, 799:2, 805:25, 806:3
**stipulate** [2] - 793:1, 795:4
**stipulation** [2] - 793:10, 794:5, 794:25, 798:20
**stolen** [2] - 723:18, 723:19
**stop** [7] - 623:8, 628:3, 652:18, 656:23, 669:11, 671:25, 729:2
**Stop** [4] - 628:3, 651:9, 652:15, 657:7
**stopped** [2] - 573:21, 686:7
**storage** [1] - 697:7
**store** [5] - 697:4, 697:10, 697:11, 697:18, 697:19
**stored** [4] - 687:11, 687:17, 722:1, 770:23
**stories** [3] - 616:6, 617:17, 664:6, 664:9
**story** [15] - 536:17, 561:10, 561:15,

561:23, 562:4, 577:22, 603:13, 615:20, 616:10, 616:11, 616:16, 617:2, 663:22, 664:3, 664:10

**straight** [2] - 539:13, 539:21
**strategy** [1] - 624:9
**stretch** [1] - 667:2
**stricken** [1] - 804:5
**strict** [2] - 801:7, 801:24
**strike** [7] - 661:24, 780:18, 780:23, 792:14, 792:17, 797:10, 804:11
**strikes** [2] - 711:17, 779:21
**string** [1] - 714:7
**stuck** [2] - 784:9, 789:11
**stuff** [4] - 528:24, 623:13, 675:16, 711:1
**subject** [19] - 546:11, 570:18, 598:21, 605:13, 607:13, 626:1, 627:18, 643:21, 688:21, 691:3, 693:22, 713:11, 719:8, 747:21, 780:18, 781:17, 792:4, 794:4, 806:7
**submit** [1] - 803:7
**submitted** [1] - 776:6
**subpoena** [11] - 706:15, 706:22, 707:14, 707:17, 707:18, 707:22, 708:2, 708:4, 710:8, 710:12, 713:19
**subsection** [1] - 522:22
**subsequent** [5] - 537:18, 575:3, 577:10, 657:25, 713:15
**substance** [5] - 548:13, 672:5, 679:23, 723:15, 741:7
**subtractions** [1] - 728:2
**successful** [1] - 518:15
**suffered** [1] - 678:19
**suggest** [7] - 508:20, 621:9, 675:8, 676:9, 724:17, 780:17, 801:23
**suggested** [3] - 531:20, 667:20, 800:19
**suggesting** [3] - 531:17, 540:3, 545:11
**suggestion** [2] - 672:21, 678:4
**suing** [1] - 799:10
**sum** [3] - 673:1, 673:24, 673:25
**summation** [1] - 577:17
**Summer** [1] - 519:2
**Sundays** [1] - 730:2
**supervisor** [2] - 732:15, 741:15
**supervisors** [2] - 748:14, 749:24
**supplied** [1] - 793:17
**supply** [4] - 692:14, 692:20, 751:22, 752:1
**support** [1] - 796:7
**supported** [1] - 684:3
**supporting** [1] - 575:16
**suppose** [1] - 690:8
**supposed** [13] - 522:9, 541:12, 541:21, 570:5, 635:2, 635:3, 635:4, 662:8, 662:12, 662:14, 662:25, 663:1, 757:7
**suppressed** [2] - 802:19, 805:4
**suppression** [1] - 805:19

**Supreme** [1] - 799:24
**Suriname** [2] - 639:14, 661:5
**surprised** [2] - 552:18, 552:19
**surprising** [1] - 676:18
**surrounding** [2] - 623:6, 623:18
**surveillance** [1] - 578:17
**suspected** [1] - 648:5
**Sustained** [5] - 551:11, 587:20, 665:24, 673:24, 741:14
**Sv-1** [2] - 522:17, 640:9
**Sv-10** [3] - 524:1, 536:21, 642:12
**Sv-2** [1] - 554:9
**Sv-21** [1] - 659:1
**Sv-22** [1] - 550:23
**swallows** [1] - 724:9
**swear** [2] - 725:7, 763:24
**switch** [2] - 556:6, 615:24
**Sworn** [1] - 681:6
**sworn** [5] - 505:15, 655:5, 681:8, 725:9, 764:4
**system** [30] - 611:21, 683:23, 684:11, 684:13, 684:16, 684:19, 684:23, 685:4, 685:5, 686:11, 687:4, 688:14, 688:16, 688:17, 689:6, 690:20, 690:21, 690:25, 691:15, 693:7, 693:8, 697:5, 697:8, 697:21, 697:24, 698:8, 698:14, 698:21, 698:23
**systems** [1] - 685:6

## T

**T-10** [3] - 666:23, 668:1, 680:7
**T-13** [1] - 663:10
**T-iii** [1] - 805:4
**Tl0** [1] - 602:12
**Tl8** [3] - 627:12, 627:13, 627:15
**table** [1] - 769:8
**Taliban** [2] - 665:14, 666:18
**talks** [1] - 620:7
**tall** [1] - 565:6
**taller** [1] - 743:15
**tamper** [1] - 647:23, 721:3, 722:14, 722:15
**tape** [7] - 562:18, 564:16, 564:20, 573:21, 576:17, 794:24, 802:24
**Tape** [7] - 650:25, 651:8, 651:17, 652:14, 652:17, 656:22, 657:6
**tape-recorded** [1] - 802:24
**taped** [1] - 605:6
**tapes** [1] - 792:19
**target** [1] - 696:20
**targets** [1] - 696:5
**tarnish** [1] - 584:17
**Tarnish** [1] - 584:20
**task** [3] - 711:17, 714:12, 715:23
**tavern** [1] - 658:4
**tax** [3] - 637:8, 637:18, 637:19
**taxes** [5] - 634:24, 635:2, 635:7, 637:5, 638:2
**team** [4] - 765:17, 765:19, 765:20,

768:13

**tech** [2] - 563:5, 563:6
**technical** [3] - 802:19, 803:8, 803:10
**technician** [1] - 624:6
**technology** [3] - 685:8, 685:10, 686:4
**telephone** [20] - 528:4, 539:16, 547:20, 548:7, 549:2, 557:7, 563:16, 564:25, 606:14, 626:19, 697:4, 698:12, 698:14, 698:16, 715:2, 748:10, 748:22, 748:25, 749:2, 754:6
**Telephone** [1] - 696:7
**telephonically** [1] - 539:7
**television** [2] - 521:24, 605:7
**temporal** [1] - 723:22
**temporally** [1] - 724:14
**ten** [7] - 560:14, 576:4, 576:5, 577:21, 592:3, 635:23, 642:22, 663:13, 686:5, 737:20, 792:20, 794:21, 794:22, 795:9
**term** [2] - 561:1, 689:22
**terms** [8] - 587:2, 596:21, 601:18, 687:3, 700:6, 770:2, 794:5, 796:20
**terrible** [1] - 665:11
**test** [1] - 702:11
**testified** [33] - 535:20, 539:5, 573:24, 611:7, 618:17, 622:5, 623:20, 639:9, 639:25, 641:20, 644:5, 644:16, 645:21, 649:3, 649:11, 655:5, 655:13, 656:2, 658:12, 658:18, 664:19, 669:25, 670:7, 670:13, 670:17, 670:22, 673:3, 673:9, 681:9, 711:12, 712:10, 748:1, 764:4
**testifies** [2] - 505:16, 725:10
**testify** [29] - 607:11, 620:7, 620:9, 622:15, 622:17, 622:20, 622:25, 623:2, 623:4, 623:6, 623:12, 623:15, 623:16, 623:18, 623:23, 624:3, 624:9, 628:18, 641:12, 646:15, 663:1, 667:17, 668:13, 668:14, 680:10, 680:11, 749:9, 793:2, 793:15
**testifying** [6] - 647:12, 648:3, 670:13, 672:21, 673:22, 680:1
**testimony** [50] - 506:21, 508:13, 508:17, 511:11, 514:13, 516:2, 518:13, 521:16, 521:22, 525:3, 529:21, 529:23, 530:5, 530:7, 532:17, 535:2, 535:8, 535:10, 537:24, 545:4, 546:6, 548:3, 561:22, 573:19, 573:20, 577:22, 584:19, 584:20, 587:21, 589:21, 606:17, 607:10, 620:15, 622:11, 626:4, 628:19, 628:22, 641:23, 646:1, 646:2, 648:2, 678:2, 678:6, 679:1, 679:9, 680:22, 680:23, 776:6, 776:15, 776:22
**text** [1] - 700:14
**themselves** [3] - 517:9, 699:16, 699:18
**theory** [3] - 570:6, 570:7, 675:10
**thinking** [3] - 610:8, 653:13, 793:7
**thinks** [1] - 803:19
**third** [1] - 554:10
**thirteenth** [1] - 795:14
**Thirty** [4] - 740:17, 740:18, 751:7, 751:8

**thirty** [6] - 641:17, 641:18, 652:3, 652:12, 656:20, 657:2

**thirty-three** [1] - 641:18

**thirty-two** [5] - 641:17, 652:3, 652:12, 656:20, 657:2

**thousand** [9] - 565:11, 634:18, 641:17, 649:14, 684:18, 792:20, 794:22, 795:10

**threat** [2] - 572:18, 646:11

**threatened** [5] - 646:2, 673:18, 673:20, 674:3, 675:18

**threats** [13] - 504:12, 645:11, 645:14, 645:23, 647:5, 668:25, 669:6, 669:21, 675:4, 675:22, 676:5, 678:3, 678:5

**Three** [1] - 729:13

**three** [21] - 512:17, 513:10, 533:3, 533:4, 551:3, 552:2, 559:2, 561:8, 567:10, 600:9, 640:16, 641:18, 670:6, 697:1, 729:12, 741:25, 742:6, 745:24, 746:4, 746:7

**threw** [1] - 656:20

**throughout** [2] - 711:22, 726:3

**throwing** [2] - 668:13, 680:11

**tick** [2] - 571:15, 597:24

**tickets** [1] - 513:23

**timber** [2] - 658:15, 662:17

**timing** [3] - 527:13, 620:3, 669:5

**tip** [1] - 632:12

**tipping** [1] - 644:13

**tired** [1] - 644:8

**Title** [2] - 801:4, 802:16

**titles** [1] - 767:21

**today** [13] - 505:19, 511:19, 624:14, 649:16, 686:15, 688:6, 689:3, 692:24, 693:6, 736:1, 743:9, 743:18, 808:16

**together** [7] - 643:13, 643:16, 713:19, 739:1, 739:2, 770:17, 775:6

**token** [2] - 796:6, 796:7

**toll** [1] - 578:24

**tomorrow** [1] - 790:20

**tone** [1] - 677:2

**tonight** [1] - 504:20

**took** [21] - 506:25, 527:4, 536:11, 537:7, 542:4, 542:5, 558:5, 563:24, 564:11, 599:9, 613:11, 613:17, 624:3, 695:15, 705:23, 705:24, 739:9, 769:12, 775:1, 775:4

**Took** [1] - 775:3

**top** [21] - 567:8, 567:9, 611:21, 612:18, 614:5, 614:25, 615:2, 686:13, 686:14, 686:16, 686:17, 689:19, 692:2, 696:25, 774:23, 781:13, 782:14, 784:9, 784:10, 787:12

**topic** [8] - 537:18, 539:14, 556:6, 589:22, 628:25, 679:22, 706:14, 759:21

**torture** [6] - 544:3, 545:20, 545:22, 546:7, 546:15, 546:25

**tortured** [2] - 545:2, 644:10

**total** [1] - 740:18

**totally** [1] - 698:21

**touch** [4] - 554:14, 618:2, 715:4,

793:22

**touched** [1] - 773:4

**tough** [1] - 535:1

**Tough** [1] - 688:12

**Tour** [1] - 750:8

**tour** [13] - 741:6, 741:9, 744:2, 750:2, 750:7, 750:24, 751:17, 752:7, 752:17, 753:2, 753:3, 753:5, 753:16

**toward** [1] - 751:11

**tower** [4] - 682:12, 682:14, 687:6

**town** [1] - 517:15, 517:18

**trace** [2] - 552:12, 552:16

**track** [1] - 631:3

**tracking** [3] - 705:6, 705:10, 705:12

**Tracking** [1] - 705:11

**trade** [1] - 688:12

**traditional** [1] - 724:2

**trafficked** [1] - 556:2

**trafficking** [1] - 764:21

**train** [1] - 708:17

**trained** [1] - 715:20

**trainer** [1] - 708:12

**transaction** [3] - 661:9, 715:13, 716:3

**Transcript** [1] - 503:12

**transcript** [12] - 503:25, 565:13, 649:21, 651:6, 656:2, 656:12, 660:20, 663:14, 664:16, 665:20, 667:12, 668:9

**translation** [2] - 559:1, 562:23

**transmission** [2] - 687:9, 687:10

**transmitted** [1] - 687:18

**transpired** [2] - 509:5, 588:6

**transport** [1] - 673:17

**travel** [1] - 564:8

**traveled** [1] - 582:2

**traveling** [1] - 673:10

**treat** [3] - 572:16, 663:16, 666:15

**treated** [1] - 665:13

**treats** [1] - 677:5

**Trial** [1] - 503:12

**trial** [15] - 504:1, 529:2, 529:9, 566:7, 566:8, 570:6, 662:1, 670:1, 675:9, 675:18, 676:6, 676:20, 678:4, 806:16, 806:17

**triangulation** [6] - 711:9, 711:12, 712:2, 712:6, 715:17, 724:18

**trickery** [1] - 515:4

**tried** [3] - 532:20, 705:21, 805:24

**tries** [1] - 792:22

**Trinidad** [6] - 524:14, 524:24, 524:25, 525:2, 525:6, 525:9

**trip** [1] - 722:11

**trouble** [1] - 626:24

**True** [1] - 597:23

**true** [62] - 523:22, 523:23, 570:2, 571:6, 571:8, 571:16, 575:14, 575:15, 576:21, 577:1, 578:6, 589:10, 595:15, 595:18, 597:24, 597:25, 598:11, 598:13, 598:25, 599:14, 616:10, 616:16, 616:21, 616:25, 617:22,

618:21, 619:1, 619:2, 620:4, 620:9, 620:16, 620:17, 620:20, 621:7, 621:9, 623:7, 623:10, 623:21, 624:1, 624:2, 624:6, 624:7, 624:10, 624:11, 624:15, 632:6, 632:9, 632:13, 634:15, 638:9, 664:8, 664:13, 664:24, 665:5, 793:7, 794:15

**truly** [1] - 596:3

**trust** [2] - 604:3, 639:18

**trustworthiness** [1] - 724:21

**truth** [19] - 546:23, 571:9, 571:12, 576:25, 577:5, 577:9, 577:16, 578:6, 578:12, 587:3, 595:16, 595:17, 663:7, 711:4, 711:18, 711:24, 712:2, 714:4, 723:11

**truthful** [7] - 586:15, 587:11, 587:13, 588:22, 640:11, 640:13, 641:10

**truthfully** [5] - 532:2, 588:25, 589:8, 622:18, 802:18

**truthfulness** [1] - 802:21

**try** [4] - 539:24, 634:1, 779:23, 794:3

**Trying** [1] - 700:6

**trying** [30] - 559:23, 572:8, 573:11, 574:8, 574:10, 578:16, 582:16, 582:22, 583:5, 584:17, 600:1, 601:2, 610:23, 617:6, 617:16, 620:24, 620:25, 625:18, 626:10, 640:13, 663:22, 664:7, 676:7, 710:9, 710:14, 711:17, 714:12, 715:23, 718:3

**Tuesday** [3] - 670:7, 670:24, 670:25

**turn** [6] - 557:13, 558:18, 559:7, 611:14, 618:3, 652:2, 658:19, 744:4

**turned** [6] - 518:13, 613:17, 744:12, 744:14, 752:9, 752:20

**turns** [1] - 793:5

**Tv** [15] - 522:7, 522:9, 523:21, 525:18, 526:7, 527:4, 533:21, 534:4, 534:16, 536:8, 536:12, 537:7, 537:9, 541:8

**twenty** [1] - 574:17

**Twenty** [1] - 786:15

**Twenty-five** [1] - 786:15

**twenty-nine** [1] - 574:17

**twice** [4] - 539:9, 603:25, 757:5, 758:3

**twist** [1] - 584:18

**Two** [6] - 533:4, 539:4, 552:2, 616:1, 641:7, 741:25

**two** [50] - 514:1, 519:18, 519:20, 519:21, 522:20, 523:1, 523:6, 533:3, 533:13, 533:14, 536:23, 537:8, 539:11, 547:3, 550:23, 559:2, 559:8, 560:1, 565:11, 571:3, 582:24, 584:15, 594:19, 595:6, 595:11, 603:5, 640:14, 640:15, 641:17, 652:3, 652:12, 656:20, 657:2, 665:3, 675:5, 678:4, 694:20, 737:7, 738:25, 742:6, 745:24, 746:4, 757:8, 759:7, 766:21, 776:15, 800:8, 803:3

**type** [14] - 682:21, 682:22, 684:4, 685:10, 687:16, 687:17, 688:13, 688:14, 688:16, 696:13, 698:3, 698:4, 698:5, 758:24

W. Name - Directcross / Atty.

**types** [5] - 682:3, 682:16, 685:6, 687:15, 687:16

## U

**Uk** [3] - 682:2, 706:8, 719:13
**ultimate** [2] - 668:19, 680:16
**ultimately** [3] - 600:7, 617:3, 707:21
**unable** [1] - 626:15
**under** [15] - 507:5, 540:1, 631:14, 633:8, 690:3, 723:9, 723:13, 723:25, 753:2, 767:6, 783:8, 786:18, 788:3, 796:2, 806:3
**Under** [2] - 727:12, 747:4
**undercover** [2] - 528:18, 528:22
**underestimates** [1] - 797:6
**underhanded** [1] - 574:10
**underlined** [2] - 522:23, 603:24
**underlying** [1] - 645:18
**undermines** [1] - 717:10
**undermining** [1] - 717:4
**underneath** [1] - 784:10
**Understood** [5] - 531:7, 602:6, 683:13, 691:1, 693:10
**understood** [10] - 509:23, 568:15, 572:18, 576:20, 580:3, 583:8, 587:12, 588:21, 608:19, 643:14
**unfair** [2] - 798:15, 803:19
**unfairly** [1] - 798:12
**unfamiliar** [1] - 612:21
**unidentified** [1] - 546:15
**uniform** [1] - 518:10
**unit** [2] - 720:12, 721:21
**United** [49] - 503:2, 503:4, 503:6, 503:13, 503:15, 503:17, 504:1, 507:6, 510:22, 511:3, 511:17, 512:2, 512:10, 512:12, 521:3, 521:7, 524:16, 524:17, 524:20, 525:17, 526:5, 526:6, 526:12, 526:15, 536:10, 536:14, 557:5, 568:17, 607:24, 608:6, 623:24, 638:10, 638:12, 641:4, 644:23, 661:11, 681:16, 684:15, 685:14, 685:19, 693:6, 701:1, 741:20, 742:20, 743:11, 748:6, 764:22, 800:15
**unknown** [1] - 599:9
**unless** [4] - 637:19, 779:21, 798:8, 806:2
**Unless** [1] - 806:2
**Unlike** [1] - 648:11
**unlike** [1] - 762:1
**unlikely** [1] - 584:14
**Unlikely** [2] - 693:7, 780:24
**unsealed** [1] - 775:3
**unseemly** [1] - 806:5
**untrue** [1] - 619:3
**unusual** [1] - 796:24
**up** [68] - 522:10, 522:23, 523:2, 525:22, 526:18, 535:16, 536:23, 552:17, 560:2, 560:4, 561:15, 561:17, 561:19, 561:22, 562:4, 562:24, 570:6, 573:16, 594:19, 595:6, 601:7, 611:8,

611:13, 611:20, 616:19, 619:8, 622:7, 623:24, 632:6, 633:25, 635:21, 661:20, 667:21, 671:4, 671:12, 671:16, 672:8, 672:11, 673:24, 673:25, 674:4, 674:8, 675:14, 675:15, 679:22, 684:21, 689:13, 689:17, 692:10, 693:1, 693:3, 695:24, 706:16, 716:7, 723:18, 724:9, 727:10, 730:3, 730:20, 738:15, 753:24, 762:24, 763:23, 775:15, 792:7, 795:2, 797:1, 806:7
**Up** [1] - 727:22
**upper** [2] - 666:4, 786:2
**upset** [2] - 751:10, 751:11
**upstate** [1] - 614:8
**urged** [1] - 800:22
**usability** [1] - 706:3
**Usb** [4] - 686:20, 689:8, 689:13, 700:22
**useful** [2] - 531:3, 698:9
**user** [2] - 705:2, 705:5
**uses** [1] - 721:21
**utilized** [4] - 685:14, 685:16, 685:18, 686:1

## V

**value** [1] - 800:20
**values** [2] - 606:3, 668:5
**various** [3] - 571:2, 667:8, 701:16
**Vaugh** [1] - 659:3
**Vaughn** [25] - 506:19, 510:8, 530:24, 572:4, 573:19, 588:20, 594:8, 605:12, 607:3, 608:21, 609:10, 639:7, 639:9, 639:13, 642:15, 650:12, 652:19, 653:12, 659:17, 680:17, 776:15, 795:8, 795:15, 795:24, 799:10
**vault** [7] - 775:2, 778:11, 806:10, 808:3, 808:12, 808:13, 808:15
**vehicles** [1] - 596:13
**vein** [2] - 799:7, 799:8
**verifies** [1] - 765:20
**version** [5] - 576:13, 576:17, 576:21, 697:1
**versus** [2] - 685:12, 729:23
**via** [1] - 708:1
**vicinity** [1] - 552:3
**Vicious** [1] - 546:20
**vicious** [1] - 546:21
**videos** [2] - 665:17, 666:20
**view** [6] - 537:11, 537:13, 575:5, 701:1, 701:4, 773:14
**viewed** [1] - 701:9
**village** [1] - 622:14
**villages** [2] - 542:2, 622:8
**violation** [3] - 802:20, 803:13
**violence** [3] - 586:23, 589:18, 589:19
**violent** [3] - 507:1, 535:1, 581:12
**visa** [8] - 512:4, 512:6, 512:11, 512:14, 512:21, 512:24, 513:12
**Visa** [1] - 673:21
**visit** [14] - 564:2, 601:11, 727:19,

727:24, 728:6, 728:25, 729:16, 730:4, 730:23, 731:10, 734:16, 734:17, 739:13, 752:15
**visiting** [5] - 729:5, 737:14, 740:6, 741:2, 744:21
**visitor** [24] - 728:1, 728:8, 728:20, 729:21, 730:1, 730:15, 730:16, 736:11, 737:22, 738:13, 739:5, 740:22, 744:5, 744:10, 754:20, 754:23, 754:24, 755:2, 755:4, 755:9, 755:12, 756:17, 757:19, 758:1
**visitor's** [1] - 730:21
**visitors** [18] - 727:8, 727:13, 729:8, 729:23, 735:20, 735:21, 735:22, 736:10, 744:14, 752:20, 752:21, 754:14, 755:21, 757:21, 757:22, 758:25, 759:19, 759:20
**visits** [3] - 606:14, 727:12
**Voice** [1] - 522:20
**voluntariness** [1] - 802:21
**volunteer** [3] - 531:5, 602:5, 624:18
**volunteers** [1] - 518:2
**voucher** [5] - 784:19, 786:16, 788:1, 788:3, 790:8
**vouchered** [2] - 786:18, 788:4
**vulgar** [1] - 560:25

## W

**Wacc** [1] - 727:2
**Wackenhut** [1] - 727:3
**Waddell** [13] - 550:4, 551:12, 552:13, 552:23, 554:1, 554:5, 555:7, 600:22, 600:25, 601:7, 604:15, 604:19, 666:15
**Waddelle** [1] - 579:1
**Wait** [3] - 677:9, 703:20, 736:7
**Waite** [7] - 723:5, 725:13, 725:16, 725:18, 726:12
**waiting** [3] - 547:16, 547:18, 784:7
**walk** [3] - 567:18, 569:19, 649:9, 649:21, 729:3, 735:7
**walked** [7] - 648:15, 648:17, 649:12, 651:13, 769:6, 773:20, 783:11
**walled** [1] - 805:18
**walled-off** [1] - 805:18
**walls** [1] - 805:13
**wants** [9] - 606:22, 675:16, 728:2, 728:6, 753:8, 753:20, 754:2, 792:4
**Wants** [1] - 620:25
**warden** [15] - 732:6, 732:7, 749:19, 750:10, 753:11, 753:12, 753:18, 753:19, 753:22, 753:24, 754:6, 761:20, 761:21, 762:3, 762:25
**Warden** [2] - 728:17, 751:9
**warden's** [1] - 750:8
**warrant** [12] - 765:10, 765:13, 765:16, 766:1, 766:3, 766:15, 766:17, 767:19, 767:24, 768:21, 768:24, 769:1, 769:13, 769:14, 770:2, 770:8, 770:11
**warranted** [1] - 562:1

**warrants** [3] - 764:24, 765:2, 801:8

**watch** [1] - 789:17

**water** [1] - 577:19

**waves** [6] - 689:18, 699:25, 700:10, 700:13, 700:16

**ways** [3] - 609:8, 609:11, 628:17

**wearing** [4] - 548:24, 549:2, 576:17, 604:23

**website** [3] - 702:4, 702:6, 703:8

**Wednesday** [1] - 614:7

**week** [5] - 533:7, 533:11, 533:13, 745:10, 790:19

**weekend** [3] - 791:4, 793:11, 799:6

**weeks** [4] - 533:13, 533:14, 746:4

**Weinstein** [1] - 506:6

**Welcome** [1] - 506:13

**well-familiar** [2] - 799:20, 799:21

**West** [2] - 538:1, 539:17

**whatsoever** [1] - 678:5

**Whereas** [1] - 794:14

**whim** [1] - 535:4

**white** [7] - 743:16, 786:3, 787:25, 788:13, 789:3, 789:8, 789:20

**whole** [8] - 570:6, 596:10, 653:19, 698:8, 729:16, 769:21, 801:4, 806:15

**wife** [11] - 512:17, 513:10, 624:6, 645:5, 647:13, 663:15, 665:4, 665:11, 665:12, 666:15, 796:10

**Wikstrom** [2] - 807:14, 807:20

**willing** [8] - 627:19, 627:22, 628:7, 628:10, 628:13, 628:15, 715:25

**willy** [1] - 796:7

**willy-nilly** [1] - 796:7

**winding** [1] - 585:16

**window** [1] - 781:17

**Windows** [1] - 700:21

**wink** [1] - 576:18

**Winter** [1] - 800:17

**wire** [1] - 711:11

**wires** [1] - 537:7, 537:8, 643:13

**wiretap** [8] - 683:10, 683:11, 711:8, 712:5, 724:19, 764:23, 801:4, 801:6

**Wiretapping** [1] - 505:24

**wish** [2] - 616:5, 716:4

**wishes** [1] - 780:20

**withdraw** [1] - 586:8

**withdrawn** [4] - 548:3, 617:5, 706:21, 720:22

**Withdrawn** [3] - 586:8, 588:9, 741:8

**witness** [68] - 504:11, 504:19, 505:13, 505:15, 505:17, 510:13, 522:24, 524:3, 532:12, 532:14, 539:4, 554:16, 572:21, 585:5, 593:2, 593:16, 609:3, 630:9, 653:13, 655:4, 662:4, 668:16, 670:2, 676:11, 676:21, 678:5, 679:9, 679:12, 680:14, 680:19, 680:20, 680:22, 681:4, 711:12, 716:3, 725:5, 725:7, 725:9, 736:3, 736:6, 753:21, 755:18, 763:16, 763:17, 763:22, 763:24, 767:15, 774:4, 776:18, 778:18, 779:8, 780:8, 783:4,

784:15, 785:12, 787:2, 788:12, 792:2, 792:4, 792:21, 792:22, 792:24, 794:12, 794:15, 794:17, 795:1, 795:22, 804:16

**Witness** [19] - 531:8, 593:2, 593:16, 602:7, 628:4, 643:4, 643:6, 643:8, 681:3, 681:12, 722:10, 725:13, 742:16, 763:13, 763:15, 763:16, 764:8, 792:2, 809:2

**witness's** [1] - 776:22

**witnessed** [2] - 630:7, 630:8

**witnesses** [4] - 573:25, 647:23, 797:21, 797:22

**wives** [1] - 730:2

**woman** [8] - 544:4, 544:21, 546:15, 546:25, 564:11, 566:21, 641:7, 802:11

**woman's** [1] - 657:21

**women** [2] - 753:10, 759:7

**wondering** [1] - 798:6

**word** [14] - 529:16, 537:22, 551:3, 563:1, 608:14, 612:19, 678:16, 697:13, 700:3, 712:7, 724:18, 732:18, 732:20, 784:10

**words** [17] - 509:9, 548:13, 562:2, 570:1, 576:20, 588:3, 603:8, 610:5, 638:1, 672:4, 679:23, 700:7, 700:13, 772:21, 773:2, 773:19, 778:12

**workings** [1] - 624:5

**works** [1] - 705:20

**world** [4] - 532:13, 685:7, 686:1, 726:3

**worn** [4] - 692:3, 720:24, 721:4, 722:15

**worried** [1] - 799:14

**worry** [2] - 712:11, 718:17

**wounded** [1] - 665:13

**write** [3] - 753:22, 762:3

**writing** [13] - 505:7, 556:22, 648:22, 648:24, 648:25, 649:2, 751:15, 753:11, 753:12, 771:7, 774:10, 774:13

**written** [1] - 802:17

**wrote** [9] - 610:12, 618:7, 724:3, 757:23, 760:12, 760:19, 774:20, 775:10, 800:17

## X

**x-ray** [1] - 730:12

**X-rays** [1] - 735:12

**Xp** [1] - 700:22

## Y

**year** [12] - 523:19, 547:14, 550:6, 564:23, 637:19, 637:20, 648:12, 745:9, 745:19, 745:20, 748:2, 760:9

**years** [12] - 520:5, 539:11, 600:9, 683:6, 683:20, 686:5, 686:10, 726:13, 726:16, 746:20, 764:18, 764:20

**yellow** [2] - 524:5, 612:4

**Yesterday** [1] - 673:15

**yesterday** [25] - 508:17, 508:22, 509:7,

509:11, 509:18, 509:19, 510:25, 511:11, 511:19, 512:21, 528:21, 564:12, 571:2, 612:16, 618:5, 622:5, 622:11, 622:23, 624:14, 634:13, 634:19, 635:16, 641:21, 658:12

**York** [13] - 503:2, 503:7, 503:24, 561:21, 567:19, 569:21, 748:7, 756:22, 757:2, 766:5, 766:7, 799:24, 801:11

**young** [5] - 544:13, 633:10, 657:20, 657:21, 665:18

**yourself** [20] - 507:5, 523:3, 524:7, 525:23, 536:12, 536:13, 536:25, 537:6, 537:9, 551:5, 556:25, 616:5, 635:24, 637:2, 707:4, 765:3, 778:22, 779:10, 783:15, 788:4

**yourselves** [1] - 790:24

## Z

**Zerillo** [3] - 749:17, 749:19, 751:9